Approved: _____
         IAN MCGINLEY / DAMIAN WILLIAMS / JOSHUA A. NAFTALIS
         Assistant United States Attorneys

Before:   HON. JAMES C. FRANCIS IV
          United States Magistrate Judge
          Southern District of New York

          - - - - - - - - - - - - - - - x

          16 MAG 3812

UNITED STATES OF AMERICA          :   SEALED COMPLAINT

           - v. -                 :   Violations of 15 U.S.C.
                                      §§ 78j(b) and 78ff; 17 C.F.R.
STEFAN LUMIERE,                   :   § 240.10b-5; and 18 U.S.C.
                                      §§ 371, 1343, and 2.
               Defendant.         :
                                      COUNTY OF OFFENSES: NEW YORK
          - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

     MATTHEW CALLAHAN, being duly sworn, deposes and says
that he is a Special Agent with the Federal Bureau of
Investigation ("FBI") and charges as follows:

## COUNT ONE
### (Conspiracy to Commit Securities Fraud and Wire Fraud)

     1.   From at least in or about June 2011 through in or
about September 2013, in the Southern District of New York and
elsewhere, STEFAN LUMIERE, the defendant, and others known and
unknown, willfully and knowingly did combine, conspire,
confederate, and agree together and with each other to commit
offenses against the United States, to wit, securities fraud, in
violation of Title 15, United States Code, Sections 78j(b) and
78ff, and Title 17, Code of Federal Regulations, Section
240.10b-5; and wire fraud, in violation of Title 18, United
States Code, Section 1343.

     2.   It was a part and object of the conspiracy that
STEFAN LUMIERE, the defendant, and others known and unknown,
willfully and knowingly, directly and indirectly, by use of the
means and instrumentalities of interstate commerce, and of the
mails, and the facilities of national securities exchanges,
would and did use and employ manipulative and deceptive devices
and contrivances, in connection with the purchase and sale of

securities, in violation of Title 17, Code of Federal Regulations, Section 240.10b 5, by (a) employing devices, schemes and artifices to defraud; (b) making and causing to be made untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon other persons, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

3. It was further a part and object of the conspiracy that STEFAN LUMIERE, the defendant, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

### Overt Act

4. In furtherance of the conspiracy and to effect its illegal objects, STEFAN LUMIERE, the defendant, committed the following overt act, among others, in the Southern District of New York and elsewhere:

a. On or about February 4, 2013, LUMIERE requested from a broker-dealer price quotes at specific levels for pricing of particular bonds which levels purported to reflect genuine market prices but which were, in fact and as LUMIERE well knew, inflated.

(Title 18, United States Code, Section 371.)

### COUNT TWO
(Securities Fraud)

5. From at least in or about June 2011 through in or about September 2013, in the Southern District of New York and elsewhere, STEFAN LUMIERE, the defendant, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails, and

2

the facilities of national securities exchanges, used and employed manipulative and deceptive devices and contrivances, in connection with the purchase and sale of securities, in violation of Title 17, Code of Federal Regulations, Section 240.10b 5, by (a) employing devices, schemes and artifices to defraud; (b) making and causing to be made untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon other persons, to wit, in connection with certain funds managed by the investment advisor ("Investment Advisor-A") at which LUMIERE was employed, LUMIERE made, and caused to be made, false and misleading representations and omissions to investors concerning those funds' monthly net asset value, including by soliciting inflated broker quotes, causing certain bonds to be misclassified in order to mask those bonds' illiquidity from investors, and paying inflated prices for certain bonds at month's end.

(Title 15, United States Code, Sections 78j(b) and 78ff;
Title 17, Code of Federal Regulations, Section 240.10b-5;
and Title 18, United States Code, Section 2.)

## COUNT THREE
(Wire Fraud)

6. From at least in or about June 2011 through in or about September 2013, in the Southern District of New York and elsewhere, STEFAN LUMIERE, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, in connection with certain funds managed by Investment Advisor-A, LUMIERE made, and caused to be made, false and misleading representations and omissions to investors regarding the funds' monthly net asset value, including by soliciting, via email and other interstate electronic communications, inflated broker quotes, causing certain bonds to be misclassified in order to mask those bonds' illiquidity from investors and paying inflated prices for certain bonds at month's end.

(Title 18, United States Code, Sections 1343 and 2.)

3

The bases for my knowledge and the foregoing charges are, in part, as follows:

7. I have been a Special Agent with the FBI for approximately seven years. I am currently assigned to a squad responsible for investigating violations of the federal securities laws and related offenses. I have participated in numerous investigations of these offenses, and I have made and participated in making arrests of individuals for participating in such offenses.

