UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - -

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 7/14/16

**ORIGINAL**

UNITED STATES OF AMERICA            :        **INDICTMENT**

    v. -                                  :        16 Cr. ____ (  )

STEFAN LUMIERE,                       :

        Defendant.           :   **16 CRIM  483**

- - - - - - - - - - - - - - - - x

**COUNT ONE**
(Conspiracy to Commit Securities Fraud and Wire Fraud)

The Grand Jury charges:

Relevant Entities and Individuals

1.     At all times relevant to this Indictment, Investment Advisor-A was a registered investment advisor with the U.S. Securities and Exchange Commission ("SEC").  Investment Advisor-A managed several billion dollars in a range of investments for clients.  Until September 2013, Investment Advisor-A managed six active hedge funds.  One such fund primarily invested in debt instruments issued by healthcare companies ("Fund-1").  Investment Advisor-A's primary place of business was New York, New York.

2.     At all times relevant to this Indictment, Christopher Plaford served as a partner in Investment Advisor-A and a portfolio manager of Fund-1 from its inception in or about May 2009 through its liquidation.  As portfolio manager, Plaford

**JUDGE RAKOFF**

directed the majority of Fund-1's investments in bonds and other credit instruments.

3.     At all times relevant to this Indictment, STEFAN LUMIERE, the defendant, served under Plaford, from in or about May 2009 through in or about April 2013, as Fund-1's Portfolio Manager for Special Situations, which represented a portion of Fund 1's portfolio.  LUMIERE was employed at Investment Advisor-A until in or about April 2013.

4.     At certain times relevant to this Indictment, Plaford also supervised another individual ("CC-1"), who worked as a trader for Fund-1 between approximately 2011 and 2013.

5.     At all times relevant to this Indictment, STEFAN LUMIERE, the defendant, Plaford, and CC-1 worked with a number of broker-dealers who executed trades for Fund-1.  In order to calculate the value of Fund-1 at the end of each month, LUMIERE, Plaford, and CC-1 primarily worked with two brokers ("Broker-1" and "Broker-2"), who worked at two different companies, both registered as broker-dealers with the SEC, and both located in New York, New York.

### The Compliance Manuals and Valuation Standards

6.     Investment Advisor-A made a number of representations to its investors about the valuation of assets contained in Fund-1, including that it used a valuation committee (the "Valuation Committee") "to implement and monitor

valuation policies according to best practices." Investment Advisor-A's internal compliance manuals (the "Compliance Manuals") — which were routinely asked for and reviewed by investors — set forth procedures for valuing securities held by, among others, Fund-1. The Compliance Manuals required the following, in sum and in part:

a. Investment Advisor-A's administrator (the "Administrator") would verify Investment Advisor-A's valuations. To that end, the Administrator used, and provided to Investment Advisor-A, month-end prices from public pricing sources, such as Reuters and Mark-It, to value Fund-1's various fixed-income securities holdings. Investment Advisor-A was allowed to substitute its own month-end price for a security only when it believed that the "price used by the Administrator was inconsistent with fair value" and Investment Advisor-A could "provide support for its pricing." This practice was known at Investment Advisor-A as a valuation "override."

b. Securities and other investment instruments were to be priced by Investment Advisor-A based on "fair value," which was defined by generally accepted accounting principles ("GAAP") as "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measuring date."

> c.     Employees at Investment Advisor-A were
directed to "[l]ook to established pricing sources including but
not limited to Bloomberg and Reuters" — third parties that
recorded the value of certain securities — for price quotations
and information relating to the prices at which a particular
security or other asset was purchased or sold.

> d.     Where market prices for a security were not
readily available, the Compliance Manuals permitted Investment
Advisor-A to use an "alternative pricing methodology," as
follows, in sum and in part:

> i.     "[R]eliability, stability and
independence" were to be "among the main criteria" in employing
an "alternative pricing methodology."

> ii.     A permitted alternative pricing
methodology included obtaining independent pricing quotes from
non-Investment Advisor-A dealers, or brokers.  The Compliance
Manuals suggested that typically "[i]t is preferential to get at
least three dealer marks," or quotes, except in a "'one of a
kind' transaction" in which a quote or pricing reference would
be available only from the transaction's counterparty.

