UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                    :
UNITED STATES OF AMERICA                            :
                                                    :   Docket No.: 16-CR-483 (JSR)
        -v-                                         :
                                                    :
STEFAN LUMIERE,                                     :
                                                    :
                Defendant.                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


# MEMORANDUM OF LAW IN SUPPORT OF
# STEFAN LUMIERE'S OMNIBUS PRETRIAL MOTIONS


Eric M. Creizman (EC 7684)

CREIZMAN PLLC
565 Fifth Avenue, Fl. 7
New York, New York 10017
T: (212) 972-0200
F: (646) 200-5022
E: ecreiz@creizmanllc.com


August 29, 2016

## <u>TABLE OF CONTENTS</u>

FACTUAL BACKGROUND ........................................................................................ 1

    I.     The Indictment ................................................................................ 2

    II.    Case Background ............................................................................ 5

ARGUMENT .......................................................................................................... 8

    I.     A Bill of Particulars is warranted to enable Lumiere to adequately prepare a defense for trial. ................................................................................ 8

       A.   Lumiere is entitled to identification of the specific brokers and other unidentified co-conspirators in the alleged scheme. ............................................. 11

       B.   Lumiere is entitled to identification of the particular securities whose value he and his co-conspirators sought to, and did, falsely inflate to investors............ 12

       C.   Lumiere is entitled to identification of the specific transactions in which he and his co-conspirators committed the alleged offense. ....................................... 13

    II.    Electronic evidence seized and imaged pursuant to the search warrant of Lumiere's apartment should be suppressed. ................................................. 13

    III.   The Government should produce the underlying notes of the Lumiere proffer. ...................................................................................... 17

    IV.   The Government should be required to provide the defense with an ongoing list of exhibits it intends to introduce at trial. ............................................. 17

    *V.*    The Government should provide all *Brady and Giglio* material expeditiously. ................................................................................. 19

CONCLUSION ...................................................................................................... 20

On behalf of Stefan Lumiere, we respectfully submit these omnibus pretrial motions: (i) for a bill of particulars; (ii) to suppress materials and information obtained from electronic devices seized pursuant to a search warrant of Lumiere's residence over two-and-a-half years ago; (iii) for production of agents' and any prosecutors' notes of Lumiere's 2014 proffer to the government; (iv) for early production of an exhibit list; and (v) immediate production of *Brady* and *Giglio* material.

## FACTUAL BACKGROUND

The indictment in this case is the culmination of a two-and-a-half-year investigation into alleged mismarking practices with respect to the Visium Credit Opportunities Fund (the "Credit Fund"), one of approximately six active hedge funds run by Visium Asset Management, LP ("Visium").[1]  The Credit Fund primarily invested in debt instruments issued by health care companies.  The government was assisted in its investigation by two of the three key alleged co-conspirators in the Credit Fund: (i) Christopher Plaford, a partner at Visium and the Portfolio Manager of the Credit Fund, and (ii) CC-1, the Credit Fund's head trader, who began cooperating with law enforcement since late 2013 with the hope of recovering a monetary award, presumably under the SEC's whistleblower program.  Plaford pled guilty to the alleged mismarking fraud under a cooperation agreement.  CC-1, according to the Criminal Complaint, "is voluntarily cooperating with the Government and will testify pursuant to a court-ordered grant of immunity."

---

[1] The information set forth in this factual background is based on the allegations of the Indictment (Creizman Decl. Ex. A), the Complaint (*Id.*, Ex. B), and the Search Warrant Affidavit (*Id.*, Ex. C).  All references to the Indictment shall be in the following format: ¶__.

## I.  The Indictment

According to the Indictment, from approximately 2011 through September 2013, when the Credit Fund was liquidated, Plaford, Lumiere, and CC-1 agreed to participate in a scheme to defraud investors and prospective investors in the Credit Fund by "deceptively mismarking each month the value of *certain* securities each month."  (¶ 11) The "objective" and "effect" of the alleged scheme was two-fold: (i) to falsely inflate the Net Asset Value ("NAV") of the Credit Fund's holdings to investors and prospective investors; and (ii) to mislead investors by characterizing the securities in the Credit Fund as more liquid than they actually were.  (¶¶11-12).

