```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------x
UNITED STATES OF AMERICA                :
                                        :       16 Cr. 483
            -v-                         :
                                        :       MEMORANDUM
STEFAN LUMIERE,                         :
                                        :
            Defendant.                  :
---------------------------------------x
```

JED S. RAKOFF, U.S.D.J.

By "bottom-line" order dated November 15, 2016, the Court denied defendant Stefan Lumiere's motion to suppress electronic evidence that the Government obtained from various digital storage devices, some of which were seized pursuant to a warrant and some of which were voluntarily produced by defendant. See Order dated Nov. 15, 2016, ECF No. 42. The denial was without prejudice to defendant's future assertion of the attorney-client privilege or work product doctrine as to individual documents. See id. This Memorandum explains the reasons for those rulings.

This matter has a surprisingly complicated procedural history, which comprises two hearings and no fewer than nine sets of written submissions. On August 30, 2016, Lumiere filed an omnibus pretrial motion in which he sought, inter alia, to suppress electronic evidence obtained from certain seized devices. See Memorandum of Law in Support of Stefan Lumiere's Omnibus Pretrial Motions ("Def. Mem."), ECF No. 15, at 13-17. At a hearing on this matter on August 31, 2016, the Court resolved all aspects of defendant's omnibus

1

motion except the motion to suppress, as to which the Court invited full briefing. See Transcript dated Aug. 31, 2016, ECF No. 20. On September 9, 2016, the Government filed answering papers. See Government's Opposition to the Defendant's Motion to Suppress, ECF No. 17. On September 16, 2016, Lumiere filed reply papers. See Reply in Support of Stefan Lumiere's Motion to Suppress ("Def. Reply"), ECF Nos. 18-19. On September 30, 2016, in an effort to head off an evidentiary hearing, the Government filed an investigating agent's sworn declaration. See Declaration of Matthew T. Callahan in Opposition to the Defendant's Motion to Suppress ("Callahan Decl."), ECF No. 22. Lumiere, in turn, filed further reply papers on October 7, 2016. See Sur-Reply in Support of Stefan Lumiere's Motion to Suppress ("Def. Sur-Reply"), ECF Nos. 24-25.

After considering the parties' submissions, the Court determined that a full factual record was required to resolve Lumiere's motion, and convened an evidentiary hearing on October 19, 2016. See Transcript dated Oct. 19, 2016, ECF No. 28. At the conclusion of the hearing, the Court invited one final round of briefing. See id. at 47-78. On October 20, 2016, the Government filed a letter clarifying its position as to one uniquely situated device. See Government's Response in Further Opposition to the Defendant's Motion to Suppress ("Govt. Post-Hearing Letter"), ECF Nos. 26-27. On October 28, 2016, Lumiere filed another set of papers that expanded his motion to include devices he had voluntarily produced to the Government. See Post-Hearing Submission on Behalf of

Stefan Lumiere in Support of His Motion to Suppression ("Def. Post-Hearing Br."), ECF Nos. 30, 33, 36. On November 8, 2016, the Government filed its final response. See Government's Post-Hearing Response in Further Opposition to the Defendant's Motion to Suppress ("Govt. Post-Hearing Br."), ECF No. 40. On November 14, 2016, Lumiere belatedly submitted documents purportedly covered by the attorney-client privilege for the Court's in camera review. See Letter dated Nov. 14, 2016 ("Def. Privilege Letter"), ECF No. 41.

Despite these many filings, the basic facts relevant to Lumiere's motion are fairly straightforward. On February 26, 2014, the Government seized a number of digital storage devices from Lumiere's apartment pursuant to a search warrant executed the previous day. See Transcript dated Oct. 19, 2016, at 4-5; Search Warrant, Ex. A to Callahan Decl. These items included a mobile phone, three computers, two tablets, seven USB flash drives, and two CD-ROM discs. See Callahan Decl. ¶ 3. That evening, the Government began "imaging" the devices, i.e., creating exact electronic mirrors, beginning with defendant's mobile phone. See Transcript dated Oct. 19, 2016, at 5. By around March 11, 2014, the Government had imaged the computers, flash drives, and CD-ROM discs. Id. at 5-6. On April 8, 2014, the Government imaged the tablets. Id. at 6.

