# EXHIBIT A

# CREIZMAN LLC

565 Fifth Avenue  7th Floor
New York, New York 10017
tel: (212) 972-0200
fax: (646) 200-5022
ecreiz@creizmanllc.com
www.creizmanllc.com

*By Email*

December 15, 2016

Ian McGinley, Esq.
Damian Williams, Esq.
Joshua Naftalis, Esq.
Assistant United States Attorneys
United States Attorney's Office for the
 Southern District of New York
1 St. Andrew's Plaza
New York, New York 10007

**Re:** *United States v. Lumiere,* **16-CR-769 (JSR)**

Dear Messrs. McGinley, Williams, and Naftalis:

We are writing to advise you that Mr. Lumiere may call David Tawil to testify at trial as an expert witness. This disclosure is being made pursuant to Rule 16(b)(1)(C) of the Federal Rules of Criminal Procedure.

Mr. Tawil is the president and co-founder of Maglan Capital, a hedge fund focused on event-driven investments. A copy of his resume is attached to this letter. Prior to starting Maglan Capital, Mr. Tawil was an associate at Skadden, Arps, Slate, Meagher & Flom, an associate at Davis Polk & Wardwell, and a Director of Leveraged Finance; Distressed Sales and Trading at Credit Suisse. Mr. Tawil has previously testified as an expert and summary witness in the District of Massachusetts in a case captioned *United States v. Amit Kanodia, et al.*, 15-CR-10131(NMG).

Mr. Tawil is expected to define terms including, but not limited to "Earnings Before Interest, Taxes, Depreciation and Amortization" ("EBITDA"), "Fair Value" as set forth in FASB 157 and Topic 820, "hedge fund," "security," "credit fund," "distressed debt," "Net Asset Value ("NAV")," "indicative quote," "broker quote," "market price," "TRACE," "big-boy letter," "liquidation," "going concern," and bonds.

Mr. Tawil is expected to describe corporate distressed debt investing, and discuss that the term typically refers to an investor purchasing debt securities at a discounted price to what the investor believes is the net present value of the recovery. In distressed debt investing, purchasers of distressed debt securities may believe that the purported risks or concerns associated with repayment of the debt are overstated. Alternatively, distressed debt investors might believe that the company has a value which is worth more than the then-current total trading value of the company's debt, by means of a going concern or a liquidation.

NEW YORK          WHITE PLAINS

Mr. Tawil is also expected to testify about the possibility of differing views among market participants as to accurate values for the same distressed security due to a particular market participant's greater access to information about the debtor company due to its position on a steering or creditors' committee, its larger holdings of the company's debt relative to other market participants, or preferential rights to the debtor company's assets in a bankruptcy proceeding due to its position on the steering committee and contributing sweat equity as well as investing additional monies or promising to invest certain monies to assist the company during the turnaround.

Mr. Tawil is also expected to testify that a hedge fund has an obligation to its investors to state a fair value for each security in which the fund invests. And, given the potential for thinly and infrequently traded markets in distressed securities, a distressed debt investor may need to utilize a number of observable inputs to establish "fair value," including broker quotes and company-specific information. Mr. Tawil is expected to testify about subscription pricing services such as Bloomberg, TRACE, Markit, and Reuters and how their pricing data are typically derived.

Mr. Tawil is also expected to testify about the meaning and differences between the terms "broker quotes," "levels," "indications," "market quotes," and "marks." The terms "broker quotes," "levels," and "indications" are generally non-binding indications of where the broker feels he or she can find a buyer and seller, usually in a price range. In contrast, a "market quote" is typically actionable and implies the price at which the broker-dealer is willing to buy and sell a certain amount of a security.

Mr. Tawil is also expected to testify about the general practice and different purposes for hedge funds to request broker quotes. He is also expected to testify about the difficulties that smaller funds face when trying to obtain end-of-month or year-end quotes from a large broker-dealer. He is also likely to testify about whether and in what circumstances larger or smaller broker-dealers are likely to have accurate quotes on given securities. Here, Mr. Tawil will likely opine that many of the securities that are at issue in this case were smaller names handled by small brokerage firms. Mr. Tawil will further testify that smaller brokerage firms that actually trade in illiquid securities are in a better position than a larger broker-dealer to provide an accurate valuation or fair value of the security.

