H1CPLUM1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,              New York, N.Y.

           v.                          16 Cr. 483(JSR)

STEFAN LUMIERE,

              Defendant.
------------------------------x
                                       January 12, 2017
                                       9:22 a.m.

Before:

                    HON. JED S. RAKOFF,

                                          District Judge


                         APPEARANCES

PREET BHARARA
      United States Attorney for the
      Southern District of New York
BY:   JOSHUA A. NAFTALIS
      P. IAN McGINLEY
      DAMIAN WILLIAMS
      Assistant United States Attorneys


CREIZMAN, LLC
      Attorneys for Defendant
BY:   ERIC M. CREIZMAN
      MELISSA MADRIGAL
      AMANDA C. SHOFFEL



ALSO PRESENT:

HOLLY MEISTER, Paralegal, U.S. Attorney's Office

SARAH PYUN, Paralegal, U.S. Attorney's Office

JONATHAN MICHAELSON, Paralegal, Creizman, LLC

MATTHEW CALLAHAN, F.B.I.

H1CPLUM1

1          (Trial resumed; jury not present)

2          (Case called)

3          THE DEPUTY CLERK:  May I bring in the jury?

4          THE COURT:  Please.  Please be seated.  Good morning.

5      Mr. Naftalis, I remind you that you have 20 minutes

6   left with this witness.

7          MR. NAFTALIS:  Yes, your Honor.

8          THE COURT:  So I thank defense counsel for his

9   submission at 2:00 a.m. this morning.  It was a pleasure to

10  receive it, and we'll talk about it after we're finished with

11  this witness.

12         MR. NAFTALIS:  Your Honor, I don't think I received a

13  copy of that.

14         THE COURT:  Excuse me?  No, you were not copied, but I

15  told my law clerk to send it to you this morning; so you now

16  have a hard copy.  But defense counsel should have copied the

17  government.

18         MR. CREIZMAN:  Yes, I actually thought that I did.

19         THE COURT:  No.

20         MR. CREIZMAN:  That is an oversight, obviously.  I

21  didn't intend it to be an ex parte.

22         THE COURT:  No, it's not an ex parte submission.

23         MR. CREIZMAN:  Sorry about that.

24         THE COURT:  Anyway, I know that it's very difficult

25  for any of the six people at government counsel table to tear

H1CPLUM1                          Keily - Direct

1   themselves away from the trial, but if one would just go and

2   retrieve it, since my clerk did send it to you this morning.

3          (Jury present)

4          THE COURT:  Please be seated.  Good morning, ladies

5   and gentlemen, and thank you so much for your promptness.  We

6   are ready to continue.  Mr. Naftalis.

7          MR. NAFTALIS:  Thank you, your Honor.

8    DAVID KEILY,

9       called as a witness by the Government,

10      having been previously duly sworn, testified as follows:

11  DIRECT EXAMINATION (Resumed)

12  BY MR. NAFTALIS:

13  Q.  Mr. Keily, can you remind the jury who Jason Thorell is?

14  A.  Jason Thorell was a credit trader at Visium Asset

15  Management.

16  Q.  Under Visium's compliance policies, was Mr. Thorell

17  supposed to have a role in the valuation of securities?

18  A.  The compliance policy that we discussed and reviewed

19  yesterday provided that the trading function would have a role

20  in the valuation policies and procedures -- well, let me

21  rephrase that.  It provided that the calculation and

22  verification of prices should be independent of the trading

23  function, to the extent practicable.

24  Q.  I believe you testified that that meant that their

25  involvement should be exceptional?

H1CPLUM1                          Keily - Direct

1    A.  Yes.  I would say that the general principle, the general

2    rule is that the calculation and verification of prices should

3    not involve the trading function except in exceptional

4    circumstances.

5    Q.  Let me direct your attention to late June 2013.  Did there

6    come a time when you spoke to Mr. Thorell?

7    A.  Yes.

8              MR. NAFTALIS:  Your Honor, with your permission, I'm

9    going to lead a little bit, given the nature of the witness?

10             THE COURT:  Go ahead.

11   Q.  Did there come a time when Mr. Thorell raised certain

12   concerns about Visium's valuation practices with you?

13   A.  I'm concerned here about the attorney-client privilege.

14   Q.  Did there come a time when Mr. Thorell raised issues

15   regarding the valuation of securities at Visium?

16   A.  Yes.

17   Q.  Did you speak to Mr. Thorell once or on more than one

18   occasion?

19   A.  On more than one occasion.

20   Q.  This first conversation was in late June, you testified?

21   A.  Yes.

22   Q.  Did there come a time when you spoke to Mr. Thorell again?

23   A.  Yes.

24   Q.  When was that?

25   A.  That was at a meeting with Mr. Thorell, Steven Ku, my boss

1    and the CFO of Visium, and myself.

2    Q.  When was that meeting?

3    A.  I don't remember the exact date, but it was in late June or

4    early July of 2013.

5    Q.  After that meeting, what, if anything, was done with

6    respect to Mr. Thorell's involvement in the valuation of

7    securities in the credit fund?

8    A.  After the meeting in early July, nothing was done.

9    Q.  Did there come a time when you spoke with Mr. Thorell

10   again?

11   A.  Yes.

12   Q.  When was that?

13   A.  That was on July 31st of 2013.

14   Q.  Who was present for that meeting?

15   A.  Just he and I were present.

16   Q.  After that meeting, what, if anything, was done with

17   respect to Mr. Thorell's involvement in the valuation of

18   securities in the credit fund?

19   A.  I believe that there was a subsequent meeting between

20   Mr. Thorell and Mr. Ku that occurred on August the 1st.

21   Q.  And after that, what happened?

22   A.  After that meeting, Mr. Thorell was no longer involved in

23   any aspect of the valuation policies and procedures at Visium.

24   Q.  And specifically, what was he no longer doing?

25   A.  Specifically, he was no longer in a position where he was

H1CPLUM1                        Keily - Direct

1   being asked by Chris Plaford to take an e-mail that was sent by

2   Mr. Plaford to him with valuation information on it, to copy

3   the contents of that e-mail onto a new e-mail which would go

4   from Mr. Thorell to Visium's operations department.

5   Q.  And what was the general role of the operations department

6   in the valuation of securities?

7   A.  The operations department had a role in the interim pricing

8   of securities at the end of a month and the beginning of the

9   new month, in other words, before the final valuation of those

10  securities was established.

11  Q.  Okay.  Was this e-mail sent to them for the purpose of

12  valuing securities?

13  A.  I'm not sure that I'm competent to comment on what the

14  purpose of that e-mail was.

15  Q.  Now, in 2013 you testified that Visium shut down the credit

16  fund?

17  A.  In 2013, in April of 2013, Visium informed the investors in

18  the credit fund that Visium would begin to liquidate the

19  positions in the credit fund.  It also informed investors that

20  it had received a substantial amount of redemptions from

21  investors.

22        Those redemptions continued into the summer of 2013,

23  and by September of 2013, Visium had liquidated all liquid

24  assets in the fund and all, but approximately five, investors

25  had redeemed from the fund.

1              So in October of 2013, Visium proceeded to, what is

2    called, compulsorily redeem the remaining investors in the fund

3    so that there remained no longer any investors in the fund, and

4    essentially they became creditors of the fund for the balance

5    of their investment, which would be paid to them once the

6    illiquid assets remaining in the fund could be liquidated.

7    Q.  Do you recall which of these illiquid assets remained with

8    Visium?

9    A.  I can recall, offhand, the two most significant ones were a

10   company called ATI and its affiliates and another company

11   called China Medical, which is often referred to in this

12   proceedings by C-Med or C-M-E-D, which is the ticker name for

13   the company.

14   Q.  To your understanding, who was in charge of Visium's

15   investment in ATI?

16   A.  Mr. Lumiere.

17   Q.  Was Visium ultimately able to sell its positions in ATI?

18   A.  Yes.

19   Q.  When?

20   A.  December of 2016.

21   Q.  So approximately three years after the credit fund

22   liquidated?

23   A.  That's correct.

24   Q.  How much did Visium sell those positions for?

25   A.  My understanding was that the sales price was $2 million.

H1CPLUM1                            Keily - Direct

1    Q.  Did Visium make money on that position?

2    A.  No.

3    Q.  Did it lose money?

4    A.  Yes.

5    Q.  A lot or a little?

6    A.  A lot.

7    Q.  Has Visium been able to sell C-Med?

8    A.  No.

9    Q.  Did there come a time when Mr. Thorell left Visium?

10   A.  Yes.

11   Q.  Approximately when?

12   A.  In November 2013.

13   Q.  And why did he leave?

14   A.  With the liquidation of most of the positions in the credit

15   fund and the remaining positions no longer being easily

16   tradeable or transferable, there was considered to be no need

17   for several employees on the credit team, including a credit

18   trader.  And in those circumstances, Mr. Thorell and three

19   other individuals on the credit team were terminated.

20          MR. NAFTALIS:  One second, your Honor.

21          THE COURT:  Yes.

22          MR. NAFTALIS:  Your Honor, we have no further

23   questions.

24          THE COURT:  Cross-examination.

25          MR. CREIZMAN:  Thank you, your Honor.

H1CPLUM1                    Keily - Cross

1    CROSS-EXAMINATION

2    BY MR. CREIZMAN:

3    Q.  Good morning.

4    A.  Good morning.

5    Q.  When you started at Visium as chief compliance officer, you

6    described it as being in the early childhood phase; is that

7    correct?

8    A.  I believe I testified that Visium's compliance program was,

9    yes, in the nascent, were in the early childhood phase.

10   Q.  And that was in 2011, correct?

11   A.  Yes.

12   Q.  July 2011?

13   A.  Yes.

14   Q.  You were in charge of all of the compliance functions at

15   Visium?

16   A.  Yes.

17   Q.  And compliance requires or includes enforcing the U.S.

18   securities laws, correct?

19   A.  No, it doesn't require enforcing the U.S. securities laws.

20   It requires administering policies and procedures that are

21   reasonably designed to prevent violations of federal securities

22   laws.

23   Q.  So it includes enforcing and administering and crafting,

24   fair to say, policies and procedure to ensure compliance with

25   U.S. securities laws?

1    A.  Yes.

2    Q.  It's also compliance's function to ensure compliance with

3    those policies, true?

4    A.  It's the responsibility of the compliance department to do

5    what it reasonably can to ensure compliance with compliance

6    policies and procedures.

7    Q.  When you say "reasonably can," meaning what it's permitted

8    to do by management?

9    A.  "Reasonably" means what any human, given 24 hours in a day

10   and 7 days in a week, can accomplish.

11   Q.  No other department at Visium is tasked with the job of

12   enforcing compliance policies; is that fair to say?

13   A.  I think it's fair to say that there were other individuals

14   that had supervisory responsibilities for Visium.  It's the

15   case that I, as chief compliance officer, reported to an

16   executive committee of three individuals, who were responsible

17   for the governance of the fund and who ultimately had

18   supervisory responsibility for Visium's compliance with federal

19   securities laws and procedures.

20   Q.  Can we try breaking that down?  You were responsible, as

21   chief compliance officer, for enforcing compliance policies,

22   correct?

23   A.  On a day-to-day basis, yes.

24   Q.  And your supervisors were also tasked with that

25   requirement, yes?

H1CPLUM1                         Keily - Cross

1   A.  The supervisors had ultimate responsibility for the firm's

2   compliance with federal securities laws and procedures and

3   regulations.

4   Q.  Did they have more responsibility than you did?

5   A.  Yes, they did.

6   Q.  So, ultimately, if you're not given the ability to enforce

7   a particular compliance policy, that is the responsibility of

8   your supervisors; is that accurate?

9   A.  Yes.

10  Q.  Compliance is also tasked with providing guidance to

11  Visium's personnel; is that right?

12  A.  Yes.

13  Q.  And that includes its portfolio managers?

14  A.  Yes.

15  Q.  And its research analysts?

16  A.  Yes.

17  Q.  And traders?

18  A.  Yes.

19  Q.  You, as of July 2011, had no visibility into the processes

20  of the valuation committee; is that correct?

21  A.  Yes.

22  Q.  You didn't know precisely how they came up with prices; is

23  that right?

24  A.  No, I did not.

25  Q.  And you didn't know how they determined various data inputs

1   in coming up with prices to represent to Visium's investors,

2   correct?

3   A.  In July 2011, no, I did not.

4   Q.  As of June of 2013, you still did not have any visibility

5   into Visium's valuation committee; is that correct?

6   A.  That's correct.

7   Q.  And you still didn't know, in July 2013, how Visium's

8   valuation committee came up with its prices, correct?

9   A.  That's correct.

10  Q.  And you still didn't know how Visium's valuation committee

11  determined how to represent the prices of its securities to its

12  investors; is that correct?

13  A.  Let me just add a couple of things here.  First of all,

14  beginning in the first quarter of 2013, the compliance

15  department did see minutes of the valuation committee.  We saw

16  those minutes after those meetings had already occurred; so it

17  would not be a fair statement to say that we had no visibility

18  or no transparency.

19          Your question, would you repeat that, please.

20  Q.  Did you have transparency in how the valuation committee

21  arrived at its prices that they represented to Visium's

22  investors?

23  A.  Other than a review of the minutes of the valuation

24  committee meetings, no.

25  Q.  Now, you wanted more visibility into the valuation process,

1   did you not?

2   A.  Yes.

3   Q.  But you were blocked in that attempt, correct?

4   A.  Yes.

5   Q.  I mean, you asked to be on the valuation committee; is that

6   right?

7   A.  That's correct.

8   Q.  And you asked about transparency, correct?

9   A.  Yes.

10  Q.  Was it Stefan Lumiere who blocked your access to the

11  valuation committee?

12  A.  No.

13  Q.  Was Stefan Lumiere, to your knowledge, on the valuation

14  committee?

15  A.  No, he was not.

16  Q.  Was Stefan Lumiere ever invited to speak to the valuation

17  committee?

18  A.  I have no knowledge on that score.  I did not attend the

19  meetings, and I don't know who was present at those meetings

20  other than through the minutes that I received with respect to

21  meetings that occurred in 2013.

22  Q.  Now, it's your job also, and it's the job of the compliance

23  department, to guide and educate Visium's employees with

24  respect to its policies, correct?

25  A.  Yes.

H1CPLUM1                          Keily - Cross

1  Q.  The compliance department at Visium provided such guidance

2  to Visium's employees between the time that you started and,

3  say, July 2013, correct?

4  A.  Yes.

5  Q.  During that time period, you provided guidance on a number

6  of different factors, areas, policies --

7  A.  Yes.

8  Q.  -- correct?  Did you provide guidance, though, on valuation

9  practices and policies?

10  A.  Without reviewing the educational materials that we

11  provided to employees and in the course of compliance training,

12  I can't say whether we did or did not.

13  Q.  You never told anyone on the credit desk about which kind

14  of brokers to approach for quotes; is that correct?

15  A.  That's correct.

16  Q.  You never talked to analysts on the credit desk about what

17  kind of broker quote you need to get; is that correct?

18  A.  That's correct.

19  Q.  You never told people on the compliance desk whether to get

20  an indicative quote or a quote that represents what someone

21  would actually pay for in a transaction in the market; is that

22  correct?

23  A.  I believe, sir, that you misspoke.  You referred to the

24  compliance desk.

25  Q.  Sorry.  The credit desk.

H1CPLUM1                        Keily - Cross

1    A.   Could you rephrase the question, please?

2    Q.   Absolutely.

3              There was never any compliance instruction to the

4    people on the credit desk as to what kind of broker quote to

5    obtain, in terms of whether it would be an indicative quote or

6    one that would be representative of an actual purchase and sale

7    in the marketplace; is that correct?

8    A.   That's correct.

9    Q.   There was never any education to any analysts on the credit

10   desk about what one could talk to brokers about during

11   conversations in obtaining quotes, and what one couldn't talk

12   to brokers about during conversations in obtaining broker

13   quotes?

14   A.   That's correct.

15   Q.   So for example, the compliance department never provided

16   any advice or education to anyone on the credit desk about

17   whether it would be permissible to educate a broker about where

18   the credit desk believed the price of a particular security in

19   its portfolio was?

20   A.   We did not address that issue.  However, we emphasized very

21   strongly that every employee at Visium had a fiduciary duty to

22   put the interests of the firm's clients ahead of his own

23   interest.

24   Q.   You have no reason to believe, at the time between

25   July 2011 and July 2013, that anyone on the credit desk wasn't

1    honoring its fiduciary obligation to Visium's investors in that

2    regard, correct?

3    A.  I think that's a very broad statement.

4    Q.  How about with respect to valuation?

5    A.  I think it would be fair to state that I had no idea that

6    what is alleged in the indictment in this matter was allegedly

7    happening.

8    Q.  We can agree that it's a fiduciary obligation of someone on

9    the credit desk, the portfolio manager of the credit desk, to

10   ensure that the prices represented to investors are accurate,

11   correct?

12   A.  Everyone involved in the valuation process at Visium had a

13   fiduciary duty to ensure the accuracy of prices.

14   Q.  And that not only goes for being overvalued but also

15   undervalued, correct?

16   A.  Yes.

17   Q.  Because a fiduciary duty to investors would implicate the

18   requirement to make sure that securities are priced accurately,

19   correct?

20   A.  Yes.

21   Q.  If securities are undervalued, that may also harm Visium's

22   investors, correct?

23   A.  Yes.

24   Q.  Are you familiar with the securities that the credit fund

25   purchased and sold?

130

H1CPLUM1                         Keily - Cross

1   A.  I'm familiar with some of those securities, yes.

2   Q.  You are aware that those securities were not frequently

3   traded, fair to say?

4   A.  I'm aware that some securities that were in the credit

5   fund's portfolio were not frequently traded, yes.

6   Q.  So in many instances, it was difficult for people to

7   determine what the fair value of a security was, correct?

8   A.  I think the answer here is that in some instances, if we're

9   talking about very illiquid securities, those would be more

10  difficult, practically by definition, to value than very

11  liquid, Level 1 securities.

12  Q.  Absolutely.  So the credit fund had lots of Level 2 and

13  Level 3 securities, correct?

14  A.  I don't know what you mean by "lots of," but, yes, it had

15  Level 2 and Level 3 securities.

16  Q.  It had a reasonable amount, substantial amount of its

17  portfolio was Level 2 and Level 3 securities; does that help?

18  A.  I --

19          MR. NAFTALIS:  Objection, your Honor.  Can we get a

20  time frame?

21          THE COURT:  Yes.

22  Q.  Well, right now, let's operate between July 2011 and

23  July 2013, if that's okay.

24          MR. NAFTALIS:  Objection, your Honor.  I think we need

25  more specificity and some foundation.

H1CPLUM1                        Keily - Cross

1              THE COURT:  Excuse me?

2              MR. NAFTALIS:  And some foundation.

3              THE COURT:  Overruled on specificity.  Sustained on

4    foundation.

5    BY MR. CREIZMAN:

6    Q.  The prosecutor yesterday asked you questions about the

7    kinds of securities in the credit fund; is that correct?

8    A.  Yes.

9    Q.  You were asked whether those securities were liquid or

10   illiquid; is that fair to say?

11   A.  He asked me what kinds of securities, as I recall, were in

12   the credit fund, and I was also asked, as I recall, to explain

13   the classification system in ASA 820 of securities in an

14   investment portfolio.

15   Q.  You had knowledge.  You were able to speak to those

16   questions with knowledge because of the position you were in at

17   Visium, correct?

18   A.  Yes, and through years of industry experience, yes.

19   Q.  So my question to you is simply a general one.  It's the

20   nature of investing in a credit fund investing, to invest in

21   corporate debt; we can agree on that, yes?

22   A.  To invest in corporate debt?

23   Q.  Yes.

24   A.  Yes.

25   Q.  Corporate debt, let's say 20 to 30 percent, at the very

H1CPLUM1                           Keily - Cross

1    least, of the credit fund's portfolio, if you know, was --

2                MR. NAFTALIS:  Objection.

3                THE COURT:  Well, he hasn't finished the question.

4    Q.  -- was Level 2 or Level 3 securities, correct?

5                THE COURT:  You now --

6                MR. NAFTALIS:  Objection.

7                THE COURT:  Overruled.  Do you know?  Just answer my

8    question.  Do you know, yes or no?

9                THE WITNESS:  The question --

10               THE COURT:  No, the question is, do you know whether

11   20 or 30 percent, at least, of the portfolio was corporate debt

12   securities?  Do you know that, yes or no?

13               THE WITNESS:  No.

14               THE COURT:  Go to another question.

15   BY MR. CREIZMAN:

16   Q.  Okay.  You don't know whether the majority of securities in

17   the credit fund portfolio were Level 2 assets or Level 3 assets

18   at any given time between June 2011 and July 2013?

19   A.  We would have to speak, first of all, about a particular

20   point in time.

21   Q.  Okay.

22   A.  I think it's impossible to generalize about the holdings of

23   the credit fund over a two-year period.

24   Q.  Okay.  All right.  Well, then let's talk about a specific

25   point in time.  You understand that at some point in, let's

H1CPLUM1                          Keily - Cross

1   say, July of 2013, you understood that Mr. Thorell would send

2   e-mails to accounting and operations, correct?

3   A.  My understanding was that he would send e-mails to the

4   operations department.

5   Q.  The nature of those e-mails included the pricing for the

6   securities in the credit fund, correct?

7   A.  It included, as I recall, the pricing for some securities

8   in the credit fund.

9   Q.  The pricing for some securities in the credit fund.  Those

10  some securities were securities where the portfolio manager's

11  view differed from that of the administrator's view of the

12  pricing, correct?

13  A.  As I later came to understand how the valuation policies

14  and procedures were being implemented at Visium, that was the

15  conclusion that I reached, yes.

16  Q.  Okay.  The answer, to your knowledge, then, is yes on that

17  question?

18  A.  Yes.

19  Q.  Okay.  So is it fair to say that as late as July 2013, your

20  sole source of information about how the valuation committee

21  arrived at prices for its investors was from Steven Ku; is that

22  fair to say?

23  A.  That would be fair to say with this important caveat, which

24  is that, as I mentioned earlier, the compliance department did

25  begin to receive minutes of the meeting of the valuation

1    committee beginning in, I believe, with respect to the first

2    quarter of 2013 and subsequently.

3              I should also mention that when the Securities and

4    Exchange Commission wanted examples of minutes of the valuation

5    committee, those were also turned over to the SEC in 2012.

6    Q.  Okay.  So in addition to the valuation committee minutes

7    that you received, Steve Ku, your boss, was the main source of

8    information about how the valuation committee arrived at

9    prices; is that correct?

10   A.  Yes.

11   Q.  Now, that remained the case in July 2013; is that right?  I

12   wasn't clear?

13   A.  Yes.

14   Q.  Now, Stefan Lumiere left Visium in April 2013; is that

15   right?

16   A.  Yes.

17   Q.  Now, as of August 2013, it was your understanding that

18   broker quotes, in and of themselves, did not ultimately

19   determine the prices that were represented to investors; is

20   that fair to say?

21              MR. NAFTALIS:  Objection, your Honor.

22              THE COURT:  Grounds?

23              MR. NAFTALIS:  Foundation and form, your Honor.

24              THE COURT:  Sustained as to form.

25   BY MR. CREIZMAN:

H1CPLUM1                        Keily - Cross

1    Q.  Mr. Ku, did he ever tell you about how securities prices

2    were arrived at?

3              MR. NAFTALIS:  Objection, your Honor.

4              THE COURT:  Sustained.

5    Q.  Did you have an understanding of how securities prices were

6    arrived at?

7    A.  At what period of time?

8    Q.  In August of 2013.

9    A.  Yes, I had a certain understanding as of that month.

10   Q.  In August of 2013, was it your understanding that broker

11   quotes, in and of themselves, did not, in and of themselves,

12   determine the prices that were represented to investors?

13             MR. NAFTALIS:  Objection, your Honor.  Same

14   objections.

15             MR. CREIZMAN:  I'm asking his understanding.  I

16   don't...

17             THE COURT:  Yes, the door was opened to this.

18   Otherwise, I would have to sustain a relevancy objection.

19             What was your understanding at that time of how the

20   prices were arrived at?

21             THE WITNESS:  The process by which prices were arrived

22   at was somewhat complicated, but my understanding at that time

23   was that a broker quote, without verification and confirmation

24   by the accounting department, would not be considered basis for

25   a final valuation of that security, which was the subject of

1   the broker quote.

2              THE COURT:  Okay.  Move on.

3   BY MR. CREIZMAN:

4   Q.  So the broker quote was one of several data points, fair to

5   say?

6   A.  I think we would have to speak more specifically on a

7   security-by-security basis.

8   Q.  Okay.

9   A.  My point, sir, was that a mere broker quote, without

10  verification that it actually came from the broker, would not

11  be considered, in and of itself, sufficient to form the basis

12  for the final valuation of a security.

13  Q.  I don't mean to quibble with you, but if a broker quote, in

14  and of itself, would not be sufficient, then that meant there

15  would have to be other data points; isn't that correct?

16  A.  It would mean that the good faith and existence of the

17  broker quote would need to be verified by the accounting

18  department before the broker quote could be accepted as an

19  alternative to pricing provided by the administrator.

20  Q.  Okay.

21             THE COURT:  Just so I'm clear, because I think counsel

22  and the witness are talking at cross purposes.

23             Are you saying that it was your understanding that the

24  broker quote, if verified, could, in certain circumstances, be

25  the basis for setting the price?

H1CPLUM1                          Keily - Cross

1                THE WITNESS:  Yes, your Honor.

2                THE COURT:  All right.

3   BY MR. CREIZMAN:

4   Q.  I want to ask you some questions about Stefan Lumiere and

5   his employment at Visium.  Do you understand?

6   A.  Yes.

7   Q.  Okay.  Now, yesterday you said that you, at some point

8   after you joined Visium, learned that Mr. Lumiere was Jacob

9   Gottlieb's brother-in-law; is that right?

10  A.  Yes.

11  Q.  And that information caused you some concern; did it not?

12  A.  I do not believe I testified that it caused me some

13  concern.

14  Q.  You mentioned that you were -- that raised issues of

15  nepotism; isn't that right?

16  A.  Yes.

17  Q.  Was that a concern of yours?

18  A.  Without more evidence about whether, in any particular

19  case, nepotism was a good thing or a bad thing --

20  Q.  That's correct.

21  A.  -- I would not have any further concerns.  I believe I

22  testified that someone who obtains a position through nepotism

23  is either, in my experience, extremely competent because the

24  person is so qualified for the position that he is hired for

25  it, in spite of the fact that there is a familial relationship,

1    or on the contrary, is that the person is extremely incompetent

2    because the person can find no other place to work but for a

3    relative.

4    Q.  Who was in charge of compliance before you joined Visium?

5    A.  At different times, it was Steven Ku, and at times, it was

6    Mark Gottlieb.

7    Q.  Who is Mark Gottlieb?

8    A.  He is the brother of Jacob Gottlieb.

9    Q.  In your estimation as a compliance officer, did Mark

10   Gottlieb fall in the line of incompetence or competence?

11   A.  It would depend in what capacity we're speaking.

12   Q.  How about providing guidance to employees at Visium on

13   Visium's compliance policies?

14   A.  I can't comment on what guidance Mr. Gottlieb, Mr. Mark

15   Gottlieb, provided to employees before I became an employee at

16   Visium.  I wasn't there.

17   Q.  That's true, but you did testify when you arrived at Visium

18   in 2011, the compliance function was in its nascent phase,

19   correct?

20   A.  That's correct.

21   Q.  Visium had been in existence for at least seven years at

22   that point, correct?

23   A.  I believe it was in existence for less than six years at

24   that point.

25   Q.  So less than six years at that point.  So in its sixth

1  year, you still found the compliance function to be in its

2  nascent phase?

3  A.  Let me just give you a little bit of background, as I

4  understand it.  Visium became a registered investment advisor,

5  meaning that it became regulated by the Securities and Exchange

6  Commission, in April of 2011.  That was three months before I

7  assumed responsibilities for the duties of a chief compliance

8  officer.

9          The compliance policies and procedures that regulated

10  investment advisors are required to have under the Investment

11  Advisor's Act, are considerably more detailed, thorough and

12  onerous than policies and procedures that a nonregulated

13  investment advisor is required to have.

14  Q.  When did Visium become a registered investment advisor?

15  A.  It became a registered investment advisor in April of 2011.

16  Q.  In April of 2011?  Okay.  Now, you didn't draft the 2011

17  compliance manual, that was in existence when you arrived; is

18  that right?

19  A.  That's correct.

20  Q.  You ultimately made a change to that compliance manual in

21  2013; isn't that right?

22  A.  That's correct.

23  Q.  You made a change to the compliance manual because you

24  didn't think the 2011 compliance manual was sufficient to

25  address all of the issues that Visium encountered on a

H1CPLUM1                              Keily - Cross

1   day-to-day basis; is that fair to say?

2   A.  It's fair to say that the 2013 compliance manual

3   represented a substantial revision to the 2011 compliance

4   manual.  There were many things that were learned in the

5   intervening two-year period.  Also, additional laws and

6   regulations were passed, and procedures had to be crafted to

7   ensure compliance with those new laws and procedures.