8. The information contained in this affidavit is based upon my personal knowledge, as well as information obtained during this investigation, directly or indirectly, from other sources and agents, including publicly available documents; documents and information provided by representatives of the U.S. Securities and Exchange Commission ("SEC"); documents provided by and conversations with investors; documents provided by Investment Advisor-A's administrator (the "Administrator"); documents provided by Investment Advisor-A; trading records; Bloomberg electronic messages ("Bloombergs"); consensually recorded conversations involving STEFAN LUMIERE, the defendant; and interviews of at least three cooperating witnesses ("CW-1," "CW-2," and "Broker-1", and collectively the "CWs").[1] Because this affidavit is prepared for the limited purpose of establishing probable cause, I have not set forth each and every fact I have learned in connection with this investigation. Where conversations and events are referred to herein, they are related in substance and in part. Where dates, figures, and calculations are set forth herein, they are approximate.

---

[1] CW-1 is voluntarily cooperating with the Government and will testify pursuant to a court-ordered grant of immunity. Though CW-1 is not expecting any other benefit directly from the Government, the Government's prosecution of LUMIERE could indirectly result in a financial benefit for CW-1. CW-2 has pled guilty to conspiracy, securities fraud, and wire fraud in connection with the conspiracy and scheme described herein, and is cooperating with the Government in the hope of receiving a reduced sentence. Broker-1 is cooperating with the Government pursuant to a non-prosecution agreement. The CWs' information has proven to be reliable, and has been corroborated by independent evidence, as described below.

4

## Relevant Entities and Individuals

9. Based upon my review of publicly available documents, documents provided by the SEC and the Administrator, and my interviews of CW-1 and CW-2, I know the following:

   a. At all times relevant to this Complaint, Investment Advisor-A was a registered investment advisor with the SEC. Investment Advisor-A managed several billion dollars in a range of investments for clients. Until September 2013, Investment Advisor-A managed six active hedge funds. CW-2 served as the portfolio manager of a certain fund ("Fund-1"), which primarily invested in debt instruments issued by healthcare companies. Investment Advisor-A's primary place of business was New York, New York.

   b. CW-2 served as a partner in Investment Advisor-A and a portfolio manager of Fund-1 from its inception in or about May 2009 through its liquidation. As portfolio manager, CW-2 directed the majority of Fund-1's investments in bonds and other credit instruments. CW-2 was employed at Investment Advisor-A until in or about December 2013.

   c. At all times relevant to this Complaint, STEFAN LUMIERE, the defendant, served under CW-2, from in or about May 2009 through in or about April 2013, as Fund-1's Portfolio Manager for Special Situations, which represented a small portion of Fund 1's portfolio. LUMIERE was employed at Investment Advisor-A until in or about April 2013.

   d. At certain times relevant to this Complaint, CW-2 also supervised CW-1, who worked as a trader for Fund-1 between approximately 2011 and 2013.

   e. At all times relevant to this Complaint, LUMIERE, CW-1, and CW-2 worked with a number of broker-dealers who executed trades for Fund-1. In order to calculate the value of Fund-1 at the end of each month, LUMIERE, CW-1, and CW-2 primarily worked with two brokers, Broker-1 and another broker ("Broker-2"), who worked at two different companies, both registered as broker-dealers with the SEC, and both located in New York, New York.

5

I.   Fund-1

   10.   Based upon my review of publicly available documents, documents provided by the SEC and the Administrator, and my interviews of CW-1 and CW-2, I know the following:

      a.   Between 2009 and 2013, Fund-1 raised hundreds of millions of dollars in investor capital, mainly from institutional and fund-of-funds investors. At its peak, in March 2012, Fund-1 had a net asset value ("NAV") of approximately $471.5 million. In its early years, Fund-1 performed well, with yearly returns in 2009 and 2010 of approximately 20% to 30%. In later years, the returns were far more modest, with returns of approximately one percent in 2011 and six percent in 2012. In the middle of 2013, Fund-1 received a string of redemption, or withdrawal, requests from investors, and Investment Advisor-A began to liquidate Fund-1's assets. By on or about September 30, 2013, Fund-1 was almost entirely liquidated, with the exception of certain illiquid securities that Investment Advisor-A side-pocketed. As a result of its inability to liquidate those positions, Investment Advisor-A was unable to fully redeem certain investors.

      b.   Fund-1 invested primarily in bonds, bank loans, and other debt instruments. Fund-1 contained a number of debt instruments that were relatively illiquid—including bonds and loans held for investment purposes—which were difficult to value.