> iii.     The Valuation Committee was required to
review each pricing decision that had been made based on an
alternative pricing methodology.  The Valuation Committee was to
"be composed of three permanent members and then two ad-hoc

- 4 -

members who will be representative of the portfolio managers or traders responsible for the securities."  A quorum of the Valuation Committee was to meet on "each valuation day ... [to] base, and document, its findings."

           iv.      The Compliance Manuals required that the pricing function "be carried out by the accounting team which is independent of the portfolio managers and trading desk," and that Investment Advisor-A would "either calculate or verify the accuracy of prices independent of the trading function to the extent practicable."

           7.     Investors in Fund-1 received monthly performance reports, among other materials, that purportedly reflected Fund-1's net asset value ("NAV") —— which was a calculation of Fund-1's total value by determining the market value of each of its holdings minus its liabilities —— calculated according to the procedures described above.

           8.     Financial Accounting Standards 157 ("FAS 157"), titled "Fair Value Measurement" and issued by the Financial Accounting Standards Board of the United States ("FASB") in 2006, standardized the definition of fair value for securities.[1] Pursuant to FAS 157, Investment Advisor-A generally had to differentiate between liquid securities with a ready and active

---

[1]     FAS 157 is now known as FASB Accounting Standards Codification 820.

market (Level I), securities with a quoted price but in a more inactive market (Level II), and securities which may have a specific or illiquid market (Level III). To classify securities pursuant to FAS 157 was to represent to investors the certainty of the exit price for that security. Importantly, given that the value of a Level III security was based on prices or valuation techniques that required inputs reflecting management's own assumptions, rather than data readily observable to the market, firms like Investment Advisor-A often tracked for investors, and maintained limits on, the percentage of a fund comprised of Level III securities.

9.     In its investor materials, including its monthly performance reports (as prepared by the Administrator) that summarized Fund-1's holdings, Investment Advisor-A touted the liquidity of Fund-1's investments. In 2011 and most of 2012, these reports reflected zero investments with a Level III categorization. Prospective investors in Fund-1 requested and reviewed these documents and relied on them, along with representations by Investment Advisor-A about how it tried to minimize Level III investments, in making investment decisions.

The Scheme to Defraud

10.     From at least in or about 2011 through at least in or about September 2013, STEFAN LUMIERE, the defendant, Plaford, and CC-1 participated in a scheme to defraud Fund-1's

- 6 -

investors and potential investors by deceptively mismarking each month the value of certain securities held by Fund-1.  The objective of the scheme was two-fold: (a) to inflate Fund-1's NAV; and (b) to mislead investors about the liquidity of Fund-1's holdings.  Investment Advisor-A assessed performance fees to be paid by investors each year based on Fund-1's profits and losses.  LUMIERE's mismarking was in violation of Investment Advisor-A's internal valuation procedures and contrary to Investment Advisor-A's representations to investors.  The effect of the scheme was to overstate Fund-1's NAV, often by tens of millions of dollars as calculated at the end of each month, which resulted in higher payments to Investment Advisor-A and higher bonuses for LUMIERE, among other benefits.  The effect of the scheme was also to deceive investors into believing that certain securities were properly categorized as Level II, when, in fact, these securities were highly illiquid Level III securities.

11.  As a part of the scheme, STEFAN LUMIERE, the defendant, Plaford, and CC-1 solicited, obtained, and relied on false and fraudulent price quotes from employees of broker-dealers — such as Broker-1 and Broker-2 — in order to improperly override prices calculated by the Administrator, purportedly as part of the alternative pricing methodology, and artificially inflate Fund-1's NAV each month.  For each month-

end valuation, LUMIERE and/or Plaford would begin by reviewing an inventory of Fund-1's investments, and proposed valuations for each, prepared by the Administrator and Investment Advisor-A's back office. LUMIERE and/or Plaford would then identify those relatively illiquid securities as to which they disagreed or disliked the proposed price, and create a list of prices reflecting where they wanted each security to be marked for month-end valuation purposes. That price was often significantly higher or lower than the price available from public price data. Typically, LUMIERE, Plaford, and/or CC-1 would then contact one or two "friendly" brokers — most often Broker-1 and Broker-2 — and dictate to the friendly brokers the price quotes that LUMIERE, Plaford, and/or CC-1 needed. The brokers would then parrot back the price quotes from their Bloomberg email account, giving the price quotes the appearance that they had come from an independent broker, and thus were in compliance with Fund-1's alternative pricing methodology. LUMIERE, Plaford, or CC-1 then submitted the friendly brokers' sham quotes as purportedly independent bases for that security's valuation to Investment Advisor-A's accounting department ("Accounting"), for the eventual submission to the Administrator.