According to the Indictment, Visium made representations to investors and prospective investors by distributing literature describing the valuation of assets in the Credit Fund.  (¶¶6-9).  According to compliance manuals provided to investors, the Credit Fund would assign price values to its assets based on GAAP.  The manuals represented that Visium's fund administrator ("MS") would verify the Credit Fund's valuations by consulting public pricing sources, such as Reuters and Mark-It.  According to the compliance manuals, MS would have the last word on asset valuations except where Visium could in good faith provide support for its pricing of assets.  In those circumstances, MS's valuation of an asset would be substituted by Visium's valuation in a practice known as a valuation "override."

In addition to the compliance manuals, the investor literature included monthly performance reports that reflected the Credit Fund's NAV, which was the calculation of the Credit Fund's total value by determining the market value of each of its holdings minus its liabilities.  The Credit Fund maintained assets that fell into three categories defined under FAS 157: (i) Level I securities: liquid securities with a ready and active

market; (ii) Level II securities: securities with a quoted price but in a more inactive

market; and (iii) Level III securities: securities which may have a specific or illiquid

market.

According to the Indictment, "given that the value of a Level III security was

based on prices or valuation techniques that required inputs reflecting management's own

assumptions, rather than data readily observable to the market, firms like [Visium]" often

identified for investors and maintained limits on the percentage of Level III securities that

would be permitted to be held in a particular fund.  Allegedly, in its investor materials,

including monthly performance reports, Visium reflected that the Credit Fund had "zero

investments" in Level III securities for 2011 and most of 2012.  Visium also represented

to its investors that it tried to minimize the investments in Level III securities in the

Credit Fund.

The Indictment alleges that Plaford, Lumiere, and CC-1 manipulated Visium's

internal valuation procedures—specifically, the valuation overrides—to deceive investors

and prospective investors in the Credit Fund.  According to the Indictment, at the end of

each month, Plaford and Lumiere would review the inventory of the Credit Fund's

investments, and examined the proposed valuations for each security that had been

prepared by MS and Visium's back office.  (¶11).  When Plaford and Lumiere identified

prices for "relatively illiquid securities as to which they disagreed or disliked," they

would create a list of prices for those securities reflecting where they wanted the

securities to be marked for month-end valuation purposes (*Id.*).  The prices selected by

Plaford and Lumiere allegedly were "often significantly higher or lower" than the price

available from public price data.  (*Id.*).

Plaford, Lumiere, and CC-1 would then allegedly contact "one or two 'friendly' brokers," usually "Broker-1 and Broker-2," and dictate to the brokers the prices quotes that they wanted. The broker would then "parrot back" the price quotes provided by Plaford, Lumiere, and CC-1, generally by Bloomberg email, thus providing the alleged co-conspirators with the ammunition they needed to override MS's valuations under Visium's internal valuation procedures. The co-conspirators would then submit the "sham quotes" to Visium's accounting department, for ultimate submission to MS, which provided the "support" they needed to accomplish the desired price overrides. Because the price quotes gave "the appearance that they had come from an independent broker, and thus were in compliance with [the Credit Fund's] alternative pricing methodology," the effect was to substitute the co-conspirators' valuations for those of MS. (¶¶11, 15(a)).

In addition, by obtaining the "sham quotes," the co-conspirators "fraudulently caused" Visium to assign a liquidity classification to securities that falsely conveyed to investors the securities were relatively liquid, "when in fact they were entirely illiquid." (¶¶12, 15(b)). In addition, in order to falsely inflate the valuations of certain securities in the Credit Fund, at the end of "certain months," Plaford and Lumiere purchased additional quantities of those securities at "deceptively inflated" prices, "markedly higher than the prevailing market was offering that security, in a practice known as 'painting the tape.'" (¶¶13, 15(c)).

For this alleged conduct, Lumiere is charged with conspiracy to commit securities and wire fraud in violation of 18 U.S.C. §371, and substantive counts of securities fraud, in violation of 15 U.S.C. §§78j(b) and 78ff, and wire fraud, in violation of 18 U.S.C. §1343.