Beginning on the evening of February 26, 2014, the Government began searching the seized devices for evidence responsive to the securities mismarking scheme described in the warrant. Id. at 6-7. According to FBI Special Agent Matthew T. Callahan, he proceeded by

3

opening individual directories and files on a document-by-document basis. Id. at 7. He did not follow any formal document review "protocols," nor did digitally mark documents "responsive" or "non-responsive" or otherwise memorialize his findings. Id. at 17-21. He also made no effort to avoid viewing potentially privileged documents. Id. at 30. With a few exceptions discussed below, Agent Callahan completed reviewing the seized devices by the end of March 2014, and he has not revisited them since that time. Id. at 9-10.

The review of the CD-ROM discs and tablets proceeded differently. Because the discs were encrypted, the Government's attempts to review their contents were unsuccessful. Id. at 21-22. The Government likewise never gained access to the Dell Surface tablet, which was protected by a password that it never received. Id. at 10, 22. For the same reason, the Government was also initially unable to search the Apple iPad tablet, but even after Lumiere provided the password, the Government still did not search it. Id. at 22-23. Moreover, as of October 2016, over 30 months after the initial seizure, the Government had not returned the tablet. Id. at 23.[1]

Within a few weeks of the seizure, based on Agent Callahan's review of the seized devices, the Government came to believe that Lumiere might have other digital devices containing relevant

---

[1] That said, the Government promptly returned devices Lumiere specifically asked for. His mobile phone was returned the day after the seizure, and his computers and flash drives were returned about six weeks later. See Transcript dated Oct. 19, 2016, at 5-6.

4

evidence. Id. at 8. After a proffer session on March 17, 2014, Lumiere, acting through counsel, voluntarily produced five more digital storage devices to the Government and consented to a search of them. Id. at 8-9, 29; Callahan Decl. ¶ 9; Consent to Search, Ex. B to Decl. of Jeffrey A. Udell ("Udell Decl."), ECF No. 37, at 2.

Lumiere retained Jeffrey A. Udell, Esq. in connection with the Government's investigation in or around March 2014. See Udell Decl. ¶ 2. The Government became aware of Udell by no later than March 20, 2014, when he turned over the five additional devices on Lumiere's behalf. See Transcript dated Oct. 19, 2016, at 8-9.[2] On April 3, 2014 – after Agent Callahan finished searching Lumiere's devices, see id. at 9 – Udell alerted the Government that they contained privileged documents and provided a list of more than 80 attorneys with whom Lumiere had communicated. See Email dated April 3, 2014, Ex. A to Udell Decl.

By the time Lumiere's motion was fully submitted, he had articulated three theories allegedly justifying blanket suppression: the Government's purported failure to search the seized devices at all; the Government's purported failure to "segregate" documents within the scope of the warrant from documents outside the scope of

---

[2] The Government was also aware that Lumiere had been in contact with an attorney named Robert Knuts shortly before the warrant was executed, though in what capacity it is unclear. See Email dated February 26, 2014, Ex. A to Supplemental Declaration of Eric M. Creizman, ECF No. 39. However, Agent Callahan testified that he only recalled being aware of Udell. See Transcript dated Oct. 19, 2016, at 30.

5

the warrant; and the Government's purported failure to screen for potentially privileged documents. For the following reasons, however, the Court found these arguments without merit.

First, Lumiere argued that the Government failed to commence and complete its search of the seized devices – i.e., execute the warrant – within a reasonable time.[3] This argument was based on United States v. Metter, an Eastern District decision that held that the Government's 15-month delay in commencing its review of an array of seized devices violated the Fourth Amendment, because the delay was unexplained, and because the Government flouted the court's instructions to review the devices and threatened to give Metter's personal records to all of his co-defendants, thus demonstrating bad faith. See 860 F. Supp. 2d 205, 211-16 (E.D.N.Y. 2012).

Here, Lumiere argued that suppression was required in this case because over 30 months after the devices were seized, the Government had "apparently" still not reviewed them. See Def. Mem. at 16-17; Def. Sur-Reply at 1-2. He inferred that no review had begun because the Government had yet to return, among other items, a brand new device (apparently referring to the Dell Surface, see Def. Reply at 1) that, Lumiere claimed, contained no evidence. However, as became clear at the evidentiary hearing, nothing in this case approaches the extreme circumstances discussed in Metter.