Mr. Tawil is also expected to testify about the process of classifying a security as Level 1, 2, or 3. Mr. Tawil is expected to testify that the responsibility for this classification lies solely with the fund itself, the administrator, and the fund auditor, and would never be discussed with a broker providing an indication. Mr. Tawil will also discuss that the Levels are a classification system which measure the liquidity of any given security, corresponding to the Input Levels identified under FAB 157, Accounting Standards Codification, Topic 820 ("ASC 820"). Level 1 securities are easy to classify and include listed stocks that have an exact price and trade regularly (e.g. Apple stock). Level 3 securities are also fairly easy to classify and involve opaque securities which are never traded and the value of which must be determined on unobservable inputs, based on a valuation model. Level 2 includes all other securities. Mr. Tawil is expected to

Ian McGinley, Joshua Naftalis, and Damian Williams, Esqs.
December 14, 2016
Page 3

opine that all remaining securities—even bonds that trade infrequently—would qualify as a Level 2 asset. A debt security could fall anywhere on the range between Level 1 and 3.

Mr. Tawil is expected to testify regarding general practices at large hedge funds as well as the role of the CFO, the operational staff, the administrator, the prime broker, the valuation committee, the executive committee, the compliance department, auditors, and internal and external legal counsel to the fund.

Very truly yours,

Eric M. Creizman
Melissa Madrigal

Enclosure (CV of David D. Tawil)

# DAVID D. TAWIL

87 Wickapecko Drive, Ocean, NJ 07712
(646) 479-9387
ddtawil@gmail.com

## EXPERIENCE

**Maglan Capital** *President and Co-Founder*; 2009-Present
- President and Co-Founder of an event-driven, distressed-focused hedge fund with a core emphasis on identifying investments (equity and debt) in corporations approaching or in bankruptcy, restructuring and other value-unlocking events
  - Concentrated portfolio of investments in small- and medium-cap companies, with a 2-3 year investment horizon with "active" involvement with management teams and Boards of Directors of subject investments, advocating for various corporate activities, ranging from balance-sheet and corporate finance optimization to operational corporate transactions

**Credit Suisse** *Director; Leveraged Finance/Distressed Sales & Trading*; 2005-2009
- Co-product founder and head of and of *trade-receivables hedging product*; responsibilities included sourcing, sales and marketing , credit evaluation, trading and hedging, documentation and closing
- Managed sourcing and sales, evaluating and investing-in alternative distressed assets. Initiated and developed over 1000 contacts in finance function (CFO, Treasurer, VP of Finance) across numerous industries (automotive, building, chemicals, metals, packaging, print, retail, technology)
- Directly responsible for a $150MM+ portfolio of high-yield and distressed investments generating average greater than 20% return on capital for four years in a row

**Davis Polk & Wardwell** *Associate; Insolvency & Restructuring*; 2001- 2005
- Advised distressed-debt investors on various credits and default-related issues
- Represented lenders in numerous in- and out-of court restructuring transactions and proceedings
- Advised major investment banks on purchase of distressed credits
- Prepared debtors for bankruptcy filing; designed and drafted plans of reorganization; negotiated and drafted documents relating to financing; negotiated and drafted documents relating to mergers and acquisitions by competitors and financial buyers; directed debtors toward and consummated reorganization and emergence from bankruptcy on stand-alone basis
- Formulated and created unique bankruptcy-remote settlement vehicles and bankruptcy-remote indemnity vehicles

**Skadden, Arps, Slate, Meagher & Flom** *Associate; Corporate Restructuring*; 1999-2001, Summer Associate; 1998

**Honorable Frank X. Altimari**, *2nd Circuit US Court of Appeals; Judicial Intern*; Summer 1997

## EDUCATION

**University of Michigan Law School**
Juris Doctor May 1999
  *Michigan Law Review;* Editor 1997-99
  **University College London Bentham School of Laws**, London, England, Fall 1998

**Yeshiva University/Sy Syms School of Business**
Bachelor of Science *magna cum laude* in Business Management, January 1996