8           Also, Visium entered into many new business endeavors,

9   which also implicated new sets of laws and regulations that

10  needed to be complied with.  So I think it's fair to say that

11  the 2013 compliance manual was different in many respects from

12  the 2011 compliance manual.

13  Q.  You had never been a compliance officer before you started

14  Visium, correct?

15  A.  That's correct.

16  Q.  You had no experience in the area of compliance; is that

17  right?

18  A.  That's not correct.

19  Q.  Okay.  You had no experience in the area of securities law

20  compliance?

21  A.  That's not correct.

22  Q.  Okay.  What is correct?

23  A.  What is correct is I had 13 years of experience in the

24  securities industry at all levels of the securities industry,

25  from the back office to the front office and as a chief

1    operating officer; that I worked very closely with internal and

2    external counsel, being myself a lawyer, during that 13-year

3    period.

4    Q.  You were previously, before you started at Visium, you were

5    at a firm that was acquired by Visium; is that right?

6    A.  Yes.

7    Q.  It was a hedge fund manager itself?

8    A.  Yes.

9    Q.  Your role at that hedge fund was marketing manager?

10   A.  I began there as the head of marketing and investor

11   relations.  The role I played the last year or so I was at

12   Catalyst was as its chief operating officer.

13   Q.  You didn't have a compliance role at Catalyst?

14   A.  Catalyst.  No, I was not the chief compliance officer

15   there.

16   Q.  Did you represent it in the area of securities law?  Did

17   you provide securities law advice to the company?

18   A.  No, I did not.

19   Q.  So were you somewhat rusty in the area of securities law

20   and compliance when you started as chief compliance officer of

21   Visium?

22   A.  I would say that there was a lot that I needed to learn and

23   re-learn, yes.

24   Q.  At the time you joined Visium, were you satisfied that the

25   existing compliance manual was thorough and comprehensive?

H1CPLUM1                          Keily - Cross

1    A.  At the time I joined Visium, I took the compliance manual

2    as I had inherited it.  As I testified before, building a best

3    practices compliance department is not something that happens

4    overnight.  It's an ongoing process, and my goal was to

5    improve, given what resources were available, in the way that I

6    could best accomplish that.  And I believe that a more

7    comprehensive and satisfactory compliance manual was issued in

8    2013.

9    Q.  Were you aware of Steve Ku's compliance expertise when you

10   joined Visium?

11   A.  I have no knowledge of any particular expertise that Mr. Ku

12   has in compliance matters.

13   Q.  And Mark Gottlieb?

14   A.  I would respond the same way.

15   Q.  Did you ask them, at the time, what their expertise or

16   experience was in compliance?

17   A.  No, I did not because their past experience at that point

18   would be irrelevant for me in July of 2011.

19   Q.  Who did you look to, then, to develop your best practices

20   at Visium?

21   A.  I looked to external compliance consultants.  I also

22   engaged in a great deal of self-study.  I attended compliance

23   seminars and compliance webinars.  I relied, especially in the

24   early days, upon the advice of experienced external counsel.

25   Q.  In all of those seminars and self-study, what would be the

H1CPLUM1                              Keily - Cross

1    appropriate response when a supervisor denies your right to

2    exercise your compliance function over a particular area of

3    practice at Visium?

4              MR. NAFTALIS:  Objection, your Honor, to form.

5              THE COURT:  Sustained.

6    Q.  Valuation is an important area at Visium, correct?

7    A.  It's an important function for any registered investment

8    advisor, correct.

9    Q.  It's an important function for any registered investment

10   advisor because valuation determines the prices that are

11   represented to investors; is that right?

12   A.  That's correct.

13   Q.  Visium has a fiduciary duty to its investors, correct?

14   A.  Yes.

15   Q.  So as chief of the compliance function, you were also chief

16   of making sure that the valuation policies complied with the

17   law, correct?

18   A.  I had a responsibility to administer the compliance

19   policies and procedures as set out in the compliance manual,

20   yes.

21   Q.  You felt that you didn't have sufficient transparency into

22   the compliance function at Visium; is that correct?

23   A.  Into the compliance function or into the valuation?

24   Q.  Sorry, into the valuation function.  I apologize.

25   A.  Could you please restate the question?

H1CPLUM1                        Keily - Cross

1    Q.  Yes, absolutely.  I have trouble between 9:00 and 11:00 in

2    the morning.  That's my training as a lawyer.

3         You felt that you didn't have sufficient transparency

4    into the valuation function at Visium?

5    A.  Yes.

6    Q.  So at some point, you approached Mr. Ku and asked whether

7    you could be on the valuation committee?

8    A.  Yes.

9    Q.  Mr. Ku told you no?

10   A.  That's correct.

11   Q.  Did you express to Mr. Ku, at the time, that you thought it

12   was important for someone in the compliance department to have

13   visibility into the valuation process?

14   A.  Please bear in mind that I was both chief compliance

15   officer, as well as general counsel, and that any advice I gave

16   Mr. Ku would be protected by the attorney-client privilege.

17   Q.  Fair enough.  But Mr. Ku did tell you no?

18   A.  Yes.

19   Q.  You did express that you were disappointed by that denial,

20   correct?

21   A.  Yes.

22   Q.  In fact, you asked a second time a number of months later;

23   is that right?

24   A.  The second time I asked was in, I forget exactly which

25   month, but August or September of 2013.

H1CPLUM1                              Keily - Cross

1   Q.  At that point, you were given observer status?

2   A.  No.

3   Q.  You were denied again?

4   A.  Yes.

5   Q.  That was after a complaint had been raised?

6   A.  Yes.

7   Q.  At that point, you expressed frustration again?

8   A.  Yes.

9   Q.  During your studies of appropriate compliance procedures,

10  what is a chief compliance officer supposed to do in that kind

11  of situation?

12  A.  The chief compliance officer is supposed to raise issues to

13  the governing body of the investment manager.

14  Q.  Did you raise those issues to the governing body of the

15  investment manager?

16  A.  Mr. Ku was a member of the governing body of the investment

17  manager.

18  Q.  Okay.  So then what happens when the governing body of the

19  investment manager says no?  What is it that you are supposed

20  to do?

21  A.  Well, all the webinars and seminars and other compliance

22  materials don't tell you what to do.  For me, it was a choice

23  of either leaving Visium or carrying on the fight, and I felt

24  that a lot of progress had been made at Visium in terms of the

25  compliance department and the legal department at that point.

```
 1                  As I testified yesterday, I felt that I had lost the
 2      battle once, I had lost the battle again, but that I would keep
 3      trying.  A few months after that, in fact, I did obtain
 4      observer status for myself, and for the new chief compliance
 5      officer, on the valuation committee, and I did obtain access to
 6      the monthly valuation workpapers.
 7      Q.  But before that time, your sources of information about
 8      compliance -- I'm sorry, about valuation policies were
 9      principally Steven Ku?
10      A.  Yes.
11      Q.  And valuation committee minutes?
12      A.  Yes.
13      Q.  As far as the valuation committee minutes go, were you
14      satisfied that the policies of the valuation committee were
15      appropriate?
16      A.  I think you have to make a distinction between the policies
17      and the implementation of those policies.
18      Q.  Okay.  The implementation of those policies?
19      A.  I think that the valuation committee minutes in the early
20      days did not completely reflect probably everything that
21      happened at valuation committee meetings, but then I had no
22      basis on which to make that judgment because I wasn't present
23      at those meetings.
24      Q.  Okay.  Now, I did start off by saying I wanted to ask you
25      questions about Stefan Lumiere; so I apologize for getting off
```

1    topic.

2              When you joined Visium, Mr. Lumiere was a portfolio

3    manager; is that correct?

4    A.  It was never entirely clear to me whether he was a

5    portfolio manager, slash, analyst.  It seemed to me that he was

6    both.

7    Q.  Okay.  He was an analyst in the credit fund; is that fair

8    to say?

9    A.  Yes.

10   Q.  He was a portfolio manager in the global fund, correct?

11   A.  I believe so, yes.

12   Q.  Okay.  The credit fund had only one portfolio; is that fair

13   to say?

14   A.  I'm not able to answer that question because I don't recall

15   whether there were sub-portfolios in the credit fund or not.

16   Based on what I recall as of this minute, I believe there just

17   might have been just one credit fund portfolio.

18   Q.  Okay.  The portfolio manager of the credit fund portfolio

19   was Christopher Plaford, correct?

20   A.  Yes.

21   Q.  No dispute about that?

22   A.  None.

23   Q.  To the extent that there were additional portfolios in the

24   credit fund, Christopher Plaford was in charge of those as

25   well?

1  A.  He was the portfolio manager and had responsibility for

2  everything that related to the investment management of the

3  credit fund.  In other words, he, as I understood it, had final

4  responsibility for making buy and sell decisions with respect

5  to the securities that the credit fund held.

6  Q.  Did he have final decision on the pricing of those

7  securities in the credit fund, at least internally?

8           MR. NAFTALIS:  Objection, your Honor.  Foundation.

9           THE COURT:  Sustained.

10  Q.  You had an understanding of what Chris Plaford's role was

11  as portfolio manager of the credit fund; did you not?

12  A.  Yes.

13  Q.  His role, one of your -- one understanding that you had was

14  that he had final say on buying and selling decisions, correct?

15  A.  Yes.

16  Q.  Did you have an understanding as to whether he had final

17  say on how to price the securities in the portfolio?

18  A.  The valuation procedures that we had examined yesterday,

19  that we have talked about, do not give a portfolio manager

20  final say over the pricing or valuation of any security.

21  Q.  That's correct.  The final valuation would be the valuation

22  committee, correct?

23  A.  That's correct.

24  Q.  But the portfolio manager's input is taken into account, in

25  some circumstances, by the valuation committee?

1    A.  In some circumstances, yes.

2    Q.  In those circumstances, for the credit fund, it would be

3    Chris Plaford who had that authority, correct?

4    A.  I'm sorry, what authority?

5    Q.  The authority over price input and information to the

6    valuation committee.

7    A.  There's nothing in the policies and procedures that state

8    who has final authority for something like that, but Chris

9    Plaford would have the final say on matters relating to the

10   management of that portfolio.

11   Q.  That's fair to say.  So, in laymen's terms, he was the

12   boss?

13   A.  Yes.

14   Q.  He had authority over the people that worked for him in the

15   credit fund, correct?

16   A.  Yes.

17   Q.  He was tasked with ensuring adherence to policies and

18   procedures at Visium over the people who worked for him in the

19   credit fund, correct?

20   A.  He has supervisory responsibility for those people under

21   him, yes.

22   Q.  Okay.  So supervisory responsibility, absolutely, that is

23   what I meant.

24          So do you recall how many people worked under Chris

25   Plaford during the time that you were there, at any given time?

1    A.  I think I can count them on my fingers here.

2    Q.  Okay.

3    A.  There's John Shoemaker and Ameesh Shah, Lee Brown, Andrew

4    Hahn, Stefan Lumiere, Jason Thorell.  I think that's it, seven.

5    Q.  Seven, okay.  Now, six of those individuals were analysts;

6    is that right?

7    A.  That's not correct.  Mr. Thorell was a credit trader and --

8    Q.  I thought you said seven.

9    A.  -- Mr. Shoemaker was responsible for trading options.

10   Q.  I'm sorry, who was responsible for trading options?

11   A.  Mr. Shoemaker.

12   Q.  So five of those seven individuals were analysts; is that

13   correct?

14   A.  Yes.

15   Q.  And two of them were traders?

16   A.  Yes.

17   Q.  T-r-a-d-e-r?

18   A.  Yes.

19   Q.  Just making sure.

20           Were you privy to the compensation that was paid to

21   the various analysts in the credit fund?

22   A.  As the one who drafted employment agreements for all the

23   employees, I knew what the base salary for the employees was.

24   However, I was not privy to their bonus compensation numbers.

25   Q.  So were you privy to the base salary information of Chris

1    Plaford?

2    A.  Yes.

3    Q.  Okay.  And what was his base salary from 2011 through 2013?

4    A.  I don't recall the exact number.  I would have to review

5    his employment agreement.

6    Q.  Okay.  Fair enough.  Are you familiar with -- well, let me

7    ask you a question.

8             Have you ever been given a bonus at Visium?

9    A.  Yes.

10   Q.  During what month of the year are bonuses paid?

11   A.  Generally, in late January or early February, and with

12   respect to portfolio managers and analysts, a balance of the

13   bonus is paid in April, after the confirmation of the final net

14   asset values of the funds for which they worked.

15   Q.  Okay.  So for a 2010 bonus, that bonus for one's work in

16   2010 would be paid in 2011?

17   A.  That's correct.

18   Q.  Fair to say?

19   A.  With the exception that the deferred portion of that bonus,

20   as I testified yesterday, might not be payable for three years.

21   Q.  Okay.

22   A.  The payment of the deferred compensation would depend on

23   that individual's remaining an employee at Visium at the end of

24   that three-year period.

25   Q.  Okay.  So in any event, though, a bonus for year 2010 would

H1CPLUM1                         Keily - Cross

1    be paid in year 2011 or later?

2    A.  That's correct.

3    Q.  And a bonus for year 2011 would be paid in year 2012 or

4    later?

5    A.  Yes.

6    Q.  I'd like to show you an exhibit in evidence, Government

7    Exhibit 1142A.

8            MR. CREIZMAN:  Ms. Meister, would you be able to put

9    that on the screen?

10           MS. MEISTER:  Yes.

11   Q.  Is Visium a Windows operation or Mac?

12   A.  Windows.

13   Q.  Windows.  Okay.

14           All right.  That is year 2011 on the screen, correct?

15   A.  Yes.

16   Q.  The individual whose 2011 W2 is Stefan Lumiere, correct?

17   A.  The exhibit's blurry and my eyesight is not what it used to

18   be.  Could it be blown up, please?

19           MR. CREIZMAN:  Thank you, Ms. Meister.

20   A.  Yes, that appears to be the W2 statement for Stefan

21   Lumiere.

22   Q.  You were asked about this yesterday?

23   A.  Yes.

24   Q.  Okay.  Do you recall testifying that Mr. Lumiere's base

25   salary was $200,000?

1    A.   Yes.

2    Q.   The total wages here, and I'm looking at box 18, is

3    $565,616.40; is that right?

4    A.   Yes.

5    Q.   You also testified yesterday that in a hedge fund,

6    generally most of the employee's compensation is earned through

7    bonuses; is that right?

8    A.   That's true for people in the front office or people in the

9    trading function, such as portfolio managers and analysts, yes.

10   Q.   Mr. Lumiere would be in the front office?

11   A.   Yes.

12   Q.   So the amount above the $200,000 would likely reflect

13   bonus, wouldn't it?

14   A.   Yes.

15   Q.   Because Mr. Lumiere didn't have any other sort of

16   additional salary beyond $200,000?

17   A.   Not that I know of, no.

18              (Continued on next page)

19

20

21

22

23

24

25

H1c2lum2                          Keily - Cross

1   Q.  Even though he occupied two roles at Visium, correct?

2   A.  Yes.

3   Q.  He wasn't paid a certain, or I don't know actually, was he

4   paid a certain amount for being an analyst in the credit fund?

5   A.  I'm not sure I understand the question.

6   Q.  Well, he had a base salary of $200,000 a year, right?

7   A.  Yes.

8   Q.  Okay.  You testified that he had two separate titles at

9   Visium, is that right?

10  A.  Yes.

11  Q.  One was in the Global Fund as a portfolio manager, is that

12  right?

13  A.  Yes.

14  Q.  And one in the Credit Fund as an analyst, is that right?

15  A.  Yes.

16  Q.  Was he paid separately for being -- was that $200,000, did

17  that represent just his payment for the Credit Fund?

18  A.  My understanding was that his base salary applied

19  regardless of the Credit Fund or the Global Fund.  It was

20  simply the base salary that he received.

21  Q.  For all of the titles that he had, for all of the

22  functions?

23  A.  As far as I know, yes.

24  Q.  So the amount above the $200,000 would likely reflect his

25  bonus.

1    A.  Yes.

2    Q.  And that bonus would not be for his performance in year

3    2011, correct?

4    A.  It would reflect possibly a couple of things.

5    Q.  Okay.

6    A.  It would reflect payment of a bonus with respect to 2010.

7    Q.  Okay.

8    A.  And it would also reflect the payment of any deferred

9    compensation, assuming he had deferred compensation, that would

10   have been payable in 2011.

11   Q.  Okay.  In no event, though, would it reflect a bonus for

12   his performance in the year 2011, correct?

13   A.  Not that I am aware of, no.

14            MR. CREIZMAN:  Ms. Meister, if you do not mind, can we

15   turn to government exhibit in evidence the 2012 compensation,

16   which I think is -- it is the next page, it would be 1142B or

17   1143.  We will find out soon.

18   BY MR. CREIZMAN:

19   Q.  This appears to be Mr. Lumiere's 2012 W-2 form?

20   A.  Yes.

21   Q.  It reflects what his base salary would be for year 2012,

22   correct?

23   A.  It would reflect the compensation that he received in

24   calendar year 2012, yes.

25   Q.  And that would include base salary, correct?

H1c2lum2                           Keily - Cross

1    A.  Yes.

2    Q.  And any bonuses, correct?

3    A.  That's correct.

4    Q.  For either 2011 or years prior.

5    A.  That's correct, yes.

6    Q.  And the salary that's shown here in number one is

7    $199,616.40.  Is that right?

8    A.  Yes.

9    Q.  That's pretty close to $200,000.

10   A.  Yes.

11   Q.  So that would reflect his base salary?

12   A.  That appears to be the case, yes.

13   Q.  And it would reflect, at a minimum, that there was no bonus

14   paid in 2012 for his performance in 2011, correct?

15   A.  That appears to be the case, yes.

16   Q.  Okay.  Thank you.

17            MR. CREIZMAN:  Sorry, Ms. Meister, may I ask you to

18   move on to just 2013.  I will try not to tax you.  Thank you.

19   Q.  Mr. Keily, do you see that?

20   A.  Yes.

21   Q.  Do you see what's on the screen?  It appears to be

22   Mr. Lumiere's 2013 W-2?

23   A.  Yes.

24   Q.  The total compensation for year 2013 was $80,000,

25   80,841.44, correct?

H1c2lum2                          Keily - Cross

1   A.  Yes.

2   Q.  During 2013, he worked approximately sometime -- he worked

3   at least through March and sometime into April, is that fair to

4   say?

5   A.  Yes.

6   Q.  And at that point he then left the company.

7   A.  Yes.

8   Q.  So this reflects his compensation for the year 2013,

9   through April, is that fair to say?

10  A.  It reflects the compensation that he received in 2013.

11  Q.  Now, you are aware that -- you were involved in

12  Mr. Lumiere's -- in the separation of Mr. Lumiere from Visium,

13  correct?  You were involved in negotiations?

14  A.  Yes.

15  Q.  Thank you.

16          He had an attorney?

17  A.  Yes, he did.

18  Q.  Do you remember the name of his attorney.

19          (Pause)

20  Q.  Do you remember would Larry Moy ring a bell?

21  A.  Yes.

22  Q.  Mr. Moy sent correspondence to you?

23  A.  Yes.

24  Q.  Okay.  He raised some complaints that Mr. Lumiere had?

25          MR. NAFTALIS:  Objection.

H1c2lum2                          Keily - Cross

1                THE COURT:  Sustained.

2    Q.  There were disputes that Mr. Lumiere raised, though?

3                MR. NAFTALIS:  Objection.

4                THE COURT:  Sustained.

5                MR. CREIZMAN:  Is that hearsay?

6                THE COURT:  Hearsay and there may be other problems

7    that we could discuss, if necessary.  But, for a starter,

8    hearsay.

9                MR. CREIZMAN:  Okay.  That sounds good.  Okay.

10   BY MR. CREIZMAN:

11   Q.  When you discovered that Mr. Lumiere was at Visium, you

12   said that the idea of nepotism came to mind, is that right?

13   A.  Yes.

14   Q.  By 2013, you were aware that the relationship between

15   Mr. Gottlieb and Mr. Lumiere had become strained, is that fair

16   to say?

17   A.  Which Mr. Gottlieb are you referring to?

18   Q.  Well, Jacob in particular.

19   A.  Could you repeat the question, please?

20   Q.  Jacob -- were you aware that, by the time Mr. Lumiere, in

21   2013, by the time he left the company in 2013, his relationship

22   with Mr. Gottlieb was -- with Jacob Gottlieb was strained?

23               MR. NAFTALIS:  Objection, your Honor.

24               THE COURT:  Sustained.

25   Q.  Were you aware, was it your understanding, that Jacob

H1c2lum2                          Keily - Cross

1   Gottlieb was going through a divorce with Mr. Lumiere's wife?

2              MR. NAFTALIS:  Objection.

3              THE COURT:  Sustained.

4              MR. CREIZMAN:  May we have a sidebar?

5              THE COURT:  Sure.  I don't know that we need a sidebar

6   on blatant hearsay but if you want one we will have one.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H1c2lum2                         Keily - Cross

1            (At the sidebar)

2            THE COURT:  So, we start with the fact that his

3    understanding of this, which would be, at best, an opinion or

4    speculation is irrelevant.  Second, putting aside the relevancy

5    problem, what it really is is a disguised way of putting before

6    the jury hearsay.  So those are the two problems you have to

7    overcome.

8            MR. CREIZMAN:  Okay.  No, I, I understand.  What I am

9    just trying to establish is that, just for everyone's

10   knowledge, that basically that the idea of any nepotism, that

11   was pretty much done; that there was no -- that Mr. Gottlieb

12   wasn't exactly looking out for Stefan at the time.

13           THE COURT:  That may be, but I just enforce the rules

14   of evidence.

15           MR. CREIZMAN:  That's fair.

16           (Continued on next page)

17

18

19

20

21

22

23

24

25

H1c2lum2                          Keily – Cross

1              (In open court)

2    BY MR. CREIZMAN:

3    Q.   I referred to Stefan Lumiere's wife inadvertently during my

4    questioning of you.  Do you recall that?

5    A.   Yes.

6    Q.   Okay.  I actually intended to discuss Mr. Lumiere's sister,

7    just to make clear.  Did you understand me to be asking about

8    that?

9              THE COURT:  It doesn't matter.  The point is the

10   question was objected to, the objection is sustained, so we can

11   move on, counsel.

12   BY MR. CREIZMAN:

13   Q.   Was the tenor of the negotiations between Mr. Lumiere and

14   Visium contentious?

15             MR. NAFTALIS:  Objection.

16             THE COURT:  First let me make sure I understand, when

17   are you talking about.

18             MR. CREIZMAN:  In 2013.

19             THE COURT:  For the entire year of 2013?

20             MR. CREIZMAN:  No, in the discussions of severance

21   from the company, separation from the company.

22             THE COURT:  All right.  So the question is –– did you

23   observe those conversations?

24             THE WITNESS:  I was and external counsel were involved

25   in an exchange of correspondence with ––

H1c2lum2                              Keily - Cross

1                THE COURT:  No, he was asking about conversations.

2                MR. CREIZMAN:  I meant correspondence, communications,

3       negotiations, I think, is what I meant to say.  9:00 is really

4       early, your Honor.

5                THE COURT:  It's almost 11:00.

6                MR. CREIZMAN:  I know, but you got me started so

7       earlier.

8                THE COURT:  Your time for excuses is running quickly.

9       So the objection is sustained.

10      BY MR. CREIZMAN:

11      Q.  Did Mr. Lumiere receive any severance pay when he left

12      Visium?

13      A.  No, he did not.

14      Q.  Mr. Lumiere's attorney asked for severance pay.

15               MR. NAFTALIS:  Objection.  Withdrawn.  Well, I will

16      stand on it.

17               THE COURT:  It seems to be catching.

18               MR. CREIZMAN:  Yes, I think I have that effect.

19               THE COURT:  Sustained.

20               MR. CREIZMAN:  Fair enough.

21      BY MR. CREIZMAN:

22      Q.  If mr. Lumiere was paid any severance pay, that would be

23      reflected on his 2013 W-2, wouldn't it?

24      A.  It would be reflected on the 2013 W-2, but it wouldn't be

25      earmarked as severance pay.

H1c2lum2                      Keily - Cross

1   Q.  Correct.  Fair enough.  That's a fair statement.

2            Do you recall that Mr. Lumiere, there came a time in

3   April 2013 that Mr. Lumiere reported to work at Visium and was

4   locked out?

5   A.  I recall being told about the incident, yes.

6   Q.  Did you communicate with Mr. Lumiere about it?

7   A.  I don't recall the particulars, no.

8   Q.  But you do recall hearing about it.

9   A.  Yes.

10  Q.  Were you involved in negotiation -- let me start

11  differently.

12           Were you familiar with an employee at Visium named

13  Jason Thorell?

14  A.  Yes.

15  Q.  And Jason Thorell worked as an analyst, as a trader in the

16  Credit Fund, correct?

17  A.  He worked as a trader in the Credit Fund, yes.

18  Q.  And there came a time that there were negotiations over

19  Mr. Thorell's departure from Visium, is that true?

20  A.  I don't recall testifying about that on direct examination.

21           MR. CREIZMAN:  Your Honor, may I ask questions that

22  are not within the scope of direct.

23           THE COURT:  Yes.

24  BY MR. CREIZMAN:

25  Q.  So was there a -- do you recall being involved in

H1c2lum2                        Keily - Cross

1   negotiations with Mr. Thorell or his representatives concerning

2   his leaving Visium?

3   A.  Yes.  There were negotiations with Mr. Lumiere's attorney

4   subsequent to his termination.

5   Q.  He was fired from Visium?

6   A.  He was terminated without cause.

7   Q.  Terminated without cause?

8           Who made the decision to terminate him?

9   A.  I don't know.

10  Q.  And who did you negotiate with?

11  A.  I negotiated with his external counsel and I negotiated

12  with his attorney and I believe the attorney's name was Jyotin.

13  Q.  I think that's right, Jyotin Hamid?

14  A.  I believe so, yes.

15  Q.  From the firm of Debevoise & Plimpton.

16  A.  Yes.

17  Q.  Do you recall sending Mr. Thorell any disciplinary letters

18  during the year 2013?

19  A.  Yes.

20  Q.  It had something to do with execution of trades?

21  A.  As I recall, he received a letter of education for not

22  promptly recording a trade, more than one trade.

23  Q.  The policy at Visium, your policy, in terms of disciplinary

24  warnings or addressing disciplinary infractions, were

25  through -- included letters, correct?

H1c2lum2                          Keily - Cross

A.   That's correct.

Q.   There were varying kinds of letters addressing disciplinary

infractions, correct?

A.   Yes.

Q.   Could you tell the jury what the different letters were and

what they were called and what degree of severity they

represented?

A.   Yes.  So, generally, if an employee had violated one of

Visium's compliance policies and procedures, depending on the

circumstances, if the violation was a first-time violation or

felt to be unintentional or inadvertent, then the employee

would receive a somewhat informal e-mail reminding the employee

of the relevant provision, admonishing the employee to be more

careful next time, and leaving the matter at that.

        If the employee again engaged in the same type of

activity or if the circumstances were felt to be less -- what's

the right word?  If there were fewer extenuating circumstances,

then the next level of discipline would be that the employee

would receive a letter of education.  This letter would outline

in greater detail the provisions in Visium's compliance manual

and the relevant provisions of federal law that were being

violated, would suggest ways in which the employee could

further educate himself, and remind the employee that any

further violations would result in a more heightened level of

disciplinary action.

H1c2lum2                           Keily - Cross

1              The next level of discipline would be a letter of

2      reprimand.  This would be for repeated or very egregious

3      violations of internal policies or federal securities laws.  A

4      letter of reprimand would state that any further violation

5      would result in termination of employment.

6      Q.  It is fair to say, as chief compliance officer, you did not

7      hesitate to send any of those kinds of letters to any officer

8      of the company, is that right, if warranted?

9      A.  In some cases, the issuance of letters were subject to

10     approval by my superior, Steven Ku.

11     Q.  But even though they were subject to your supervisor, there

12     was an instance where you sent a letter, a disciplinary letter

13     to the head of the firm, is that right?

14     A.  Yes.

15     Q.  Jacob Gottlieb?

16     A.  Yes.

17     Q.  And that was a letter of education?

18     A.  Yes.

19     Q.  Which is the most serious letter?

20     A.  No.

21     Q.  No.  I'm sorry.  The second most serious letter?

22     A.  Yes.

23     Q.  Sorry.

24              Now, the letter that you sent to Mr. Thorell --

25     actually was there a letter that you sent to Mr. Thorell that

H1c2lum2                          Keily - Cross

1    he responded to in 2013?

2                MR. NAFTALIS:  Objection.

3                THE COURT:  Sustained.

4                Counsel, aside from this question, how much longer do

5    you have on cross?

6                MR. CREIZMAN:  Another 20 minutes.

7                THE COURT:  Okay.  Then I think maybe we will give the

8    jury their mid-morning break now, then we will continue

9    thereafter.

10               So, ladies and gentlemen, we will give you a 15-minute

11   break at this time.

12               (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

H1c2lum2                          Keily - Cross

1                    (Jury not present)

2                    THE COURT:  Mr. Keily, you can step down.  We will see

3          you in 15 minutes.