II.   The Compliance Manuals and Valuation Standards

   11.   Based on my review of documents provided by Investment Advisor-A as well as my interviews of CW-1 and CW-2, I have learned the following:

      a.   Investment Advisor-A made a number of representations to its investors about the valuation of assets contained in Fund-1, including that it used a valuation committee (the "Valuation Committee") "to implement and monitor valuation policies according to best practices." Investment Advisor-A's internal compliance manuals (the "Compliance Manuals")—which were routinely asked for and reviewed by investors—set forth procedures for valuing securities held by, among others, Fund-1. The Compliance Manuals required the following:

6

b. The Administrator would verify Investment Advisor-A's valuations. To that end, the Administrator used, and provided to Investment Advisor-A, month-end prices from public pricing sources, such as Reuters and Mark-It, to value Fund-1's various fixed-income securities holdings. Investment Advisor-A was allowed to substitute its own month-end price for a security only when it felt that the "price used by the Administrator was inconsistent with fair value" and Investment Advisor-A could "provide support for its pricing." This practice was known at Investment Advisor-A as a valuation "override." At all times relevant to this Information, the Administrator was a U.S.-based, multinational, financial-services corporation.

c. Securities and other investment instruments were to be priced based on "fair value," which was defined by generally accepted accounting principles ("GAAP") as "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measuring date."

d. Employees were directed to "[l]ook to established pricing sources including but not limited to Bloomberg and Reuters"—third parties that recorded the value of certain securities—for price quotations and information relating to the prices at which a particular security or other asset was purchased or sold.

e. Where market prices for a security were not readily available, the Compliance Manuals permitted use of an "alternative pricing methodology," as follows, in sum and in part:

i. "[R]eliability, stability and independence" were to be "among the main criteria" in employing an "alternative pricing methodology."

ii. A permitted alternative pricing methodology included obtaining independent pricing quotes from non-Investment Advisor-A dealers, or brokers. The Compliance Manuals suggested that typically "[i]t is preferential to get at least three dealer marks," or quotes, except in a "'one of a kind' transaction" in which a quote or pricing reference would be available only from the transaction's counterparty.

iii. The Valuation Committee was required to review each pricing decision that had been made based on an

7

alternative pricing methodology. The Valuation Committee was to "be composed of three permanent members and then two ad-hoc members who will be representative of the portfolio managers or traders responsible for the securities." A quorum of the Valuation Committee was to meet on "each valuation day ... [to] base, and document, its findings."

       iv. The Compliance Manuals required that the pricing function "be carried out by the accounting team which is independent of the portfolio managers and trading desk" and that Investment Advisor-A would "either calculate or verify the accuracy of prices independent of the trading function to the extent practicable."

    f. Investors in Fund-1 received monthly performance reports, among other materials, that purportedly reflected Fund-1's NAV, calculated according to the procedures described above.

    g. Financial Accounting Standards 157 ("FAS 157"), issued by the Financial Accounting Standards Board of the United States in 2006, standardized the definition of fair value for securities.[2] Generally speaking, pursuant to FAS 157, titled "Fair Value Measurement," firms such as Investment Advisor-A had to use FAS 157 to differentiate between liquid securities with a ready and active market (Level I), securities with a quoted price but in a more inactive market (Level II), and securities which may have a specific or illiquid market (Level III). To classify securities per FAS 157 was to represent to investors the certainty of the exit price for that security. Importantly, given that the value of a Level III security was based on prices or valuation techniques that required inputs reflecting management's own assumptions, rather than data readily observable to the market, firms like Investment Advisor-A often tracked for investors, and maintained limits on, the percentage of a fund comprised of Level III securities.

    h. In its investor materials, including its monthly performance reports (as prepared by the Administrator) that summarized Fund-1's holdings, Investment Advisor-A touted the liquidity of Fund-1's investments. In 2011 and most of 2012, these reports reflected zero investments with a Level III categorization. Prospective investors in Fund-1 requested and reviewed these documents and relied on them, along with

---

[2] FAS 157 is now known as FASB Accounting Standards Codification ("ASC") 820.

8

representations by Investment Advisor-A about how it tried to minimize Level III investments, in making investment decisions.