        12.   By obtaining these sham quotes, STEFAN LUMIERE, the defendant, and Plaford caused a number of Fund-1's

securities to be misclassified in order to mislead investors
about the liquidity of the securities (*i.e.*, how actively traded
the securities were).  Specifically, for a number of illiquid
bonds, LUMIERE and Plaford fraudulently caused Investment
Advisor-A to assign a classification that led investors to
believe that the bonds were relatively liquid, when in fact they
were entirely illiquid.  This was done contrary to disclosures
to investors about Fund-1's percentage of illiquid investments,
in order to induce investors to invest in or keep their money in
Fund-1.

13.  As a further part of the scheme, at the end of
certain months, STEFAN LUMIERE, the defendant, and Plaford
purchased additional quantities of certain securities — in
which Fund-1 had an established position — at a deceptively
inflated price, markedly higher than the prevailing market was
offering that security, in a practice known as "painting the
tape."  Plaford would then report that inflated price to
Accounting for NAV purposes.

14.  In both cases — the sham broker quotes and the
inflated prices — it was LUMIERE's and Plaford's intent to
increase the price of certain securities in order to inflate
Fund-1's month-end valuation.

## Means and Methods of the Conspiracy

15.   Among the means and methods by which the conspirators, including STEFAN LUMIERE, the defendant, would and did carry out the conspiracy were the following:

a.   To support their fraudulent pricing of certain bonds, LUMIERE and others obtained sham broker quotes that were supposed to reflect price ranges at which third-party brokers believed there was a genuine market to buy or sell a security or other asset held by Fund-1.  In truth and in fact, LUMIERE and others fraudulently selected prices for their month-end valuations and then instructed brokers to parrot those prices back to LUMIERE and others.

b.   To further deceive investors and to mask the illiquidity of certain bonds, LUMIERE and others caused certain bonds to be misclassified as more liquid than they actually were — i.e., Level II instead of Level III — which misclassification was contrary to relevant accounting principles and internal policies of Investment Advisor-A.

c.   To further inflate Fund-1's month-end NAV, LUMIERE and others purchased bonds above their prevailing market price, for the purpose of causing the prices of those bonds to be marked at values greater than what they actually were worth.

## Statutory Allegations

16.     From at least in or about June 2011 through in or about September 2013, in the Southern District of New York and elsewhere, STEFAN LUMIERE, the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, to wit, securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5; and wire fraud, in violation of Title 18, United States Code, Section 1343.

17.     It was a part and object of the conspiracy that STEFAN LUMIERE, the defendant, and others known and unknown, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails, and the facilities of national securities exchanges, would and did use and employ manipulative and deceptive devices and contrivances, in connection with the purchase and sale of securities, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making and causing to be made untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not

- 11 -

misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon other persons, in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

18.   It was further a part and object of the conspiracy that STEFAN LUMIERE, the defendant, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

### Overt Act

19.   In furtherance of the conspiracy and to effect its illegal objects, STEFAN LUMIERE, the defendant, committed the following overt act, among others, in the Southern District of New York and elsewhere:

a.    On or about February 4, 2013, LUMIERE requested from a broker-dealer price quotes at specific levels for pricing of particular bonds which levels purported to

reflect genuine market prices but which were, in fact and as

LUMIERE well knew, inflated.

(Title 18, United States Code, Section 371.)

### COUNT TWO
### (Securities Fraud)

The Grand Jury further charges:

20.   The allegations contained in paragraphs 1 through

15 and 19 of this Indictment are repeated and realleged as if

fully set forth herein.