The Indictment includes does not identify any specific securities that were allegedly inflated, any dates that sham quotes were allegedly requested from or received by "friendly brokers," (except February 4, 2013, the sole overt act alleged in connection with the conspiracy count), any securities that were intentionally purchased "above their prevailing market price" or the dates those purchases occurred, or any specific documents provided to investors in which the fraudulent representations appear, let alone the specific misrepresentations allegedly made in those documents.

## II. Case Background

On June 15, 2016, Lumiere surrendered to authorities with counsel and appeared before Magistrate Judge Francis on a criminal complaint. (DE 1, 3). The grand jury returned the Indictment against Lumiere on July 14, 2016. (DE 6). At Lumiere's arraignment before this Court on July 18, 2016, the government requested three weeks, until August 8, 2016, to "substantially complete" its discovery obligations under Rule 16, which the Court granted. (Tr. 7-18-16 Hr'g at 2, Creizman Decl. Ex. D). The government did not disclose to the Court the volume of discovery it expected to produce. The Court granted defense counsel three weeks from August 8, 2016, to August 29, 2016, to file defense motions. (*Id.* at 3). The government represented to the Court that it would take approximately two weeks to try this case. When the Court asked defense counsel if he agreed, defense counsel replied that "I think so, Your Honor. I haven't received the evidence, but yes." (*Id.* at 4). The Court set December 19, 2016 as the date for trial.

Later that evening, on July 19, 2016, defense counsel served the government with a request for discovery and, on the following day, July 20, 2016, with a request for a bill of particulars. (*See* Creizman Decl. Exs. E and F). The government responded by email to defense counsel's letters that it understands its discovery obligations and that it also

5

"does not believe that a bill of particulars is appropriate or necessary in this case." (*See* Creizman Decl. Ex. H).

On August 8, 2016, the government produced voluminous discovery to the defense, consisting of over 125 recorded conversations, which, in total last at least 200 hours, if not more.  The discovery consisted of well over one million pages of documents, including emails reflecting communications between the alleged Credit Fund co-conspirators and a number of different brokers, price quotes provided by the brokers for thousands of securities over several years, reams of financial records, thousands of pages of investor materials, tens of thousands of emails, thousands of pages of complex market valuation analyses, and trading records.  (Creizman Decl. Ex. H).

On August 9, 2016, the government provided an enormous volume of Bloomberg text messages—occupying 1 terabyte of data—in a format that is extremely difficult to access—and which we have been substantially unable to access—and in a size—in addition to the previous day's discovery—that required the defense purchase to purchase external hard drives and new computers so that the firm's attorneys could appropriately review the discovery.  In its cover letter accompanying that discovery, the U.S. Attorney's Office offered to provide the text messages in an alternative format so long as the defense purchased and provided the government with a 1 terabyte hard drive, which the defense provided to the government.  (Creizman Decl. Ex. I).  However, the defense has not yet received the Bloomberg messages in the alternative format.  The government also offered to provide forensically imaged copies of electronic data seized from Lumiere pursuant to a search warrant on a 2 terabyte hard drive, which has been provided to the

6

government.  (Creizman Decl. Ex. H). The defense has not received the forensically imaged data.

On August 9, 2016, the government provided additional discovery in the form of compensation information for Lumiere at Visium (which, incidentally, reflects that he received his largest bonus *before* the alleged scheme began).[2]  (Creizman Decl. Ex. J). On August 15, 2016, the government provided five additional recorded conversations made by CC-1, lasting about an hour in total, along with draft transcripts of those recordings.  (Creizman Decl. Ex. K).

On August 17, 2016, the government provided an additional 7,500 pages of audit workpapers performed by a major accounting firm that, again, is produced in a format that is extremely difficult to access.  (Creizman Decl. Ex. L).  On August 29, 2016, in response to a specific request by the defense, the government produced a 302 memorandum of Mr. Lumiere's April 24, 2014 proffer with the government (with prior counsel) and a proffer agreement signed by Mr. Lumiere.  (Creizman Decl. Ex. M).  The government has advised the defense that it will produce on August 30, 2016, what appears an additional tens of thousands of documents obtained from MS, although the government has not identified the subject matter of the documents.