---

[3] Lumiere only made this argument as to the seized devices and conceded that it did not apply to the voluntarily produced devices. See Def. Mem. at 17; Def. Reply at 1.

Specifically, Agent Callahan credibly testified that he promptly began reviewing the bulk of the seized devices after the warrant was executed on February 26, 2014, and had completed his review by the end of March 2014. See Transcript dated Oct. 19, 2016, at 6-9. Metter plainly has no application to these devices, because there was no delay in reviewing them at all, much less a constitutionally unreasonable one. As for the Dell Surface and the two CD-ROM discs, the suppression motion was moot, because the Government never gained access to them in the first place. See Transcript dated Oct. 19, 2016, at 6, 22; Callahan Decl. ¶ 6.

The Apple iPad presented the only arguably close question. As of October 2016, some 30 months after seizing the device and obtaining the password from Lumiere, the Government still had not reviewed its contents. See Transcript dated Oct. 19, 2016, at 5, 22-23. However, following the evidentiary hearing, the Government represented that it did not intend to search the iPad at all, and resolved to return it to Lumiere and destroy its digital copies. See Govt. Post-Hearing Letter at 1. There is therefore no evidence to suppress, so, as with the Dell Surface and the CD-ROM discs, Lumiere's motion is moot as to the Apple iPad.

Moreover, even if the Government had not chosen this course, there was no showing of bad faith on the Government's part, as would be necessary for blanket suppression. See Metter, 860 F. Supp. 2d at 215-16. In general, the Government promptly effected the seizures, searched the devices to which it had access, and returned the ones

7

Lumiere asked for. For example, the Government seized, imaged, searched, and returned Lumiere's mobile phone to him within one day, per his request. See Transcript dated Oct. 19, 2016, at 4-5, 14-15. As for the Apple iPad itself, Agent Callahan credibly testified that he did not search it because the FBI turned to other aspects of the investigation, see id. at 22-25, a complex affair involving several defendants in multiple civil and criminal cases in the Southern District of New York.[4] In short, there is nothing like the pervasive bad faith that led the Metter court to order blanket suppression.

Second, Lumiere argued that the Government violated the Fourth Amendment by failing to "segregate" evidence within the scope of the warrant from evidence outside the scope of the warrant.[5] Lumiere cited no authorities holding that the Fourth Amendment requires anything along those lines for electronic evidence maintained on digital storage devices. Instead, Lumiere relied on United States v. Debbi, which found a Fourth Amendment violation where the Government blatantly seized large volumes of physical records outside the scope of a search warrant, made no effort to separate evidence of crimes from everything else, and refused to return the bulk of the non-responsive materials notwithstanding repeated requests by Debbi and the encouragement of this Court. See 244 F. Supp. 2d 235, 237-38

---

[4] See, e.g., United States v. Plaford, No. 16-cr-400 (Abrams, J.); United States v. Johnston, No. 16-cr-406 (Carter, J.); SEC v. Valvani, No. 16-cv-4512 (Failla, J.).

[5] So framed, this argument could only apply to the seized devices.

8

(S.D.N.Y. 2003). <u>Debbi</u> suppressed all evidence outside the scope of the warrant, ordered its return, and convened an evidentiary hearing to evaluate whether the Government's apparent bad faith warranted blanket suppression. <u>Id.</u> at 238.[6]

As the foregoing sketch suggests, this case is a far cry from <u>Debbi</u>. Nonetheless, Lumiere argued here that the Government violated the Fourth Amendment because even though Agent Callahan conceded that the seized devices contained documents outside the scope of the warrant, he did not follow a formal document review "protocol," did not mark documents "responsive" and "not responsive," and did not otherwise memorialize his findings. <u>See</u> Transcript dated Oct. 19, 2016, at 17-21. That left his non-responsive personal data readily accessible to any member of the investigating team, which, defendant argued, is as much a Fourth Amendment violation in the digital setting as it was in the physical setting in <u>Debbi</u>.