4                    (Witness not present)

5                    THE COURT:  Please be seated.

6                    So although the letter that was sent at 2 a.m. from

7          defense counsel does purport to copy the government, as I

8          noted, they were not, inadvertently, copied, but the court's

9          law clerk sent a copy to the government earlier this morning.

10                   Have you now received that?

11                   MR. WILLIAMS:  Yes, your Honor, we have received it.

12                   THE COURT:  Okay.  I will give you my overall view,

13         and then we will have specific conversations on it after you

14         have had a chance during the break to examine it in more

15         detail, since you got it while the proceedings were proceeding,

16         albeit at a very slow pace.

17                   My first take on this is that some of this is

18         admissible and some is not, and it is going to be a function of

19         what the witness says before the government plays the portions

20         of the recordings that it wants to play.

21                   For example, in the first item, the government's

22         portion of proposed Exhibit 1223T, which is a conversation

23         between Mr. Thorell while he was cooperating and Mr. Lumiere,

24         begins -- this is the government's version -- with the words,

25         from Mr. Thorell, "I just need -- I need to know if you're in

or out."  That sentence will be meaningless if the witness

hasn't given some context about what they were talking about.

On the other hand, the defense, in order to provide

that context, would want to play something like three pages

of -- sorry, two and a half pages of prior conversation, the

first sentence of which is, from Mr. Thorell, "I got more for

you, bro.  Are you focused on this or not?"  Another

meaningless statement.  So the jury is asked to either start

with a meaningless statement played by the government or a

meaningless statement played by the defense.

But the broader point, which I agree with, is that

what's being discussed is, so far as Mr. Lumiere was aware, was

a possible whistleblower suit, and that has to be brought out.

But the most obvious way it would be brought out would be by

the witness saying before this snippet was played, well, we

talked about bringing a whistleblower suit, and then it all

makes sense.  So I can't rule on what the defense wants to

include in until I hear what Mr. Lumiere says.  So I will make

my rulings at the point in time when the relevant snippet is

about to be played.  Now, I understand that that will be

awkward and that I may be asking the real parties in interest,

the paralegals, to back up and play a little bit more, but I'm

sure they will be able to do that.

MR. NAFTALIS:  Your Honor, that's our intention is to,

rather than have an awkward back and forth --

H1c2lum2                          Keily - Cross

1             THE COURT:  Yes, and I assumed that was the case.

2   But, you know, similar situations will rise with the other

3   proposed additions from the defense.

4             All right.  So I have two other matters right now,

5   very short matters.  So, once again, you can leave your stuff

6   at counsel table, but you need to leave the tables so we can

7   call those other matters.

8             (Recess)

9             (In open court; jury not present)

10             THE DEPUTY CLERK:  May I bring in the jury?

11             THE COURT:  Yes.

12             Defense counsel has 20 minutes.

13             MR. CREIZMAN:  I think I underestimated how much time

14   I have.  I have more with this witness.  I apologize, but I

15   don't know.  I apologize for that.

16             THE COURT:  How long do you have?

17             MR. CREIZMAN:  I think it could be an hour.  I

18   apologize.  I did not mean to mislead the court.

19             THE COURT:  I am concerned, very much concerned --

20             THE DEPUTY CLERK:  Jury entering the courtroom.

21             THE COURT:  Come to the sidebar.

22             (Continued on next page)

23

24

25

H1c2lum2                         Keily - Cross

1              (At the sidebar)

2              THE COURT:  First, of course, based on what counsel

3    had said, I told the jury that this case would last no more

4    than two weeks, and that I was hopeful that it would be

5    completed by the end of next week.

6              Second, I should let counsel know that, again, in

7    reliance on their estimates, I accepted, shortly before trial,

8    a request from the Department of Commerce and the Department of

9    State to go to Kuwait to help train Middle Eastern judges in

10   various aspects of international law, and I am currently

11   scheduled to leave for that very late on the evening of the

12   23rd.  That could be moved a day or two, but it can't be moved

13   a huge amount.  So I think we need to adhere to what was

14   counsel's own estimates and really move this along.

15             I will give you your hour.  This is an important

16   witness.  But I urge counsel for both sides to keep in mind the

17   need to keep this case going, all right?

18             MR. CREIZMAN:  Thank you.

19             (Continued on next page)

20

21

22

23

24

25

```
 1                (In open court)

 2                (Pause)

 3                THE COURT:  So, counsel, you still have 59 minutes.

 4                MR. CREIZMAN:  Okay.  Sorry about that.

 5                THE COURT:  It will be 58 very shortly.

 6      BY MR. CREIZMAN:

 7      Q.  I apologize, Mr. Keily.  I did not see you there.

 8                We were discussing the termination of Mr. Thorell.

 9      Were you involved in the negotiating the settlement agreement

10      with his counsel?

11      A.  Yes, external counsel and I were involved in that

12      settlement agreement.

13      Q.  And that was after Mr. Thorell was terminated?

14      A.  Yes.

15      Q.  And Mr. Thorell was terminated, do you recall when?

16      A.  In November 2013.

17      Q.  So he was -- so he worked there until November 2013, and do

18      you recall when the settlement agreement was entered into

19      between Visium and Mr. Thorell?

20      A.  I don't recall the exact date, but I believe it was in May

21      or June of 2014.

22      Q.  Did you draft the settlement agreement?

23      A.  No, I did not.

24      Q.  Did you review the settlement agreement or drafts of the

25      settlement agreement before it was ultimately entered into?
```

H1c2lum2                         Keily - Cross

1   A.  Yes.

2   Q.  And you were, I assume, not the person who signed the

3   agreement?

4   A.  No.

5   Q.  But you did see the final agreement?

6   A.  Yes.

7   Q.  And the agreement was brought before you for its approval,

8   the final agreement, yes?

9   A.  I'm sorry, could you repeat the question, please?

10  Q.  You approved the final version of the agreement before it

11  was signed?

12  A.  I reviewed the agreement, but it was not my place to

13  approve or disapprove the signing of it.

14  Q.  Who signed the agreement?

15  A.  I don't recall.

16  Q.  It was your task to review the agreement, though?

17  A.  Yes.

18  Q.  And provide any comments.

19  A.  Yes.

20  Q.  Who did you provide those comments to?

21  A.  I think we are beginning to get into the domain of

22  privileged confidential attorney/client communications.

23  Q.  Fair enough.  I am not seeking to find out the substance of

24  anything that you commented on.  All I am trying to get at is

25  you did actually comment on it for the -- for whoever was the

H1c2lum2                          Keily - Cross

1   decision-maker at Visium.

2   A.  Yes.

3   Q.  I would like to show you a document that is marked defense

4   Exhibit 206.

5              MR. CREIZMAN:  Your Honor, may I approach?

6              THE COURT:  Yes.

7              MR. NAFTALIS:  Your Honor, we are going to object to

8   this exhibit, just to put you on notice.

9              THE COURT:  Let me see it.

10             (Pause)

11             THE COURT:  Well, it may be relevant to the next

12  witness.  I'm not sure what the relevance is here to this

13  witness.  So unless you want to make a sidebar proffer, the

14  objection is sustained.

15             MR. CREIZMAN:  I would like to make a sidebar proffer

16  briefly.

17             THE COURT:  Okay.  That's fine.

18             (Continued on next page)

19

20

21

22

23

24

25

H1c2lum2                          Keily - Cross

1                    (At the sidebar)

2                    THE COURT:  Yes.

3               MR. CREIZMAN:  Given that the attorney did draft the

4       agreement, the reason -- I'm just going to proffer what I want

5       to offer it for.  I want to offer it for certain -- to go

6       through certain provisions, to highlight certain provisions,

7       one which would be that Mr. Thorell represents that he would

8       return company property.  This is June of 2014; that

9       Mr. Thorell agrees to keep the agreement confidential, and so

10      on and so forth.

11                   THE COURT:  So what's the relevance?  I can see how

12      that's relevant to Mr. Thorell.

13                   MR. CREIZMAN:  Yes, it is relevant to Mr. Thorell.

14                   THE COURT:  How is it relevant to this witness?

15                   MR. CREIZMAN:  This witness is the person who

16      negotiated the agreement from Visium's side.  It does reflect

17      what Visium's state of mind was as to entering -- what it

18      thought it was doing when it provided Mr. Thorell also with

19      175 --

20                   THE COURT:  Their state of mind, what is that relevant

21      to?

22                   MR. CREIZMAN:  I mean, I think that it might have

23      been -- I mean, yes, I agree that it is more focused -- this

24      would be more impactful and probably relevant by

25      cross-examining Mr. Thorell as to whether he withheld it.

H1c2lum2                          Keily - Cross

1            THE COURT:  Yeah.

2            MR. CREIZMAN:  But I have a witness here who knows

3       about the agreement.

4            THE COURT:  First of all, the agreement, if it comes

5       in at all, speaks for itself, so his opinions and so forth are

6       neither here nor there.  Second of all, his opinions about it

7       would be, as you yourself just said a moment ago, at most

8       relevant to the company's view.  The company's view is not an

9       issue in this case in any way, shape, or form, so I don't see

10      the relevance.

11           MR. CREIZMAN:  Well, just to make clear, I think the

12      company's view is somewhat important, because if they felt

13      misled in some way by Mr. Thorell in the course of their

14      negotiations of a settlement, that would be relevant.

15           THE COURT:  To what?

16           MR. CREIZMAN:  To whether Mr. Thorell --

17           THE COURT:  -- is truthful?  No, it is not.  It is

18      just his attitude.  They might be right they might be wrong.

19      It is not evidence.  Sustained.

20           MR. CREIZMAN:  I may want to just save your Honor's

21      time, on the same sort of vein, in terms of reputation and

22      character evidence, opinion as to reputation and character of

23      Thorell, anticipating that you might -- that he is going to be

24      a witness, Mr. --

25           THE COURT:  I'm still hoping that will occur.

1          MR. CREIZMAN:  If Mr. Keily spent time with

2    Mr. Thorell and worked with people who knew Mr. Thorell, I

3    think.

4          THE COURT:  So you want to call him as a negative

5    character witness.

6          MR. CREIZMAN:  Yes.

7          THE COURT:  That's a different issue.

8          What's the government's view on that?

9          MR. NAFTALIS:  I mean, I don't -- what are the basic

10   questions you want to ask about?

11         THE COURT:  Let's pull out the rule.

12         MR. CREIZMAN:  That would be helpful.  I think it's

13   608 or 609.

14         THE COURT:  Yes.  So --

15         MR. CREIZMAN:  612.

16         THE COURT:  -- a witness's credibility may be attacked

17   or supported by testimony about the witness's reputation for

18   having a character for truthfulness or untruthfulness or by

19   testimony in the form of an opinion about that character.  But

20   evidence of truthful character is admissible only after the

21   witness's character for truthfulness has been attacked.  The

22   last sentence is not relevant here.

23         So you would presumably say you would have to lay a

24   foundation, which you may or may not have a basis for, and then

25   the question would be, given your familiarity with his

H1c2lum2                          Keily - Cross

1    reputation, does he have a reputation for being truthful or

2    untruthful.

3             MR. CREIZMAN:  That's what I would ask.

4             THE COURT:  And he presumably would say, what?  He was

5    the most bald-faced liar I ever met or something like that, in

6    your hope, in your wish, so.

7             MR. CREIZMAN:  He might say either untruthful or he

8    would say -- which would be great, or he might say that, he

9    might voice the opinion that, I am not qualified to answer or

10   something along those lines.

11            THE COURT:  And, knowing this witness, he would first

12   ask you to rephrase the question.

13            So I come back to the government, assuming he can lay

14   the foundation, why is that not proper?

15            (Counsel confer)

16            MR. NAFTALIS:  I don't know if it's connected to this,

17   but, in theory, this should come after Mr. Thorell testifies.

18            THE COURT:  No.  No, no.  No, no, no.  We know he is

19   going to testify.  If he were not going to testify --

20            MR. NAFTALIS:  I don't think, in the bounds that your

21   Honor has laid out, we have an issue with it.

22            THE COURT:  Okay.  Great.

23            MR. WILLIAMS:  Let me just specify what that means,

24   though.  This document is going to be admitted to attack his

25   credibility.

H1c2lum2                        Keily - Cross

1              THE COURT:  No.  This document isn't coming in.

2              MR. CREIZMAN:  I am staying away from that.

3              THE COURT:  Whoa.  Whoa.

4              This document has been ruled out without prejudice to

5    its coming in when Mr. Thorell testifies.

6              MR. WILLIAMS:  Understood.

7              (Continued on next page)

H1c2lum2                         Keily - Cross

1          (In open court)

2          THE COURT:  By the way, ladies and gentlemen, you may

3    wonder why we have sidebars.

4          One reason, of course, is so that you can yawn and

5    stretch.

6          But the main reason is, sometimes I cannot make a

7    ruling on evidence until I know what counsel thinks the

8    testimony will be; and if I were to hear an elaborate

9    discussion of what the testimony will be and then I were to

10   say, no, it is not admissible, the cat would be out of the bag

11   if you heard all of that.  So that's why we have sidebars.

12         We will try to keep them to a minimum, but I do want

13   to explain why we have them.

14         Okay.  Go ahead, counsel.

15   BY MR. CREIZMAN:

16   Q.  Mr. Keily, when you arrived at Visium in 2011, was

17   Mr. Thorell working there?

18   A.  Yes.

19   Q.  And over your time at Visium, did you have a chance to

20   interact with Mr. Thorell?

21   A.  From time to time, yes.

22   Q.  And did you interact with other people at the company who

23   interacted with Mr. Thorell on a regular basis?

24   A.  Other than people who worked with him on the credit team, I

25   don't know of others who worked with him on a regular basis.

H1c2lum2                              Keily - Cross

1    Q.   Okay.  So did you interact -- did you ever discuss -- did

2    you ever have discussions with anybody about Mr. Thorell's

3    reputation for truthfulness or untruthfulness?

4    A.   I don't recall having any discussions about his reputation

5    for truthfulness or untruthfulness.

6    Q.   Were you aware whether he had any reputation for being

7    truthful or untruthful?

8              MR. NAFTALIS:  Objection, your Honor.

9              THE COURT:  No, I will allow it.

10   Q.   Were you aware of whether Mr. Thorell had any reputation at

11   Visium for being truthful or untruthful?

12   A.   I recall discussions with other Visium employees about

13   Mr. Thorell, but I don't recall any that focused on that

14   particular aspect of his personality.

15   Q.   Let me see if I could rephrase.  Based on those

16   discussions, were you aware -- or any discussions you had at

17   Visium, were you aware of whether Mr. Thorell had a reputation

18   at Visium for being a truthful person or an untruthful person?

19   A.   I don't recall.

20   Q.   You knew Mr. Christopher Plaford, correct?

21   A.   Yes.

22   Q.   And he was at the company Visium when you arrived at the

23   company in 2011?

24   A.   Yes.

25   Q.   And he was there with you until December 2013, is that

1    correct?

2    A.   Yes.

3    Q.   Was Mr. Plaford terminated?

4    A.   Yes.

5    Q.   Was there a severance payment made to Mr. Plaford?

6    A.   I recall that there was a settlement agreement that was

7    reached.  I don't recall what proportion of that, if any, was

8    actually earmarked to severance as opposed to other items.

9    Q.   Were you involved in the negotiation of settlement

10   agreement?

11   A.   External counsel and I were involved.

12   Q.   And you reviewed the agreement?

13   A.   Yes.

14   Q.   And made comments on the agreement?

15   A.   Yes.

16   Q.   And over the time that you were at Visium, did you interact

17   personally with Mr. Plaford?

18   A.   I interacted with him solely in a business context.

19   Q.   And Mr. Plaford was a partner at Visium?

20   A.   Yes, he was what people referred to as a partner, but that

21   does not mean that he was legally a partner of Visium Asset

22   Management Limited Partnership.

23   Q.   So he had the title of partner.

24   A.   Yes.

25   Q.   And was he entitled to greater compensation than

1  nonpartners at Visium?

2  A.  I would assume so; but, as I testified, I don't know what

3  people's total compensation was.

4  Q.  Whether title or not, was Mr. Lumiere a partner of Visium?

5  A.  No.

6  Q.  At any time was he a partner of Visium?

7  A.  Not that I know of, no.

8  Q.  And you did mention that he was a portfolio manager of a

9  particular fund, correct?

10  A.  Yes.

11  Q.  And that was a fund that was subsumed within the global

12  fund, correct?

13  A.  I think it would be inaccurate to say that a fund was

14  subsumed within the Global Fund.  The Global Fund at the level

15  of the Master Fund, the Visium Global Master Fund, was one

16  fund.  It had various different portfolios --

17  Q.  I see.

18  A.  -- managed by different portfolio managers within that

19  fund.  Sometimes those subportfolios might be referred to as

20  silos or something like that.

21  Q.  I see.

22        Could you explain to the jury what the difference is

23  between a fund and a portfolio within a fund?

24  A.  Okay.  A fund could be comprised simply of one portfolio,

25  meaning one pool of assets that is ultimately managed by one

1   portfolio manager, or you can have a different type of fund

2   structure whereby you have a number of different portfolio

3   managers, and capital or money is allocated to each of those

4   portfolio managers, and each of those portfolio managers then

5   goes out and makes his or her own independent decisions on

6   investment.  And you might have, above the whole structure, a

7   head portfolio manager or a director of research or someone who

8   coordinates the whole.  But, as I said, you can have you can

9   call them subportfolios or silos, but essentially run by a

10  different, call it, subportfolio manager within one legal

11  structure called the fund.

12  Q.  Was Mr. Lumiere the manager or director of the Global Fund,

13  the entire Global Fund?

14  A.  No.

15  Q.  Who was in charge of the Global Fund?

16  A.  That varied over time.  My understanding was that

17  ultimately the firm's investment committee and directors of

18  research were responsible for the overall coordination of the

19  Global Fund.

20  Q.  And you would consider Mr. Lumiere's portfolio within the

21  Global Fund to be a silo?  Would that be fair to say?

22  A.  Yes.

23  Q.  About how much money was allocated to Mr. Lumiere's silo

24  fund -- portfolio?

25  A.  I don't know.

H1c2lum2                           Keily - Cross

1   Q.  How many employees worked for Mr. Lumiere's silo portfolio?

2   A.  I assume that none did other than Mr. Lumiere.

3   Mr. Lumiere, let it be understood, did not employ anybody.

4   Some portfolio managers did have analysts who worked under

5   them, but my understanding and recollection is that Mr. Lumiere

6   did not have anyone who served under him in that capacity who

7   was solely allocated or whose time was solely allocated to

8   Mr. Lumiere and his portfolio management activities.

9   Q.  So Mr. Lumiere's silo fund had no full-time analysts, fair

10  to say?

11  A.  No full-time analysts, yes.

12  Q.  And no one reporting to him directly.

13  A.  I -- that I can't say.  I don't know exactly what formal or

14  informal reporting lines may have existed below the level of

15  Mr. Lumiere.

16  Q.  Did Mr. Lumiere's silo fund represent the majority of the

17  allocated funds in the Global Fund?

18  A.  I don't believe so, no.

19  Q.  Did it represent over 25 percent of the allocated funds in

20  the Global Fund?

21  A.  Two comments.  One is that I don't know what percent of the

22  whole his silo or portfolio accounted for; and the second is,

23  that percentage would have changed over time.

24  Q.  And do you know how many portfolios were in the Global

25  Fund?

H1c2lum2                          Keily - Cross

1    A.  I don't know exactly.  I do know that the number did change

2    over time as the Global Fund grew and as more portfolio

3    managers were hired by Visium.

4    Q.  Were you aware of other portfolios within the Global Fund

5    that had full-time analysts?

6    A.  Yes.

7    Q.  And do you know about how many full-time funds -- full-time

8    portfolios had analysts?

9    A.  I can't give you an exact number from memory.  I could give

10   you a back of the envelope guesstimate of maybe four or five or

11   six.

12   Q.  And as for the Credit Fund, were you aware of any silo

13   portfolios in that fund?

14   A.  I really could not tell you whether there were silo

15   portfolios or subportfolios, but my best recollection and

16   understanding is that there could have been or there may not

17   have been.  I just don't know.  That wasn't something that I

18   focused on.

19   Q.  For the portfolios that you were aware of in the Credit

20   Fund, it was Mr. Plaford that had sole investment discretion

21   over the fund.

22   A.  Mr. Plaford, as I testified, had ultimate investment

23   discretion over the fund.

24   Q.  And authority.

25   A.  Yes.

H1c2lum2                          Keily - Cross

1   Q.  And Mr. Lumiere reported to him in that capacity?

2   A.  As far as I know, yes.

3   Q.  And it was a direct report, correct?

4   A.  As far as I know, yes.

5   Q.  Analogous to you having a direct report to Mr. Ku?

6   A.  As far as I know, yes.

7   Q.  You told the jury yesterday about accounting standards

8   codification.  Is that what it stands for ASC 20?

9   A.  Yes, 820.

10  Q.  820, right.  820.

11          It basically distinguishes securities into three

12  different levels, categorizes them?

13  A.  Yes.

14  Q.  And one level is -- level 1 is frequently traded

15  securities?

16  A.  They are -- yes, they are securities that are traded on

17  active markets and the prices of those securities or values are

18  readily ascertainable and easily observable.

19  Q.  And level 2 securities, there are something called

20  observable market inputs, right?

21  A.  That's correct.

22  Q.  Is that a term -- let me ask you this:  Were you ever

23  involved at Visium in actually determining whether an asset

24  falls within levels 1, 2, or 3?

25  A.  No.

H1c2lum2                          Keily - Cross

1   Q.  So you never were involved in the decision-making process

2   as to whether to categorize for Credit Fund investors whether

3   any of the securities in the Credit Fund were in either level

4   1, level 2, or level 3?

5   A.  I was not involved in those decisions, no.

6   Q.  Have you ever been involved in any -- at any time in your

7   career in classifying an asset as level 1, level 2, or level 3?

8   A.  As an observer on Visium's valuation committee, I see those

9   debates take place, and I should mention, since I became an

10  observer on Visium's valuation committee, I have seen those

11  discussions and debates take place, and I have rendered advice

12  to Visium on related matters.

13  Q.  You mentioned the word "debates."  So would it be fair to

14  say that classifying a security as level 2 or level 3 is a

15  matter of interpretation?

16  A.  No.  It might be, but it not always is.  Sometimes it is

17  very clear into which category an asset falls.

18  Q.  But sometimes it is not clear, correct?

19  A.  That may be the case.  It is fact-and-circumstance

20  dependent.

21  Q.  Of course.  And I am saying, when you saw debates, those

22  facts and circumstances suggested that some people believed

23  that a security should be in level 2 and somebody believed that

24  a security should be in level 3?

25  A.  Yes.

H1c2lum2                          Keily - Cross

1   Q.  You told the jury about a term yesterday called "painting

2   the tape"?

3   A.  Yes.

4   Q.  That term, as I recall, was not -- well, let me rephrase

5   that.

6          The term "painting the tape" was not mentioned

7   anywhere in the March 2011 Visium compliance manual, correct?

8   A.  That's correct.

9   Q.  And the term "painting the tape" was not mentioned anywhere

10  in the 2013 revised compliance manual, correct?

11  A.  That I don't recall without reviewing the manual, however,

12  both manuals refer to market manipulative trading.  I don't

13  believe it is necessary to list.  In fact, it is impossible to

14  list every type of market manipulative trade.  But, yes,

15  painting the tape is one example of that.

16  Q.  It is not a criticism.  I am just asking the question.

17         Now, "painting the tape," when was the first time you

18  actually is heard that term?  Do you remember?

19  A.  No, I don't.

20  Q.  Was it when you first met with the prosecution team in this

21  case?

22  A.  No.

23  Q.  Is it fair to say that you discussed the term "painting the

24  tape" more often with the prosecution in your meetings with the

25  prosecution team in preparation for this case than at any time

H1c2lum2                              Keily - Cross

1    before in your career?

2    A.   No.

3    Q.   Is it fair to say that you discussed the term more than

4    once with the prosecutors in preparation for your testimony?

5    A.   Yes.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H1CPLUM3                          Keily - Cross

1    Q.  I'd like to revisit Government Exhibit 906 that's in

2    evidence.  Mr. Michaelson, our paralegal, would like to attempt

3    to put this on the screen.

4            I want to focus on the valuation section, which is

5    Page 34.  Mr. Keily, you remember talking about this yesterday

6    with the prosecutor?

7    A.  Yes.

8    Q.  Do you recall telling the jury that the compliance manual

9    was made available to investors?

10   A.  Copies of the compliance manual were available for

11   investors who asked to examine copies, yes.

12   Q.  Are you aware if any particular type of investor actually

13   examined a copy of the compliance manual?

14   A.  I'm sorry, could you repeat the question?

15   Q.  Are you aware of any single time that an investor actually

16   asked to view the compliance manual?

17   A.  Yes.

18   Q.  Okay.  That includes the March 2011 compliance manual?

19   A.  I don't recall which edition of compliance manuals were

20   examined by which investors on which dates.

21   Q.  Okay.

22   A.  But I do recall that sophisticated institutional investors

23   wanted very much to be able to examine, and did examine at some

24   great length, the compliance manuals.

25   Q.  Okay.  You said sophisticated institutional investors.

1  Were there any unsophisticated institutional investors that

2  invested in the credit fund?

3  A.  No, I don't believe so.  It's almost a contradiction in

4  terms.

5  Q.  Were there any individual investors that invested in the

6  credit fund?

7  A.  I believe there were high-net worth individuals who had

8  investments, yes.

9  Q.  Those high-net worth individuals were sophisticated

10  investors?

11  A.  Those high-net worth individuals certified in the

12  subscription agreement to the funds that they were accredited

13  investors and that they were qualified purchasers, both of

14  which are technical definitions under the federal securities

15  laws that attempt to define what a sophisticated investor is.

16  Q.  The net asset value of the funds is computed by the

17  year-end prices; is that fair to say?  Or, I'm sorry, it's

18  reported by the prices of the securities in the fund; is that

19  fair to say?

20  A.  I'm not sure I understand the question.

21  Q.  Neither do I, and I'm not sure I understand securities all

22  that well.

23        What does net asset value represent?

24  A.  In simplest form, it represents the value of a fund's

25  assets, minus the value of its liabilities.

1  Q.  Okay.  Does the pricing of securities have any impact on

2  the net asset value of a fund?

3  A.  Absolutely.

4  Q.  In what way does it have that impact?

5  A.  Well, both the asset side and the liability side are

6  affected by the valuation of securities.  So when you're

7  computing the -- let's just look at the asset side.  If you're

8  computing the asset side of net asset value, you need to

9  compute the fair market value or fair value, I guess, under ASC

10 820 of those securities.  And the issue is that those

11 securities are still in existence.  In other words, they

12 haven't been turned into cash.

13       It would be easier if, at the end of every reporting

14 period, you had to sell everything and turn it all into cash.

15 Then there would be no valuation issue, but that would be very

16 inefficient and that, of course, is not the way that investment

17 portfolios are done.  So at the end of a reporting period, you

18 have to look at the valuation of assets.

19       And with respect to short positions, those are

20 positions where the portfolio manager is betting that the value

21 will decrease.  There, you have to look at the valuation on the

22 liability side.

23 Q.  Okay.  Is it fair to say that the net asset value is an

24 indicator to investors of how well their investment is doing?

25 A.  Yes.

H1CPLUM3                          Keily - Cross

1   Q.   Okay.  Since the valuation of securities is basically the

2   foundation -- or impacts the net asset value, is it fair to say

3   that -- as on the top of Page 34, in the first paragraph --

4   that the valuation policies and procedures are intended to be

5   fair, consistent and verifiable, recognizing that investors may

6   both subscribe to and redeem interests in the funds in reliance

7   on the values derived from such policies and procedures?  You

8   would agree with that statement?

9   A.   The second statement in that first paragraph?

10  Q.   Yes.

11  A.   Yes.

12  Q.   So a sophisticated investor would certainly want to look at

13  the valuation section of a compliance manual of the fund,

14  correct?

15  A.   A sophisticated investor would be interested in the firm's

16  valuation policies and procedures.

17  Q.   Okay.  I would like to turn for a moment to Page 35.  I'm

18  going to skip to Page 35.  That doesn't necessarily mean I

19  won't go back to 34; so I hope no one has any false

20  expectations.

21            So Page 35, if you zoom in on the paragraph above

22  Section 4.  Now, it says there, Visium will generally look to

23  established pricing sources, including but not limited to,

24  Bloomberg and Reuters.  The pricing function will be carried

25  out by the accounting team, which is independent of the

1   portfolio managers and the trading desk.  The administrator

2   will also verify the prices using its own independent data

3   sources.

4           Okay.  So that paragraph alone, some funds could

5   simply put in their materials, right?  Some funds, perhaps -- I

6   don't know if you're aware or not in your history of working

7   for funds, but are you aware whether some funds simply price

8   their securities according to established pricing sources

9   exclusively?

10  A.  I'm not competent to express an opinion on what percentage

11  of hedge funds out there rely solely on established pricing

12  sources or not.  I haven't seen a survey of the universe to

13  know or to opine on that percentage.