## Overview of the Scheme to Defraud

12.   As explained more fully below, from at least in or about 2011 through at least in or about September 2013, STEFAN LUMIERE, the defendant, CW-1, and CW-2 participated in a scheme to defraud Fund-1's investors and potential investors by deceptively mismarking each month the value of certain securities held by Fund-1. The objective of the scheme was two-fold: (1) to inflate Fund-1's NAV, which was a calculation of the Fund-1's total value by determining the market value of each of its holdings minus its liabilities; and (2) to mislead investors about the liquidity of Fund-1's holdings. Investment Advisor-A assessed performance fees to be paid by investors each year based on Fund-1's profits and losses. LUMIERE's mismarking was in violation of Investment Advisor-A's internal valuation procedures and contrary to Investment Advisor-A's representations to investors. The effect of the scheme was to overstate Fund-1's NAV, often by tens of millions of dollars as calculated at the end of each month, which resulted in higher payments to Investment Advisor-A and higher bonuses for LUMIERE, among other benefits. The effect of the scheme was also to deceive investors into believing that certain securities were properly categorized as Level II, when, in fact, these securities were highly illiquid Level III investments.

13.   The fraud took at least two forms. First, STEFAN LUMIERE, the defendant, CW-1, and CW-2 solicited, obtained, and relied on false and fraudulent price quotes from employees of broker-dealers—such as Broker-1 and Broker-2[3]—in order to improperly override prices calculated by the Administrator and artificially inflate Fund-1's NAV each month. For each month-end valuation, LUMIERE and/or CW-2 would begin by reviewing an inventory of Fund-1's investments, and proposed valuations for each, prepared by the Administrator and Investment Advisor-A's back office. LUMIERE and/or CW-2 would then identify those relatively illiquid securities as to which they disagreed or disliked the proposed price, and create a list of prices reflecting where they wanted each security to be marked for month-end valuation purposes (the "Override List"). That price was often significantly higher or lower than the price available from public price data. Typically, LUMIERE, CW-1, and/or CW-2 would then contact one or two "friendly" brokers—most often

---

[3] Broker-2 died in July 2015.

9

Broker-1 and Broker-2—and dictate to the friendly brokers the price quotes that LUMIERE, CW-1, and/or CW-2 needed. The brokers would then parrot back the price quotes from their Bloomberg email account, giving the price quotes the appearance that they had come from an independent broker, and thus were in compliance with the Fund's alternative pricing methodology. LUMIERE, CW-1, or CW-2 then submitted the friendly brokers' sham quotes as purportedly independent bases for that security's valuation to Investment Advisor-A's accounting department ("Accounting"), for the eventual submission to the Administrator.

14. By obtaining these sham quotes, STEFAN LUMIERE, the defendant, and CW-2 caused a number of Fund-1's securities to be misclassified in order to mislead investors about the liquidity of the securities (i.e., how actively traded the securities were). Specifically, for a number of illiquid bonds, LUMIERE and CW-2 fraudulently caused Investment Advisor-A to assign a classification that led investors to believe that the bonds were relatively liquid, when in fact they were entirely illiquid. This was done contrary to disclosures to investors about Fund-1's percentage of illiquid investments, in order to induce investors to invest in or keep their money in Fund-1

15. Second, at the end of certain months, STEFAN LUMIERE, the defendant, and CW-2 purchased additional quantities of certain securities—in which Fund-1 had an established position—at a deceptively inflated price, markedly higher than the prevailing market was offering that security, in a practice known as "painting the tape." CW-2 would then report that inflated price to Investment Advisor-A's accounting department for NAV purposes. In both cases—the sham broker quotes and the inflated prices—it was LUMIERE's and CW-2's intent to increase the price of certain securities in order to inflate Fund-1's month-end valuation.

**The Scheme**

I. Mismarking

16. Based upon my review of publicly available documents, documents provided by the SEC, Investment Advisor-A, and the Administrator, and my interviews of CW-1 and CW-2, I know the following:

a. Beginning in or about June 2011, CW-2 and STEFAN LUMIERE, the defendant, began meeting to predetermine the

10

prices for certain relatively illiquid assets in Fund-1, with the goal of improving Fund-1's NAV and avoiding classifying certain assets as Level III. In or about late June 2011, CW-2 contacted CW-1 and told CW-1, in sum and substance, that at the end of each month, CW-2 would email CW-1 the Override List. For each listed asset, the Override List would include a sham valuation price provided by LUMIERE or CW-2. CW-2 instructed CW-1 to copy the list and send it—in a new email from CW-1 and without any evidence that the information came from CW-2—to Investment Advisor-A's accounting and operations departments. CW-2 instructed CW-1 not to tell anyone at Investment Advisor-A about this directive.