21.   From at least in or about June 2011 through in or

about September 2013, in the Southern District of New York and

elsewhere, STEFAN LUMIERE, the defendant, willfully and

knowingly, directly and indirectly, by use of the means and

instrumentalities of interstate commerce, and of the mails, and

the facilities of national securities exchanges, used and

employed manipulative and deceptive devices and contrivances, in

connection with the purchase and sale of securities, in

violation of Title 17, Code of Federal Regulations, Section

240.10b-5, by (a) employing devices, schemes, and artifices to

defraud; (b) making and causing to be made untrue statements of

material fact and omitting to state material facts necessary in

order to make the statements made, in light of the circumstances

under which they were made, not misleading; and (c) engaging in

acts, practices, and courses of business which operated and

would operate as a fraud and deceit upon other persons, to wit,
LUMIERE made, and caused to be made, false and misleading
representations and omissions to investors concerning Fund-1's
monthly NAV, including by soliciting inflated broker quotes,
causing certain bonds to be misclassified in order to mask those
bonds' illiquidity from investors, and paying inflated prices
for certain bonds at month's end.

    (Title 15, United States Code, Sections 78j(b) and 78ff;
    Title 17, Code of Federal Regulations, Section 240.10b-5;
       and Title 18, United States Code, Section 2.)

### COUNT THREE
(Wire Fraud)

The Grand Jury further charges:

22.  The allegations contained in paragraphs 1 through
15 and 19 of this Indictment are repeated and realleged as if
fully set forth herein.

23.  From at least in or about June 2011 through in or
about September 2013, in the Southern District of New York and
elsewhere, STEFAN LUMIERE, the defendant, willfully and
knowingly, having devised and intending to devise a scheme and
artifice to defraud, and for obtaining money and property by
means of false and fraudulent pretenses, representations, and
promises, transmitted and caused to be transmitted by means of
wire, radio, and television communication in interstate and
foreign commerce, writings, signs, signals, pictures, and sounds

for the purpose of executing such scheme and artifice, to wit, LUMIERE made, and caused to be made, false and misleading representations and omissions to investors regarding Fund-1's monthly NAV, including by soliciting, via email and other interstate electronic communications, inflated broker quotes, causing certain bonds to be misclassified in order to mask those bonds' illiquidity from investors and paying inflated prices for certain bonds at month's end.

(Title 18, United States Code, Sections 1343 and 2.)

### FORFEITURE ALLEGATION

24.   As a result of committing one or more of the offenses alleged in Counts One through Three of this Indictment, STEFAN LUMIERE, the defendant, shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, any and all property, real or personal, that constitutes or is derived from proceeds traceable to the commission of the offenses alleged in Counts One through Three of this Indictment.

### Substitute Assets Provision

25.   If any of the above-described forfeitable property, as a result of any act or omission of STEFAN LUMIERE, the defendant,

a.    cannot be located upon the exercise of due diligence;

- 15 -

           b.    has been transferred or sold to, or
deposited with, a third party;

           c.    has been placed beyond the jurisdiction of
the court;

           d.    has been substantially diminished in value;
or

           e.    has been commingled with other property
which cannot be divided without difficulty,

it is the intent of the United States, pursuant to Title 21,
United States Code, Section 853(p), and Title 28, United States
Code Section 2461, to seek forfeiture of any other property of
LUMIERE up to the value of the forfeitable property described
above.

        (Title 18, United States Code, Section 981(a)(1)(C);
          Title 21, United States Code, Section 853(p);
          Title 28, United States Code, Section 2461.)

_____  
FOREPERSON

*Preet Bharara*  
_____  
PREET BHARARA  
United States Attorney

- 16 -

Form No. USA-33s-274 (Ed. 9-25-58)

---

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**UNITED STATES OF AMERICA**

v.

**STEFAN LUMIERE,**

Defendant.

---

**INDICTMENT**

16 Cr. ___ (  )

(15 U.S.C. §§ 78j(b) & 78ff;
17 C.F.R. §§ 240.10b-5;
18 U.S.C. §§ 371, 1343, & 2.)

---
PREET BHARARA
United States Attorney

---
Foreperson

---

7/14/16: Case is assigned to Judge Rakoff.

Maas, J.