In light of the voluminous discovery produced to defense counsel, on August 10, 2016, the defense requested an adjournment of the December 19, 2016 trial date, to which the government consented until January 9, 2016.  On August 12, 2016, the Court granted defense counsel's motion for an adjournment of the trial date until January 9,

---

[2] The Indictment alleges that the effect of the scheme resulted in "higher bonuses for Lumiere, among other benefits," although such bonuses and benefits are not reflected in the compensation information for Lumiere.

2016, and stated that "[n]o further extensions will be granted on any grounds

whatsoever."  (DE 9).

## **ARGUMENT**

**I.  A Bill of Particulars is warranted to enable Lumiere to adequately prepare a defense for trial.**

Notwithstanding the extraordinary volume of discovery produced in this case,

and, in fact, perhaps even more so because of it, Lumiere is left in the dark as to the

essential nature of the crime with which he is charged.  The government declines to

identify in the millions of pages of documents and in the hundreds of hours of audio

recordings basic facts concerning the allegedly false representations which the

government contends Lumiere agreed to, and did, cause to be made to Visium investors.

Indeed, Lumiere should not be required to guess at what the charges are against him or

sift through "mountains of documents" to determine the transactions he must defend

against at trial.  *United States v. Bortnovsky*, 820 F.2d 572, 575 (2d Cir. 1987).  As courts

in this Circuit have held, "[i]t is no solution to rely solely on the quantity of information

disclosed by the government;" because sometimes, as here, "the large volume of material

disclosed is precisely what necessitates a bill of particulars.  *United States v. Bin-Laden*,

92 F. Supp. 2d 225, 234 (S.D.N.Y. 2000).

Lumiere is entitled to basic, fundamental specifics of the offenses he is charged

with violating, including identification of: (i) the "others," and specifically, the brokers,

besides Plaford and CC-1 who were the members of the alleged conspiracy; (ii) the

specific bonds and other securities held by the Credit Fund that Lumiere sought to, or did,

artificially inflate the value of; (iii) the specific dates and times, or the specific

communications, in which Lumiere sought to, or did, obtain sham quotes from brokers;

and (iv) the specific trades in which Lumiere and his co-conspirators allegedly purchased bonds and other securities "above their prevailing market price" for the purpose of falsely inflating their value in reports to investors and prospective investors.

The government—represented in this case by three seasoned, able prosecutors—declines to provide this basic information to Lumiere, despite the vast amount of discovery in this case, the massive disparity in resources between the government and the defense, the substantial complexity of the materials provided in discovery and of the transactions at issue, and the relatively brief time period in which Lumiere and his counsel have to review these materials and prepare for trial—especially in comparison to the two-and-a-half years of the government's investigation (along with a parallel and cooperative investigation conducted by the SEC) before this case was brought.

The government apparently expects Lumiere to discern what he is being charged with and what transactions he must defend, apparently on the theory that he knows what it is he did or did not do.  Judge Weinfeld, however, rejected that very proposition almost 60 years ago:

> The fact that a defendant may have some, or even all the information requested, does not necessarily defeat his right to a bill of particulars.  The issue on a motion for a bill of particulars is *what the Government intends to prove* upon the trial in support of its charge.  The defendant is entitled to this information in order properly to prepare to meet the charges and to avoid surprise upon the trial.  The Government's position also disregards the fact that *a defendant is presumed to be innocent* and hence, that *it must be assumed he is ignorant of the facts* on which the pleader founds his charges.

*United States v. Spur Knitting Mills, Inc.*, 187 F. Supp. 653, 654 (S.D.N.Y. 1960) (quotations omitted) (emphasis added).  For the same reasons, the government's familiar argument that particulars should not be granted to avoid "tailored testimony" should be rejected because it is based on an improper presumption of guilt, which ignores and

9

rejects any possibility that Lumiere's account of the events is truthful and supportive of innocence.