There were several difficulties with defendant's argument, but the Court will focus in this Memorandum on just a few of them. To start with, the Second Circuit recently considered the exact analogy Lumiere relied on – paper files to digital files – and found it wanting. <u>See</u> <u>United States v. Ganias</u>, 824 F.3d 199, 211-21 (2d Cir. 2016) (en banc). Indeed, <u>Ganias</u> acknowledges that meaningful digital segregation may well be impossible. "Though to a user a hard drive

---

[6] Such targeted suppression and return, rather than wholesale suppression, is the typical remedy for overseizure. <u>See</u> <u>United States v. Matias</u>, 836 F.2d 744, 747 (2d Cir. 1988).

9

may seem like a file cabinet, a digital forensics expert reasonably perceives the hard drive simply as a coherent physical storage medium for digital data – data that is interspersed throughout the medium, which itself must be maintained and accessed with care, lest this data be altered or destroyed." Id. at 212 (emphasis in original). This "interspersion . . . may affect the degree to which it is feasible, in a case involving search pursuant to a warrant, to fully extract and segregate responsive data from non-responsive data." Id. at 213. Ganias further suggests, as remedies to privacy concerns like Lumiere's, that defendants can seek the return of seized devices pursuant to Fed. R. Crim. P. 41(g) or can stipulate to certain facts. See id. at 218-19. Lumiere pursued neither course of action. True, this discussion is dicta, but it is instructive nonetheless, and Lumiere's failure to explain why segregating responsive data was even feasible, much less mandatory, is telling.[7]

Lumiere also appeared to fault the Government for not systematically memorializing the results of its review of the evidence. The Court rejected this attempt to constitutionalize

---

[7] Lumiere recognized the existence of Ganias, but not its import. See Def. Post-Hearing Br. at 5. Relying on the fact that the agents in Ganias segregated records to some uncertain extent, Lumiere argued that segregation was mandatory. That badly misread the case. For one thing, the extent to which the Government did in fact segregate records was disputed. Compare Ganias, 824 F.3d at 205-06 & n.12 with id. at 232-33 (Chin, J., dissenting). More importantly, as discussed above, the majority opinion went on to explain that there are serious reasons to doubt that segregation is required in a digital setting.

10

document review procedures. "[I]t is generally left to the discretion of the executing officers to determine the details of how best to proceed with the performance of a search warrant — subject, of course, to the general Fourth Amendment protection against unreasonable searches and seizures." See United States v. Salameh, 54 F. Supp. 2d 236, 277 (S.D.N.Y. 1999). Just how the Government retrieves relevant documents for later use, if it does not memorialize its results, was not explored in detail at the evidentiary hearing. However, Agent Callahan testified that he relied on remembering the locations of particular records, and he noted that agents can instruct forensic examiners to retrieve records they want to review in further detail. See Transcript dated Oct. 19, 2016, at 18. Although arguably a bit perfunctory, those methods did not strike the Court as constitutionally unreasonable.

Unlike in Debbi, moreover, all available evidence showed that the Government executed the warrant in good faith. "[T]he drastic remedy of the suppression of all evidence seized is not justified unless those executing the warrant acted 'in flagrant disregard' of the warrant's terms." United States v. Matias, 836 F.2d 744, 747 (2d Cir. 1988) (emphasis in original) (quoting United States v. Medlin, 798 F.2d 407, 411 (10th Cir. 1986)). "Government agents flagrantly disregard the terms of a warrant so that wholesale suppression is required only when (1) they effect a widespread seizure of items that were not within the scope of the warrant and (2) do not act in

11

good faith." United States v. Shi Yan Liu, 239 F.3d 138, 140 (2d Cir. 2000) (citation and internal quotation marks omitted).