14  Q.  Okay.  No.  I'm wondering.  How about any?  Are you aware

15  whether it's a practice of some hedge funds to price their

16  securities solely according to third-party sources?

17  A.  I think it's a matter of what types of instruments hedge

18  funds invest in.  If a hedge fund invests solely in Level 1

19  assets, then there's no reason for it to use anything but

20  established pricing sources.

21  Q.  If the fund also invests in Level 2 assets, would it be

22  fair to say that certain of those funds rely solely on pricing

23  sources that are established pricing sources --

24          MR. NAFTALIS:  Objection.

25  Q.  -- and not the pricing of the -- or not any pricing, but

H1CPLUM3                        Keily - Cross

1    put forth by their portfolio manager?

2              MR. NAFTALIS:  Objection, your Honor, foundation,

3    asked and answered.

4              THE COURT:  Sustained.

5    BY MR. CREIZMAN:

6    Q.  In any case, Visium did not solely look to established

7    pricing sources, including but not limited to, Bloomberg and

8    Reuters; isn't that right?

9    A.  I believe I testified that with respect to the period in

10   question, I can talk about what these policies and procedures

11   say.

12   Q.  Okay.

13   A.  But I'm not prepared to talk about it and have no

14   knowledge, except in retrospect, how those policies and

15   procedures were implemented.

16   Q.  I'm not asking about how they were implemented.  I'm simply

17   asking about the representations that were made to investors.

18   What I'm asking, essentially, and I'm seeing that -- I

19   certainly don't want to antagonize you.

20              So let's go on back to Page 34.  I'm going to focus on

21   Paragraph 1, under Fair Value.  I'm going to focus on the

22   beginning of the sentence, "however," and that sentence says --

23   I won't even make you read it like the government did.

24              However, if there are circumstances where a hedge fund

25   manager believes that the application of fair value would not

H1CPLUM3                        Keily - Cross

1    produce an accurate or fair valuation for a given instrument,

2    it may employ alternative means to value an instrument as

3    permitted by agreement.

4              Okay.  Now, is it fair to say that investors,

5    sophisticated investors who read Visium's disclosures,

6    understand that if there are circumstances where a portfolio

7    manager believes that fair value would not produce an accurate

8    or fair valuation for a given instrument, it may produce

9    alternative means to value an instrument?  Is that fair?

10             MR. NAFTALIS:  Objection.

11   A.  No --

12             THE COURT:  Well, the objection was well taken, but

13   since the answer was blurted out, I think we'll just leave it

14   as is.  But I would caution the witness to wait, if there's an

15   objection, before answering.  Go ahead.

16   BY MR. CREIZMAN:

17   Q.  Let's move down to Paragraph 2 -- I'm sorry, section 2,

18   paragraph 2, the second paragraph, third sentence.  We know

19   from your testimony that -- I believe, that there was a fund

20   administrator for Visium?

21   A.  For the funds, yes.

22   Q.  Okay.  And that fund administrator was Morgan Stanley

23   Financial Services?

24   A.  It was Morgan Stanley Fund Services.

25   Q.  Sorry, Morgan Stanley Fund Services?

H1CPLUM3                        Keily - Cross

A.   Yes.

Q.   Morgan Stanley Fund Services, according to the compliance

manuals you testified about yesterday, provided initial prices

to the securities and the bonds based on established pricing

sources?

A.   I did not testify to that effect yesterday, in my

recollection.

Q.   You testified, though, to what the compliance manual said,

correct?

A.   I testified, as I recall, to what an administrator in

general does, but I don't recall any testimony about what

exactly Morgan Stanley Fund Services did in respect of the

valuation policies and procedures of Visium, other than that,

as I recall, to read some paragraphs from Pages 34, 35 and 36.

Q.   Did those paragraphs, as you recall, describe what the fund

administrator did?

A.   It describes what some of the fund administrators' duties

are, yes.

Q.   Okay.  In any event, going back to the third sentence on

Page 34, paragraph 2, in the event that Visium feels that a

price used by the administrator is inconsistent with fair

value, then it will document the discrepancy and provide

support for its pricing.

        You were asked about that sentence yesterday, correct?

A.   I believe so.

199

1    Q.  And you testified that Visium investors were provided

2    information about discrepancies like that, correct?

3    A.  I testified, as I recall, that Visium investors were

4    provided with a report called the Strata report, which

5    indicated what percentage of a firm's net asset value was

6    calculated in reliance on manager-supplied prices.

7    Q.  Okay.  I think that's right.  Going back to Page 35, and

8    now we'll go to section 4.  Okay?  And this is something that

9    both govern the policies at Visium, correct, and also something

10   investors would certainly review, correct?

11   A.  Something that certain investors would review, yes.

12   Q.  Okay.  Where market prices for an instrument are not

13   readily available or in the instance the market price does not

14   reflect fair value, then Visium shall look to alternative

15   sources, with reliability, stability and independence being the

16   main criteria.

17         Do you have any understanding who, under this

18   compliance policy, determines whether a market price reflects

19   fair value?

20   A.  That's the way the policy is drafted --

21   Q.  Right.

22   A.  -- makes that the responsibility of the valuation

23   committee.

24   Q.  The valuation committee would make that decision as to

25   whether the market price reflects fair value or not?

H1CPLUM3                          Keily - Cross

1   A.   Yes.

2   Q.   Between July 2011 and July 2013 and beyond, you didn't have

3   observer status on the valuation committee; isn't that right?

4   A.   That's correct.

5   Q.   So if the valuation committee delegated the responsibility

6   of determining whether the market price reflected fair value to

7   a portfolio manager, that would be something that you would or

8   would not know about?

9          MR. NAFTALIS:   Objection, your Honor, foundation,

10  speculation.

11         THE COURT:   Sustained.

12  Q.   In any event, the valuation committee -- whatever its

13  internal processes were -- it's your understanding, determined

14  whether the market price reflects fair value or not?

15  A.   I'm sorry, could you repeat the question?

16  Q.   This compliance manual, dated from March 2011, it governed

17  Visium's compliance policies from 2011 until you revised the

18  policy, correct?

19  A.   There were additions that were not material to these

20  matters that were appended to the March 2011 compliance manual,

21  but, yes, this was, for all practical purposes here, the

22  compliance manual in effect until September 2013.

23  Q.   Okay.   It's your understanding that during that time

24  period, it was the valuation committee that determined whether

25  the market price reflects fair value or not, correct?

H1CPLUM3                         Keily - Cross

1   A.   As I testified before, I can talk about what these policies

2   and procedures provide for, but I cannot testify as to how they

3   were implemented.

4   Q.   The only people that could testify as to how they were

5   implemented were the people on the valuation committee?

6   A.   With respect to these matters, yes.

7   Q.   All right.   In terms of whether these matters, meaning the

8   items in the compliance manual on valuation, in terms of who

9   policed whether those representations were enforced, that would

10  not have been the chief compliance officer, correct?

11  A.   I'm sorry, could you repeat the question?

12  Q.   What I'm saying is that you had no role during that time

13  period in determining, in terms of enforcing, in terms of

14  policing whether those representations that were made to

15  investors were actually followed?

16  A.   I'm sorry, but are we talking about determining, enforcing?

17  Q.   Both.   How about determining?

18  A.   Why don't we take one at a time?

19  Q.   Let's do that.

20  A.   So please ask the question.

21  Q.   Okay.   Determining.   Did you have any role in determining

22  whether those representations to investors were carried out

23  during the time period of July 2011 to July 2013?

24            MR. NAFTALIS:   Asked and answered, your Honor.

25            THE COURT:   I'll allow it.   You can answer it again.

1    A.  My question, sir, would be what representations are you

2    referring to?

3    Q.  Okay.  The representations that we reviewed on Pages 34 and

4    35.

5    A.  Those aren't representations to investors.  Those stipulate

6    what policies and procedures are.

7    Q.  Okay.  So did you have any role, during that time, in

8    determining whether those policies and procedures were enforced

9    or carried out?

10    A.  I believe I've testified to that already.

11    Q.  And your testimony was no?

12    A.  My testimony was that during the period in question, from

13    July 2011 through at least July 2013, that I had no

14    transparency into what the operations of the valuation

15    committee, or how it implemented these policies and procedures,

16    other than that gained through post hoc review of the valuation

17    committee minutes, beginning in 2013.

18    Q.  Okay.  I want to focus on the time period, though.  During

19    the time period, who had that function in terms of determining

20    and whether these policies were enforced with respect to the

21    credit fund during 2011 to 2013?

22    A.  Are we referring, in this case, to the valuation policies

23    and procedures?

24    Q.  Correct, yes, is the shorthand.  Thank you.

25    A.  Yes.  Valuation policies and procedures during that period

1  of time were run by the finance and the accounting department

2  and were ultimately under the control of the valuation

3  committee.

4  Q.  Okay.  I think we are done, mercifully, with Government

5  Exhibit 906.  One more minute.

6          THE COURT:  All right.  Well, you have a full five

7  minutes and 20 seconds left on the time.

8          MR. CREIZMAN:  All right.  I am definitely done.

9  Q.  I'd like to discuss with you Government Exhibit 712, which

10  I believe is in evidence.  Yes, it's in evidence.  Okay,

11  terrific.

12          MR. CREIZMAN:  Oh, Mr. Michaelson, can you put that on

13  the screen?  Thank you.

14  Q.  Okay.  And this document here, dated October 2010, was this

15  a document that was distributed to investors?

16  A.  Yes.

17  Q.  Sophisticated investors?

18  A.  It was -- I can't make that categorical statement because I

19  don't know who received copies of this document.

20  Q.  Okay.  But do you know what the purpose of this document

21  is?

22  A.  Yes, it's a private placement memorandum.

23  Q.  What is a private placement memorandum?

24  A.  The purpose of a private placement memorandum, as I

25  testified yesterday, is to solicit an investment from

investors, and in this document, it describes the nature of the

investment, the investment vehicle, the investment manager, the

type of investment strategy that's being pursued, the risk of

making an investment, and it also goes into detail about the

procedures for buying into or selling out of the investment and

several other matters.

Q.   Now, while people like me and you might enjoy reading this

at home at night, this is mainly for potential investors in the

credit fund, correct?

A.   Yes.

Q.   Okay.  So on Page 37, if you would -- and I just want to

focus on one sentence and one sentence only, and that is on

line one, two, three, four, five, six, seven -- line seven in

paragraph 15.  Okay.  I'm going to read this.  The

administrator, in computing the net asset value of the fund --

just to break right here, net asset value is otherwise known as

NAV?

A.   That's correct.

Q.   Which we talked about before?

A.   Yes.

Q.   Will use prices that are determined by the fund -- and just

to be clear, "the fund" here is referring to the Visium credit

opportunities fund?

A.   It's referring to both the offshore theater fund and the

master fund, yes.

1  Q.  The fund that Mr. Plaford is the portfolio manager of?

2  A.  Yes.

3  Q.  In fund's the sole discretion and described in the

4  administration agreement, right?  That's what it says?

5  A.  Yes.

6  Q.  Was there an SEC audit, administrative audit of the fund of

7  the Visium funds during your tenure?

8  A.  There was an SEC examination of the investment manager,

9  Visium Asset Management, yes.

10  Q.  Okay.  Were there individuals from the SEC that were

11  present at Visium during a particular period of time in

12  connection with that examination?

13  A.  Yes.  It was a routine regulatory examination, and it's

14  customary for the staff of the SEC to be present at the

15  manager's office during the examination.

16  Q.  That happened while you were at the fund?

17  A.  While I was at Visium, yes.

18  Q.  Sorry, while you were at Visium.

19       Do you know how long these SEC representatives were

20  basically spending their days at Visium's offices?

21  A.  How long they spent their days?

22  Q.  Meaning how many days, weeks, months?

23  A.  I believe that they first came on premises in late November

24  of 2011.

25  Q.  Okay.

H1CPLUM3                          Keily - Redirect

1   A.  And I believe their last day on the premises was in or

2   around March 1st of 2012.

3   Q.  Okay.  You mentioned yesterday that, I believe, the SEC was

4   provided documents relating to the valuation process at Visium?

5   A.  During the examination?

6   Q.  Yes.

7   A.  As best as I can recall, yes.

8   Q.  Okay.  So that was one of the areas that the SEC looked at?

9   A.  Yes.

10  Q.  Okay.  Did the SEC make any findings as to pricing?

11          THE COURT:  Sustained.

12  Q.  The SEC was provided documentation regarding valuation,

13  correct?

14  A.  Yes.

15  Q.  It was an area that the SEC looked at; is that right?

16  A.  Yes.

17          THE COURT:  Counsel, your --

18          MR. CREIZMAN:  No further questions.

19          THE COURT:  -- time is up.  Redirect.

20          MR. NAFTALIS:  Briefly, your Honor.  Thank you.

21          Ms. Meister, can you please bring up Government

22  Exhibit 1120 in evidence.  Can you zoom into the top third of

23  the document, please.

24  REDIRECT EXAMINATION

25  BY MR. NAFTALIS:

1    Q.  Mr. Keily, this is the certification you looked at at the

2    beginning of your testimony; is that right?

3    A.  Yes.

4    Q.  It's for Mr. Lumiere, the defendant?

5    A.  Yes.

6    Q.  And in it, the defendant specifically acknowledges in

7    writing that he has read and understands and agrees to abide by

8    Visium's compliance policy, right?

9    A.  Yes.

10   Q.  The point of this, as you testified, is there's evidence,

11   if there's ever a dispute, to show that someone actually read,

12   reviewed and said they understood the policy, correct?

13   A.  Yes.

14   Q.  At any time, did the defendant ever come to you and say I

15   don't understand the policy?

16   A.  Not that I recall, no.

17   Q.  Okay.  In fact, he certified that he read and understood it

18   and agreed to abide by it, right?

19   A.  Yes.

20   Q.  We saw that he actually signed a similar certification in

21   2009; is that right?

22   A.  Yes.

23   Q.  For substantially the same valuation policy?

24   A.  Yes.

25   Q.  It's an individual's responsibility to comply with the

H1CPLUM3                        Keily - Redirect

1   compliance policy, right?

2   A.  Everyone has that responsibility who is employed by Visium,

3   yes.

4   Q.  That's the point of the acknowledgment, right?

5   A.  Yes.

6   Q.  An individual can't say, it's up to someone else to catch

7   me if I run afoul?

8           MR. CREIZMAN:  Objection.

9           THE COURT:  Sustained.

10  Q.  We spent a lot of time on the valuation policy, right?

11  A.  Yes.

12  Q.  It includes a lot of details?

13  A.  Yes.

14  Q.  All right.  We're finally done.  And its guidance --

15          THE COURT:  Is that a question or a hope?

16          MR. NAFTALIS:  It's a hope.  I really hope it's almost

17  done.

18  Q.  It provides guidance and specifically lays out Visium was

19  supposed to value its securities, right?

20  A.  Yes.

21  Q.  Mr. Creizman asked you a number of questions implying that

22  you did not provide guidance to the defendant about how to

23  comply with the compliance policy, correct?

24          MR. CREIZMAN:  Objection as to what I implied.

25  Q.  Mr. Creizman stated that you did not give guidance to the

1    defendant about how to comply with the compliance policy,

2    right?

3    A.  I don't recall the exact dialogue, but the defendant let it

4    be clear, while as educated as all other employees, was

5    educated in compliance policies and procedures that were

6    relevant to his or her job.

7    Q.  Right.  It says in the compliance policy, for example --

8    it's fair to say you didn't need to give additional guidance to

9    anybody at Visium about how to value securities; it's laid out

10   there, right?

11              MR. CREIZMAN:  Objection on leading grounds.

12              MR. NAFTALIS:  It's redirect, your Honor.

13              THE COURT:  Yes, the rules on redirect don't change.

14   Sustained.

15   BY MR. NAFTALIS:

16   Q.  Did you feel the need to give additional education to the

17   defendant -- where he did not come to you and say, I don't

18   understand what I'm doing -- about how to apply the valuation

19   procedures in the compliance policy?

20              MR. CREIZMAN:  Objection, asked and answered.

21              THE COURT:  Overruled.

22   A.  There were two questions there.  Can we go through them one

23   by one, please?

24   Q.  Just to walk it through, the defendant acknowledged that he

25   understood exactly how Visium is supposed to value things,

H1CPLUM3                           Keily - Redirect

1   correct?

2   A.  I'm sorry, I couldn't hear that part.  Your Honor was

3   coughing.

4   Q.  The defendant --

5            THE COURT:  The jury should not infer that that was

6   any comment.

7   Q.  The defendant acknowledged that he understood the policy,

8   correct?

9   A.  Yes.

10  Q.  He never came to you and said, I need help?

11  A.  No.

12  Q.  Did you feel the need to further educate the defendant on

13  the policy?

14  A.  No.

15  Q.  In the policy, it provides guidance, for example, about

16  fiduciary duties and conflicts of interest?

17  A.  Yes.

18           MR. CREIZMAN:  Objection.  I mean, I just wanted to

19  mention that it was leading.

20           THE COURT:  Yes.  We'll let the last answer stand, but

21  I think it should not continue to be a problem.

22  Q.  So it provides --

23           MR. NAFTALIS:  I'll move on.  I think we've made the

24  point.

25           THE COURT:  I need to advise both counsel, for whom I

H1CPLUM3                              Keily - Redirect

1  have the greatest respect on both sides, that all you should do

2  is ask questions.  Both counsel have actually have a human

3  tendency to get an answer that maybe fits their predilections

4  to say, "yes," "right," or "I've made my point" or whatever.

5  Don't do that, either side.  Go ahead.  Put another question.

6  BY MR. NAFTALIS:

7  Q.  Did you feel the need to provide additional guidance to the

8  defendant about whether it was appropriate to manipulate the

9  value of securities?

10 A.  No.

11 Q.  Was that topic covered in the compliance policy?

12 A.  Yes.

13 Q.  Did you feel that you needed to provide additional guidance

14 to the defendant about manipulating value of a portfolio?

15 A.  No.

16 Q.  Would that topic be covered by the compliance policy?

17 A.  Yes.

18 Q.  Did you feel that you should tell the defendant that he

19 should not manipulate brokers into giving fake quotes?

20            MR. CREIZMAN:  Objection.

21            THE COURT:  Overruled.

22 A.  No.

23 Q.  Was that topic covered by the compliance policy?

24 A.  Yes.

25 Q.  Did you feel that you needed to give guidance to the

1   defendant about selecting brokers to give quotes who did not

2   even trade in those securities?

3   A.  No.

4   Q.  Was that topic covered by the compliance policy?

5   A.  Under the strictures to engage -- to act in accordance with

6   one's fiduciary duty to obtain the most accurate valuations

7   possible and to avoid any conflict of interest and to put the

8   client's interests ahead of one's own, yes.

9   Q.  Did you feel that you needed to give the defendant

10  additional guidance about portfolio pumping?

11  A.  No.

12  Q.  That topic was covered in the compliance policy, correct?

13  A.  Yes.

14  Q.  Now, Mr. Creizman asked you about certain disciplinary

15  infractions with respect to Mr. Thorell?

16  A.  Yes.

17  Q.  Were you aware of disciplinary infractions by the

18  defendant?

19  A.  Yes.

20          MR. CREIZMAN:  Objection.

21          MR. NAFTALIS:  I think that door's been open, your

22  Honor.

23          THE COURT:  I think we'll need a sidebar on this one.

24          (Continued on next page)

25

 1                (At the side bar)

 2                THE COURT:  So first of all, just so I know what we're

 3     talking about, what are the infractions we're talking about?

 4                MR. NAFTALIS:  They included the fact that Mr. Lumiere

 5     was disciplined or told that he should not be trading with his

 6     brother; so he's giving preferential trades to his brother.  He

 7     was disciplined for expenses --

 8                THE COURT:  And the brother's name wasn't even

 9     Gottlieb.

10                MR. NAFTALIS:  He did not report his external trading

11     accounts to the firm.  He didn't comply with the expense

12     policy.  He stopped showing up for work.  I think this has been

13     opened because the theme seems to be that somehow Mr. Lumiere

14     has been somehow unfairly treated by Visium, that they didn't

15     pay him his compensation, or whatever it is.

16                The line of cross that they were getting into on

17     Thorell was that somehow he got preferential treatment and he

18     was disciplined but still got this bonus at the end of his

19     termination.  We avoided this on purpose, and Mr. Creizman

20     stepped right into it.  We didn't mean to do it, but --

21                THE COURT:  I'm not quite sure I would use that

22     analogy.

23                MR. NAFTALIS:  Also, this whole theme about Gottlieb,

24     that somehow about the divorce, which is already before the

25     jury.  I mean, Gottlieb got a letter of education, but somehow

1   his client is above scandal.

2              MR. CREIZMAN:  I wouldn't say that.  That was not my

3   point.

4              THE COURT:  So on the one hand, I think the door has

5   been opened, but on the other hand, I think there is a 403

6   problem here that wouldn't pertain to anyone else that pertains

7   to the defendant.  That is, would the jury be prejudiced

8   against the defendant, not by the limited purpose for which

9   this is being offered, but by the inferences they might draw

10  from the various violations that he was accused of.

11             All of these were, as I understand it, charges, not

12  adjudications, right?

13             MR. NAFTALIS:  I don't think there's really like a

14  process there.  It's more of a -- I don't think he ever denied

15  it.  He was trading with his brother and never reported the

16  fact that he was trading with his brother.  His brother worked

17  at another brokerage firm.

18             MR. CREIZMAN:  I think he does argue about that.

19             MR. NAFTALIS:  I don't think that changes -- the

20  argument is going to be that Lumiere has no disciplinary

21  record.

22             THE COURT:  You're not going to be arguing that he has

23  no disciplinary history?

24             MR. CREIZMAN:  No, but now I feel like I need to do

25  one recross, which is -- now that the jury has heard this.

1              THE COURT:  They haven't heard anything.

2              MR. CREIZMAN:  They've heard him say yes to the

3     question.

4              THE COURT:  Well, that's --

5              MR. CREIZMAN:  If I were, my recross would simply be:

6     None of those disciplinary actions regarded pricing or

7     valuation, correct?

8              MR. NAFTALIS:  But then why did you go into the

9     Thorell stuff?

10             MR. CREIZMAN:  Thorell is a witness.

11             THE COURT:  All right.  Well, anyway, I am sustaining

12    the objection solely on a 403 basis, but I'm not going to

13    permit that additional question on recross, which I think then

14    does open the door so wide.  Then the jury is going to, if you

15    put that question, want to know exactly what the violations

16    were because I think you're suggesting none of them have to do

17    anything with pricing.

18             Well, maybe they had to do with other things that

19    might bear directly or indirectly on valuations somebody makes.

20    By the way, all of this is without prejudice to this possibly

21    being used or not, I don't know, if the defendant takes the

22    stand, which he may or may not.

23             So with those rulings, the objection is sustained.

24             MR. CREIZMAN:  Permission to just sound a little bit

25    like a wiseguy, but I don't really mean any disrespect or

1    anything like that.

2              THE COURT:  No.

3              MR. CREIZMAN:  Will I be permitted to ask the

4    question, him object, and then --

5              THE COURT:  No, no.

6              MR. CREIZMAN:  Okay.  Thank you.

7              THE COURT:  I'm glad you raised that at the sidebar so

8    I won't have to reprimand you in front of the jury.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1             (In open court)

 2             MR. NAFTALIS:  It's an odd way to end, but we have no

 3     further questions.

 4             THE COURT:  Okay.  Anything else from the defense?

 5             MR. CREIZMAN:  No, your Honor.

 6             THE COURT:  All right.  Very good.  You may step down.

 7     Thank you very much.  Please call your next witness.

 8             (Witness excused)

 9             MR. NAFTALIS:  Your Honor, the government calls Jason

10     Thorell.  Your Honor, I think we need to have a sidebar, it

11     occurs to me.

12             THE COURT:  Okay.  Before we swear?

13             MR. NAFTALIS:  Without the jury here.

14             THE COURT:  Oh, all right.  Come to the sidebar.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

H1CPLUM3                          Keily – Redirect

1              (At the side bar)

2              MR. NAFTALIS:  He needs to invoke before to trigger

3     the immunity agreement.

4              THE COURT:  Oh, thank you very much for raising that.

5     Okay.  I think I'll just tell the jury that we'll have pity on

6     them and give them an early lunch.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court)

2              THE COURT:  So ladies and gentlemen, counsel have

3     convinced me that it would be cruel and unusual to start this

4     witness without first giving you lunch.  I, of course, argued

5     vigorously against their position, but they overwhelmed me.

6              So we will take lunch now, and we will resume.  Why

7     don't we say we'll resume very promptly at 2:00; so you'll have

8     an hour or more.  See you then.

9              (Jury not present)

10             THE COURT:  Please be seated.  I know you sent it to

11    me before, but do you have a copy of that agreement?

12             MR. NAFTALIS:  One moment, your Honor.

13             THE COURT:  My law clerk has it.  Okay.  So we still

14    have to swear the witness in.

15     JASON THORELL,

16         called as a witness by the Government,

17         having been duly sworn, testified as follows:

18             THE DEPUTY CLERK:  Please be seated.  State your name

19    and spell it slowly for the record.

20             THE WITNESS:  Jason Thorell, T-h-o-r-e-l-l.

21             THE COURT:  Mr. Thorell, is it your intention to

22    invoke your Fifth Amendment privilege against

23    self-incrimination with respect to all subsequent questions

24    pertaining to this matter, unless you are granted immunity?  Is

25    that correct?

H1CPLUM3                    Keily - Redirect

1               THE WITNESS:  Yes.

2               THE COURT:  Okay.  So I've actually pre-signed it, but

3     I will reaffirm the immunity order and give it to my courtroom

4     deputy to docket.  All right.  Anything else we need in that

5     regard?

6               MR. NAFTALIS:  No, your Honor.  That's it.

7               THE COURT:  All right.  So, Mr. Thorell, we'll start

8     with you at 2:00.  Okay?

9               Anything else counsel needs to raise with the Court?

10              MR. CREIZMAN:  No, your Honor.

11              MR. NAFTALIS:  No.

12              THE COURT:  Very good.  We'll see you at 2:00.

13              (Luncheon recess)

14

15

16

17

18

19

20

21

22

23

24

25

1                          AFTERNOON SESSION

2                              2:10 p.m.

3                (In open court; jury not present)

4                MR. NAFTALIS:  Judge, do you want us to distribute the

5      transcript binders now?  We're going to play a clip pretty

6      soon.

7                THE COURT:  Why don't you put them on the seats,

8      that's a good idea.  And let's get the witness on the stand.

9                (Jury present)

10               THE COURT:  Does everyone have one of those binders

11     now?  Don't open them yet, but, you know, they will become

12     relevant shortly.  But for now, you can just put them down

13     beside you.

14               So let's swear in the witness.

15               (Witness sworn)

16               THE DEPUTY CLERK:  Please state your name.

17               THE DEFENDANT:  Jason Thorell.

18               THE COURT:  Spell your last name.

19               THE DEFENDANT:  T-H-O-R-E-L-L.

20               THE COURT:  Counsel.

21      JASON THORELL,

22          called as a witness by the Government,

23          having been duly sworn, testified as follows:

24      DIRECT EXAMINATION

25      BY MR. NAFTALIS:

1    Q.  Good afternoon, Mr. Thorell.

2    A.  Good afternoon.

3    Q.  How old are you?

4    A.  38.

5    Q.  Where were you born?

6    A.  Plymouth, Massachusetts.

7    Q.  How far did you go in school?

8    A.  I went through college, got a bachelor of science in

9    finance.

10   Q.  Where?

11   A.  Providence College.

12   Q.  In what year?

13   A.  Graduated in 2001.

14   Q.  Are you familiar with a hedge fund called Visium Asset

15   Management?

16   A.  Yes.

17   Q.  How?

18   A.  I worked there.

19   Q.  When did you work there?

20   A.  From 2011 to 2013.

21   Q.  Mr. Thorell, did you receive a subpoena to be in court

22   today?

23   A.  Yes.

24   Q.  Are you testifying here under a compulsion and immunity

25   order from the court?

1    A.   Yes.

2    Q.   What do you understand that order to do?

3    A.   It compels me to testify, and anything I say cannot be used

4    against me by the government as long as I do not lie.

5    Q.   Does this immunity order protect you from prosecution using

6    evidence other than testimony here in court and evidence

7    derived from your testimony?

8    A.   No.

9    Q.   Do you have any agreements with the government?

10   A.   No.

11   Q.   Were you willing to answer questions at this trial without

12   receiving immunity?

13   A.   No.

14   Q.   Mr. Thorell, what is your understanding of what you did

15   that caused you to need immunity?

16   A.   I participated in a mismarking scheme with others.

17   Q.   When you say "mismarking," what do you mean?

18   A.   Valuation mispricing.

19   Q.   Where did you do this?

20   A.   At Visium Asset Management.

21   Q.   Did you understand that the mismarking or misvaluation of

22   securities was illegal?

23   A.   Yes.

24   Q.   Did you engage in this mismarking alone or with other

25   people?

1   A.  With others.

2   Q.  Do you recognize anyone in the courtroom today who engaged

3   in the mismarking of securities at Visium with you?