b. On or about July 1, 2011, CW-2 emailed CW-1 the Override List for the month ending June 2011. The email instructed CW-1 to provide accounting and operations personnel at Investment Advisor-A with price quotes (bids and asks) from third-party brokers related to the purchase and/or sale of certain of the securities included in the Override List. Specifically, CW-2 provided CW-1 with hard copies of Bloombergs from third-party brokers. Those Bloombergs contained price ranges at which the third-party brokers would purportedly buy or sell the security or other asset at issue (the "Sham Broker Quotes"). LUMIERE and CW-2 used the Sham Broker Quotes to support the valuations that they assigned to securities and other positions included in the Override List, as part of the scheme to inflate Fund-1's month-end NAV.

c. From in or about July 2011 through in or about June 2013, LUMIERE and CW-2 prepared an Override List and instructed CW-1 to email it and supporting Sham Broker Quotes to Investment Advisor-A's accounting and operations departments, which in turn forwarded that information to the Administrator.

d. At various times between in or about July 2011 and in or about June 2013, Broker-1 and Broker-2, among other brokers, provided Sham Broker Quotes to Fund-1 at the price levels requested by LUMIERE, CW-1, and/or CW-2. Broker-1 and Broker-2 falsely and fraudulently provided some or all of the Sham Broker Quotes at either artificially high or low price ranges (depending on Fund-1's position in the security at issue). For example, the Sham Broker Quotes sought by LUMIERE, CW-1, and CW-2 frequently were well outside the ranges within which the securities actually had traded around the time at which the brokers provided the Sham Broker Quotes to LUMIERE, CW-1, or CW-2. In addition, in some cases, LUMIERE, CW-1, and

11

CW-2 solicited and received Sham Broker Quotes for securities in which Broker-1 and Broker-2 typically did not trade or broker.

    e. The Sham Broker Quotes materially impacted the accuracy of Fund-1's NAV. Investment Advisor-A's accounting and operations personnel used the Sham Broker Quotes to support the valuations set by LUMIERE and CW-2 for certain securities and other assets included in the Override List, and those valuations were then used by Investment Advisor-A and the Administrator to calculate Fund-1's NAV, inflating the amount investors owed to Investment Advisor-A in fees.

    17. Based on my interviews of CW-1, I have learned the following, in substance and part:

    a. STEFAN LUMIERE, the defendant, directed CW-1 to use his personal cellphone—as opposed to work phones—to call the personal cell phones of the third-party brokers to solicit Sham Broker Quotes for securities listed in the Override List, because LUMIERE did not want the calls to occur on phone lines that might have been recorded by the third-party brokers' employers. Those third-party brokers included Broker-1 and Broker-2.

    b. In around late 2011 or early 2012, LUMIERE directed CW-1 to provide more business to the third-party brokers (including Broker-1 and Broker-2) providing the Sham Broker Quotes, because those brokers were helping Investment Advisor-A with its month-end pricing.

    c. At some point during the scheme, LUMIERE approached CW-1 and asked CW-1 to find another friendly broker to provide Sham Broker Quotes. CW-1 suggested a certain broker ("Broker-3"), because Broker-3 worked at a "bottom of the barrel" brokerage house. LUMIERE immediately obtained approval for Investment Advisor-A to use Broker-3.

    18. Based on my interviews of CW-2 and my review of the employment contract for STEFAN LUMIERE, the defendant, with Investment Advisor-A, I have learned the following in substance and part:

    a. LUMIERE and CW-2 had discussions about how it was in their best interests to conceal from investors that many of the assets in Fund-1 were illiquid, Level III assets. To achieve this goal, LUMIERE and CW-2 used Level III methodology, namely financial models, to pre-determine a monthly

12

price for multiple bonds, including bonds issued by China Medical Technologies, Inc. ("China Med")—which, as described below, had declared bankruptcy—and then gave those prices to Broker-1 and Broker-2 to regurgitate in the form of Sham Broker Quotes, all in order to deceive investors by supporting a Level II classification, and therefore obscuring the bonds' illiquidity from the investor community.

        b. CW-2 paid LUMIERE 3 to 5 percent of the profits LUMIERE made on LUMIERE's positions in Fund-1. This arrangement was consistent with LUMIERE's employment contract, which entitled LUMIERE to a percentage of his net trading profits. LUMIERE's positions in Fund-1 included certain bonds which LUMIERE and CW-2 schemed to mismark, including China Med and others described below.

### A. The Sham Broker Quotes

        19. As part of this investigation, CW-1 and the Administrator have provided a number of Bloombergs between Investment Advisor-A employees and brokers, including Broker-1 and Broker-2. In addition, in or about February 2014, pursuant to a valid search warrant, I reviewed Bloombergs sent and received by, among others, STEFAN LUMIERE, the defendant, CW-2, Broker-1 and Broker-2, between November 1, 2011 and July 1, 2013.