By not providing the basic particulars requested there is a substantial danger that Lumiere will be unfairly surprised at trial or that the government will be able to present a crime to the jury for which the grand jury did not vote to indict Lumiere. *See, e.g., United States v. Davidoff*, 845 F.2d 1151, 1154-55 (2d Cir. 1988) (reversing conviction where trial court failed to order a bill of particulars identifying the victims of all the extortionate schemes the government intended to prove); *Bortnovsky*, 820 F.2d at 573 (by merely dumping mounds of discovery on the defendants, the "relevance of key events was shrouded in mystery" and defense counsel "were left unguided as to which documents would be proven falsified or which of some fifteen burglaries would be demonstrated to be staged").

Lumiere is simply requesting essential information so that the defense can focus on potentially relevant communications in the ocean of documents, which, on the surface, do not reflect any wrongdoing whatsoever. In these circumstances, the bill of particulars Lumiere seeks is warranted. *See, e.g., United States v. Nachamie*, 91 F. Supp. 2d 565, 571 (S.D.N.Y. 2000) (ordering the government to disclose in a bill of particulars which Medicare claims were false "and in what way they were false," where the government "produced over 200,000 pieces of paper in hundreds of boxes and files, relating to 2,000 Medicare claims"); *United States v. Savin*, 2001 WL 243533, at *3 (S.D.N.Y. Mar. 7, 2001) (ordering the government to specify in a bill of particulars the fraudulent "intercompany transfers" involved in the alleged offense where the indictment did not identify the amounts, dates, means, corporate entities, or co-conspirators involved).

A. **Lumiere is entitled to identification of the specific brokers and other unidentified co-conspirators in the alleged scheme.**

Identification of Lumiere's alleged co-conspirators is particularly critical here, where there are hundreds of thousands of pages of emails and text messages between members of the alleged conspiracy and many other brokers—not solely the brokers the defense believes, based on the allegations in the Complaint and elsewhere in the discovery, to be "Broker-1" and "Broker-2" discussed in the Indictment—and where the government declines to identify the communications in which sham quotes were requested or provided or to identify the specific bonds or other securities for which sham quotes were requested or obtained.

Courts generally consider six factors in determining whether to require identification of unindicted co-conspirators: (1) the number of co-conspirators; (2) the breadth and duration of the conspiracy; (3) whether the government otherwise has provided adequate notice of particulars; (4) the volume of pretrial disclosure; (5) the potential danger to co-conspirators; and (6) the potential harm to the government's investigation. *See, e.g.*, *Nachamie*, 91 F. Supp. 2d at 572.

Here, each of these factors weighs strongly in favor of directing the government to identify the unindicted co-conspirators. First, the number of co-conspirators is potentially vast given the sheer volume of communications with many different brokers concerning price quotes for many different securities over a lengthy period of time. Second, the conspiracy is alleged to encompass at least three years of conduct. Third, the government has not provided notice of who the unnamed "others" are. Fourth, the volume of pretrial discovery is massive. Fifth, there are no allegations of violence in the Indictment and therefore no indication of potential danger to co-conspirators.

11

The need for identification of Lumiere's alleged co-conspirators is palpable here. The government should not be permitted to take the anomalous position that revealing the identities of the broker co-conspirators would impede its investigation, while at the same time arguing that Lumiere is not entitled to particulars because he knows what he did and who he did it with.  Any claim that revealing the identities of co-conspirators would harm the investigation is not credible.

In these circumstances, courts routinely have ordered the government to identify unnamed conspirators.  *See, e.g.*, *United States v. Oruche*, 2008 WL 612694, at * 4 (S.D.N.Y. Mar. 5, 2008) (ordering particulars identifying unindicted co-conspirators because the "volume of discovery and the breadth of the conspiracies weigh in favor of disclosure of the unindicted co-conspirators because it will narrow [defendant's] review of the wiretap conversations and therefore facilitate his preparation for trial"); *United States v. Kahale*, 789 F. Supp.2d 359 (E.D.N.Y. 2009) (ordering disclosure of unindicted co-conspirators in part because of "the relative complexity of the fraud . . . [which] by their nature carry a greater potential for unfair surprise at trial due to their complexity"). *See also*, *United States v. Lino*, 2001 WL 8356, at *13 (S.D.N.Y. 2000); *Savin*, 2001 WL 243533, at *3; *Nachamie*, 91 F. Supp. 2d at 573; *United States v. Ferrarini*, 9 F. Supp. 2d 284, 299 (S.D.N.Y. 1998).