Far from flagrantly disregarding the search warrant, the Government carefully abided by it. The warrant (which Lumiere has never challenged) did not, by its own terms, require the Government to use a search protocol or segregate documents.[8] It merely required agents to review the seized devices for responsive evidence, which had only to be "identified." See Search Warrant ¶¶ 11-12. That is what exactly what Agent Callahan did. See Transcript dated Oct. 19, 2016, at 7, 19 (testifying, inter alia, that Callahan "reviewed the computers and . . . looked at files to determine whether the files were responsive to the search warrant" and "made determinations as to what was responsive and what wasn't"). The warrant also expressly authorized Callahan's methods. Compare Search Warrant ¶ 12 (authorizing agents to "survey[] various file directories or folders and the individual files they contain" and "conduct[] a file-by-file review by 'opening' or reading the first few 'pages' of such files") with Transcript dated Oct. 19, 2016, at 7 (testifying that Callahan "manually [went] through file folders, looking for documents and

---

[8] Lumiere divined a duty to segregate files in the warrant's instructions to "review the seized [Electronically Stored Information] for information and data within the scope of this warrant" and to "evaluate its contents and determine whether the data is responsive to the warrant." See Search Warrant ¶¶ 11-12. The Court was not persuaded. Those are but general instructions to review the seized devices for evidence of the alleged crimes. Nothing in those instructions requires the Government to separate responsive and non-responsive documents, or mark each document, or otherwise record any individual document's import or relevance.

12

other recordings in evidence" and "went through individual file folders one by one").

More broadly, the Government acted in good faith throughout these proceedings. For example, the Government promptly returned seized devices that Lumiere requested without burdening defendant or the Court with motion practice under Fed. R. Crim. P. 41(g). See, e.g., Transcript dated Oct. 19, 2016, at 5, 14-15. Even the saga of the Apple iPad suggests good faith. The Government candidly conceded at the evidentiary hearing that to search it at this late date would require a new search warrant, see id. at 39-40, and chose instead to destroy its digital copies and to promptly make the device available to Lumiere. See Govt. Post-Hearing Letter at 1. This behavior stands in marked contrast to Debbi, where the Government overseized copious amounts of physical records, thereby depriving defendant of their use, and refused multiple requests by Debbi and this Court's direction to return items beyond the scope of the warrant. See 244 F. Supp. 2d at 237-38.

Third, Lumiere sought blanket suppression because the Government adopted no precautions against viewing privileged documents in its search of Lumiere's devices, despite being on notice of attorney-client communications. Unlike the previous arguments, Lumiere sought suppression on these grounds of evidence obtained from both the seized and voluntarily produced devices. Lumiere cited no authorities in support of this argument, however, though the remedy he sought suggested that he had the Fourth

13

Amendment in mind. The Court likewise found no instances in which a court ordered blanket suppression because care was not taken to avoid reviewing privileged documents. Indeed, "[t]he general remedy for violation of the attorney-client privilege is to suppress introduction of the privileged information at trial," see United States v. SDI Future Health, Inc., 464 F. Supp. 2d 1027, 1047 (D. Nev. 2006), not to order wholesale suppression. Lacking more direct authority, the Court evaluated Lumiere's novel argument under the "general touchstone of reasonableness which governs Fourth Amendment analysis," see United States v. Ramirez, 523 U.S. 65, 71 (1998), and found the Government's review reasonable.

Defendant's argument was all but frivolous when applied to the voluntarily produced devices. When Lumiere consented to a search, he agreed not to seek suppression, save only for individual documents subject to the attorney-client privilege. See Consent to Search at 2 (acknowledging that Lumiere's consent to search was made "with the understanding and agreement that he shall assert no claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, or any other federal rule, that any information contained in the Subject Property, or any leads therefrom, should be suppressed, except to the extent that the Subject Property contains information subject to the protections of the attorney-client privilege"). Lumiere did not argue that his consent was involuntary or otherwise defective. Accordingly, the Government's search of the produced devices was reasonable, so blanket suppression was denied.

Lumiere's argument as to the seized devices had more to recommend it, but it ultimately fared no better. As a preliminary matter, one obvious predicate to this argument was the existence of documents subject to the attorney-client privilege. As noted above, Lumiere submitted several documents for the Court's in camera review, and the Court agreed that many of them are arguably privileged. Defendant submitted, for example, audio recordings of discussions he had with individuals purporting to be attorneys in which they discussed legal issues relevant to this case, as well as emails of a similar nature. However, Lumiere could not state with any confidence that these documents were found on the seized devices, and admitted that some of them were likely found on the voluntarily produced devices. See Def. Privilege Letter at 2. The Court nonetheless assumed for the sake of argument that the seized devices contained some arguably privileged materials.