4   A.  Yes.

5   Q.  Can you identify who that individual is?

6   A.  Yes.

7   Q.  Identify where they're sitting and what they're wearing.

8   A.  Second table to the back, third person to my left, black

9   suit.

10          THE COURT:  The record will reflect the identification

11   of the defendant.

12   Q.  Who is that?  What's that person's name?

13   A.  Stefan Lumiere.

14   Q.  Did there come a time when you reported your concerns about

15   the mismarking of securities?

16   A.  Yes.

17   Q.  Who did you report your concerns to first?

18   A.  First I reported internally to Jacob Gottlieb.

19   Q.  Who is he?

20   A.  He's the founder and was the CIO, chief investment officer,

21   of Visium Asset Management.

22   Q.  We'll look at the details later, but how, if at all, did

23   you feel that Visium addressed the concerns you had raised

24   about the mismarking of securities?

25   A.  I think overall, in general, they neglected to address them

H1C3LUM4                          Thorell - direct

1   or were generally dismissive of my concerns.

2   Q.  Did there come a time when you reported your concerns about

3   the mismarking of securities of Visium to agencies of the

4   government?

5   A.  Yes.

6   Q.  Which agency did you report to first?

7   A.  The SEC.

8   Q.  Did you subsequently speak to other government agencies?

9   A.  Yes.

10  Q.  Which ones?

11  A.  The Department of Justice, which consisted of the U.S.

12  Attorney's Office, as well as the FBI.

13  Q.  Did the FBI ask you to do anything?

14  A.  Yes.

15  Q.  What did you do?

16  A.  Upon their request, I agreed to make recordings.

17  Q.  Who did you record?

18  A.  Among others, I recorded Stefan Lumiere.

19  Q.  What was your understanding of the goal of making those

20  recordings?

21  A.  To assist in the investigation, and more specifically, to

22  gather evidence.

23          MR. NAFTALIS:  Your Honor, I'm going to read a

24  stipulation, but I will just do the substance.

25          THE COURT:  Okay.

1          MR. NAFTALIS:  The parties stipulate that Government

2   Exhibits 1208-A, 1209-A, 1212-A, 1216-A, and 1219-A through

3   1234-A are true and correct copies of certain recordings that

4   Stefan Lumiere, the defendant, made.  The conversations

5   contained on compact discs as Government Exhibits 1235 to 1239,

6   along with the file titles indicated on the recordings are

7   authentic.

8          It is further stipulated and agreed that this

9   stipulation may be received in evidence at trial.

10          Your Honor, we offer Government Exhibit 1403 and we

11   also offer the exhibits I just read.

12          THE COURT:  All received.

13          (Government's Exhibit 1403, 1208-A, 1209-A, 1212-A,

14   1216-A  received in evidence)

15          (Government's Exhibit 1219-A to 1234-A,1235 to 1239

16   received in evidence)

17   Q.  Mr. Thorell, in front of you you'll see a compact disc.  Do

18   you see that?

19   A.  Yes.

20   Q.  And Government Exhibits 1219-T through 1226-T and 1234-T.

21   You can pick them up.

22   A.  Yes, I see them.

23   Q.  Generally, what is on that CD, which is marked 1236?

24   A.  Yes.  I recognize the CD.  It's a collection of recordings

25   that I made.

1    Q.  How do you recognize that CD?

2    A.  Because I've listened to it in the past, and I remember it.

3    I also initialed it and dated it.

4    Q.  There are certain pieces of paper in front of you marked

5    1219-T through 1226-T as well as 1234-T.  Do you see those?

6    A.  Yes, I do.

7    Q.  Do you recognize those?

8    A.  I do.

9    Q.  How do you recognize them?

10   A.  Again, I remember them, and again, I initialed and dated

11   each one of them.

12   Q.  Generally, what are they?

13   A.  Generally they're transcripts that correspond to the

14   recordings on the CD.

15   Q.  Do they truly and accurately reflect the substance of what

16   was discussed on these recordings?

17   A.  Yes.

18   Q.  Are the attributions of the speakers correct?

19   A.  Yes.

20        MR. NAFTALIS:  Your Honor, we offer Government

21   Exhibits 1219-T through 1226-T and 1224-T as aids to the jury.

22        MR. CREIZMAN:  No objection.

23        THE COURT:  What that means, ladies and gentlemen, is

24   that the ultimate evidence are the recordings themselves, and

25   parts of those will be played for you.  But when you're in the

1   jury room, if you want any part of it played, just send us a

2   note and we will play it for you.

3           These transcripts are not themselves evidence, they

4   are a way of helping you when you're listening to the tape to

5   know what is being said.  But if you have any question at any

6   point, like maybe you'll have a question not about what a word

7   was but how it was said, what was the intonation or something

8   like that, you'll just let us know and we'll play the tapes for

9   you during your deliberations, and portions will be played

10  right now.

11          So, you can look at all these transcripts as we get to

12  each tape.  But remember, the transcripts themselves are not

13  the evidence.  The ultimate evidence is the tape itself.

14          Go ahead, counsel.

15          MR. NAFTALIS:  Thank you, your Honor.

16  Q.  Mr. Thorell, you testified that you went to the SEC at a

17  certain point?

18  A.  Yes.

19  Q.  When was that, roughly?

20  A.  That was roughly late December of 2013.

21  Q.  When did you go to the SEC?

22  A.  I went to the SEC -- oh, initially, in terms of making the

23  report?

24  Q.  When did you first report anything to --

25  A.  Oh.  I first reported it September of 2013.

1   Q.  Did you subsequently make recordings of the defendant?

2   A.  I did.

3   Q.  When did you do that?

4   A.  Late 2013, to -- starting point to start in early '14, in

5   that timeframe.

6   Q.  When you met with Mr. Lumiere, did you discuss potentially

7   reporting to the SEC together?

8   A.  Yes.

9   Q.  That's called blowing the whistle?

10  A.  Yes.

11  Q.  Had you already blown the whistle to the SEC?

12  A.  Yes.

13  Q.  Why did you say this to Mr. Lumiere?

14  A.  It was a decision made, as brought up by myself and in

15  discussion with the FBI to -- in order to get him to discuss

16  whatever is pertinent to the investigation, I felt that it was

17  fairly a natural subject, given that on a limited basis prior

18  to that, we had already discussed it anyway, so it was bound to

19  come up regardless.

20  Q.  Did you actually intend to blow the whistle with

21  Mr. Lumiere?

22  A.  No.

23  Q.  In fact, had you already blown the whistle?

24  A.  Yes.

25  Q.  During your discussion with Mr. Lumiere, did you also

1   discuss working together in the future?

2   A.  Yes.

3   Q.  Just generally, what type of work were you talking about?

4   A.  In terms of career work?

5   Q.  Right.

6   A.  I recollect that he had mentioned he was starting a fund,

7   and there was a possibility of me joining that fund at some

8   point.  And then more general terms, my situation and any

9   potential job leads that I had.

10  Q.  Did you actually intend to work with Mr. Lumiere?

11  A.  No.

12          MR. NAFTALIS:  Ms. Pyun, can you bring up Government

13  Exhibit 1223-T and the jury can flip to 1223-T in their

14  binders.

15  Q.  Mr. Thorell, who are the participants in this recording?

16  A.  Myself and Stefan Lumiere.

17  Q.  When was the recording made?

18  A.  January 17 of 2014.

19          MR. NAFTALIS:  Ms. Pyun, can you please play

20  Government Exhibit 1223-A, which is in evidence.

21          (Audio recording playing)

22          MR. NAFTALIS:  Your Honor, can we ask the jury if they

23  can hear that?  I'm not clear.

24          A JUROR:  Just start it over.

25          A JUROR:  We missed the first part.

1              MR. CREIZMAN:  Could we have a side bar?

2              THE COURT:  Yes.

3              (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (At the sidebar)

2              MR. CREIZMAN:  This happens to be one of those

3     transcripts that I addressed last night.

4              THE COURT:  So, I'm sorry, when they're about to play

5     one that you think something else should be played as part of

6     it, you need to approach the sidebar first.

7              Let me take a look at this one now.

8              MR. CREIZMAN:  Right.

9              THE COURT:  Which is yours?  Which exhibit are we on?

10             MR. CREIZMAN:  1223-T and I had a proposed --

11             THE COURT:  The first one.  All right.

12             MR. NAFTALIS:  I think this is the one you mentioned

13    where we indicated we were going to lay the foundation before

14    to give the context.

15             THE COURT:  So my recollection is that the question

16    that's being put here had to do with bringing a whistleblower

17    suit.  Let me go back and see what defense counsel -- let me

18    see.  For example, in part of what defense counsel had

19    submitted, which is immediately prior to the conversation that

20    was played, about a page and a half before, Mr. Lumiere says "I

21    don't know how I go about suing Visium, the administrators I've

22    spoken to say," etc., etc.

23             So, my understanding was that that was a reference to

24    a whistleblower suit, which is not the foundation that was just

25    laid.

1          MR. NAFTALIS:  If you keep reading, your Honor.

2          THE COURT:  Okay.

3          MR. NAFTALIS:  Just, your Honor, to be clear, we

4    included the beginning of this because we thought to avoid a

5    rule of completeness issue.  Meaning, we included that little

6    beginning part because we assumed that they would want the

7    context.  And I think that now what they want to do is use that

8    to now put in three pages.

9          THE COURT:  No.  I understand that objection.  But let

10   me just see.  So, they continue discussing that.  And

11   Mr. Lumiere gets into discussions with his attorney, I'm

12   referring now all to stuff that's in the defense proposed

13   submission.  And then Mr. Lumiere talks about how he hates

14   these guys, meaning Visium, and he says how, you know, so it's

15   not clear to me that this is in the context of reporting it, of

16   blowing the whistle, as the witness just said.  It was more in

17   the context, and maybe I'm missing something here, but it is

18   in --

19         MR. NAFTALIS:  It is the last line.

20         MR. WILLIAMS:  If you look at page four, your Honor,

21   between lines nine through 12.

22         THE COURT:  Let's look at that.  Page four, lines nine

23   and 12.  "Mr. Thorell:  I'm sure, like, it could be him, I

24   don't know, like, no one has said I'm going to blow the

25   whistle, but people have said I will take down this company.

1    So I don't want to say names, because that doesn't mean they're

2    going to do it.  So if you're not first in, like," and then

3    Mr. Lumiere says, "Are you looking to do this more from

4    damaging them or are you looking at potentially getting a fee

5    for yourself or both?"  Which, again, sounds to me like a

6    whistleblower situation.  "Mr. Thorell:  Probably both.  But I

7    really want to damage them."

8            And then we get to the part that was just played, so

9    it seems to me that at least what should be played is at an

10   absolute minimum from line nine.

11           MR. CREIZMAN:  If I may add, the context for the

12   previous discussion is that Mr. Lumiere is saying that about a

13   whistleblower suit, his concern about -- because what comes out

14   of context, I think, is Mr. Lumiere says things like I'm

15   concerned about a whistleblower suit, and that leaves open the

16   idea that perhaps he's concerned about his own exposure.  When

17   he was actually concerned about his rep -- his ability to raise

18   money for a new hedge fund because he used to work at Visium,

19   that's why he talks about marketers.

20           THE COURT:  That may be true, but I don't think that's

21   the immediate context of what the government is playing.

22           So what I think the government should play is what

23   they just played, which will have to be played again anyway

24   because the jury had trouble hearing it and understanding it.

25   But, starting at line nine.

1          Now in terms of transcripts, and this goes to any

2    further rulings I make on this.  For now, of course, they'll

3    only have the transcript of the portion the government

4    originally intended to play.  But when the transcripts are

5    prepared in final, they will include whatever else I've added,

6    and I will let the jury know it will include that as well.

7    That will have to be prepared and introduced as a substitute

8    for the transcripts that are being introduced now.

9          MR. WILLIAMS:  Your Honor, can we just notify the

10   Court that the clip that we just played was pre-snipped from a

11   larger audio.  So the paralegals will have to find the whole

12   audio, locate where --

13         THE COURT:  You know, that's why I asked them in your

14   presence in open court earlier today would there be any problem

15   doing it, and they said no.

16         MR. WILLIAMS:  There will not be a problem.

17         THE COURT:  Let's do it.

18         MR. WILLIAMS:  It will take a little bit to locate it.

19         THE COURT:  How long is a little bit?

20         MR. CREIZMAN:  I have the timestamps.

21         (Continued on next page)

22

23

24

25

H1C3LUM4                    Thorell - direct

1        (In open court)

2        THE COURT:  Ladies and gentlemen, in order to give you

3   the full context, we're going to play a little bit more of that

4   tape, a few lines that start before.  Right now those added

5   lines will not be part of what you have in the transcript, but

6   we will prepare a new transcript before the case is given to

7   you for your deliberations.  So when you go in the jury room,

8   they'll have a full transcript of everything that's being

9   played.  But for now it will be just a few lines that are not

10   part of your transcript and it goes into the transcript.

11        (Pause)

12        THE COURT:  All right, in order to move this along,

13   because I can see that the logistics are in their normal state,

14   I will read the lines that I've admitted.  So if you want to

15   get out your transcript and turn back to where you were before,

16   and again, this can be played for you at any time you want, but

17   so we can move forward.

18        So this is Mr. Thorell talking:  "I'm sure, like, it

19   could be him.  I don't know.  Like, no one has said 'I'm going

20   to blow the whistle,' but people have said 'I will take down

21   this company.'  So I don't want to say names because that

22   doesn't mean they're going to do it.  So if you're not first

23   in, like."

24        And then Mr. Lumiere says:  "Are you, are you looking

25   to do this more from damaging them or are you looking at

1   potentially getting a fee for yourself or both?"

2          Mr. Thorell says:  "Probably both, but I really want

3   to damage them."

4          Mr. Lumiere says:  "Yeah."

5          Now we pick up with the recording so maybe you'll play

6   the recording from that point on.

7          MR. NAFTALIS:  Yes, your Honor.

8          THE COURT:  The original recording.

9          MR. NAFTALIS:  It's 1223-A.

10         (Audio recording playing)

11  BY MR. NAFTALIS:

12  Q.  Okay, Mr. Thorell, looking at this transcript, as an aid,

13  Mr. Lumiere says that "Chris has been mismarking shit since the

14  beginning."  Do you see that?

15  A.  Yes.

16  Q.  Who is Chris?

17  A.  Chris Plaford, my former boss at Visium.  Portfolio

18  manager.

19  Q.  Of which fund?

20  A.  Visium.

21  Q.  The credit fund?

22  A.  The credit fund.

23  Q.  And then Mr. Lumiere continues "Originally in 2011, he was

24  marking them too low."

25         And then moving down to line 15, Mr. Lumiere again

H1C3LUM4                        Thorell - direct

1     says "He's been mismarking shit egregiously outside context of

2     what was right from the beginning."

3            So who was mismarking since 2011 and who was

4     egregiously mismarking?  What does Lumiere say?

5     A.  Lumiere states that Chris Plaford was.

6     Q.  Was it just Chris Plaford who was egregiously mismarking

7     things since 2011?

8     A.  No, it was not.

9     Q.  Who else was doing that since 2011?

10    A.  Stefan.

11    Q.  When you spoke to Mr. Lumiere and he used the word "Chris

12    did this," what did you understand him to mean?

13    A.  I understood him to mean that, in the context of this

14    transcript, that he's speaking for Chris, but also himself.

15    Q.  And Mr. Lumiere references two securities, ATI and China

16    Med?

17    A.  Yes.

18    Q.  Who is responsible for the investments in ATI?

19    A.  Stefan.

20            MR. NAFTALIS:  We can put this aside.

21    Q.  Mr. Thorell, let's go back to your background.  What have

22    you done generally done for work since finishing college?

23    A.  In a general sense, I've been a trader in fixed income on

24    the buy side.

25    Q.  What do you mean by buy side?

H1C3LUM4                         Thorell - direct

```
1   A.  Buy side is a term that's used to establish the fact that
2   you're working in the capacity of an investment management
3   side.  In other words, the client of the sell side, which is
4   typically banks and broker-dealers.
5   Q.  Are hedge funds on the buy side?
6   A.  Yes.
7   Q.  Where did you first work after college?
8   A.  I first worked at Fidelity Investments.
9   Q.  What is Fidelity?
10  A.  It's a large asset management firm based out of Boston with
11  many mutual funds.
12  Q.  How long did you work there?
13  A.  Approximately five years.
14  Q.  What was your first position?
15  A.  My first position was as an accounting analyst.
16  Q.  What did that basically mean?
17  A.  It was an entry-level position where I had a number of
18  administrative duties.  More specifically, those included the
19  duties included keeping track of certain funds in regards to
20  their pricing, their valuation, and one of those duties was
21  assisting in the calculation of the NAV and verifying nightly
22  prices with the traders.
23  Q.  Did you come to have another position at Fidelity?
24  A.  Yes.
25  Q.  What was that?
```

1   A.  The job was entitled bank loan specialist.  Essentially

2   what that was, was, a position where I assisted mostly the

3   traders at Fidelity on the fixed income or high yield desk in

4   settling their trades, especially trades that the bank loan

5   trader made.

6   Q.  Did there come a time that you left Fidelity?

7   A.  Yes.

8   Q.  Where did you work next?

9   A.  I next worked at Mizuho Securities.

10  Q.  What is Mizuho Securities?

11  A.  Is a big international bank based out of Tokyo, the office

12  I worked at was in New York.

13  Q.  What did you do there?

14  A.  I was, again, a trader in charge of a certain amount of

15  allocated capital where I traded primarily bank debt, which is

16  a form of fixed income.

17  Q.  How long were you at Mizuho for?

18  A.  Approximately a year.

19  Q.  Where did you work after that?

20  A.  I next worked at Black Diamond Capital Management.

21  Q.  Where was Black Diamond?

22  A.  The headquarters, which is where I worked at, is based in

23  Lake Forest, Illinois, just outside Chicago.

24  Q.  What is Black Diamond?

25  A.  It is essentially a fairly large hedge fund specializing in

H1C3LUM4                       Thorell - direct

1   distressed investing.

2   Q.  How long were you at Black Diamond for?

3   A.  I was at Block Diamond approximately two and a half years.

4   Q.  What did you do for them?

5   A.  I was the distressed trader.

6   Q.  What type of distressed security, distressed debt?

7   A.  Debt, correct.

8   Q.  Did there come a time that you left Black Diamond?

9   A.  Yes.

10  Q.  Where did you go after that?

11  A.  Visium Asset Management.

12  Q.  Why did you move to Visium?

13  A.  It was pretty much entirely a personal decision.  I'm from

14  the Boston area, so I wanted to be back closer to my family.

15  And New York is obviously much closer than the Chicago area.

16  So, that's pretty much the reason.

17  Q.  You said you worked at Visium for what years?

18  A.  I worked there from early 2011 through most of '13.

19  Q.  What did you do at Visium?

20  A.  I was the credit trader.

21  Q.  Was there a particular fund you focused most of your

22  energies on?

23  A.  Yes, the credit opportunities fund.

24  Q.  Were there any other dedicated credit traders at Visium

25  during the time you worked there?

1   A.  No.

2   Q.  Roughly how much were you paid when you worked at Visium?

3   A.  I had a base salary that remained consistent of 150,000 per

4   year.  And if you include the bonuses, it ranged from

5   approximately 200 to -- 270, 280,000 to about 350,000 which,

6   again, includes the base salary with bonus included.

7           MR. NAFTALIS:  Ms. Pyun, can you bring up what's been

8   marked or what's admitted as Government Exhibit 106 in

9   evidence.

10  Q.  Mr. Thorell, there are hard copies in front of you if

11  that's easier or you can follow along on the screen.

12          What is Government Exhibit 106?

13  A.  Government Exhibit 106 is a marketing presentation for the

14  Visium Credit Opportunities Fund dated March 2013.

15  Q.  Is this sometimes called a pitch book?

16  A.  Yes.

17  Q.  Who were these presentations generally used for in your

18  experience?

19  A.  Generally used for investors of the fund as well as

20  prospective investors.

21          MR. NAFTALIS:  Ms. Pyun, can we go to page six,

22  please.

23  Q.  What is reflected on slide six?

24  A.  It's an organizational chart of Visium.

25  Q.  Who is at the top in the black box?

1   A.  Jacob Gottlieb.

2   Q.  Who is he?

3   A.  He is -- he was the founder and CIO of the firm.

4           MR. NAFTALIS:  Ms. Pyun, can we zoom in on the left

5   column only, please.

6   Q.  What is in the left column?

7   A.  That is the list of the members of the credit team

8   structured as a hierarchy of the team.

9   Q.  Who is on top?

10  A.  Chris Plaford.

11  Q.  Who is number two?

12  A.  Stefan Lumiere.

13  Q.  Where are you?

14  A.  I am at the bottom.

15  Q.  Let's talk about each of these people.  You mentioned

16  Mr. Plaford.  What was his position between 2011 and '13?

17  A.  He was the portfolio manager for the credit fund.

18  Q.  On a day-to-day basis, what did he do?

19  A.  He -- his basic duties included running the fund, which

20  essentially was the person in charge of making the investment

21  decisions; in other words, what to buy and sell, risk

22  management, etc.

23  Q.  Was he your boss?

24  A.  Yes.

25  Q.  Now, you testified earlier that you had engaged in the

1    mismarking of securities in the credit fund with Mr. Lumiere,

2    is that correct?

3    A.   That's correct.

4    Q.   In addition to doing this with the defendant, was

5    Mr. Plaford also involved in the mismarking of securities?

6    A.   Yes, he was.

7    Q.   So let's talk about Mr. Lumiere, the defendant.  What was

8    his role at Visium between 2011 and 2013?

9    A.   It was my understanding that he was a portfolio manager in

10   charge of a section or subsection of the credit fund with a

11   certain strategy specific to him, which included special

12   situations and distressed investing.

13   Q.   So let's take that one at a time.

14              MR. NAFTALIS:  Ms. Pyun, can you bring up Government

15   Exhibit 1160 in evidence.  Let's zoom in on that.  The whole

16   thing.

17   Q.   What is the date on this e-mail?

18   A.   The date is Monday, December 12 of 2011.

19   Q.   Who is it from?

20   A.   It's from Stefan.

21   Q.   Looking at the bottom in the signature block, what is the

22   title that he uses?

23   A.   In the subject block he uses the title of "we would

24   like" --

25   Q.   No, in the signature block at the bottom.

1    A.  Oh, I'm sorry.  The title is beneath his name, portfolio

2    manager, and then distressed and special situations.

3    Q.  What are special situations?  Actually, withdrawn.

4            Did you come to have an understanding of whether

5    Mr. Lumiere can make trading decisions within the credit fund?

6    A.  Yes.

7    Q.  Did Lumiere direct you to execute trades?

8    A.  Yes.

9    Q.  And you mentioned he managed a portion of the credit fund?

10   A.  Yes.

11   Q.  Approximately how much was his allocation of capital?

12   A.  I don't know exactly.  But, I would estimate that it was

13   between 50 to 75 million.

14            MR. CREIZMAN:  Objection.

15            MR. NAFTALIS:  Your Honor.

16            THE COURT:  Sustained.

17   Q.  You executed trades for the defendant?

18   A.  Yes.

19   Q.  In that capacity, as a member -- are you a member of the

20   credit team?

21   A.  I'm sorry, was I a member of the credit team?

22   Q.  Right.

23   A.  Yes.

24   Q.  In that capacity, did you become aware of the approximate

25   amount of capital that Mr. Lumiere managed in the credit fund?

1   A.  Yes, I had a strong conviction of the amount of capital.

2   Q.  How much money did he manage in the credit fund

3   approximately?

4   A.  Approximately 50 to 75 million.

5   Q.  Could anyone other than Mr. Plaford or the defendant make

6   the decision to buy or sell a security in the credit fund?

7   A.  No.

8   Q.  Are you familiar with the term "covering a name" or

9   "covering a position"?

10  A.  Yes.

11  Q.  When you use that term, when a portfolio manager covers a

12  name or covers a position, can you explain what that means?

13  A.  It's generally meant as a term to establish responsibility

14  for a certain name that's likely held in the portfolio.  So

15  that someone has responsibility for the name and certain duties

16  come with that responsibility, which include likely that person

17  made the investment decision, but following that, include

18  following financial performance, you know, through quarterly

19  statements, listening to management calls, visiting company,

20  etc.

21  Q.  As a portfolio manager in the credit fund, did the

22  defendant cover certain names?

23  A.  Yes.

24  Q.  We'll come back to that in a bit.  And was Mr. Lumiere

25  senior to you at Visium?

H1C3LUM4                          Thorell - direct

1   A.  Yes.

2   Q.  What, if anything, did he say about being your boss?

3   A.  He said on numerous occasions that he was my boss.

4   Q.  Who determined your compensation?

5   A.  Chris Plaford.

6   Q.  Just Chris Plaford?

7   A.  Well, Chris Plaford, but I had strong reason to believe --

8   in fact, it may have even -- I think almost positive it was

9   said to me by Stefan that -- in fact, I know now, thinking

10  about it, that he had input and discussed my compensation with

11  Mr. Plaford.

12         So, I think the best way to state it is Plaford had

13  the ultimate decision, but was influenced by Stefan.

14  Q.  Based on your observation, how did Mr. Lumiere carry

15  himself at Visium?

16  A.  He held himself very highly and project himself with a

17  very -- kind of -- an ego that was orally pervasive, I would

18  say.

19  Q.  What was the last word?

20  A.  Pervasive.

21  Q.  What was the word before that?

22  A.  Ego.

23  Q.  During your time working with the defendant, did you come

24  to have an understanding of his performance as a portfolio

25  manager?

H1C3LUM4                        Thorell - direct

1    A.  Yes.

2    Q.  What was your understanding?

3    A.  That, overall, it was not very good.

4    Q.  When you say "not very good," what do you mean?

5    A.  Lost money.

6    Q.  And during your time at Visium, what, if anything,

7    generally happened to portfolio managers who lost money?

8    A.  They get fired.

9    Q.  Can you remind the jury when you started at Visium?

10   A.  Yes, I started at Visium in January of 2011.

11   Q.  How had the credit fund performed before you arrived there?

12   A.  Very well.

13            MR. NAFTALIS:  Ms. Pyun, can you bring up Government

14   Exhibit 117 in evidence.  Just 117, sorry.  Let's zoom in on

15   the top half, please.

16   Q.  Do you recognize this slide?

17   A.  Yes, I do.

18   Q.  What is it?

19   A.  It's a part of -- appears to be part of the pitch book, and

20   specifically it is a chart that lists the returns for the

21   credit fund.

22   Q.  Looking at the right column it says YTD.  Do you know what

23   that means?

24   A.  Yes.  Year-to-date performance.

25   Q.  How did the credit fund perform year-to-date to the partial

1    year 2009?

2    A.  Very well.  Almost 20 percent.

3    Q.  How did the credit fund perform for 2010?

4    A.  Again, very well, almost 32 percent.

5    Q.  What about 2011?

6    A.  It was marginal.  Another way of saying that, almost flat,

7    which means just above zero, less than 1 percent.

8    Q.  2012, how did the fund do?

9    A.  It was up 5.8 percent.

10   Q.  And then for the portion of a year listed here, how did it

11   do through July?

12   A.  For that portion, it had a negative return of 4.6 percent.

13   Q.  To your understanding, was the performance of the credit

14   fund sent to the fund's investors?

15   A.  To my understanding it was sent.

16          MR. CREIZMAN:  Objection.  Timeframe.

17          THE COURT:  Do you want to put a timeframe on it?

18   When was it sent?

19   Q.  At what periods were the returns generally sent to

20   investors?

21   A.  I would estimate that --

22   Q.  Like, was it monthly, quarterly, annually?

23   A.  Well, it likely was monthly, and I'm basing that off of

24   that's when pricing was done in terms of a formal manner to

25   communicate to investors.  So, because of that calculation

1   being done on a monthly basis, I would presume that the -- the

2   NAV is part of your returns, that would be included in what's

3   sent.

4   Q.  Did there come a time when the credit fund closed down?

5   A.  Yes.

6   Q.  When did that happen?

7   A.  The credit fund essentially shut down September 30 of 2013,

8   except for, it's my understanding, small number, not in size

9   but number of credits or positions within the fund that were

10  illiquid or unable to be traded.  But aside from those few

11  exceptions, the fund was shut down then.

12  Q.  Why was the fund shut down?

13  A.  I believe because of poor performance, but in conjunction

14  with that, withdrawals.  In other words, redemptions from

15  investors.

16  Q.  To your knowledge, approximately when did the credit fund

17  start to become mismarked?

18  A.  To my knowledge, in mid 2011.  Perhaps a little earlier,

19  but around mid '11.

20  Q.  Let's just look at Government Exhibit 117.  How did the

21  funds start to do in the middle of 2011?

22  A.  It started to perform more poorly than previously, and

23  noticeably it started to have down months; in other words,

24  negative returns.

25  Q.  Okay.  And the defendant was involved beginning in the

1   middle of 2011?

2   A.  Yes, he was.

3   Q.  When did the mismarking continue through?

4   A.  Through approximately mid 2013, probably most likely

5   sometime in or including August of '13.