        20. Based on my review of the Bloombergs described above, as well as my review of documents provided by the SEC containing historical trading data for certain securities (the "SEC Price Data"), and my discussions with CW-1 and CW-2, I have learned that Broker-1 and Broker-2 sent STEFAN LUMIERE, the defendant, CW-1 and CW-2 quotes that were well outside the ranges within which the securities actually traded in or around the time at which the brokers provided the Sham Broker Quotes. Below are a few (of many) examples of fraudulent Sham Broker Quotes provided for securities that LUMIERE was responsible for.

#### ATI Enterprises

        a. Investment Advisor-A's internal records, which contained data from Markit (a service that provides market data related to, among other assets, debt traded over-the-counter, and which is used by firms for valuation and trading purposes), priced the ATI Senior Debt at $32.50 for the month ending September 2011. At this valuation, Investment Advisor-

A's position in this bond would have been valued at approximately $6,495,456.

   b. On or about September 30, 2011, Broker-1 sent a Bloomberg to STEFAN LUMIERE, the defendant, that included a quote for, among other assets, "ATI 1st," or the ATI Senior Debt. The quote indicated an offer to buy the debt at $85 (the "bid") and sell it at $92 (the "ask").

   c. On or about October 3, 2011, Broker-2 sent a Bloomberg to STEFAN LUMIERE, the defendant, with an offer to buy the ATI Senior Debt at $86 and sell it at $90.

   d. For the month of September 2011, CW-2 sent CW-1 an Override List that included CW-2's valuation of $88.50 for senior debt issued in connection with the acquisition of ATI Enterprises in or about September 2011 (the "ATI Senior Debt"). Based on this valuation, Investment Advisor-A's total position in the ATI Senior Debt for the month September 2011 was at $17,687,628 (the vast majority held in Fund-1), which was over $11 million more than Investment Advisor-A's valuation of its share of the ATI Senior Debt.

### Nebraska Book Company

   e. SEC Price Data from TRACE (which records historical trade information for bonds, such as the Nebraska Book 10% Bonds) indicated that the Nebraska Book 10% Bond traded between $70 and $77.75 on December 30, 2011 (the last day of trading for the month). The Administrator initially valued Fund-1's position of Nebraska Book 10% Bonds using a price of $70.50.

   f. On or about December 6, 2011, Broker-2 sent a quote to, among others, STEFAN LUMIERE, the defendant, and CW-2 at Investment Advisor-A, indicating an offer to buy Nebraska Book 10% Bonds for $80. On or about December 12, 2011, Broker-2 sent another quote indicating an offer to buy the Nebraska Book 10% Bonds for $82. As was the case with the $80 offer on December 6th, this quote was sent to LUMIERE and CW-2 at Investment Advisor-A.

   g. On or about December 30, 2012, Broker-2—in spite of the quotes Broker-2 had sent earlier in the month, and the actual trades executed on December 30, 2011—sent LUMIERE a price quote offering to buy the Nebraska Book 10% Bond at $90 and sell at $93. In addition, on or about January 3, 2012,

14

Broker-3 sent LUMIERE a price quote offering to buy the Nebraska Book 10% Bond at $90 and sell it at $92.

        h.    These quotes ultimately were sent to the Administrator, who changed the valuation of Fund-1's position of Nebraska Book 10% Bonds using a price of $91. This change—from $70.50 to $91—caused the overall valuation of Fund-1's holdings of Nebraska Book 10% Bonds to be increased by approximately $2,473,735.

### China Medical Technologies, Inc.

        i.    On or about August 3, 2012, China Med publicly announced in a 6-K report that on July 27, 2012, a Cayman Islands' bankruptcy court had appointed liquidators in connection with a June 15, 2012 bankruptcy filing by China Med. STEFAN LUMIERE, the defendant, and CW-2 received that 6-K report on or about August 7, 2012.

        j.    On or about August 31, 2012, media reports on the China Med bankruptcy noted that China Med had "in various documents list[ed] operations in Beijing, Hong Kong and the Cayman Islands," but that, as of that date, "the liquidators ha[d] been unable to locate any other [China Med] assets anywhere in the world outside the Cayman Islands." One of the liquidators was quoted as saying, "[I]t appears the company's financial troubles resulted from alleged 'fraudulent transfers' of assets and that the money is missing."

        k.    For the month ending August 31, 2012, the SEC Price Data, which contained data from TRACE, indicated that particular bonds issued by China Med with a four-percent coupon rate and a maturity date of August 15, 2013 (the "China Med 4% Bonds") had last traded in August 2012 at a price of $16. The Administrator initially valued Fund-1's position of China Med 4% Bonds using a price of $13.

        l.    On or about September 4, 2012, in connection with Fund-1's month-end valuation for August 2012, STEFAN LUMIERE, the defendant, received a quote from Broker-2 for China Med 4% Bonds. In that quote, and despite the publicly available information regarding China Med's bankruptcy and the market's corresponding historical trading information, Broker-2 provided an offer to buy the bonds at $36 and sell for $40. Similarly, on or about September 11, 2012, LUMIERE received a quote from Broker-1 offering to buy the China Med 4% Bonds for $37 and sell them for $41.