**B.  Lumiere is entitled to identification of the particular securities whose value he and his co-conspirators sought to, and did, falsely inflate to investors.**

Lumiere should not have to wade through the voluminous discovery in the vain hope of discerning which securities the government intends to prove were the subject of his or his alleged co-conspirators' efforts to set artificial prices.  The mere reference to a particular kind of practice in the Indictment where there are thousands of securities that

were given price quotes over a period of years makes the Indictment's charges "so general that they do not advise [the defendant] of the specific acts of which he is accused." *United States v. Feola*, 651 F. Supp. 1068, 1132 (S.D.N.Y. 1987).

### C. Lumiere is entitled to identification of the specific transactions in which he and his co-conspirators committed the alleged offense.

For the same reasons, Lumiere seeks identification of the: (i) specific communications with brokers, or the dates and times of those communications, in which he and his co-conspirators sought sham price quotes; and (ii) the specific transactions in which he and his co-conspirators allegedly "painted the tape."  Courts in this Circuit in analogous circumstances have granted particularization of the dates, amounts, and locations of alleged criminal transactions.  *See, e.g., United States v. Siddiqi*, 2007 WL 549420 (S.D.N.Y. Feb. 21, 2007); *Lino*, 2001 WL 8356 at *13; *United States v. Ferrara*, 990 F. Supp. 146, 153 (E.D.N.Y. 1998).

## II. Electronic evidence seized and imaged pursuant to the search warrant of Lumiere's apartment should be suppressed.

In February 2014, the government applied for, and subsequently executed, a search warrant of Lumiere's apartment for a wide range of electronic data and audio recordings based on statements Lumiere made to CC-1 during three separate conversations CC-1 surreptitiously recorded at the behest of the government.  (Creizman Decl. Ex. C at ¶¶ 26-31.  During that search, the government seized computer equipment, including a brand new laptop on which Lumiere had no relevant data.  (Creizman Decl. ¶4).  The government also seized numerous electronic storage devices.  Nevertheless, although the government has returned an iPhone, a laptop, and two desktop computers to Lumiere, for over two-and-a-half years the government has held on to a substantial number, if not the bulk of, the electronic devices it seized.  The government has yet to

return these items to Lumiere or provide him with forensically-imaged copies.  Even more problematic, the fact that the government has not returned even a brand new laptop with no data suggests the government has not yet even reviewed all of the electronic devices.  Nor has the government identified whether any of the electronic discovery contained privileged communications, and, if so, what procedures law enforcement and the prosecution undertook to determine whether any of the materials are privileged.

On July 20, 2016, defense counsel requested by letter: (i) immediate return of the original computer equipment and digital storage devices; (ii) a statement as to whether the electronic data on the devices has been reviewed, and if so, the steps taken to evaluate the contents of the data and to determine whether the data is responsive to the warrant; and (iii) an inventory of all items seized from Lumiere's apartment. (Creizman Decl. Ex. N).  To date, the government has not responded to this letter.  Nor has the government provided the defense with any of the fruits of its search and seizure of Lumiere's electronic devices.

In similar circumstances, Judge Irizarry ordered wholesale suppression of the fruits of the seizure and search of electronic data.  *See United States v. Metter*, 860 F. Supp. 2d 205 (E.D.N.Y. 2012).  In that case, Metter was charged with conspiracy to commit securities fraud and related offenses.  *Id.* at 206.  After Metter was charged in a criminal complaint, the government obtained and executed several search warrants for Metter's electronic devices based on affidavits attesting to probable cause to believe Metter used computers from his home to further the alleged fraud.  *Id.* at 208.  As here, the search warrants sought a broad array of electronic data, and sought permission to "search, copy, image, and seize the computer hardware," and to "perform an off-site

search for 'evidence, fruits, and instrumentalities' of violations of specified criminal

statutes.'" *Compare id.* at 209, *with* Creizman Decl. Ex. C ¶¶8 (permitting "seizure of

computers, ESI, and electronic storage media," "the copying of any Computer, ESI, or

electronic storage media for later review," and, if necessary, "examination of all the

seized data to evaluate its contents and determine whether data is responsive to the

warrant").