Even so, the Government's review was reasonable. It is true that Agent Callahan employed no special procedures to avoid viewing potentially privileged documents. See Transcript dated Oct. 19, 2016, at 30. However, at the time he reviewed the seized devices, Agent Callahan was only aware of one attorney representing defendant, Jeffrey Udell, see id., and so was not in a position to do more than keep an eye out for Udell's name. More generally, the Government completed its review of the seized devices before being alerted to the fact that they might contain significant numbers of privileged documents. In particular, although Lumiere placed great

15

weight on Udell's April 3, 2014 email informing the Government that Lumiere's devices might contain privileged communications with some 80 lawyers, by that point Agent Callahan had already completed reviewing the seized devices. See April 3, 2014 email at 2-4; Transcript dated Oct. 19, 2016, at 6-9. Nor has Agent Callahan revisited the electronic evidence since that time. See Transcript dated Oct. 19, 2016, at 9. This after-the-fact notice of potentially privileged documents did not render the Government's earlier search unreasonable.[9]

In any event, the Court saw nothing that caused it to doubt the Government's good faith. See Shi Yan Liu, 239 F.3d at 140. Much like the phantom segregation "requirement" rejected above, the warrant mandated no special procedures for avoiding privileged documents. Agent Callahan's review was therefore consistent with the warrant, see Matias, 836 F.2d at 747-48, and as the Court has now mentioned several times, the evidence showed that the Government has acted in good faith throughout this case.

---

[9] That said, the Government's position that its warrant execution was constitutionally sound is in some tension with its assertion that it is not aware of any privileged documents. See, e.g., Govt. Post-Hearing Br. at 4. One would expect that a reasonable review of the evidence would detect some privileged documents if there are as many as defendant suggests. However, the Government's review need only be reasonable, not perfect, and law enforcement is given significant latitude in determining how to execute a warrant. See Salameh, 54 F. Supp. 2d at 277. Moreover, at most Lumiere showed that a small number of the approximately 25 million documents in the Government's production are arguably privileged. Thus, although it is conceivable that the Government's professed ignorance could suggest unreasonable warrant execution on some set of facts, no such proof was offered here.

16

Finally, Lumiere made two subsidiary requests that the Court will briefly address. First, because Lumiere had been unable to complete his review of the 25 million documents the Government produced to him, he requested that the Court not treat his failure to assert privilege as waived. See Def. Post-Hearing Br. at 9-10. This request was granted in the bottom-line order. The Court notes, however, that although many of the documents Lumiere submitted for in camera review appear arguably privileged, he has not yet met his burden of proving as much. See United States v. Stern, 511 F.2d 1364, 1367 (2d Cir. 1975) ("The burden of establishing the existence of an attorney-client relationship rests on the claimant of the privilege."). The Court's denial of suppression was therefore without prejudice to Lumiere's assertion of the attorney-client privilege or work product doctrine as to individual documents on a motion in limine or at trial.[10]

Defendant also asked the Court to require the Government to state whether it relied on certain purportedly privileged documents bearing Lumiere's "annotations" in presenting this case to a grand jury. See Def. Post-Hearing Br. at 9. These documents, which the Court reviewed in camera, do indeed bear someone's handwritten notes

---

[10] The Government stated that it will confer with defense counsel and use a "wall" protocol if it becomes aware of privileged documents, see Govt. Post-Hearing Br. at 4, which may well moot this issue entirely. See United States v. Longo, 70 F. Supp. 2d 225, 265 (W.D.N.Y. 1999) (finding suppression motion moot because "the Government represents that it does not intend to introduce any information protected by the attorney-client privilege at trial").

17

and appear to relate to the potential mismarking of securities. Nonetheless, the Court denied this request. Lumiere identified no legal basis for employing this procedure, had no reason to believe the Government relied on these documents, and had not even established that they are privileged.

For the foregoing reasons, the Court denied defendant's motion to suppress, but without prejudice to defendant's future assertion of privilege as to individual documents. The parties are reminded that the trial of this case will commence at 9:00 A.M. on January 9, 2017.

Dated: New York, NY
       November 28, 2016

JED S. RAKOFF, U.S.D.J.