6   Q.  And did the defendant leave the firm at a certain point?

7   A.  Yes.

8   Q.  Was the defendant involved in the mismarking from -- when

9   did he continue to -- through when was he involved with the

10  mismarking?

11          MR. CREIZMAN:  Objection.  This is asked and answered.

12          THE COURT:  Overruled.

13  A.  Can you repeat the question, please?

14  Q.  You said that the defendant started to engage in the

15  mismarking of securities with you in the middle of 2011.

16  Through when was he involved in that mismarking?

17  A.  Through the time of his departure, which I believe was

18  April of 2013.

19          MR. NAFTALIS:  We can take that down, please.  Thank

20  you.

21  Q.  Let me direct your attention to the middle of 2011.  How

22  long had you been at Visium for that point?

23  A.  Through the middle of 2011, approximately five, maybe six

24  months.

25  Q.  Where did you sit at that point physically?  Where did you

1   sit in the office?

2   A.   Physically, I sat with the rest of the credit team, which

3   mostly consisted of the other analysts in a desk-type setup

4   where we're all located next to each other.  With the exception

5   of Chris Plaford, the portfolio manager, and Stefan Lumiere,

6   the other portfolio manager, who both had offices right off to

7   the side of the desk with the other team, including myself.

8   Q.   Did they have their own offices or did they share an

9   office?

10  A.   No, they each had their own office.

11  Q.   At that time, around the middle of 2011, did anyone else on

12  the credit team have their own office, beside the defendant and

13  Mr. Plaford?

14  A.   No.

15  Q.   In the middle of 2011, did there come a time when you spoke

16  to Mr. Plaford in his office?

17  A.   Yes.

18  Q.   How did that conversation begin?

19  A.   He contacted me, likely gave me a phone call, and asked if

20  he -- if I could come on by in his offices.

21  Q.   Did you do so?

22  A.   Yes.

23  Q.   Was anyone else present for this meeting?

24  A.   No.

25  Q.   Was the door open or closed?

H1C3LUM4                        Thorell - direct

1    A.  It was closed.

2    Q.  Did you frequently meet with Mr. Plaford in his office?

3    A.  No, very infrequent, very seldom.

4    Q.  What did Mr. Plaford say to you during this meeting?

5    A.  He -- it was a very brief meeting, he started by saying

6    that he had just got out of some meeting that had to do with

7    the pricing process and making some changes to it.  And as part

8    of the changes to the monthly pricing process, I as trader

9    would now be involved.  And the brief description of my

10   involvement that he gave me as part of the exchanges was that

11   it was decided, again, as trader that he, Plaford, as portfolio

12   manager, would send me an e-mail with an attachment on it which

13   the attachment was a spreadsheet.  And I was to take that

14   e-mail and that spreadsheet, and to reattach the spreadsheet

15   onto my own e-mail as if it was my own spreadsheet.  And under

16   that -- my own e-mail with his spreadsheet on my e-mail, send

17   it off to the operations group.

18           And he concluded the meeting with "Do not tell anyone

19   else at the firm about this conversation."

20   Q.  Let's go through the details of what Mr. Plaford said.  You

21   said he just got out of a meeting?

22   A.  Yes.

23   Q.  But there was going to be a change to the pricing process?

24   Generally what was this pricing process?

25           First, when did it occur?

1    A.  I'm sorry.  When did the pricing process -- on a monthly

2    basis.

3    Q.  What did you understand him to mean by the monthly pricing

4    process?

5    A.  I really didn't know.  It was a very vague, ambiguous

6    conversation.  But the best takeaway I had at the time was it

7    is a process that involves several steps, and this is just

8    based off of being new to Visium, but prior experience as well,

9    several steps that ultimately conclude in ending up with a

10   calculation for the NAV, which is Net Asset Value, to convey

11   that to investors as a measure of performance for the fund.

12   Q.  Before this conversation with Mr. Plaford, had you had any

13   involvement in the valuation of securities at Visium?

14   A.  No.

15   Q.  Can you just walk through again sort of the steps of what

16   Mr. Plaford was asking you to do?  He was going to send you

17   what?

18   A.  Sure.  He was going to send me an e-mail which he mentioned

19   there would be a attachment on it with a spreadsheet, Excel

20   spreadsheet, and that upon me receiving that e-mail, I was to

21   take that spreadsheet, reattach it on to my own e-mail, and

22   then send that off as if it were my own e-mail to the

23   operations group.

24   Q.  What was the operations group?

25   A.  Operations is a group within Visium, and it's pretty

1   standard, that does a lot of the back-end work.  In other

2   words, administrative work and support for investment team and

3   physically for traders like myself, which include settling

4   trades.

5           Specific to this situation, they had also had a role

6   in the pricing process.

7   Q.  Did you come to have an understanding of what this

8   attachment was?  We'll get to the details, but what was this

9   attachment that you would be forwarding along to operations?

10  A.  Right.  Initially I did not know.  But I did come to have

11  an understanding, and I eventually learned that it was a list

12  of securities within the portfolio and prices, and then

13  eventually I determined that those were overrides.

14  Q.  What do you mean by "overrides"?

15  A.  Overrides was a term used to mean that certain prices were

16  internally decided by some means to use as the price as inputs

17  in the -- inputs to calculation in the NAV, rather than what is

18  customarily the rule, which is using a benchmark pricing

19  service.  In Visium's case, that benchmark was typically

20  Reuters, a third-party pricing service.

21  Q.  What was your initial reaction to Plaford's request?

22  A.  I was at a loss.  I was overwhelmed.  I -- had a lot to

23  take in.  I was very confused.  The concluding remark or

24  request about not mentioning it anyone else was, to put it

25  mildly, unconventional, but raised a bit of a red flag.

1          I wasn't given a lot of details.  I felt that the

2    practice of taking a spreadsheet from someone else and, rather

3    than forwarding it, putting it on as your own and sending it

4    off, was not good practice.  So, I didn't know exactly what was

5    going on.  I had never been in a situation like that before.

6    It was a lot of confusion, a lot to take in, and it was a bit

7    of a red flag.

8          MR. NAFTALIS:  Ms. Pyun, can you bring up Government

9    Exhibit 719 in evidence, please.  Let's zoom in on the top

10   portion.

11   Q.  Who is this e-mail from and who is it to?

12   A.  It's from Chris Plaford to myself.

13   Q.  What is the subject?

14   A.  Prices.

15   Q.  What does he write in the first line?

16   A.  "Attached is price sheet send to Ops@Visiumfunds.com and

17   say 'highlighted names are broker quotes.'"

18   Q.  And the attached price sheet, again, what kind of

19   information did you come to learn was on this attachment?

20   A.  It was generally a list of securities or loans held within

21   the portfolio and prices.

22   Q.  Did the credit team refer to this document by any other

23   name?

24   A.  Yes.  At times it was referred to as bond comparison

25   spreadsheet or sometimes final bond comparison spreadsheet.

1   Q.  Did you follow Mr. Plaford's instructions and forward the

2   attachment to ops and write "highlighted names are broker

3   quotes"?

4               MR. CREIZMAN:  Objection.

5               THE COURT:  Ground?

6               MR. CREIZMAN:  Form.

7               THE COURT:  Borderline, but I'll allow it, overruled.

8   A.  For clarification purposes, I technically -- I didn't

9   forward it, but I did take -- I did follow his instructions

10  whereby I took his e-mail, reattached the spreadsheet to my

11  own, and sent it off as my own to operations and included

12  his -- in this case what he requested me to write in the

13  e-mail.

14              MR. NAFTALIS:  Ms. Pyun, can we bring up Government

15  Exhibit 720 in evidence.  Zoom in on the bottom half.

16  Q.  What is the date of this e-mail?

17  A.  The date is Tuesday, July 5, 2011.

18  Q.  When did Mr. Plaford send you that prior e-mail?

19  A.  He sent it on July 1st, 2011.

20  Q.  Who is this e-mail from and who is it to?

21  A.  It's from myself to ops, which is operations group.

22  Q.  What do you write in the body of the message?

23  A.  "Highlighted names are broker quotes."

24  Q.  What did Mr. Plaford tell you to write?

25  A.  Highlighted names are broker quotes.

1    Q.  What's attached to this e-mail?

2    A.  It is the attachment that Chris Plaford had provided me.

3           MR. NAFTALIS:  Let's go back to Government Exhibit

4    719, please, and zoom again on the top piece.

5    Q.  He references broker quotes.  What did you understand

6    broker quotes to mean?

7    A.  They were quotes provided by brokers, which, again they --

8    they were on the sell side, so, their clients included asset

9    managers, hedge funds such as Visium.  And as part of their

10   job, they traded with the buy side asset managers.  And again,

11   as part of their job, one of the services they provided was the

12   pricing, the monthly pricing service.

13          Oh, and to answer your question what is a broker

14   quote?

15   Q.  Right.

16   A.  It's a quote with an indication of where a broker -- their

17   best estimate of where the price is in terms of bond prices.

18   That includes two prices.  One is the bid, which is where a

19   broker will buy it, and one is the offer or ask, they mean the

20   same thing, which is where the broker will sell it.

21   Q.  Before the middle of 2011, in your experience, did brokers

22   provide quotes for securities that they did not trade?

23   A.  No.

24   Q.  In your experience, why was that?

25   A.  If they did not trade it, it was almost inevitable that

1   they did not know the name.  And by "name," I mean credit or

2   bond in the sense that they're not familiar with it enough to

3   accurately price or value that particular security.

4           MR. NAFTALIS:  Let's look at the attachment to this to

5   Government Exhibit 719.  And can you zoom in on the -- let's

6   zoom in on the top with the first highlighting.

7   Q.  I want you to walk the jury through what each of these

8   columns are.  The first is labeled "account number."  What does

9   that mean?

10  A.  Sure.  Account number is an identifier that specifies the

11  corresponding fund to that identifier.

12  Q.  Just looking at this spreadsheet, each item or description

13  is listed three times, is that right?

14  A.  That's right.

15  Q.  And the account numbers repeat, so to speak?

16  A.  Yes.

17  Q.  Can you just explain, does one of these account numbers

18  correspond to the credit fund?

19  A.  Yes.

20  Q.  Which one is that?

21  A.  It's the account number that ends in KH8.

22  Q.  So in the example of the one that's highlighted, for

23  example, the one in the middle?

24  A.  Yes, yes.

25  Q.  What does CUSIP mean?

1   A.  CUSIP is a unique identifier that's used to identify a

2   particular bond.

3   Q.  What does "description" mean?

4   A.  Description is a way of describing a security that includes

5   the bond ticker, the coupon or industry, and the maturity date.

6   Q.  There is a column labeled "currency."  What is that?

7   A.  That's the currency that the bond is issued or denominated

8   in.

9   Q.  The next one says "long short."  What does that mean?

10  A.  Long is the term to mean that the position is held with the

11  investment view that -- it is a bullish bet.  So in other

12  words, the investment play, so to speak, is that the view is

13  that the position will perform well and go up in value.

14  Q.  So that you own the position?

15  A.  You own the position.

16  Q.  And then "quantity" is what?

17  A.  That's the amount of the bond held.

18  Q.  And then let's skip out pricing and go to Reuters price.

19  What does Reuters price mean?

20  A.  Reuters price is, it's part of Reuters, it is a third-party

21  service.  They provide to provide pricing, again, as a

22  third-party service, so that firms such as Visium could rely on

23  a third-party independent benchmark service.

24              (Continued on next page)

25

```
 1    Q.  And to the left of Reuters, it says Our Price.  What does
 2    Our Price mean?
 3    A.  That would be Visium's internally generated price.
 4    Q.  Now, if you look at the bottom, you see one of the rows is
 5    highlighted -- or three of the rows are highlighted -- for the
 6    same security?
 7    A.  Yes.
 8    Q.  Did you come to have an understanding of what the
 9    highlighted positions -- what the highlighting meant with
10    respect to those positions?
11    A.  Yes.  I came to understand that the highlighted names were
12    the pricing overrides.
13    Q.  When you say overrides -- let's just walk through the first
14    highlighted one.  What is ARDX?  We don't have to read the
15    rest, but what is ARDX?
16    A.  It's a bond ticker that's for Aurora Diagnostics, the
17    company.
18    Q.  The numbers that follow it, are those just the specifics of
19    the bond?
20    A.  That's correct.
21    Q.  In this case, it indicates that it is a long position?
22    A.  That's right.
23    Q.  That Visium owned the bond?
24    A.  That's right.
25    Q.  In the middle column, you said that's the credit fund?
```

1   A.   Yes.

2   Q.   Approximately how many bonds did Visium own in the credit

3   fund of this Aurora Diagnostics?

4   A.   About 20 million.

5   Q.   Now, we'll focus in particular in the Our Price versus

6   Reuters price.   What is the Reuters independent price here?

7   A.   103.

8   Q.   And what does Visium say that this bond is worth?

9   A.   106-and-a-half.

10  Q.   Since it's highlighted, what does that mean; which price is

11  Visium going to use?

12  A.   If it's highlighted, they're going to use the -- it's an

13  override; so they'll use Visium's price, the 106-and-a-half.

14  Q.   What's the difference between 106-and-a-half and 103?

15  A.   Three-and-a-half points.

16  Q.   It's about 20 million bonds, you said?

17  A.   Yes.

18  Q.   20 million bonds?

19  A.   Yes.

20  Q.   Okay.   At three-and-a-half points, can you do the math for

21  us?   If you use a price of three-and-a-half on the entire 20

22  million bonds, what does that mean in dollars?

23  A.   That would be $700,000.

24  Q.   Okay.   To whose favor?

25  A.   Visium's.

H1CPLUM5                          Thorell - Direct

1   Q.  That means that the value of these bonds is $700,000 higher

2   now?

3   A.  Yes.

4   Q.  Or they're marked $700,000 higher?

5   A.  Yes.  Using Visium's mark, yes.

6   Q.  Let's just zoom out for one second.  Okay.  So that's

7   700,000-additional dollars.  And there are multiple highlights

8   on this page, right?

9   A.  Yes.

10  Q.  Let's go to the next page.  More highlighting again, right?

11  A.  Yes.

12  Q.  Using the override price?

13  A.  In general?  Yes.

14  Q.  Go to the next page.  More highlighting again?

15  A.  Yes.

16  Q.  Using the override price?

17  A.  Yes.

18  Q.  Can we zoom in on the bottom half?  Perfect, yes.

19          So let's look here at the top, the top set of

20  securities that are called Sevan FRN; do you see that?

21  A.  Yes.

22  Q.  What was Sevan?

23  A.  Sevan was a credit -- it's a company, Sevan Marine, that is

24  a Norwegian company that provided maritime products, floating

25  platforms for trailing companies.

1   Q.  The FRN, we don't need to get into the details of it, but

2   what does that mean?

3   A.  It means floating rate note.

4   Q.  Who covered Sevan?

5   A.  Stefan.

6   Q.  Again, what does it mean to cover a company?

7   A.  It means that you are responsible, you are in charge for

8   that name.  Likely, it was your investment idea and,

9   therefore -- again, your specific duties include risk

10  management, staying on top of performance in terms of financial

11  statements, management calls, financial models, among other

12  things.

13  Q.  Okay.

14          MR. NAFTALIS:  I have two more questions and then we

15  can --

16          THE COURT:  Yes.  We'll need to give the jury their

17  mid-afternoon break.

18  Q.  And here, just to look at it, the position is held long

19  again; is that right?

20  A.  Yes, that's right.

21  Q.  Do you recall whether the right column is the Reuters'

22  column?

23  A.  Yes.

24  Q.  Okay.  And what's that here?

25  A.  It's about 91-and-a-quarter.

1    Q.  What's the Visium price?

2    A.  93.

3    Q.  Again, it's the highlighting.  This position is

4    highlighted; so what does that mean?

5    A.  Override.

6              MR. NAFTALIS:  We can break here, your Honor.

7              THE COURT:  All right.  Very good.  So at least we'll

8    take a 15-minute break at this time.

9              (Jury not present)

10             THE COURT:  Please be seated.  All right.  Anything we

11   need to take up?

12             MR. CREIZMAN:  One housekeeping thing, your Honor.

13             THE COURT:  Yes.

14             MR. CREIZMAN:  May I personally be excused from the

15   Daubert hearing this evening?  My colleagues will handle it.  I

16   inadvertently stood up Judge Engelmayer on an in camera hearing

17   that I did not recall, and I think he issued basically a bench

18   warrant.  He wants me to appear there at 5:15.

19             THE COURT:  Well, you know, Judge Engelmayer is just a

20   kid.  You have to get your priorities straight here.

21             MR. CREIZMAN:  That's what I did last night.

22             THE COURT:  That's fine, of course.

23             MR. CREIZMAN:  Okay.

24             MR. NAFTALIS:  The one thing I wanted to flag --

25             THE COURT:  Yes.

1          MR. NAFTALIS:  -- is that because defense has provided

2     these objections so late, the flow of using these recordings is

3     getting massively interrupted, and the effect of playing them

4     is really slowing down the case; so I don't know what to do.

5     We're going to play more.

6          THE COURT:  Well, you know, let me ask you this.  Are

7     you going to get to more this afternoon?

8          MR. NAFTALIS:  Yes.

9          THE COURT:  Kind of while we're at it, how much more

10    do you have with this witness?

11         MR. NAFTALIS:  I think I'm about halfway through.

12         THE COURT:  Okay.

13         MR. NAFTALIS:  We're not there quite yet, just so you

14    know; so there is time, but --

15         THE COURT:  All right.  Let's see if we can deal with

16    it now.  So the next one that was the subject of defense

17    counsel's submission was what is connected to Government

18    Exhibits 1224T and 1225T, and the defense first wants to play

19    what is approximately a page, a little over a page, that

20    connects what is being played from the first of those exhibits

21    to the second of those exhibits.

22         While I thought one could maybe knock out some of

23    those intervening lines, it seemed to me that it was

24    appropriate to play that entire connecting portion.  So I'm,

25    subject to hearing from counsel, inclined -- which would also

1    make this a single exhibit, I think and a single transcript.

2    So, in other words, on what was given to me, and these page

3    numbers, I don't know if they correspond to anything else, but

4    on the defense submission, this would be Page 1, line 23, the

5    entirety of Page 2 and Page 3, lines 1 through 5.

6         The result would be there would be one uninterrupted

7    playing, beginning on what in the defense submission is Page 1,

8    line 2 and onto Page 4, line 6.

9         Now, thereafter, the defense thought that completeness

10   demanded an additional nearly five pages, none of which seem to

11   me to fit within the rule of completeness, even under the

12   fairly broad interpretation that I gave it to receive a

13   connecting portion.  So let me stop there to hear from the two

14   sides.  Just so you're clear, my tentative ruling is to give

15   the connecting portion but none of the rest.

16        Anything from the government?

17        MR. NAFTALIS:  Your Honor, I guess the issue with the

18   intervening snippet it's really irrelevant.  He's trying to get

19   in something his lawyer allegedly told him after the fact in

20   place of testifying.  It had nothing to do with his state of

21   mind at the time, and it's really going to confuse the jury.

22        THE COURT:  I think that is true, largely true, but I

23   think it does give the jury a feeling for the context.  And

24   also, I think there's some advantages to having the two

25   sections you want to play connected up by whatever was

1    intervening, even if it was otherwise irrelevant, just to show

2    the overall flow.

3            I don't really disagree that, taken narrowly, it's

4    largely irrelevant, but I think to provide a real feel for how

5    this conversation went, it would be --

6            MR. NAFTALIS:  Your Honor, I guess the issue is we're

7    not playing them back to back.  The issue is, he is telling --

8    meaning Mr. Lumiere is saying this is what happened back then.

9    I mean, the part about Mr. Lumiere talking about his lawyer has

10   nothing to do with what happened.

11           THE COURT:  The defense's point has always been to

12   emphasize that this is retrospective, and this helps place in

13   context that very fact because the discussions with his lawyer

14   and all show what stage this conversation was taking place, in

15   the overall context.

16           But before I hear further from the government.  Let me

17   hear if the defense wanted to say anything about the lengthy

18   additional portion you wanted to include.

19           MR. CREIZMAN:  I do because I think that, you know, to

20   the extent that Mr. Naftalis points out that, you know, his

21   conversation with the lawyer is after the fact, the material

22   that we highlight after the statement by -- this is the

23   exchange:

24           Jason Thorell:  But that, the thing is, it doesn't

25   matter.  If he has an explanation because he's lying, you know

1    that.

2            And they ended off with Stefan:  Yes, so that's the

3    way he did it.

4            It goes forward, though, to explain why at the time

5    he, you know, Stefan -- I'm sorry, Mr. Lumiere goes on later in

6    this transcript to explain why, at the time, he didn't think

7    Mr. Plaford was lying and why he did come to --

8            THE COURT:  But I think you misunderstand the rule of

9    completeness.  The rule of completeness does not mean that

10   everything, every self-serving statement that a party may have

11   made at some point in a recording comes in just because it puts

12   an arguably different spin on what was said.

13           If that was the case, the rule of completeness would

14   really be a rule that entire recordings in their entirety would

15   always be admissible, which is clearly not the law.  So it has

16   to have a more proximate connection.  It has to, in addition to

17   adding something that is relevant to the jury, it has to be

18   reasonably close to the statements that were made, and the

19   ruling I made earlier is really much closer to an example.

20           There was, at least at the minimum, a possibility that

21   what they were actually talking about was a whistleblower suit,

22   not on a blowing-the-whistle-to-the-government approach, and we

23   needed to add those lines that the Court did add to show that

24   that was a possible way of reading it.  But here, it's just

25   going on at great length with a much less proximate causation.

1          The only reason I'm even thinking of allowing in the

2    intervening part is not because it is itself relevant, I don't

3    think on its face it is narrowly relevant, but I think that

4    there's always a benefit, within limits, when you're going to

5    play two snippets and they are connected by to fairly short

6    intervening snippet, which makes clear the retroactive or

7    retrospective aspect of it, that that is appropriate under the

8    rule of completeness.  But I'm not hearing yet something that

9    would allow all this other stuff that you want to allow in.

10          MR. CREIZMAN:  Well, maybe not all of it, but by

11    leaving that snippet of the conversation -- yes, so that's the

12    way he did it -- where he basically says it doesn't matter if

13    he has an explanation because he's lying, it is leaving the

14    impression -- it's not that long after this conversation that

15    Mr. Lumiere provides context for why he now thinks he was

16    lying, but why at the time he did not.  And I think that that's

17    important because without that -- because if the government

18    wants to leave in that little snippet --

19          THE COURT:  Well, the most I could see would be adding

20    lines 6 and 7.  Now, at that point in time and the CMED thing,

21    I wasn't really involved, I helped out at the beginning, that

22    again would show that, taken most favorably to you, that that's

23    a retrospective analysis.  I'll hear from the government on

24    that in a minute, but I don't see anything more that could be

25    added under the rule of completeness.

1          MR. CREIZMAN:  Well, if I could just offer my

2    suggestion.  I would say up to -- you know, he gets into the

3    meat of it just a couple of lines later, down from 9 to 13.

4    You know, at least there, you know, if we're not going to have

5    the whole -- the fulsome explanation or discussion by

6    Mr. Lumiere, at least through Line 13 there's some context, I

7    think, that Mr. Lumiere's talking about seeing -- you know,

8    he's talking about -- well, I guess if you go there, then

9    really it's to line 24.  I mean, there's an explanation that

10   he's making.  It was somewhat substantive, meaning this is what

11   Chris Plaford was telling him.

12         THE COURT:  Well, I understand your point.  As you

13   were talking, of course, it grew and grew, and before we know

14   it -- I understand why you had the whole full page in.

15             Although, your term fulsome, if you look it up in the

16   dictionary, although that now is sometimes misused as being

17   very complete.  Fulsome originally was a term of disparagement,

18   as in sneering.  Fulsome praise meant sneering, ironic,

19   overexaggerated praise, and I assume that wasn't the meaning

20   you wanted to ascribe to your client's statements.

21             So in any event, I have your point, but I'm only going

22   to add 6 and 7.  Let me hear if there's anything the government

23   wants to say on this.

24         MR. WILLIAMS:  Your Honor, if we could just clarify.

25   It sounds like the Court has admitted, under Rule 106,

1   basically the connective tissue between the first clip and the

2   second clip so that it is one clip?

3          THE COURT:  Yes.

4          MR. WILLIAMS:  If the government only plays the first

5   clip and does not play the second clip, then the connective

6   tissue, therefore --

7          THE COURT:  Then we don't need the connective tissue.

8          MR. WILLIAMS:  Okay.  And so --

9          THE COURT:  That's a strategy call that you can make.

10          MR. WILLIAMS:  Understood, your Honor.  And then as to

11   the second clip, where we are right now is that your Honor,

12   under Rule 106, would be allowing the defense to get in lines 7

13   and 8?

14          THE COURT:  No, 6 and 7.

15          MR. WILLIAMS:  6 and 7, alone?

16          THE COURT:  Yes.

17          MR. WILLIAMS:  Then the connective tissue is out.  So

18   we will consult internally, and then figure out what the plan

19   is.

20          THE COURT:  All right.

21          MR. NAFTALIS:  Your Honor, just on the connective

22   tissue, I think that Mr. Creizman is being a little creative

23   with what the connective tissue does.  The point of the first

24   clip is that Mr. Lumiere is saying these brokers did not trade

25   in these securities.  Okay?  It has nothing to do with when he

1    figured out something about Chris Plaford, which he's trying to

2    put the two together, my lawyer told me -- and my lawyer told

3    me these guys may or may not be in trouble.

4           He's saying, I knew at the time that these brokers

5    never traded in it.  How is his lawyer talking to him after the

6    fact, explaining to him -- what does he learn from his lawyer

7    at that point?  He's putting this in because his lawyer is

8    saying, these guys won't get in trouble.  It has nothing to do

9    with what he knew when.  That's the point of that clip is that

10   he is admitting these guys are --

11          THE COURT:  I hear what you're saying, but I adhere to

12   my rulings and reasons already stated.  If you don't want that

13   in, you're free to only play the first clip.

14          All right.  Now, I wasn't quite sure what else defense

15   counsel was seeking.  You gave me some additional clips, but I

16   think those were just clips of what the government is putting

17   in, not anything additional you wanted in?

18          MR. CREIZMAN:  Right.  Those were just the

19   government's clips alone, and then I put the clips in context.

20          THE COURT:  So we've covered what we needed to cover;

21   do I have that right?

22          MR. CREIZMAN:  Yes, your Honor.

23          THE COURT:  Very good.  We'll take five minutes.

24          MR. NAFTALIS:  Your Honor, I just wanted to be clear

25   that these are the only objections, that we can just go through

1   our direct examination?

2            THE COURT:  Yes.  However that plays out, you need to

3   prepare a transcript.

4            MR. WILLIAMS:  If the first clip is on its own?

5            THE COURT:  Yes.  If the first clip is on its own,

6   you'll need to prepare a new transcript.

7            (Recess)

8            THE DEPUTY CLERK:  May I bring in the jury?

9            THE COURT:  Yes, and let's get the witness on the

10  stand.

11           (Jury present)

12           THE COURT:  Please be seated.  All right, counsel.

13           MR. NAFTALIS:  Thank you, your Honor.  Ms. Pyun, can

14  you bring Government Exhibit 719 back up, please.

15  BY MR. NAFTALIS:

16  Q.  This is the e-mail from July 1st, 2001; is that correct?

17  A.  Yes, that's correct.

18  Q.  The initial one we were looking at?

19  A.  Yes.

20  Q.  What does Mr. Plaford write in the second paragraph?

21  A.  The second paragraph he writes:  For the names that are

22  highlighted, you will need to print out the hard copy for ops.

23  Only need highlighted names.  Below is a sheet with which

24  bank/time for the price to use.  Make sure the mid-market price

25  from the broker matches the price in the sheet, but it should.

1   Let me know if there are any issues.

2   Q.  Okay.  So he says, for the names that are highlighted, do

3   you see that part?

4   A.  Yes.

5   Q.  And we saw a bunch of highlighted securities on the

6   attachment?

7   A.  Yes.

8   Q.  Again, what are the highlighted securities?

9   A.  The pricing overrides.

10  Q.  Was Visium going to use its price over the Reuters price?

11  A.  Correct.

12  Q.  Then Mr. Plaford goes on to say, for those things, you will

13  need to present the hard copy for ops?

14  A.  Yes.

15  Q.  What did you come to understand the printing out the hard

16  copy for ops meant?

17  A.  I came to understand it was referencing the Bloomberg

18  messages sent from brokers to myself and many other people that

19  contained the prices of the bonds.  I would equate it to an

20  e-mail, only in Bloomberg format, and it's the way the brokers

21  send out prices, to communicate price fluctuations throughout

22  the day.

23  Q.  So there's two types of Bloombergs, the Bloomberg you

24  referred to it earlier, the pricing source, right?  Bloomberg

25  can be a pricing source; is that correct?

1    A.   Yes.   There's Reuters pricing source, but Bloomberg can be

2    one, yes.

3    Q.   But Bloomberg also has an e-mail system?

4    A.   Yes.

5    Q.   Okay.   In this case, you said that he's asking you to print

6    out Bloomberg e-mails and those e-mails are from brokers?