15

m. Broker-1's and Broker-2's quotes were ultimately sent to the Administrator, who changed the valuation of Fund-1's position of China Med 4% Bonds using a price of $38. This change in price—from $13 to $38—caused the overall valuation of Investment Advisor-A's holdings of China Med 4% Bonds to be increased by approximately $9,244,500.

B. The Recordings

21. Beginning in or about early 2014, CW-1 recorded a series of conversations he had with STEFAN LUMIERE, the defendant, as directed by law enforcement. I have reviewed the audio recordings of those conversations. Based on a review of CW-1's January 3, 2014 and January 17, 2014 meetings with LUMIERE, for instance, I have learned that LUMIERE told CW-1, in sum and substance, and among other things, the following:

a. CW-2 had been egregiously "mismarking" securities held by Fund-1 since its inception in 2009.

b. LUMIERE obtained Sham Broker Quotes at CW-2's direction at prices that LUMIERE at times knew were false.

c. LUMIERE also directed CW-1 to obtain such Sham Broker Quotes.

d. With regard to China Med, the pricing was "not legitimate," because even after the CEO of China Med went missing, and it was clear that China Med bond holders would not be repaid, China Med bonds were marked at an inflated value.

e. LUMIERE had preserved in a safe deposit box multiple forms of evidence documenting his and CW-2's valuation scheme, including hardcopy documents and electronic recordings of conversations LUMIERE had had with CW-2.

22. In or about February 2014, pursuant to a valid search warrant, I searched an apartment and safe-deposit box belonging to STEFAN LUMIERE, the defendant. During that search, I recovered, among other things, computer equipment and other digital storage devices. Following the execution of that warrant, LUMIERE, through his attorney, provided me with additional electronic media that contained recordings of conversations LUMIERE had had with CW-1, CW-2, Broker-1, and others (the "LUMIERE Recordings"). Based on my review of the LUMIERE Recordings, I have learned that:

16

a. CW-2 and LUMIERE had numerous conversations in which CW-2 instructed LUMIERE to obtain predetermined price quotes from brokers. In a number of these conversations, CW-2 made it clear to LUMIERE that CW-2 was not concerned with the accuracy of these prices. For example, in one call, LUMIERE told CW-2 that LUMIERE had tried to get a price quote for a particular bond, but that the broker had refused because the bond did not trade. In response, CW-2 told LUMIERE to just price the bond at around par value, and LUMIERE agreed.

b. In other recorded conversations, LUMIERE contacted brokers and obtained price quotes from brokers at predetermined levels CW-2 previously provided to LUMIERE. For example, on one particular day, LUMIERE called two different brokers, including Broker-1 and Broker-2, regarding month-end price quotes. In the first call, LUMIERE told Broker-1 that CW-2 had asked him for some levels, told Broker-1 that they needed "back-up," and then dictated a number of prices to Broker-1. Broker-1 responded, "I'll shoot this out to you and [CW-1]." LUMIERE then called Broker-2 and dictated a number of price quotes, on different bonds, to Broker-2. Broker-2 responded by stating that he had already sent some of the levels to LUMIERE.

C. The Brokers

23. I have learned the following from Broker-1, in sum and substance and among other things:

a. On several occasions, LUMIERE contacted Broker-1 at the end of the month and said that he needed some "levels" on particular securities. LUMIERE asked that Broker-1 send them to him. LUMIERE would then dictate the securities and the desired price "levels" that he wanted Broker-1 to send back to him. Broker-1 would then send the requested levels electronically through his Bloomberg account. While the majority of requests for quotes came from LUMIERE—both on Broker-1's desk line and personal cellphone—CW-1 and CW-2 also periodically asked Broker-1 for price quotes.

b. Broker-1 was not familiar with all of the securities on the list of securities provided by LUMIERE. Broker-1 also was not familiar with the price at which those securities were being traded. Nevertheless, Broker-1 did no due diligence to verify if Investment Advisor-A's requested levels were accurate.

c. On one occasion, LUMIERE mailed a thumb-drive to Broker-1 containing price quotes for hundreds of securities. Broker-1 took the prices from the thumb-drive and sent them back to LUMIERE.