Unlike here, however, after seizing the electronic data, the government did not

"promptly return" *all* of "the computer hardware to its appropriate owner." *Id.* at 210.

Nevertheless, Judge Irizarry found that "the government's subsequent inactivity with

respect to the imaged hard drives and email correspondence" violated Metter's

Constitutional rights. *Id.* at 210.  Indeed, at the time the motion to suppress was before

the court, it had been 15 months since the government had executed its search warrants of

Metter's residence, and it still had not "conducted its review of the evidence seized and

imaged to determine whether any of that imaged evidence fell outside the scope of the

search warrant." *Metter*, 860 F. Supp. 2d at 211.  Nor was it clear "when the government

would complete its privilege review of the imaged evidence." *Id.*

Judge Irizarry granted Metter's motion to suppress any fruits of the seized

electronic devices in their entirety.  While recognizing that "under current law there is no

established upper limit as to when the government must review seized electronic data to

determine whether the evidence seized falls within the scope of a warrant," the Fourth

Amendment requires the government to complete its review . . . within a 'reasonable'

period of time." *Id.* at 215.  The court had not found any authority "indicating that the

government may seize and image electronic data and then retain that data with no plans

whatsoever to *begin* review of that data to determine whether any irrelevant, personal information was improperly seized." *Id.* Accordingly, Judge Irizarry ruled that suppression was appropriate because the "government's blatant disregard for its responsibility in this case [was] unacceptable and unreasonable." *Id.* Indeed, the "government's retention of *all* imaged electronic documents, including personal emails, without any review whatsoever to determine not only their relevance to this case, but also to determine whether any recognized legal privileges attached to them, is unreasonable and disturbing." *Id.*

Although the court recognized that wholesale suppression is an extreme remedy, blanket suppression was warranted because the government: (i) sought permission, as here, for what amounts to a general search of an individual's electronic devices, and (ii) did not act in good faith, by failing to conduct the review it promised to determine whether the evidence seized was relevant to the warrant. *Id.* at 216. As Judge Irizarry concluded, "the Court cannot, in the interest of justice and fairness, permit the government to ignore its obligations. Otherwise, the Fourth Amendment would lose all force and meaning in the digital era and citizens will have no recourse as to the unlawful seizure of information that falls outside the scope of a search warrant and its subsequent dissemination." *Id.*

The rationale for suppression in *Metter* applies here with even greater force because the government has held on to Lumiere's electronic data for approximately 30 months—twice as long as the government held the electronic evidence in *Metter*—and apparently has not reviewed the electronic data—as it had promised to do. Nor has it identified what, if any, steps it took, or plans to take, to review the materials for privilege.

The government also has not returned all of the original computer equipment and storage devices, or even provided Lumiere with forensic images of the electronic data seized.

Accordingly, the Court should suppress the fruits of all electronic evidence the government seized pursuant to its February 2014 search warrant of Lumiere's apartment.

### III. The Government should produce the underlying notes of the Lumiere proffer.

On August 29, 2016, defense counsel reiterated their earlier request, dated July 19, 2016, that the government produce Lumiere's prior statements under Fed. R. Crim. P. 16, this time specifying the FBI's 302 memorandum of Lumiere's 2014 proffer, and the agents' and attorneys' handwritten notes.  In response, the government quickly provided the FBI 302 and the proffer agreement, but not the underlying notes taken by the agents and by any prosecutors.  Under Fed. R. Crim. P. 16(a)(1)(B)(ii), the government must disclose to the defense "the portion of *any* written record" of a defendant's relevant statement made in response to interrogation by a person whom the government then knew to be a government agent.  *See also*, *United States v. Stein*, 424 F. Supp.2d 720, 728-729 (S.D.N.Y. 2006) (rough notes of an interview of a defendant are discoverable under Rule 16 as a defendant's statement made in response to interrogation by a person whom the defendant knew to be a government agent).  Accordingly, the government should be required to produce all notes taken by agents and prosecutors at Lumiere's 2014 proffer.