7    A.   Yes.

8    Q.   With quotes, price quotes?

9    A.   Yes.

10   Q.   And what were those broker quotes used for?

11   A.   They were used as support or, in other words, backup to

12   substantiate the override prices that Visium was using instead

13   of the default or benchmark Reuters price.

14   Q.   Okay.   Did the defendant, during the course of this

15   mismarking scheme, give you Bloomberg broker quotes --

16   A.   Yes.

17   Q.   -- to substantiate the overrides?

18   A.   Yes.

19   Q.   Let's look at an example of how this plays out.   Let's go

20   back to the attachment to this e-mail very quickly, to the

21   Sevan Marine on Page 3 of the attachment.   And looking at the

22   second-to-last column for the Sevan Marine quote, what is the

23   Our Price?

24   A.   That would be -- the Our Price is 93.

25   Q.   That's going to override the 91.246?

1    A.  Correct.

2            MR. NAFTALIS:  Ms. Pyun, can you bring up Government

3    Exhibit 625C?  Actually, before I do that, your Honor, the

4    parties have stipulated that Government Exhibit 625C, 640D and

5    640E are authentic.  And the government offers those exhibits.

6            THE COURT:  Any objection?

7            MR. CREIZMAN:  No objection.

8            THE COURT:  Received.

9            (Government's Exhibits 625C, 640D and 640E received in

10   evidence)

11   BY MR. NAFTALIS:

12   Q.  Let's go to 625C, please.  And can you blow that up,

13   please.

14            So before we get into the details, what is this?  What

15   type of a document is this?

16   A.  In general, this is a broker quote.

17   Q.  Okay.  This is what a Bloomberg e-mail looks like?

18   A.  Yes.

19   Q.  Okay.  And looking at the bottom message, where it says

20   below Original Message, who's it from and who's it to?

21   A.  It's from Scott Vandersnow from Princeridge, and it's to

22   Stefan.

23   Q.  What's the date?

24   A.  The date is June 30th of 2011.

25   Q.  Okay.  Just so the jury knows where you're getting the year

1    from, where do you get the year from when you look at Bloomberg

2    messages?

3    A.  It's not immediately transparent.  The 6/30 is up in the

4    top left, and to make sure you have the right year, it's in

5    small type on the bottom towards the right portion in small

6    print.  I'm trying to find where it is.  It's a little

7    difficult to find.  The very most-bottom line under the 3, and

8    again small print, to the right you'll see 05–July–2011.

9    That's where I get the year.

10   Q.  If it helps you to look at the screen?

11   A.  Oh, it's highlighted on the screen, sorry.

12   Q.  It's not supposed to be a total test.

13          So let's start with the From line here.  Who was Scott

14   Vandersnow?

15   A.  He was a bond salesman at Princeridge.

16   Q.  Okay.  And what is Princeridge?

17   A.  It was a broker, and I believe provided some investment

18   banker services as well.

19   Q.  In your experience, what was the reputation of Princeridge?

20          MR. CREIZMAN:  Objection.

21          THE COURT:  Sustained.

22   Q.  What type of firm was Princeridge?

23   A.  It was a broker on the sales side.

24   Q.  How did it compare to a firm like JP Morgan?

25          MR. CREIZMAN:  Objection.

1          THE COURT:  Sustained.

2   Q.  What was your view of Princeridge?

3          MR. CREIZMAN:  Objection.

4          THE COURT:  Sustained.

5          MR. NAFTALIS:  Your Honor could we have a sidebar?

6          THE COURT:  No.  So far, I haven't heard anything that

7   would be even remotely admissible in evidence, but the one

8   question that sort of came possibly within the realm of

9   admissibility was, if you want to ask him about comparative

10  size, I might permit that.

11         MR. NAFTALIS:  Okay.  I have another one that occurred

12  to me.  We'll see if you like it.

13         THE COURT:  Okay.  Hope springs eternal.

14  BY MR. NAFTALIS:

15  Q.  How did Princeridge compare in size to JP Morgan?

16  A.  Can you define size?  In terms of assets, in terms of

17  volume of trading, or all of the above?

18  Q.  The bonds, in terms of the bond trading business?

19  A.  It was very small compared to JP Morgan.

20  Q.  All right.  Did you ever talk to people -- how did you

21  describe Princeridge at Visium?

22         MR. CREIZMAN:  Objection.

23         MR. NAFTALIS:  Your Honor, we need a sidebar if this

24  is --

25         THE COURT:  All right.  Get out.  I don't want to

H1CPLUM5                         Thorell - Direct

1    deprive you of a sidebar.

2              (Continued on next page)

1              (At the side bar)

2              MR. NAFTALIS:  I don't know what the objection really

3    is because the relevance is that these are bottom-of-the-barrel

4    firms.

5              THE COURT:  These are what?

6              MR. NAFTALIS:  Bottom-of-the-barrel firms.

7              THE COURT:  Yes, I know.  I don't know how you

8    establish that through any of the -- if you ask a witness

9    what's your opinion about X, that is, on its face, an

10   inadmissible piece of evidence because witnesses, percipient

11   witnesses, can only talk about things they saw, heard, observed

12   and so forth, and that's not what you're asking for.  You're

13   asking for his opinion.

14             MR. NAFTALIS:  He did business with them, though.  He

15   does know them.

16             THE COURT:  Well, then you can describe the facts, if

17   he has facts that show that they're bottom of the barrel.  One

18   fact that might be relevant, which I allowed you to do, is

19   their size.  But what you really want, I think, to get at is

20   they're a poorly regarded, fly-by-night type of operation, or

21   something of that sort.  That's an opinion.  I don't see how

22   that comes in.

23             MR. NAFTALIS:  But they were handpicked because Visium

24   doesn't even trade with them really.

25             THE COURT:  Pardon?

1              MR. NAFTALIS:  Visium doesn't even trade with them.

2      They were picked because --

3              THE COURT:  Handpicked by who?

4              MR. NAFTALIS:  By Stefan Lumiere.

5              THE COURT:  So if your question is, how did you come

6      to -- did this witness do trades with them?

7              MR. NAFTALIS:  The whole point was they were so bad,

8      he didn't trade with them.  He was directed by the defendant to

9      trade with them.

10             THE COURT:  Okay.  So the question is, were you

11     directed to trade with them?  Yes.  By whom?  So and so.  But

12     that doesn't still get you what you want.  I understand what

13     you want, but I don't see how it comes in under the rules of

14     evidence.

15             MR. McGINLEY:  Your Honor, it goes to why.  Could he

16     ask:  Why did you select Princeridge?  They provided the broker

17     quotes in this case.

18             THE COURT:  So I thought he didn't do the selecting?

19     I thought Mr. Lumiere did the selecting.  And if you're asking

20     him why did Mr. Lumiere select them, unless Mr. Lumiere told

21     him -- now, if Mr. Lumiere said something, now, of course,

22     that's admissible.  But if he just perceived that Mr. Lumiere

23     chose it because it was a bad operation, that's not going to

24     come in.

25             MR. NAFTALIS:  Can I ask him:  Did you trade with

1   them?  No.  Why not?

2                  THE COURT:  Pardon?

3                  MR. NAFTALIS:  Did you trade with this firm?  Why not?

4                  THE COURT:  And what's he going to say?

5                  MR. NAFTALIS:  He's going to say no, because they were

6   terrible.  I mean, they're intertwined.

7                  MR. CREIZMAN:  What does it mean, they're terrible in

8   that sense?  I didn't trade with them because they're terrible?

9                  MR. NAFTALIS:  Because they don't trade in any of

10  these bonds.

11                 THE COURT:  Actually, the --

12                 MR. NAFTALIS:  I'll lay a foundation.

13                 THE COURT:  All right.  Because you certainly haven't

14  yet.  So the objection, just so everyone is clear, is not to

15  relevance.  Of course, it's relevant.  The objection is to the

16  nature of what's being given, which is an opinion.  If you want

17  to qualify him, which you can't because he didn't give an

18  expert report, as an expert, then that would be one thing.

19                 I doubt there could be an expert in this area, but

20  maybe so.  Now, you can bring out objective facts, like their

21  size.

22                 MR. NAFTALIS:  Okay.

23                 (Continued on next page)

24

25

1                  (In open court)

2                  MR. NAFTALIS:  May I proceed, your Honor?

3                  THE COURT:  Yes.

4      BY MR. NAFTALIS:

5      Q.  So I know you answered this, but can you compare the size

6      of Princeridge to a firm like JP Morgan?  I'm referring to

7      their bond trading business.

8      A.  Very, very small.

9      Q.  Did you ever do business with -- did you ever trade with

10     Princeridge?

11     A.  In terms of Visium, prior to Visium or through my career?

12     Q.  At Visium.

13     A.  Very, very seldom.

14     Q.  And you were the only credit trader at Visium?

15     A.  Yes.

16     Q.  Okay.  Why didn't you trade with Princeridge?

17     A.  Because they didn't align with the practice that any trader

18     should abide by, which is the overarching premise of good

19     execution, which is following fiduciary obligation to provide

20     best execution for the shareholders.

21     Q.  When you say best execution, what do you mean?

22     A.  Achieving the best price.

23     Q.  Did they even trade in many of the bonds that were in the

24     credit fund?

25                  MR. CREIZMAN:  Objection.  Foundation.

1        THE COURT:  Well, if you know.  I will allow that if
2  you know the answer.
3  A.  Prior to -- prior to discussions with Visium, in particular
4  with Stefan, very unlikely they would be involved in the name.
5  However, because of Visium's business, which was almost
6  entirely in terms of trading buys with them, they may have
7  become active in that capacity.  But if you remove Visium from
8  the equation, I don't know, it would be speculation, but
9  unlikely.
10  Q.  What was your understanding of the relationship, if any,
11  between Mr. Lumiere and Mr. Vandersnow?
12  A.  Upon starting at Visium, they knew each other, and it's
13  likely they knew each other before then.  How long before then,
14  I don't know.  They have a good, tight relationship, friendly,
15  appear to be friends.
16  Q.  Now, what, if anything, did Mr. Lumiere say about whether
17  you should trade with Mr. Vandersnow?
18  A.  He, on at least one occasion, pointed out to me that I
19  should concentrate on directing trades to Mr. Vandersnow at
20  Princeridge and, accordingly, also the other brokers involved,
21  the other two.
22        And the premise behind that comment was that they're
23  helping out with -- and this was articulated by Stefan.  The
24  premise was that they're helping out with the monthly pricing,
25  you know, providing the backup for the overrides and, in turn,

1    they should be rewarded with some business, trading business

2    from Visium.

3    Q.   Okay.  So to be clear, who is getting the pricing overrides

4    from Mr. Vandersnow at Princeridge?

5    A.   Mostly Stefan.

6    Q.   Okay.  And Stefan tells you to then trade with

7    Mr. Vandersnow?

8    A.   Yes.

9    Q.   Okay.  Did you trade with him?

10   A.   Very seldom, and only one aligned on those few occasions

11   with best practice in terms of trading.

12   Q.   Okay.  Had you ever heard of Mr. Vandersnow before you got

13   to Visium?

14   A.   No.

15   Q.   How large is the market that you trade in?  I mean, do you

16   know the broker dealers that you trade with generally?

17   A.   Large in terms of --

18   Q.   How many people trade in the space that you trade in?  Do

19   you know the major brokers?

20   A.   In terms of companies rather than employees?  Yeah, I know

21   all the major banks, and then there are lesser-known broker

22   dealers and other brokers that are less capital intensive or

23   have no capital; so it varies.

24   Q.   You've been trading bonds since Fidelity in 2001?

25   A.   Yes.

1          MR. CREIZMAN:  Objection.

2    Q.  Had you ever run into this Mr. Vandersnow?

3    A.  No.

4    Q.  Not until Mr. Lumiere said to start sending him some

5    business?

6    A.  Well, the conversation about directing trades because of

7    what, apparently, was quid pro quo-type thing, I had been put

8    in touch with Mr. Vandersnow and had a dialogue with him.  I

9    had been put in touch, but that was kind of separate from the

10   discussion about providing trades for him.

11   Q.  Who put you in touch with him?

12   A.  Stefan.

13   Q.  So he picked Mr. Vandersnow for you to do business with?

14          MR. CREIZMAN:  Objection, leading.

15          THE COURT:  Well, I think, given the somewhat

16   ambiguous nature of the last two answers, I think that's fair

17   to put that question.

18          Because the jury may be unclear, if I understand it,

19   Mr. Lumiere first put you in touch with Mr. Vanderstill, is it?

20          MR. NAFTALIS:  Vandersnow, your Honor.

21          THE COURT:  And then, subsequently, he had the

22   conversation with you that you related about to send him some

23   business because they were helping out with the pricing, or

24   words to that effect; do I have that right?

25          THE WITNESS:  That is right.

1          THE COURT:  Okay.  Go ahead, counsel.

2    BY MR. NAFTALIS:

3    Q.  Then you didn't trade with them often?

4    A.  Almost never.

5    Q.  So let's go back to Government Exhibit 625C.  So this is

6    the June 30th, 2011.

7          MR. NAFTALIS:  You can leave it where it was,

8    Ms. Pyun.

9    Q.  And just to refresh you, what was the override price for

10   Sevan FRN that we saw on the attachment to the prior e-mail?

11   A.  It was 93.

12   Q.  Okay.  And looking here, what are the two numbers written

13   to the right?  There's Sevan FRNL, and then -- which I won't

14   read, and then there's two numbers?

15   A.  92-and-a-half and 93-and-a-half.

16   Q.  What does that mean?

17   A.  92-and-a-half is the bid; 93-and-a-half is the offer price.

18   Q.  So what's the middle of that?

19   A.  93.

20   Q.  You can zoom out a little bit.  Zoom back in.

21          And then there's another security up here called FFN;

22   do you see that?

23   A.  Yes.

24   Q.  Okay.  What was FFN?

25   A.  That's the bond ticker for FriendFinder Network.

1  Q.  What is FriendFinder?

2  A.  It is an online matchmaking, dating service catering

3  towards the adult entertainment business.

4  Q.  Who was in charge of the investment in this adult

5  entertainment business?

6  A.  Stefan.

7  Q.  Okay.  Is this another quote for a series of securities for

8  this FriendFinder company?

9  A.  Yes.

10  Q.  Now, the prior e-mail, Mr. Plaford directed you to print

11  out the hard copy for ops.  Looking at the top here, do you see

12  it says "screen printed"?

13  A.  Yes.

14  Q.  From Stefan Lumiere.  Did Mr. Lumiere give you this

15  document?

16  A.  Yes, it says screen printed; so, yes.

17  Q.  Okay.  What did you do with the document?

18  A.  I obtained it from Stefan, and I would then collect this

19  and possibly other forms of backup and compile them on my desk

20  and, in turn, operations would then pick them up.  So

21  eventually, they were passed off to operations from myself.

22  Q.  We can take this down, please.  Thank you.

23        So this was in the middle of 2011, where Mr. Plaford

24  sends you an e-mail with an attachment.  You take that

25  attachment then to ops, right?

1  A.  Yes.

2  Q.  Okay.  Then, at the same time, Mr. Lumiere is giving you

3  this Bloomberg broker quotes; is that right?

4  A.  Yes.

5  Q.  And these support the overrides?

6  A.  Yes.

7  Q.  So it's the backup from the brokers that are supposed to

8  give some sort of substantiation for these numbers?

9  A.  Yes.

10  Q.  How did the process continue -- meaning the month-end

11  pricing process, continue after that, meaning after 2011?

12  A.  It was pretty much the same.  There were certain slights or

13  variations to the process, but in general, it maintained the

14  same procedure.

15  Q.  And when did that continue through?

16  A.  Through approximately August of 2013.

17  Q.  And the defendant continued to solicit broker quotes and

18  give them to you to support these overrides at that time or at

19  least through that time at Visium?

20  A.  Yes, through the time he was at Visium, yes.

21        MR. NAFTALIS:  Can we please bring up Government

22  Exhibit 114 in evidence.

23  Q.  This is an e-mail, correct?

24  A.  Yes.

25  Q.  And who is it from and who is it to?

1   A.  It's from Stefan to myself.

2   Q.  What does he write in the subject line?

3   A.  Month end in your Bloomberg.

4   Q.  What did you understand that to mean?

5   A.  It was a reference to he's providing me Bloomberg backup.

6   In other words, one of the messages we discussed and would have

7   forwarded to me because he's stating to me that it's in my

8   Bloomberg.

9   Q.  Look at your Bloomberg e-mail, basically?

10  A.  Same thing, yes.

11  Q.  Now, we saw a sample of a broker quote from Mr. Vandersnow;

12  do you remember that?

13  A.  Yes.

14  Q.  Did Mr. Vandersnow continue to provide broker quotes to

15  Mr. Lumiere?

16  A.  Yes.

17  Q.  And did Mr. Lumiere continue to give those to you?

18  A.  Yes.

19  Q.  Can we please bring up Government Exhibit 640E.  And this

20  is another Bloomberg message?

21  A.  Yes.

22  Q.  Who is it from and who was it to?

23  A.  It's from Scott Vandersnow at Princeridge to Stefan.

24  Q.  What's the date on this e-mail, to this message?

25  A.  It's October 2nd of 2012.

1    Q.  So just before the e-mail he sent you telling you that

2    Bloombergs were in your in box?

3    A.  Yes.

4    Q.  Looking below that, it's a little faint.  Do you see that

5    there's some phone numbers, and then it says, September month

6    end?

7    A.  I'm sorry, can you repeat the question?

8    Q.  Let's highlight that.  Do you see it says, September month

9    end?

10   A.  Yes.

11   Q.  What does that mean?

12   A.  That would be a statement in reference to the fact that

13   those are prices for September month-end pricing.

14   Q.  Then there are four securities listed; is that right?

15   A.  Yes.

16   Q.  And the third one down that says ATI Priority Legacy?

17   A.  Right.  Technically, it's a loan, but therefore, loans are

18   securities, yes.

19   Q.  Okay.  Thank you.  Again, who covered ATI?

20   A.  Stefan.

21   Q.  Was Visium's investment in ATI profitable?

22   A.  No.

23   Q.  Can we bring up Government Exhibit 640D, please.

24            Who is this Bloomberg message from and who is it to?

25   A.  It's from John Brook at Janney Montgomery to Stefan.

1    Q.   And what's the date of this one?

2    A.   September 28th, 2012.

3    Q.   Again, this is near the month end, near the e-mail that

4    Mr. Lumiere sent to you?

5    A.   Yes.

6    Q.   What does Mr. Brook write that's Janney month-end level,

7    September 2012?

8    A.   Yes.

9    Q.   Again, what does that mean?

10   A.   Again, it means the same as last time, where it's

11   referencing the fact that these level of equities, in other

12   words, a fair price.  So it's month-end prices for September

13   month end of 2012.

14   Q.   And who was Jonathan Brook?

15   A.   He was a bond salesman at Janney Montgomery.

16   Q.   What was your understanding of the relationship, if any,

17   between Mr. Brook and Mr. Lumiere?

18   A.   It was a very strong relationship.  They were friends, and

19   I knew that they had gone way back to, as far and maybe the

20   beginning of their careers, as far back as SLK, Spear and

21   Leeds.

22   Q.   Is that another --

23   A.   SLK, it's a broker, was one.

24   Q.   And how did you say they knew each other, Mr. Brook and

25   Mr. Lumiere?

1   A.  As far as I know, they first met each other at SLK as

2   coworkers.

3   Q.  How did you -- did you ever -- I'm sorry, were you

4   speaking?

5   A.  No.

6   Q.  I guess I'm hearing things, sorry.

7            How were you introduced to Mr. Brook?

8   A.  Through Stefan.

9   Q.  What, if anything, did Mr. Lumiere say about whether you

10  should trade with Mr. Brook?

11  A.  He encouraged me to trade with him.

12  Q.  Did he say why?

13  A.  He said that on numerous occasions, but again, specific to

14  the one that was mentioned about Scott Vandersnow, was in the

15  same context.  He was included in that group as well.

16  Q.  Just a reminder of what you mean, what do you mean?

17  A.  So again, there was a specific conversation where Stefan

18  had asked me to -- or directed me to direct as many trades as

19  possible to the brokers that were participating in providing

20  these quotes that basically matched up the overrides as

21  support, and Janey and Princeridge and, to some extent, Odeon

22  were those brokers.

23  Q.  We'll come back to Odeon.  What were the -- how big was

24  Janney Montgomery's bond business or trade business?

25  A.  It was very small.

H1CPLUM5                          Thorell - Direct

1   Q.  How did it compare to JP Morgan or Goldman Sachs?

2   A.  Very other end of the spectrum, very small.

3   Q.  Did you ever trade with Janney Montgomery?

4   A.  On limited occasions, if it fit certain criteria.  It's

5   generally unlikely, but on certain situations I would.

6                    (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   Q.   Why didn't you trade with them?

2   A.   Again, they did not provide the services necessary to

3   achieve the primary objective of an effective trader, which is

4   providing best execution for fiduciary obligation duties.

5   Q.   Listed below the month and levels, do you see that there

6   are four and now we'll call them loans for ATI?

7   A.   Yes.

8   Q.   And again, the defendant was responsible for ATI, is that

9   right?

10  A.   That's correct.

11  Q.   And then at the bottom, do you see it says Sevan FRN?

12  A.   Yes.

13  Q.   That was the security we looked at earlier?

14  A.   Yes.

15  Q.   And who was responsible for that security?

16  A.   Stefan.

17  Q.   Then there is a company called C-Med, it says both

18  tranches?

19  A.   Yes.

20  Q.   Who was responsible -- who covered C-Med?

21  A.   I don't know if there was one person specifically

22  responsible, but what I do know is that Stefan was involved,

23  Chris Plaford was involved, Ameesh Shah, the analyst, was

24  involved.

25  Q.   Was Visium's investment in C-Med profitable?

H1C3LUM6                         Thorell - direct

1    A.  No.

2            MR. NAFTALIS:  At this point I'd like to direct the

3    jury to their transcript binders, please.  We're going to look

4    at Government Exhibit 1223-T.

5    Q.  What's the date of this recording?

6    A.  January 17, 2014.

7    Q.  Who participated in this recording, or this conversation I

8    mean?

9    A.  Myself and Stefan.

10           MR. NAFTALIS:  Remember, this is the one we heard

11   earlier.  Can we just play it again?  Your Honor, I apologize,

12   because I'm going to run into the same problem.  I'd like to

13   play it again but --

14           THE COURT:  Go ahead.

15           MR. NAFTALIS:  Can we play it again with the

16   recognition we will update the beginning?

17           THE COURT:  Yes.

18           (Audio recording playing)

19   Q.  We listened to this earlier.  How does Mr. Lumiere say that

20   ATI and C-Med were valued or misvalued?

21   A.  Egregiously.

22   Q.  Whose positions are those?

23   A.  ATI was Stefan's, and he was also involved definitely

24   involved in China Med.

25   Q.  To your understanding, did the defendant egregiously

1   mismark these securities in getting these broker quotes?

2   A.  Yes.

3        MR. NAFTALIS:  You can take that down, thanks.

4   Q.  Now as the month end pricing process continued, from 2011

5   to '12 to '13, what, if anything, stood out to you?

6   A.  Eventually there seemed to be a pattern over a culmination

7   of months where some of the noticeable things were the sheer

8   amount of the overrides in terms of the number of securities or

9   loans on a monthly basis.

10       In addition to that, I would say that the magnitude of

11  the discrepancy between what Visium's override price was versus

12  the de facto benchmark Reuters third-party price.  So there is

13  a large difference between the two.

14       I would also add that on a number of these overrides,

15  the companies involved, the positions were in themselves very

16  large, so China Med, for example, and ATI both stand out where

17  China Med was upwards of 50 million, maybe more, ATI was also

18  very sizable, and there's more examples of that.

19  Q.  Let's walk through this a little more.  You said there was

20  a large number of overrides?

21  A.  Correct.

22  Q.  Can you put a number -- what do you mean by a large number

23  of overrides?  How many per month approximately?

24  A.  I would estimate, I don't know for sure, but I would put it

25  in the ballpark of 50 to 75.

1  Q.  Why did this catch your attention?

2  A.  Because just from being in the industry and acting in the

3  trading capacity I've been in for years, it was common

4  knowledge to me that overrides were possible and acceptable on

5  rare, legitimate occasions.  And they were -- I viewed that

6  as -- if you had a legitimate reason, it was the exception,

7  rather than the rule, because it's used very seldom.

8         Whereas in this case, because of the sheer amount, it

9  appeared to me very striking in the sense that this was the

10  opposite, and by no means convention, and it seemed that it was

11  the rule to use override, rather than the exception, which

12  should not be the case.

13  Q.  Did you notice a pattern of any kind, one way or the other,

14  in terms of whether these overrides favored Visium or not?

15  A.  Yes.  They almost always favored Visium.

16  Q.  What percentage of the time?

17  A.  Roughly 90 percent of the time.

18  Q.  When the overrides favored Visium, what is the effect on

19  the overall valuation of the portfolio?

20  A.  It would be a positive effect and it -- it would -- the

21  overrides would inevitably make their way into the NAV and it

22  has a value and be communicated to investors as from a

23  performance standpoint.

24  Q.  You mentioned the magnitude of the difference.

25  A.  Yes.

1  Q.  And that's the magnitude in the difference between what and

2  what?

3  A.  Between the price that Visium provided, which was likely

4  more favorable and that they used as overrides, versus what

5  should have been the de facto benchmark third-party price, in

6  the case of bonds, Reuters.

7  Q.  Did you notice any particular types of securities where

8  there was this large magnitude in difference?

9  A.  Yes.  Generally, more -- more illiquid, but specifically

10 China Med and ATI and some more.

11 Q.  Who generally covered these names?

12 A.  Generally Stefan, and Plaford was involved as well.

13         MR. NAFTALIS:  Can you please bring up Government

14 Exhibit 1164 in evidence.  And first let's look at the top to

15 see who it is to and from.

16 Q.  Who is this e-mail from and who is it to?

17 A.  It's from Stefan to Josh Rozenberg.

18 Q.  What is the date?

19 A.  Tuesday, February 5 of 2013.

20 Q.  What does the subject line say?

21 A.  P&L contribution for 2009, 2010, 2011, 2012.

22         MR. CREIZMAN:  Your Honor, may we have a side bar,

23 please.

24         THE COURT:  All right.

25         (Continued on next page)

1          (At the sidebar)

2          MR. CREIZMAN:  I'm not sure what this is being

3   introduced for, and it seems like it would be hearsay.  I don't

4   know what Stefan Lumiere to Josh Rozenberg, I don't think he's

5   on the e-mail.

6          MR. NAFTALIS:  It is the defendant's own statement.

7   And it is being introduced to show the P&L means these are all

8   the positions, and it is the all the positions that are

9   mismarked are his.

10         MR. CREIZMAN:  Okay.  That's fine.  The other point is

11  that the witness keeps offering about the de facto benchmark

12  being Bloomberg, I don't know what to do about that.  I'm not

13  going to object to the statements of the witness, but I mean, I

14  just don't think it is appropriate.

15         THE COURT:  I'm sorry.  What is not appropriate?

16         MR. CREIZMAN:  The witness keeps offering this

17  commentary about the de facto benchmark.

18         THE COURT:  I do agree with that.  I think that the

19  witness needs to be instructed he should just answer the

20  question and not give the state of the universe or whatever

21  pops into his head, and sometimes he has erred in that

22  direction.

23         MR. NAFTALIS:  I don't think we're going to -- I hope

24  that the questions don't trigger this issue again, but I

25  appreciate it.

H1C3LUM6                    Thorell – direct

 1              THE COURT:  I will monitor it and intervene because I

 2     understand how it is awkward for all concerned.  But, I do need

 3     something to keep awake and that will keep me active.