II. Painting the Tape

24. Based on my review of documents provided by Investment Advisor-A as well as my interviews of CW-2, I have learned the following:

a. STEFAN LUMIERE, the defendant, and CW-2 believed that China Med might be the subject of a tender offer from another company to buy China Med. LUMIERE and CW-2 met to discuss this potential tender offer and decided that it would be advantageous for Fund-1 if the price per share for the tender offer were higher than the current market price for China Med. Thus, in an effort to increase the price of the anticipated tender offer for China Med and to further inflate Fund-1's month-end NAV, which would lead investors to overpay management and performance fees to Investment Advisor-A, LUMIERE and CW-2 on at least two occasions directed others to purchase China Med 4% Bonds above their prevailing market price. In other words, LUMIERE and CW-2 intentionally paid more money than necessary for those bonds in late-month trades. CW-2 would then use the higher price Investment Advisor-A had paid to support an inflated month-end valuation for the bond—a bond in which Fund-1 had a significant position prior to the manipulative trades—which therefore inflated Fund-1's NAV that month.

b. Specifically, on or about October 28, 2011, LUMIERE and CW-2 caused Fund-1 to purchase an additional 760,000 China Med 4% Bonds at $71.50, just two days after, as Lumiere and CW-2 knew, the fund had paid $63.51 for 585,000 of the same bonds. There was only a small amount of trading activity in the China Med 4% Bonds between Fund-1's October 26 and October 28 trades, never at or higher than $64. Thereafter, Reuters increased its pricing for the bonds to $71.88, which LUMIERE and CW-2 used for the October 2011 month-end valuation of Fund-1's position.

c. In addition, on or about March 23, 2012, LUMIERE and CW-2 caused Fund-1 to purchase an additional 784,000 of China Med 4% Bonds at $43.25. Earlier that week, the same bonds had traded no higher than $30. LUMIERE and CW-2 later marked the China Med 4% Bonds at $43.50 for their March 2012

18

month-end valuation. Reuters, however, valued the China Med 4% Bonds at the end of March 2012 at $28.80.

   d. LUMIERE and/or CW-2 instructed others to engage in trading with the purpose of influencing Fund-1's valuation for the China Med 4% Bonds, improving Fund-1's overall NAV, and, as a result, increasing the fees investors were required to pay to Investment Advisor-A.

### The Effect of the Fraudulent Scheme

   25. As discussed above, Fund-1's return rate dropped from around 30 percent in 2010 to approximately one percent in 2011. Numerous investors who contributed money to Fund-1 in 2011 and 2012 lost money on their investments. I have spoken to several of those investors, each of whom told me that he or she would not have invested in Fund-1 had he or she not been misled by, among others, STEFAN LUMIERE, the defendant, and CW-2 regarding how LUMIERE and CW-2 were valuing and classifying Fund-1's assets.

   26. In or about December 2012, the Valuation Committee ultimately reclassified a number of bonds to Level III. As a result, the percentage of Level III bonds increased from zero to approximately just under nine percent of Fund-1's NAV. This large increase led to numerous investor complaints and demands for more information from Investment Advisor-A about this increase.

   27. Several investors have also said that they would not have invested in Fund-1 had they known that STEFAN LUMIERE, the defendant, and CW-2 were inflating Fund-1's NAV by millions of dollars at the end of each month, from at least June 2011 through June 2013, through the use of Sham Broker Quotes, the mischaracterization of certain bonds' liquidity and deceptive trades above the prevailing market.

   28. As just one example of the monthly inflation of Fund-1's performance by STEFAN LUMIERE, the defendant, and CW-2, for the month-end of April 2012, Fund-1's NAV was approximately $451,294,620. However, at least approximately $26,347,352, or 6.2%, was attributable to LUMIERE's and CW-2's mismarking of particular bonds on the Override List—the price for which was supported by Sham Broker Quotes—insofar as LUMIERE's and CW-2's prices for those bonds were markedly higher than the price of those bonds as determined by publicly available pricing sources.

19

WHEREFORE, I respectfully request that a warrant be issued for the arrest of STEFAN LUMIERE, the defendant, and that he be arrested and imprisoned, or bailed, as the case may be.

*[signature]*
MATTHEW CALLAHAN
Special Agent
Federal Bureau of Investigation

Sworn to before me this
14th day of June 2016

*[signature]*
HON. JAMES C. FRANCIS IV
United States Magistrate Judge
Southern District of New York