### IV. The Government should be required to provide the defense with an ongoing list of exhibits it intends to introduce at trial.

The Court has the inherent authority to order the government to identify for the defense a preliminary and continually updated exhibit list, identifying the specific documents it intends to rely upon at trial.   This is especially warranted where, as here, the Indictment's allegations lack necessary specificity, and the government has produced

17

an extraordinary amount of discovery material, a substantial portion of which is produced in a format that is difficult for the layperson to access or review.  It is also warranted because of the vast disparity in resources between the government and the defense, the staffing of three experienced, talented prosecutors on what is expected to be a two-week trial, and the complexity of the valuation materials, price quotes, financial and audit documents, and the numerous, and sometimes lengthy, audio recordings, that are likely to be at the heart of the government's case.  Indeed, the government does not fulfill its obligations under Rule 16 by burying "the defense under an avalanche of documentary and electronic outpourings, [thus rendering] the defense incapable of distilling that which is germane and relevant to the impending trial."  *See, e.g.*, *United States v. Washington*, 819 F. Supp. 358, 368 (D. Vt. 1993).

The court's decision in *United States v. Turkish*, 458 F. Supp. 874 (S.D.N.Y. 1978) to require the government to provide a preliminary exhibit list well in advance of trial is instructive here.  In that case, the government produced upwards of 25,000 documents—a paltry amount compared to the enormous amount of discovery produced in this case—and the court required the government, within 14 days of trial, to "identify those documents which it intends to offer, or to use or to refer in connection with the testimony of any witness, on its case in chief.  It is further required promptly to identify any other documents when and if a decision is made between now and trial to offer to use or to refer to such documents."  *Id.* at 882.

In comparison, the astonishing volume and complexity of the discovery in this case truly requires the unusual step of requiring the government, well in advance of trial,

to provide the defense with a preliminary exhibit list in good faith, to which it is not ultimately bound and may supplement.

**V.  The Government should provide all *Brady and Giglio* material expeditiously.**

"A prudent prosecutor will be quick to disclose any information that tends to exculpate the defendant.  As the representative of the Government, the prosecutor's task is not to win a case, but to see that justice is done." *United States v. Frank*, 11 F. Supp. 2d 322, 327 (S.D.N.Y. 1998).  "[G]enerous disclosure of information helpful to the defendant will increase confidence in the outcome of trial." *Id.*  "Complying with the Jencks Act, of course, does not shield the government from its independent obligation to timely produce exculpatory material under *Brady*—a constitutional requirement that trumps the statutory power of 18 U.S.C. § 3500." *United States v. Rittweger*, 524 F.3d 171, 181 n.4 (2d Cir. 2008).

This Circuit has interpreted *Brady and Giglio* to require the earliest disclosure necessary for effective use by the defense of "material, which if not disclosed, creates a reasonable probability of altering the outcome" of trial.  *United States v. Coppa*, 267 F.3d 132, 146 (2d Cir. 2001).  Thus, the defense is entitled to immediate disclosure of exculpatory or impeachment material where later disclosure would deprive the defense of its effective use at trial.  *Id.*

Accordingly, we request that the Court order the government to produce all *Brady* and *Giglio* material of which it is aware immediately, and in any event, no later than 30 days before trial.

## **CONCLUSION**

For the foregoing reasons, we respectfully request that the Court grant Stefan Lumiere's omnibus pretrial motions: (i) for a bill of particulars; (ii) to suppress electronic evidence seized pursuant to a search warrant of his apartment over two-and-a-half years ago; (iii) produce the agents' and any prosecutor's notes of his 2014 proffer; (iv) for an early exhibit list, well in advance of trial; and (iv) for expeditious production of *Brady* and *Giglio* material.

Dated:  New York, New York
        August 29, 2016

Respectfully submitted,

<u>/s/ Eric M. Creizman</u>
Eric M. Creizman (EC 7684)
CREIZMAN LLC
565 Fifth Avenue
New York, NY 10017
Tel. (212) 972-0200
Fax (646) 200-5022
ecreiz@creizmanllc.com