 4              (Continued on next page)

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (In open court)
 2              MR. NAFTALIS:  I think the last question was who was
 3    Josh Rozenberg, but I can't remember.
 4    Q.  Who was Josh Rozenberg?
 5    A.  He was a senior accountant at Visium.
 6    Q.  What does the subject line say?
 7    A.  P&L contribution for 2009, 2010, 2011, and 2012.
 8    Q.  What does P&L mean?
 9    A.  Stands for profit and loss.
10    Q.  When someone at a hedge fund says their P&L, what does that
11    mean?
12    A.  It's common language within the industry to mean how much
13    you're making or losing for the company or the fund.
14    Q.  Are these the positions that someone covers or is in charge
15    of?
16    A.  Yes.
17              MR. NAFTALIS:  Let's expand that e-mail, please.  Just
18    to be clear, the e-mail below it, perfect.  Maybe let's zoom in
19    on that top half and we'll have to go in sections.
20    Q.  So Mr. Lumiere's forwarding an e-mail that he previously
21    sent to Mr. Rozenberg, right?
22    A.  Yes.
23    Q.  He previously sent it on February 4, a couple days earlier?
24    A.  Yes.
25    Q.  There is a number of securities listed on this e-mail, is
```

1    that right?

2    A.   That's right.

3    Q.   To your knowledge, was the value of any of the securities

4    listed on Mr. Lumiere's P&L mismarked during the month end

5    valuation process between 2011 and 2013?

6    A.   Yes.

7    Q.   What percentage of them, looking at this list?

8    A.   Generally speaking, the majority.

9    Q.   Let's go through each of them.  We've talked about ATI,

10   right?

11   A.   Yes.

12   Q.   Was the value of that security mismarked?

13   A.   Yes.

14   Q.   Just going down, which are the ones that stand out to you?

15   A.   Right.  The ones that stand out the most are Angiotech.

16          MR. NAFTALIS:  Just leave it so he can read it.  And

17   just highlight as he goes, please.

18   A.   Again, Angiotech, Elan, Friendfinder all issues, Sevan

19   Marine, all three, Sevan Drilling, Sevan Marine, all three

20   listed, Iasis PIK, Lee Enterprises, Nebraska Books, North

21   Atlantic Trading, Selmed, both the floaters and the seniors,

22   Skilled Health, UHS, U.S. Oncology, Rotech all issues.

23   Q.   Generally, who provided the broker quotes for all of these

24   mismarked securities?

25          MR. CREIZMAN:  Objection.  Leading.

1          THE COURT:  I'll allow that.  Overruled.

2    A.  Generally who -- can you clarify?  Within Visium?

3    Q.  Who provided the broker quotes to support the overrides to

4    you?

5    A.  Generally Stefan did.

6    Q.  Now, you said that you started to notice a pattern?

7    A.  Yes.

8    Q.  Did you notice any particular brokers that were providing

9    the broker quotes that were used for overrides?

10   A.  Yes.

11   Q.  Which ones?

12   A.  Typically it was any one of three, on most occasions two of

13   the three were more frequent, which were Princeridge and

14   Janney.  And then on other less frequent occasions, Odeon as

15   well.

16   Q.  And again, who was the primary contact at Princeridge?

17   A.  Scott Vandersnow.

18   Q.  Who was the primary contact at Janney?

19   A.  Jon Brook.

20   Q.  We'll get to it in a second, but who was the primary

21   contact at Odeon?

22   A.  Matt O'Callaghan.

23   Q.  Why did it catch your attention that the majority of the

24   overrides were coming from these two to three brokers?

25   A.  Well, first, obviously, there's only two to three.  But

1    specifically, they fell into certain criteria, which were the

2    kind of -- again, the opposite of JPMorgan or Goldman, much

3    smaller in size.  And therefore, had less of a trading platform

4    built out, lesser known, their business was not as -- there is

5    not as much volume, as much creating done in their business as

6    opposed to the other major brokers.

7    Q.  What type of a firm -- let me just do the whole line for

8    Odeon.

9            For Odeon and Matt O'Callaghan, how did you first meet

10   Mr. O'Callaghan?

11   A.  The first interaction I had with him was prior to Visium

12   when I worked at Black Diamond Capital Management.  He called

13   me, I suppose it was a cold call, and just introduced himself.

14   I didn't know who he was, and I just started talking to him.  I

15   don't even know if I had traded with him while I was at that

16   firm or not.

17            When I got to Visium, I continued to talk to him.  We

18   eventually met.

19   Q.  Did Visium keep a list of brokers that you were allowed to

20   trade with?

21   A.  Yes.

22   Q.  When you first got to Visium, was Odeon on this approved

23   list?

24   A.  No.

25   Q.  Did you initially try to get Odeon approved?

1    A.  Yes.

2    Q.  Were they approved?

3    A.  No.

4    Q.  Do you know why not?

5    A.  The feedback that I got back was that I'd been talking to

6    Matt O'Callaghan, again, at Odeon about some illiquid revolver

7    trade that was unlikely to get done, but possible, and for

8    those reasons, in case the trade came to fruition, I naturally

9    needed to make sure we could trade with Odeon.

10           So I followed the protocol within Visium, which was

11   requesting Odeon to be set up, so to speak, or approved as a

12   legitimate counter-party to trade with.  And in that process,

13   included requesting it from Risk Management, and in some

14   capacity, I was denied through Risk.

15           But to further the explanation, ultimately Jacob

16   Gottlieb, again, head of the firm, walked over to me in person

17   and asked me why I wanted Odeon set up to trade with, and I

18   explained to him the reasons that in bond trading --

19           THE COURT:  I think you're going beyond the scope of

20   the question.  And we need to confine ourselves to the question

21   asked.  So counsel, put another question.

22   Q.  So Odeon was not approved.

23   A.  That's correct.

24   Q.  Did there come a time after that, when you spoke to the

25   defendant about Mr. O'Callaghan and Odeon?

1   A.   Yes.

2   Q.   How did that conversation begin?

3   A.   Stefan had walked over to me and said for certain reasons

4   he wondered -- he wanted to know if I knew of any brokers that

5   could help out with the month-end pricing in the same capacity

6   that Princeridge and Janney were helping out.

7   Q.   And by that you mean what?

8   A.   Providing prices that supported Visium's override prices.

9   Q.   What did you say to the defendant?

10  A.   I said that it's possible Matt O'Callaghan at Odeon would

11  be willing to do that.

12  Q.   Did Visium subsequently approve Odeon as an approved

13  broker?

14  A.   Yes.

15       MR. NAFTALIS:   Can you please bring up Government

16  Exhibit 1160 in evidence.

17  Q.   Who is this e-mail from?

18  A.   Stefan.

19  Q.   Who is it to?

20  A.   It's to Chris Plaford, Amal, who worked in Risk, and

21  myself.

22  Q.   When you say "Risk," what did Risk do?

23  A.   Risk was a department that was in charge of monitoring any

24  type of risk within Visium's portfolio and measuring downside

25  and trying to mitigate any potential losses.

1   Q.  Did they approve the counterparties for Visium?

2   A.  Yes.

3   Q.  What is the date on this e-mail?

4   A.  Monday, December 12 of 2011.

5   Q.  What does the defendant write in the subject line?

6   A.  "We would like to open up an account with."

7   Q.  And then what does he write in the first sentence?

8   A.  Odeon Matt O'Callaghan salesman and the phone number.

9   Q.  And did Odeon subsequently get approved as a counter-party

10  for Visium?

11  A.  Yes.

12  Q.  And thereafter, did the defendant get broker quotes from

13  Mr. O'Callaghan?

14  A.  Yes.

15          MR. NAFTALIS:  We can take that down.

16  Q.  In front of you is Government Exhibit 657.  Do you see

17  that?

18  A.  Yes.

19  Q.  Have you previously seen that document?

20  A.  Yes.

21  Q.  Have you reviewed it?

22  A.  I have.

23  Q.  How do you know you've reviewed it?

24  A.  I remember doing so, and I also initialed it and dated it.

25  Q.  Is that in the corner by the exhibit sticker?

1   A.   It is.

2   Q.   What is contained in Government Exhibit 657?

3   A.   It is a list of all the broker quotes provided from Odeon,

4   specifically from Matt O'Callaghan at Odeon, to Visium, to

5   mostly Stefan.

6   Q.   When you a say list of broker quotes, what is contained in

7   that exhibit?

8   A.   Mundane broker quotes, prices for backup.

9   Q.   Is it a series of Bloombergs?

10  A.   Yes.

11  Q.   Who are they generally from and to?

12  A.   Generally from Matt O'Callaghan at Odeon to Stefan.

13  Q.   This is the first page.  Who is the bottom e-mail from and

14  who is it to?

15  A.   The bottom part of the Bloomberg message is from Matt

16  O'Callaghan to Stefan.

17  Q.   And then looking at the bottom it says "NEBRK dip."  What

18  was NEBRK?

19  A.   Nebraska Books.

20  Q.   Who was in charge of Nebraska Books?

21  A.   Stefan.

22  Q.   Let's go to the second page of this exhibit, please.  Is

23  this a continuation of the prior message?

24  A.   Yes, it is.

25  Q.   Is that another quote for a Nebraska Books security?

H1C3LUM6                          Thorell - direct

1   A.  Yes it is.

2   Q.  Again there is FFN.  What is FFN?

3   A.  Friendfinder Network.

4           MR. NAFTALIS:  You can take that down.

5   Q.  In front of you is also Government Exhibit 658.  Have you

6   seen that exhibit before?

7   A.  Yes, I have.

8   Q.  And how do you know you've seen it?

9   A.  I've initialed it and dated it.

10  Q.  What is in Government Exhibit 658?

11  A.  It's again a list of Bloomberg messages.

12  Q.  Generally from who to who?

13  A.  Generally from Scott Vandersnow at Princeridge to Stefan.

14  Q.  Do you want to hold it up so we can see it?

15          MR. NAFTALIS:  Government Exhibit 656, let's look at

16  that one.  You can put that aside.

17  Q.  Have you seen that exhibit before?

18  A.  Yes, I have.

19  Q.  Have you reviewed it?

20  A.  Yes, I have.

21  Q.  How do you know?

22  A.  I also initialed it and dated it.

23  Q.  Generally, what's in Government Exhibit 656?

24  A.  Generally, again, it is a list of Bloomberg messages of

25  broker quotes.

H1C3LUM6                         Thorell - direct

1    Q.  From who to who?

2    A.  Generally from Stefan to Plaford -- or to Plaford and in

3    this case myself.

4    Q.  Just flip, don't look at the screen I think -- just look --

5    A.  Yeah.  Generally from John Brook at Janney Montgomery to

6    Stefan.

7    Q.  I'm sorry.  Who are those message generally from and to?

8    A.  The messages generally are from John Brook at Janney to

9    Stefan.

10   Q.  And those are broker quotes again?

11   A.  Yes.

12          MR. NAFTALIS:  We're going to play another recording,

13   your Honor, if the jury can take out their binders and we'll go

14   to Government Exhibit 1224-T.

15          MR. CREIZMAN:  Your Honor?

16          THE COURT:  I infer that the government has elected

17   the one, the option that does not require the intervening

18   portion.  Correct?

19          MR. NAFTALIS:  Right.

20   Q.  What is the date of this recording?

21   A.  Dated January 17, 2014.

22   Q.  Who are the participants?

23   A.  Myself and Stefan.

24   Q.  Is this another one of the recordings that you made at the

25   direction of the FBI?

1    A.  Yes, that's correct.

2             MR. NAFTALIS:  Can we please play the recording.

3             (Audio recording playing)

4    Q.  Let's blow up the transcript so everyone can see it.  The

5    defendant here says that "We would call the brokers and say

6    'Chris needs a level for this.'"

7             Do you see that?  It's in the middle of line 12 to 13.

8    A.  Yes, I see that.

9    Q.  What is a level again?

10   A.  A level is another name for a price.

11   Q.  It says "Chris is indicating these are the levels."  Do you

12   see that?

13   A.  Yes.

14   Q.  Is that how it works?  Does someone say, someone else just

15   say what the levels are?

16   A.  No.

17   Q.  What happened, what happens in practice?

18   A.  In practice, it's the other way around.  It's the brokers,

19   in other words the sell side, that provide liquidity to the buy

20   side that -- and subsequently, assuming that they know the name

21   and traded them, will provide the quotes to their clients such

22   as Visium.

23   Q.  So the brokers are the ones that tell the hedge fund what

24   the levels are?

25   A.  Correct.

1    Q.   Not vice versa?

2    A.   Correct.   Not vice versa.

3    Q.   And in this case, Lumiere says that he said that Chris

4    needs the levels.   You see that?

5    A.   Yes.

6    Q.   Who spoke to the brokers?

7    A.   Stefan.

8    Q.   And who gave the indications as to what quotes Visium

9    wanted?

10   A.   Stefan.

11             THE COURT:   Counsel, I'm sorry, some time in the next

12   couple of minutes we'll need to find a place to break for the

13   day.

14             MR. NAFTALIS:   Maybe I'll finish with this recording,

15   your Honor.

16             THE COURT:   That's fine.

17   Q.   And then at the bottom Mr. Lumiere says "And these are

18   not -- the words like I use traffic in these names -- are

19   bullshit.   They're just basically trusting that Chris knows the

20   situation."

21             Now, what does it mean when a broker traffics in a

22   name?

23   A.   It's a term that connotates that the broker knows the name

24   because they're familiar, they trade the name, they're active.

25   They probably have a research analyst on it, and they're in

1  proper position to know what the current price of that

2  particular security is.

3  Q.  And in the case of the securities that the defendant was

4  getting broker quotes for, did Janney and Princeridge and Odeon

5  traffic in those names?

6  A.  No.

7  Q.  Then Mr. Lumiere says "They're basically just trusting that

8  Chris knows the situation."

9          Do you see that?

10  A.  Yes.

11  Q.  What did you understand that to mean?

12  A.  It's my understanding he's saying that the brokers didn't

13  traffic in the names, so because they didn't traffic it, they

14  didn't know the names, and were unable to price it.  And in

15  turn, they had to rely on Lumiere to get prices from to know,

16  where otherwise they would have no idea what level or price to

17  provide.

18  Q.  And again, it is Lumiere who is telling the brokers the

19  number that they trust?

20  A.  That's correct.

21          MR. NAFTALIS:  Your Honor, we can break here.

22          THE COURT:  Ladies and gentlemen, we'll break for

23  today.

24          You were terrific and on time this morning, but

25  remember that past performance is no guarantee of future

H1C3LUM6

1    success.  So, we want to start bright and early at 9 o'clock

2    tomorrow.  Have a very good evening.  We'll see you then.

3                (Jury excused)

4                THE COURT:  You can step down.  We'll see you tomorrow

5    at 9 o'clock.

6                So, I will ask my favorite question and this will be

7    binding.  How much longer do you have with this witness?

8                MR. NAFTALIS:  Well then I'll get a broker quote

9    that's a little higher.

10               I think I'm more than halfway through, but I had to

11   jump ahead because of the foundation issue with that these were

12   not great brokers.

13               I would say it's an hour, hour and a half.

14               THE COURT:  I'll give you an hour and a half.  Now, we

15   are going to have the Daubert hearing in about a half hour.  I

16   have two other matters I have to handle before that, so again,

17   you can leave your stuff at counsel table, but you yourselves

18   will have to vacate it.  Just be back here at 5:30.

19               Is there anything else other than the Daubert hearing

20   that any counsel needs to raise with the Court?

21               MR. McGINLEY:  Very quickly, your Honor.  There are

22   some other recordings in this case that we intend to play

23   through other witnesses.

24               THE COURT:  They were not the subject of defense

25   counsel's request for completeness.

H1C3LUM6

1            MR. McGINLEY:  We wanted to confirm that was

2      exhaustive and he did not plan --

3            THE COURT:  He said that.

4            MR. McGINLEY:  Okay.

5            THE COURT:  By 2 o'clock this morning, I'm sure he was

6      exhausted.  So, no, that issue is now closed.

7            The other thing I'm going to need from the government

8      is a revised transcript for the first clip, where we did add

9      those few lines.  Okay?  Very good.  Anything from defense?

10           MR. CREIZMAN:  No, your Honor.

11           THE COURT:  Very good.  Thanks.  We'll see you in a

12     half hour.

13           (Recess)

14           (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1           (Jury not present)

2           THE COURT:  Okay.  So let's get the expert on the

3    stand, please.

4           MS. MADRIGAL:  Your Honor, I'd like to correct one

5    thing.

6           THE COURT:  Yes.

7           MS. MADRIGAL:  Unfortunately, we've been calling our

8    expert -- pronouncing his name improperly.  It's actually

9    Mr. Tawil.

10          THE COURT:  Oh, thank you very much.

11    DAVID TAWIL,

12        called as a witness by the Government,

13        having been duly sworn, testified as follows:

14          THE COURT:  Please be seated.  State and spell your

15    full name.

16          THE WITNESS:  My name is David Tawil, D-a-v-i-d,

17    T-a-w-i-l.

18          THE COURT:  All right.  So I think, since the

19    government is the one who's challenging, not in all respects,

20    but in a couple of respects, the witness' potential testimony,

21    the government should put the first questions.

22          MR. McGINLEY:  Thank you, your Honor.

23    DIRECT EXAMINATION

24    BY MR. McGINLEY:

25    Q.  Good evening, Mr. Tawil.

1    A.  Good evening.

2    Q.  Have you seen the expert notice in this case?

3    A.  I have.

4    Q.  So I may ask you a few questions about that.  Just

5    generally, you're the president of a hedge fund; is that right?

6    A.  That's correct.

7    Q.  And what are your assets under management?

8    A.  80 million.

9    Q.  And when did you found the hedge fund?

10   A.  2009.

11   Q.  What types, just generally, of securities do you hold?

12   A.  Let me preface the answer by saying the strategy of the

13   fund is event driven, which means generally that we invest in

14   situations that the price of the securities are going to be

15   materially affected by certain events that we anticipate

16   occurring.

17          My background, I don't know if we'll get into it,

18   prior to being involved in investing was bankruptcy

19   restructuring and turnaround, as a lawyer, for a number of

20   years.  So our investments go ahead and surround particular

21   events relating to restructuring, distressed and bankruptcy.

22   The types of securities that we own in those situations vary

23   from situation to situation.

24          In the history of our fund, we've owned equities,

25   options on those equities, fixed income securities, running the

1   gamut from performing bonds, defaulted bonds, convertible

2   debentures, and then bank debt, as well, and in addition,

3   derivatives.

4   Q.  Well, how about now, what's the breakdown percentage—wise

5   bonds?

6   A.  Currently, sure, it is over 80 percent equities and that's

7   just about the available universe currently for our size

8   returns.

9              THE COURT:  So let me ask you this.  In the defense

10  disclosure of your testimony, it says -- and this is at the

11  bottom of Page 2:  "Mr. Tawil is also expected to testify about

12  the process of classifying a security as Level 1, 2 or 3.

13  Mr. Tawil is also expected to testify that the responsibility

14  for this classification lie solely with the fund itself, the

15  administrator and the fund auditor, and would never be

16  discussed with a broker providing an indication."

17             So is that testimony you expect to give?

18             THE WITNESS:  Correct.

19             THE COURT:  So are you saying that the responsibility

20  for this classification lies solely with the fund itself, the

21  administrator and the fund auditor, as a matter of law or as a

22  matter of practice and custom?

23             THE WITNESS:  I would say as a matter of both.

24             THE COURT:  So I will not allow anyone to testify as

25  to what the law requires.  That's solely a determination for

1    the Court to make.

2               So if, however, the evidence in this case was that the

3    classification had been discussed with someone other than the

4    fund itself, the administrator or the fund auditor, you would

5    say -- putting aside that this would not be your determination

6    whether or not that was a violation of law, you would say that

7    would be a material departure from custom and practice?

8               THE WITNESS:  I would say the following.  Can I

9    elaborate slightly on the answer?

10              THE COURT:  Sure.

11              THE WITNESS:  At the end of the day, classification of

12   the securities runs directly to the fiduciary duties that the

13   fund has to its investors.

14              THE COURT:  Right.

15              THE WITNESS:  The professionals that are working on

16   behalf of the investors directly in fiduciary association

17   include the fund itself, the auditors of that fund, the

18   administrator of that fund.  The broker has no relationship at

19   all with the investors of that fund.  They have no duties to

20   the investors of that fund and so, therefore --

21              THE COURT:  I'll assume that, for the sake of

22   argument.

23              THE WITNESS:  So it wouldn't --

24              THE COURT:  Although, I think an argument could be

25   made, which I won't decide right now, that all employees of a

H1CPLUM7                          Tawil - Direct

1   hedge fund bear certain direct or indirect fiduciary duties and

2   that you can't escape those duties, if you're any employee, by

3   virtue of what your position is or isn't.  But put that aside

4   because that's a legal debate that I'll have to resolve.

5          I'll put my question again.  Supposing, contrary to

6   what you believe is the custom and practice, someone other than

7   the fund itself, the administrator or the fund auditor,

8   discusses and even expresses a strong view, or maybe even says

9   I want it to be done X way or Y way as to classifying security

10   as to Level 1, 2 or 3, is it your opinion that would be a

11   material departure from custom and practice?

12          THE WITNESS:  Yes.

13          THE COURT:  Okay.  So let me ask this --

14          THE WITNESS:  Can I explain why?

15          THE COURT:  Sure.

16          THE WITNESS:  Because I don't think it's -- the

17   content of that point is not a relevant piece of content

18   between the relationship that the fund has with the broker.

19   The broker couldn't care less where the fund classified the

20   asset, nor could -- I mean, maybe the fund wants to ask the

21   broker, where do you think the classification of this asset may

22   be, but the broker is in no better position to go ahead and

23   make that determination than the fund itself.  And so it would

24   seem, to me, quite odd.  I've never asked a broker, where did

25   you classify this?

H1CPLUM7                          Tawil - Direct

 1              THE COURT:  I'll take a hypothetical that has nothing
 2      to do with this case.  So supposing a broker goes to the people
 3      who will be making the determination and says, it's really
 4      important to me that this be classified as Level 2, rather than
 5      Level 3, because I've got friends, relatives and all sorts of
 6      close acquaintances involved in the particular asset you're
 7      talking about, and they really want it to be classified better,
 8      for reasons that have nothing to do with you so much as to
 9      their situation.  So I'll pay you a million dollars to classify
10      it as 2 rather than 3.  In your view, that's not normal custom
11      and practice?
12              THE WITNESS:  Oh, not at all.
13              THE COURT:  But if it happened, it would be, among
14      other things, a total material departure from what you say is
15      custom and practice, yes?
16              THE WITNESS:  That's correct.
17              THE COURT:  Okay.  So let me go to defense counsel,
18      just on this issue.  Maybe I should start with the government.
19      What is your accusation with respect to the defendant here
20      regarding the classification of 1, 2 or 3?
21              MR. McGINLEY:  Your Honor, that he intentionally
22      helped to misclassify the bonds at issue.
23              THE COURT:  So now I come to defense counsel.  So what
24      is the relevance of this witness to the issue of whether or not
25      the defendant played a role in the classification?  If he

H1CPLUM7                          Tawil - Direct

1    didn't play a role, because the jury doesn't believe that

2    people who say he did, then there's nothing there for the

3    defense to be concerned with.

4           If he did play a role, it's clearly, among other

5    things, in violation or departure, material departure, from

6    what your own witness says is the normal practice and custom.

7    So what's the relevance, from your standpoint, of his

8    testimony?

9           MS. MADRIGAL:  Your Honor, more generally, I'm not

10   even sure whether this particular part of the disclosure is

11   moot at this point.  More generally --

12          THE COURT:  Well, they haven't challenged a lot of

13   what he's proposing to say.  They challenged this and one other

14   aspect.  That's why we're having this hearing.  If you say he's

15   not going to testify, we can move along.

16          MS. MADRIGAL:  In full disclosure, we approached the

17   government to have a discussion about this, and the government

18   made the choice to continue with this hearing.

19          THE COURT:  Well, I appreciate that full disclosure.

20   They chose not to give you the answer to their position, but

21   now I'm asking, and we haven't had a prior discussion.

22          MS. MADRIGAL:  That's fine, your Honor.

23          THE COURT:  So are you offering this part of the

24   witness' testimony or not?

25          MS. MADRIGAL:  I don't think that this is going to be

1   part of his testimony.

2           THE COURT:  I take it, because I have to know now, the

3   answer to that is no?

4           MS. MADRIGAL:  The answer to that is no, and just more

5   generally, for your Honor's -- for your knowledge, the purpose

6   of Mr. Tawil's testimony is really to provide background for

7   the jury on distressed debt.

8           THE COURT:  As a general matter, the government has no

9   problem with that.  This is one of the two areas that they did

10  have a problem; so that one is now moot because it's not going

11  to be part of his testimony.

12          MS. MADRIGAL:  I'm sorry, your Honor, if I can

13  interrupt?

14          THE COURT:  Yes.

15          MS. MADRIGAL:  I believe that the second -- I mean,

16  the government can speak for itself.  The second issue that the

17  government had raised was their objection to Mr. Tawil

18  testifying about whether certain securities were, in fact,

19  valued property, and I can also say that Mr. Tawil will not be

20  rendering any opinion about whether or not any security in the

21  credit fund was properly valued.

22          THE COURT:  Okay.  So let me just make sure.  I'm

23  looking at the government's motion.

24          MR. McGINLEY:  Your Honor, if I may?

25          THE COURT:  Yes.

1          MR. McGINLEY:  It might help.  Your Honor, there are

2     really two other issues.  It sounds like the first one is now

3     moot.  The second one was the particular security at issue,

4     whether Mr. Tawil intended to opine on whether those were

5     valued correctly.  I believe defense counsel has said he will

6     not testify to any of the securities at issue during the time

7     frame.  I just want to make sure I have that.

8          THE COURT:  Yes.  I see defense counsel nodding her

9     head in agreement.

10          MR. McGINLEY:  So just to speed it up, the last

11     portion is the general practices.  This is the last paragraph

12     of the expert notice.  It's also quoted in the government's

13     brief, but I could read it if it's quicker.  It's one sentence.

14          THE COURT:  Go ahead.

15          MR. McGINLEY:  Mr. Tawil is expected to testify

16     regarding general practices at large hedge funds, as well as

17     the role of a CFO, the operational staff, the administrator,

18     the prime broker, the valuation committee, the executive

19     committee, the compliance department, auditors and internal and

20     external legal counsel to the fund.

21          And, your Honor, the government's argument here is

22     there is simply no relevance to this testimony at this point,

23     unless the defendant intends to say he was aware of these

24     general practices at other places, and either he followed them

25     or didn't follow them.  It's just unclear for what purpose

1     that's being offered.

2              MS. MADRIGAL:  Yes, so I mean, again, this testimony

3     goes more to just explaining to the jury -- I understand the

4     issue with the characterization of a large hedge fund, but

5     again, to explain to the jury how a hedge fund is structured

6     and how it's not just one person making all of the decisions.

7     There's an executive committee, there's compliance, there's

8     auditors, there's an administrator and, I mean, the jury --

9              THE COURT:  The question in this case is not how hedge

10    funds in general are.  The question is how this hedge fund

11    operated.  Now, you had the general counsel on the stand, and

12    you had plenty of opportunity to bring out from him how this

13    hedge fund operated and, to some degree, both sides did.  So

14    what's the relevance of how, in general, hedge funds operate?

15             MS. MADRIGAL:  Well, your Honor, I will say this much.

16    When we drafted this expert disclosure on December 15th, we

17    weren't sure how the testimony was going to develop.

18             THE COURT:  I'm not being critical at all.  I'm just

19    saying I just need to know whether you're still offering that

20    testimony or not.

21             MS. MADRIGAL:  We would be happy to exclude that from

22    the testimony.

23             THE COURT:  Okay.  Very good.  So I think we've

24    resolved everything.

25             MR. McGINLEY:  Just one last issue, your Honor,

1    because we haven't gotten any 3500.  We've gotten the

2    agreement, but very little else; so I wanted to inquire.

3              THE COURT:  So what about that?

4              MS. MADRIGAL:  Well, there has been no expert report

5    prepared.  I had a telephone conversation with Mr. Tawil.  I

6    may have notes from that, which I'm happy to provide to the

7    government, and I will do so this evening.  In terms of 3500

8    material, that's probably it, and I will turn that over.

9              THE COURT:  All right.  I should note for the record

10   that this doesn't effect you.  Of course, an expert report is

11   required in every federal civil case.  In a federal criminal

12   case, there has been some ambiguity as to whether what's

13   required is a formal report or just something like what you

14   presented here.

15             Last Friday, in response to a proposal from the

16   National Commission on Forensic Science, the Department of

17   Justice issued new regulations saying that from here on out,

18   they will be producing full expert reports when a forensic

19   scientist testifies.

20             Now, near as I can tell, this witness is not a

21   forensic scientist; so you're still off the hook.  But I notify

22   both sides that, in my court, I think I'm now always going to

23   demand an expert report from any expert in any criminal case,

24   whether it's the government or the defense.  But that's just

25   because the evening is young, and I felt we ought to spend a

1    few more minutes together.

2                Anything else from the government?

3                MR. McGINLEY:  Just one thing further, your Honor, on

4    the scope of Mr. Tawil's testimony, and I promise this is the

5    last, just to confirm that he doesn't intend to testify about

6    Visium specifically, his knowledge of what was going on at

7    Visium or his knowledge of the discovery in this case.

8                THE COURT:  Is that right?

9                MS. MADRIGAL:  That's correct.

10               THE COURT:  Very good.  Excellent.  Well, thank you

11   very much, and I'm sorry that, given what happened, that we had

12   to drag you down here, but it was still nice to meet you and

13   find out how to pronounce your name.  All right.  We'll see you

14   all at 9:00.

15               (Witness excused)

16               MS. MADRIGAL:  Thank you, your Honor.

17               (Adjourned until 9:00 a.m. on January 13, 2017.)

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                      Page

DAVID KEILY

Direct (Resumed) By Mr. Naftalis . . . . . . . 116

Cross By Mr. Creizman  . . . . . . . . . . . 122

Redirect By Mr. Naftalis . . . . . . . . . . 206

JASON THORELL

Direct By Mr. Naftalis . . . . . . . . . . . 221

DAVID TAWIL

Direct By Mr. McGinley . . . . . . . . . . . 318

GOVERNMENT EXHIBITS

Exhibit No.                                     Received

 1403, 1208-A, 1209-A, 1212-A, 1216-A    . . . 226

 1219-A to 1234-A,1235 to 1239   . . . . . . 226

 625C, 640D and 640E  . . . . . . . . . . . 277