H1DPLUM1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
   UNITED STATES OF AMERICA,        New York, N.Y.
3
          v.              16 Cr. 483(JSR)
4
   STEFAN LUMIERE,
5
             Defendant.
6  ------------------------------x
                           January 13, 2017
7                             9:19 a.m.

8  Before:

9                  HON. JED S. RAKOFF,

10                            District Judge

11
                     APPEARANCES
12
   PREET BHARARA
13      United States Attorney for the
       Southern District of New York
14  BY:  JOSHUA A. NAFTALIS
       P. IAN McGINLEY
15      DAMIAN WILLIAMS
       Assistant United States Attorneys
16

17  CREIZMAN, LLC
      Attorneys for Defendant
18  BY:  ERIC M. CREIZMAN
       MELISSA MADRIGAL
19      AMANDA C. SHOFFEL

20

21  ALSO PRESENT:

22  HOLLY MEISTER, Paralegal, U.S. Attorney's Office

23  SARAH PYUN, Paralegal, U.S. Attorney's Office

24  JONATHAN MICHAELSON, Paralegal, Creizman, LLC

25  MATTHEW CALLAHAN, F.B.I.

H1DPLUM1

1            (Trial resumed; jury not present)

2            THE COURT:  The government has something they want to

3    raise?

4            MR. WILLIAMS:  Yes, your Honor.  Your Honor, given the

5    pace of the witness testimony so far, we have a lay witness who

6    has a flight back to Virginia, and we wanted to put him on this

7    morning first thing -- he's a very short witness -- so that he

8    can make his flight and get out of town.

9            I have consulted with Mr. Creizman, who is fine with

10   it, and so we just thought that it made most sense to do that

11   as opposed to having him stay over the weekend.

12           THE COURT:  Put that witness on the stand.  Bring in

13   the jury.  I assure you, ladies and gentlemen, this case is

14   going to be over by Friday of next week, and if I have to

15   impose time limits, I will.

16           (Jury present)

17           THE COURT:  Please be seated.  Good morning, ladies

18   and gentlemen.  Thank you once again for your promptness.

19   We're going to interrupt the witness who was on the stand to

20   take a witness who has a flight that he has to catch.  So we'll

21   take that witness right now, and then we'll go back to the

22   witness who was previously on the stand.  So we'll swear in the

23   witness.

24    CHRISTOPHER WIESE,

25        called as a witness by the Government,

1        having been duly sworn, testified as follows:

2             THE DEPUTY CLERK:  Please be seated.  State your name

3    and spell it slowly for the record.

4             THE WITNESS:  My name is Christopher Wiese.  Last name

5    is spelled W-i-e-s-e.

6             THE COURT:  Bring the microphone a little closer, and

7    say it again.

8             THE WITNESS:  Christopher Wiese.  Last name spelled

9    W-i-e-s-e.

10            THE COURT:  Counsel.

11   DIRECT EXAMINATION

12   BY MR. WILLIAMS:

13   Q.  Mr. Wiese, if you don't mind just coming a little closer to

14   the microphone at this time so we can better hear you.

15            MR. WILLIAMS:  Your Honor, at this time, we'd like to

16   just read a brief stipulation.

17            THE COURT:  That's exiting.  Go ahead.

18            MR. WILLIAMS:  If called as a witness, records

19   custodian from the CFA Institute would testify that Government

20   Exhibit 800 through 808 are true and correct copies of records

21   from the CFA, as well as Government Exhibits 817 through 819.

22            The record reflects that on Government Exhibit 800

23   through 808 and 817 through 819 were retrieved from the

24   computer archive system of CFA.  The record reflected on

25   Government Exhibit 800 through 808 and 817 through 819 were

H1DPLUM1                          Wiese - Direct

1    created by a person with knowledge of, or created from

2    information transmitted by a person with knowledge of the

3    information shown, were created at or near the time information

4    became available to CFA, and were created and maintained by CFA

5    as part of its regularly conducted business activities.

6              If called as a witness, a records custodian from the

7    Financial Industry Regulatory Authority, FINRA, would testify

8    that Government Exhibits 809 through 815 are true and correct

9    copies of records from FINRA.

10             The records reflected on government Exhibit 809

11   through 815 were retrieved from the computer archive system of

12   FINRA.  The record reflected on Government Exhibits 809 through

13   815 were created by a person with knowledge of, or created from

14   information transmitted by a person with knowledge of the

15   information shown, were created at or near the time the

16   information became available to FINRA, and were created and

17   maintained by FINRA as part of its regularly conducted business

18   activities.

19             It's further stipulated and agreed that this

20   stipulation may be received in evidence at trial.

21             Your Honor, at this time, the government offers

22   Government Exhibits 800 through 808, 817 through 819, 809

23   through 815.

24             THE COURT:  Received.

25             (Government's Exhibits 800 through 808, 817 through

1    819, 809 through 815 received in evidence)

2               MR. WILLIAMS:  And also Government Exhibit 1402.

3               THE COURT:  Received.

4               (Government's Exhibit 1402 received in evidence)

5    BY MR. WILLIAMS:

6    Q.  Good morning, Mr. Wiese.  How are you?

7    A.  Very well, thank you.

8    Q.  Where do you work?

9    A.  I work for CFA Institute in Charlottesville, Virginia.

10   Q.  What is the CFA Institute?

11   A.  CFA Institute is a global nonprofit organization in the

12   finance industry with the mission of promoting the highest

13   standards of ethics, education and professional competence in

14   the investment industry.

15   Q.  How long have you worked there?

16   A.  I've been with CFA Institute for 13 years.

17   Q.  What's your current position?

18   A.  Currently, I'm head of the Curriculum and Learning

19   Experience Team, which it is the responsibility of my team to

20   write and edit all of the curriculum that our candidates use to

21   study for the program, and to produce and to distribute

22   ancillary study tools, such as practice exams.

23   Q.  How long have you been in that position?

24   A.  For a year-and-a-half.

25   Q.  Can you walk the jury through the various positions that

1   you had at the CFA Institute?

2   A.   Certainly.  For the previous eight years, I was head of

3   candidate products.  In that role, I'm doing everything I'm

4   doing now.  Just about a year-and-a-half ago we added the

5   curriculum writers into my team and merged them into one team,

6   putting that team in charge of a whole end-to-end study

7   curriculum for candidates.

8          Previous to that I was, for about two years, a

9   curriculum director; so I worked within the team actually

10  writing curriculum for the program.  And for about a

11  year-and-a-half before that, I was publications manager, and in

12  that role, I wrote and edited content that we provide our

13  members as part of their continuing education after they've

14  already been through our program.

15  Q.   Before you joined CFA Institute, where did you work?

16  A.   I worked for approximately six years for Strong

17  Investments, which was a mutual fund company in the midwest

18  that was subsequently bought out a couple of years after I

19  left.

20  Q.   Were you an investment professional?

21  A.   Yes, I was a mutual fund analyst.

22  Q.   Now, are you familiar with the CFA charter?

23  A.   Yes, sir.

24  Q.   What is the CFA charter meant to signify?

25  A.   It's meant to signify someone who has competence in

1    investment analysis and in portfolio management, and who has

2    agreed to abide by our code of standards of ethical conduct.

3    Q.  Are you familiar with a Masters of Business Administration,

4    or MBA?

5    A.  Yes, sir.

6    Q.  How does a CFA charter compare to an MBA in terms of skills

7    that are covered?

8    A.  An MBA program is typically more broad based and expansive

9    and multi-disciplinary in the sense that, yes, it teaches some

10   finance but also some accounting and marketing and operations

11   management.  All with the goal of developing general business

12   acumen and important skills like critical thinking.

13           In contrast, the CFA program is meant to be a very

14   hands-on, how-to-do-investments program, and we teach

15   investment analysis and portfolio management to a much deeper

16   level than a Masters program customarily would.

17   Q.  For you, yourself, are you, yourself, a CFA charter holder?

18   A.  Yes, since 2002.

19   Q.  Can you explain to the jury what someone has to do in order

20   to obtain a CFA charter?

21   A.  They must pass all three levels of the CFA program in

22   sequence.  They must accrue at least four years of relevant

23   work experience.  Typically that means they're operating in the

24   capacity as an investment decisionmaker, and they must become a

25   CFA Institute member and, as a part of that, agree to hold to

1    an ethical code of standards.

2    Q.   You mentioned the three levels, are those exams?

3    A.   Yes.

4    Q.   Okay.  And so what does the Level I exam -- let me take a

5    step back.  What topics are covered on the exams?

6    A.   The program is divided into ten topic areas, ethics,

7    quantitative investment analysis, which is really math, and

8    statistics for finance, economics, financial statement

9    analysis, corporate finance, equities, fixed income securities,

10   alternative investments.  That would entail things like

11   commercial real estate, derivatives and portfolio management.

12   Q.   So what does the Level I exam cover?

13   A.   Well, each level covers a range of those topics, but the

14   complexity increases over time.  So Level I is about developing

15   foundational material and a general understanding of the basic

16   tools that someone working in the industry should have, and for

17   each of the major types of investments, foundational

18   information about how they work, important issues for them, the

19   types of risks that those investors face and so forth.

20   Q.   What about the Level II exam?

21   A.   So Level II, the complexity goes up a bit.  The major theme

22   or goal at Level II is to develop candidate's evaluation

23   skills.  So there we introduce more complex investment tools,

24   and for each type of investment, we go into considerably more

25   detail and present a lot of the real-world complexities and

1    nuances that someone would face when they're attempting to

2    estimate the value of an asset.

3    Q.  And what about the Level III exam, what does that cover?

4    A.  Level III has an emphasis of portfolio management.  So the

5    candidates are required to take everything they learned at

6    Level I and II and apply it not just to individual securities

7    but for managing a whole basket of securities that might behave

8    a little bit differently to outside events, and to manage the

9    whole profile of that portfolio and its risk and its return as

10   the world changes around it.

11   Q.  Based on your experience at CFA Institute, approximately

12   how many hours do candidates spend studying for each level?

13   A.  We do quite a bit of surveying of our candidates, and then

14   we supplement that information with an analysis of their use of

15   our digital study tools.  And we find that, on average, they

16   spend approximately 300 hours preparing for each of the three

17   levels.

18   Q.  Mr. Wiese, you mentioned valuation.  Is that a covered

19   topic within the CFA curriculum?

20   A.  Yes, it's a covered topic throughout the whole curriculum

21   but with an emphasis at Level II.

22   Q.  You mentioned earlier in your testimony the term

23   fixed-income securities.  What does fixed-income securities

24   mean?

25   A.  When a government or corporation or other big entity wants

1    to borrow money from investors, they go to the fixed income or

2    debt market.  A common example of a fixed income security is

3    something like a bond.  So if a corporation wants to raise

4    money, they will sell these bonds.  Each one of the bonds will

5    have a face value, say a thousand dollars, and the company will

6    sell enough of them to raise however much money they need.

7           So each investor that bought that bond for a thousand

8    dollars is entitled to receive interest payments.  What's

9    customary in the U.S. for the corporate bond market would be

10   semi-annual interest payments.  So they receive these payments

11   at a rate stipulated by the bond until maturity, which is

12   essentially the life of the loan, and at maturity, it is

13   promised to -- with the last interest payments, to return that

14   principal.

15          Now, as a bond investor, I don't have to hold onto

16   that bond until maturity to get my money back.  I can sell that

17   bond to another investor, if I need to access my funds earlier.

18   It's unlikely I'll be able to sell that bond at the same fixed

19   value that I bought it from from the company.  The actual price

20   I'm able to achieve is going to depend on a number of factors,

21   such as what has happened to the prevailing level of interest

22   rates or how much time is left until maturity, or whether the

23   bond issuer's credit is better or worse than when I originally

24   bought the bond.

25   Q.  Mr. Wiese, why does the CFA Institute curriculum focus on

1    valuation?

2    A.   Valuation is an extremely important issue because the

3    estimation of risk and return is kind of a paramount issue to

4    investors, and a lot of investment managers attempt to

5    differentiate themselves based on things like investment

6    performance.  And, right or wrong, a lot of investors look to

7    investment performance as an indication of who might have

8    competence in the industry.

9            So if valuation isn't calculated correctly and

10   consistently over time, then those risks can be over- or

11   understated, or the returns could be over- or understated and

12   then investors are not making well-informed decisions.

13   Q.   Are you familiar with pricing services like Reuters, Markit

14   and IDC?

15   A.   Yes, I'm generally familiar with them.

16   Q.   How does the CFA curriculum prepare someone to understand

17   prices provided by those services?

18   A.   Each of those services provide a tremendous amount of data.

19   The value they add is to collect data from a variety of sources

20   and to bring it all together in one place and to do some

21   initial calculations to provide relevant statistics that

22   investment managers would want to know.

23           Our program teaches people how to evaluate which bits

24   of those data are relevant based on a particular investment

25   that they're considering, and it teaches the strengths,

1   weaknesses and inherent assumptions being made by that data so

2   that they can make sure that they're using the right data and

3   that they're interpreting it correctly.

4   Q.  You're the head of curriculum and learning experience

5   today.  Have you reviewed material that candidates for the CFA

6   charter received in the late 1990s and early 2000s?

7   A.  Yes, I have.

8   Q.  All right.

9           MR. WILLIAMS:  Now, Ms. Meister, can we please publish

10  Government Exhibit 817 and go to page 25 of this document.

11  Okay.

12  Q.  So, Mr. Wiese, do you see this document on your screen?

13  A.  Yes, I do.

14  Q.  All right.

15          MR. WILLIAMS:  Now, if you can just, Ms. Meister,

16  please blow up under site sessions, all the way down to part B.

17  And if you could zoom out, sorry, to include all of -- do you

18  see where it says Learning Outcomes, all of that below.

19  Q.  Okay.  Mr. Wiese, what is this section dedicated to?

20  A.  This section is dedicated to helping candidates understand

21  the fundamental characteristics of bonds and issues they should

22  be aware of in fixing a value to them, and ultimately how to

23  determine the bond's value, and to determine the impact of

24  changes in interest rates on that value.

25  Q.  I should have asked you.  This document is a curriculum

1  guide from what year?

2  A.  This would be from 1998.

3  Q.  Okay.  And have you reviewed CFA's records relating to a

4  person named Stefan Lumiere?

5  A.  Yes, I have.

6  Q.  Did Stefan Lumiere pass the Level I examination?

7  A.  He did pass in 1998.

8  Q.  And what was the passage rate in 1998 for the Level I

9  examination?

10  A.  That year, for Level I, it was 59 percent.

11  Q.  And so from CFA's perspective, what does that mean in terms

12  of Stefan's Lumiere mastery of the valuation topics that you

13  just went over?

14  A.  His passing that exam would have indicated to us that he

15  had mastered the foundational level of material with respect to

16  fixed income, as well as everything else that was on the exam.

17  Q.  Let's look at Government Exhibit 818.  We can go to Page

18  39.

19        So, Mr. Wiese, this is the curriculum material for the

20  Level II examination.

21        MR. WILLIAMS:  If you can zoom in on the learning

22  outcome section, Ms. Meister.

23  Q.  So, Mr. Wiese, do you see where it says the financing

24  decision and the candidate should be able to?

25  A.  Yes.

1    Q.  What, generally, was a candidate for the CFA expected to be

2    able to do on the Level II examination for valuation?

3    A.   In relation to this particular study session, it was about

4    assessing a bond issuer's ability to make good on their

5    investments, and it was about how that ability to pay effects

6    on a bond's valuation.

7    Q.  Did Stefan Lumiere pass the Level II examination?

8    A.  He did.

9    Q.  What year did he do that?

10   A.  In 2000.

11   Q.  What was the passage rate in 2000 for the Level II

12   examination?

13   A.  54 percent.

14   Q.  What does that mean in terms of his mastery of the topics

15   that you just summarized?

16   A.  That he had mastered the valuation, and that he was

17   eligible to take our Level III program.

18   Q.  Now, let's look at Government Exhibit 819.  Mr. Wiese, this

19   is the next, the Level III, curriculum guide for asset

20   valuation for debt investments.  If we could look at the

21   section under Learning Outcomes, the introduction to the bond

22   portfolio management.

23        Mr. Wiese, what generally was a candidate expected to

24   learn and master on the Level III examination?

25   A.   In this case, it was about managing a portfolio of bonds

1    and the issues that come into play with respect to an entire

2    portfolio.

3    Q.  So what were some of the issues that the candidate should

4    have been able to master?

5    A.  For example, for a given change in interest rates, how that

6    would have an effect on the entire portfolio of bonds, how that

7    would affect their value, and how that would affect the

8    potential return from that portfolio.

9    Q.  Now, did Stefan Lumiere pass the Level III examination?

10   A.  He did.

11   Q.  And what year did that happen?

12   A.  2001.

13   Q.  What was the passage rate in that year?

14   A.  For Level III that year, it was 82 percent.

15   Q.  And again, what does that mean from the CFA Institute's

16   perspective in terms of his mastery of these topics?

17   A.  At that point, we would have considered him to have

18   completed the program and demonstrated mastery of all three

19   levels, and provided he had the work experience and met the

20   other criteria, he would have been eligible to become a CHR

21   holder.

22   Q.  Was Stefan Lumiere, in fact, awarded the CFA charter?

23   A.  Yes, he was.

24   Q.  So, Mr. Wiese, you testified earlier that promoting ethical

25   conduct is a core part of the CFA Institute's mission, can you

1    explain why that is?

2    A.   Aside from the moral imperative to do the right thing, I

3    think one of the important issues in finance is that it's based

4    on trust.  Whether it's banking, insurance or investments, it's

5    all based on trust.  So if you go to a bank and deposit money,

6    you may know that they are consolidating those deposits with

7    other depositors and making loans to people so they can buy

8    houses and cars, but you trust if you go down to the bank to

9    make a withdrawal, that they've got adequate reserves that

10   you're able to get your money back.

11           Similarly, with an investment manager, you may know

12   that what you're investing in has some inherent risk, that

13   stocks and bonds fluctuate and it's possible you will lose

14   money, but you trust that those risks have been adequately

15   assessed.  And you're trusting that the risks and the potential

16   return are being accurately conveyed to you and, ultimately,

17   that those investments are suitable given your situation.

18           So if that trust is violated, I think of that as like

19   a small crack in the dam, and if you get enough cracks in the

20   dam, you start to have systematic problems with trust and that

21   makes everyone, from the initial individual investor and

22   everyone in the industry, worse off.  And if it is particularly

23   problematic, you can start to see problems such as 2008, where

24   we had a financial crisis, and a lot of that was built around

25   lost trust.

1              THE COURT:  Sustained.

2    Q.  Mr. Wiese, are those ethical standards that you mentioned

3    for CFA Institute are they codified anywhere?

4    A.  They're codified in a code of ethics and the standards of

5    professional practice.

6    Q.  The code of standards, what does it require CFA charter

7    holders to do with their clients?

8    A.  The code of ethics itself covers issues such as putting

9    client's interests first, for behaving with integrity, and

10   confidence.

11             THE COURT:  Counsel, come to sidebar.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

H1DPLUM1                       Wiese – Direct

1              (At the side bar)

2              THE COURT:  I don't know whether to be more troubled

3     by the government's conduct or the defense conduct.  Here we

4     have a witness who, in effect, is suggesting that the entire

5     financial crisis of 2008 is a function of the breakdown in

6     trust attributable to the kinds of violations that are alleged

7     against the defendant in this case, a grossly prejudicial form

8     of testimony.  But defense counsel, who apparently thinks that

9     he should be even more sedentary than a potted plant, allowed

10    this entire testimony to come in, and it was only finally when

11    the Court, on its own, cut it off that it was cut off.

12             Now, this was supposed to be a short witness.  I'll

13    give you three minutes more with this witness.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

H1DPLUM1                          Wiese - Cross

1                     (In open court)

2       BY MR. WILLIAMS:

3       Q.  I just have one final question.

4       A.  Yes.

5       Q.  Is Mr. Lumiere still a charter holder?

6       A.  No, he is not.

7                 MR. WILLIAMS:  No further questions.

8                 THE COURT:  Cross-examination?

9       CROSS-EXAMINATION

10      BY MS. SHOFFEL:

11      Q.  Good afternoon, Mr. Wiese.  I understand you have a flight

12      back to Virginia; so I just have a couple of questions for you.

13              You have no reason here to believe that Mr. Lumiere

14      did not adhere to any of the professional standards or conduct

15      that you just described?

16      A.  That is correct.

17      Q.  Okay.  You don't know him?

18      A.  Correct.

19      Q.  Okay.  You aren't a professor, right?

20      A.  I was not.

21      Q.  Okay.  When you talked about this curriculum, you described

22      a general curriculum that was in place about 25 years ago?

23      A.  I'm sorry, can you re-ask the question?

24      Q.  Sure.  When you talked about the curriculum a few minutes

25      ago, the study guide, they were from 1999; is that right?

```
 1   A.  Yes, that's correct.

 2   Q.  Okay.  That flight back to Virginia, is the government

 3   paying for that?

 4   A.  Yes, they are.

 5   Q.  Okay.  And when you just mentioned that Mr. Lumiere's

 6   membership was not current, that's because he chose not to

 7   renew it; that's right, isn't it?

 8   A.  I would presume that but I do not have firsthand knowledge.

 9   Q.  Okay.  It was a voluntary lapse in membership, can we agree

10   to that?

11   A.  So far as I'm aware, yes.

12            MS. SHOFFEL:  No further questions, your Honor.

13            THE COURT:  All right.  Anything else?

14            MR. WILLIAMS:  No, your Honor.

15            THE COURT:  Thank you very much.  You may step down.

16   Let's get the other witness back on the stand.

17            (Witness excused)

18            THE COURT:  Please be seated.  The Court reminds the

19   witness he's still under oath.  Okay.

20            MR. NAFTALIS:  Thank you, your Honor.

21    JASON THORELL,

22       called as a witness by the Government,

23       having been previously duly sworn, testified as follows:

24   DIRECT EXAMINATION (Resumed)

25   BY MR. NAFTALIS:
```

1   Q.  Mr. Thorell, when we broke yesterday, we were talking about

2   three brokers who provided broker quotes to the defendant; do

3   you recall that?

4   A.  Yes.

5   Q.  And what were their names again?

6   A.  Scott Vandersnow, John Brook and Matt O'Callaghan.

7   Q.  And where did each of them work?

8   A.  Scott Vandersnow worked at Princeridge; John Brook worked

9   at Janney Montgomery and Matt O'Callaghan worked at Odeon.

10  Q.  Did you speak to the defendant about these firms?

11  A.  Yes.

12  Q.  How did the defendant describe these firms?

13            MR. CREIZMAN:  Objection.

14            THE COURT:  Ground?

15            MR. CREIZMAN:  Foundation, form, ambiguity.

16            THE COURT:  Well, what did the defendant say?  I'm

17  asking you.

18            THE WITNESS:  You're asking me?  Among other terms,

19  the term "bucket shop" was used.

20  BY MR. NAFTALIS:

21  Q.  And what is a bucket shop?

22  A.  It's slang in the industry for -- a somewhat derogatory

23  term for a non-prestigious type of broker dealer.

24            MR. NAFTALIS:  Ms. Pyun, can you bring up Government

25  Exhibit 1158 in evidence, please.  Zoom in on the top.

1   Q.  And before we get to the e-mail, can you remind the jury

2   what Mr. Lumiere told you about his relationship with John

3   Brook?

4   A.  He had known him for a long time, that they went way back,

5   presumably they started their careers, I'm not sure.  It was

6   way back when they were, at one point, actual coworkers at SLK,

7   which is a Spear, Leeds, Kellogg.

8   Q.  Okay.  And let's look at this e-mail.  Who sends this?

9   A.  Stefan.

10  Q.  And what's the date?

11  A.  Tuesday, March 20th of 2012.

12  Q.  What does Mr. Lumiere write in the first two sentences?

13  A.  He writes, I am organizing a distressed idea dinner on

14  Thursday, March 29th, at 7:00 p.m.  John Brook, a good friend

15  and ex-colleague of mine and currently running the credit

16  effort at Janney Montgomery, will be sponsoring.

17  Q.  Okay.  So he calls John Brook a good friend?

18  A.  Yes.

19  Q.  And an ex-colleague?

20  A.  Yes.

21          MR. NAFTALIS:  You can take that down, please, then.

22  And, Ms. Pyun, can you bring up Government Exhibit 656 in

23  evidence.

24  Q.  Mr. Thorell, can you remind the jury what 656 is, just this

25  collection of documents?  It should be in front of you.

 1   A.  This is a collection of broker quotes, which it's mostly of

 2   quotes sent from John Brook at Janney Montgomery to Stefan.

 3          MR. NAFTALIS:  Okay.  And, Ms. Pyun, could you just

 4   scroll through this exhibit slowly to show the jury what we're

 5   looking at.

 6          (Pause)

 7   Q.  There's also Government Exhibit 658 in front of you?

 8   A.  Yes.

 9   Q.  Okay.  What is contained in that exhibit again?

10   A.  The date that I dated it or the --

11   Q.  Just generally, what's in that exhibit, to remind the jury?

12   A.  What's in the exhibit is another list of broker quotes.  In

13   this case, the broker quotes are generally from Scott

14   Vandersnow at Princeridge to Stefan.

15   Q.  Okay.  Just generally, in terms of thickness, how would you

16   compare that one to the one from John Brook?

17   A.  I'm sorry, in terms of what?

18   Q.  The thickness of the papers in front of you.

19   A.  It appears to be very similar in terms of thickness.

20   Q.  You can put those aside.  Thanks.

21          MR. NAFTALIS:  Now, if the jury can open up in their

22   binders to Government Exhibit 1226T.

23   Q.  What's the date of this recording?

24   A.  January 17th of 2014.

25   Q.  Who are the participants?

H1DPLUM1                        Thorell - Direct

1   A.  Stefan Lumiere and myself.

2   Q.  Were you working with the FBI at the time this recording

3   was made?

4   A.  Yes, I was.

5          MR. NAFTALIS:  Ms. Pyun, can you play this, please.

6          (Audio played)

7   Q.  We're going to walk through the details of this recording,

8   but generally, what are you discussing here with the defendant?

9   A.  Generally, I'm looking for a description from Stefan as to

10  what went on that I was not privy to, and he went on to

11  describe it in certain detail.

12  Q.  Okay.  So at the top, Mr. -- well, you say:  So, like, how

13  was it communicated to brokers, just on cell phones or like

14  telephone calls?

15  A.  Yes.

16  Q.  Excuse me, just like, and then Lumiere said:  Telephone

17  calls.

18         What did you understand that to mean?

19  A.  I was asking the mechanism for how this was communicated,

20  and I suggested telephones and was going to offer up other

21  possibilities, and he affirms that it was telephone

22  conversations.

23  Q.  And just to be more specific, how is what communicated?

24  A.  The broker quote, the requests to brokers for certain

25  prices.

1   Q.  Then Mr. Lumiere says:  You know most brokers don't price

2   things.  Do you see that at Line 9?

3   A.  Yes, I do.

4   Q.  What did you understand that to mean?

5   A.  My understanding was it's in reference to the brokers that

6   Visium had been dealing with, specifically Stefan and on seldom

7   occasions Chris Plaford, as well, in regards to the specific

8   dealers pricing the securities for the loans that were needed

9   as overrides.

10  Q.  Just to be more specific, when Mr. Lumiere says:  Most

11  dealers don't price things, what was he referring to with

12  respect to, for example, Janney Montgomery, Princeridge and

13  Odeon?

14  A.  He was referring to the fact that they were not active in

15  trading.  To go back to the other term that was used

16  previously, they didn't traffic in the name, which again is

17  synonymous with knowing the name because they traded it.  So as

18  a result, they generally should not be pricing it because

19  they're not familiar with it enough.

20  Q.  And then the defendant says that, I'm paraphrasing -- I'm

21  reading:  You tell the brokers that we know, tell them that

22  this is where we think they are and that is it.

23          And what does Mr. Lumiere say then here?

24  A.  He's saying that because if they don't price things,

25  because presumably -- or because, obviously, they don't know

H1DPLUM1                    Thorell - Direct

```
1    enough information to provide the pricing, that they need
2    guidance.  Thus, his comment that they need to be told where
3    the prices should be.
4              MR. CREIZMAN:  Your Honor, I object to the -- this
5    kind of speculation.  If the witness has an understanding or
6    knows -- thinks he's competent to answer it, otherwise....
7              THE COURT:  So I don't want speaking objections in the
8    future, counsel, but the objection is sustained.
9              MR. NAFTALIS:  I'll just rephrase it.
10   Q.  What did you understand the defendant to be saying when he
11   said:  You tell the brokers that we know.  Tell them that this
12   is where we think they are and that's it?
13   A.  He's telling them that --
14             MR. CREIZMAN:  Objection.
15             THE COURT:  No, he's giving his understanding.
16             MR. CREIZMAN:  Oh, okay.
17   A.  It's clear to me what he's telling them.  What he's saying
18   is that he needs to give the brokers guidance for pricing
19   because of the prior statements given here, which again
20   specifically the brokers don't -- they're not active and they
21   don't know; so, thus, they need guidance provided by we, being
22   Stefan.
23   Q.  And, again, the defendant says:  You know, trusting that
24   Chris knew the levels, what did you understand this phrase, the
25   brokers trusting that Chris knew the levels meant?
```

1   A.  He is -- he's effectively -- he's saying that the brokers

2   need to trust that Chris knew the levels, that's what he

3   states.

4   Q.  What did you understand that to mean?

5   A.  My understanding was that Stefan was communicating to the

6   brokers that these are the levels and giving the brokers

7   guidance on behalf of himself.

8   Q.  To be clear, was Mr. Lumiere the one speaking to the

9   brokers?

10  A.  Yes.

11  Q.  And were the brokers trusting him?

12  A.  Yes.

13          MR. CREIZMAN:  Objection.

14          MR. NAFTALIS:  I'll rephrase.

15  Q.  Did you understand the brokers to be trusting him?

16          MR. CREIZMAN:  Objection.

17          THE COURT:  Sustained, leading.

18  Q.  Who else, if anyone, did you understand the brokers to be

19  trusting besides Mr. Plaford?

20  A.  The only alternative that I could think of would be

21  Plaford, but that's far less likely a scenario.

22  Q.  Besides Plaford?

23  A.  Oh, besides Plaford?  Stefan.

24  Q.  Who primarily spoke to the brokers to get their quotes?

25  A.  Mostly Stefan.

1   Q.  We can take that down.  Thank you.

2           Now, did there come a time that you, yourself,

3   solicited broker quotes for use in the month-end valuation

4   process?

5   A.  Yes.

6   Q.  Approximately how many times did you do this?

7   A.  Roughly two to four.

8   Q.  How did it come about that you called brokers for quotes?

9   A.  It was a seldom occasion where Plaford is out of the office

10  and, more importantly, Stefan was also out of the office,

11  presumably traveling.  And Stefan, on those limited occasions,

12  had called me from his cell phone and directed me to help out

13  with the pricing process, which was typically his role, but

14  because he was traveling, asked me to call up one of the

15  brokers, likely Princeridge or Janney, and directed me to

16  provide them with the specific pricing for a specific security.

17          In addition to that, he said to make sure to tell them

18  to state in the Bloomberg message that serves as an override,

19  to state that it is for month-end quotes, make that statement

20  in the Bloomberg.  He also added that I was to use my personal

21  cell phone and call the broker on their personal cell phone.

22          (Continued on next page)

23

24

25

1   Q.  Did you have a desk phone?

2   A.  I did.

3   Q.  And did the brokers have their own desk phones?

4   A.  Yes.

5   Q.  But the defendant directed you to use your personal cell

6   phone?

7   A.  Yes, he did.

8   Q.  And call the brokers' personal cell phones?

9   A.  Yes.

10  Q.  And then tell them the quotes that you wanted?

11  A.  That Stefan provided me, yes.

12  Q.  For specific securities?

13  A.  Yes.

14  Q.  For the use of month-end pricing?

15  A.  Yes.

16  Q.  Where did you get -- did you do this?

17  A.  Yes.

18  Q.  Where did you get the securities and the prices you wanted

19  from?  Where did you get that information?

20  A.  Stefan.

21  Q.  Did you communicate that information to the brokers?

22  A.  Yes.

23  Q.  What did the brokers do?

24  A.  They provided the prices and followed the instructions just

25  as Stefan had directed me and as I had then, in turn, provided

H1d2lum2                      Thorell - Direct

1   them with the instructions, exactly how I just mentioned them.

2   Q.  Did you do any research to verify the prices before you

3   called the brokers?

4   A.  No, I did not.

5   Q.  Do you know if the brokers did any research to come up with

6   the numbers they sent back to you?

7   A.  No, I do not know that.

8          MR. NAFTALIS:  Ladies and gentlemen, if you can take

9   out your binders again.  We are going to look at Government

10  Exhibit 1234T.

11  BY MR. NAFTALIS:

12  Q.  Mr. Thorell, what's the date of this recording?

13  A.  The date is January 17 of 2014.

14  Q.  And who participates in this call?

15  A.  Stefan and myself.

16         MR. NAFTALIS:  Ladies and gentlemen, just flip the

17  page, you can follow along, and then we can play it.

18         You can play it, please.

19         (Audiotape played)

20  BY MR. NAFTALIS:

21  Q.  So in the first line you say, "Here's the deal, like a

22  small handful of times, you told me to call on a cell phone to

23  make quotes."  The defendant says, "Yeah."

24         And then you say, "Like probably five times."  And the

25  defendant says, "Yeah."

H1d2lum2                          Thorell - Direct

1              What are you referring to there?

2   A.   I am referring to what we had just discussed prior to this,

3   which is that I reminded Stefan of the fact that he directed me

4   to provide instructions to the brokers, you know, as mentioned,

5   in giving the quotes and the other instructions as well, in

6   order to get the backup necessary for the overrides.

7   Q.   And then in the last line, the defendant says, "Yeah,

8   Chris, Chris told me to make these phone calls on a cell phone,

9   too."

10             Do you see that?

11  A.   I do.

12  Q.   What did you understand that to mean?

13             MR. CREIZMAN:  Objection.

14             THE COURT:  Ground.

15             MR. CREIZMAN:  I don't -- it's -- I mean --

16             THE COURT:  Pardon?

17             MR. CREIZMAN:  It's -- I don't know.

18             THE COURT:  Overruled.

19             MR. CREIZMAN:  It just seems like plain language.

20             THE COURT:  Go ahead.  You may answer.

21  A.   Well, at face value, it means Chris told me what he said,

22  but my understanding was that Stefan was requesting that I use

23  my personal cell phone.

24  Q.   Looking at the last line, what did you understand the

25  defendant to mean when he said "Chris, Chris told me to make

1    these phone calls on a cell phone, too."

2    A.  I didn't believe that Chris told -- I felt that that was

3    coming directly from Stefan.

4          MR. NAFTALIS:  We can take that down, please.

5    Q.  Now, Government Exhibit 657 is in evidence in front of you.

6          MR. NAFTALIS:  Let me back up.  Can we bring up

7    Government Exhibit 1160 again, and let's just zoom in.

8    Q.  What is the date on this e-mail?

9    A.  The date is Monday, December 12, 2011.

10   Q.  Looking at the first sentence, can you remind the jury what

11   this e-mail is about.

12   A.  Would you like for me to read it or --

13   Q.  Just remind the jury what's going on here.

14   A.  Right.  What is going on is that Stefan is making a request

15   to risk management, Amol, I can't pronounce his last name, but

16   he works in risk, he is on the "to" line in the e-mail, and he

17   is requesting that if he -- the broker Odeon be approved for

18   trading, and then it goes on -- that's it for now.

19   Q.  That's Matt O'Callaghan at Odeon?

20   A.  That's correct.

21   Q.  Just before this, I believe you testified yesterday, you

22   had a conversation with the defendant about Mr. O'Callaghan?

23   A.  I did, yes.

24   Q.  Can you remind the jury how this came about?  What was the

25   defendant looking for?

1   A.  He was looking for another broker that would fit the

2   criteria of the other two brokers -- and, again, those were

3   Janney and Princeridge -- that would possibly be willing to

4   participate in providing support for Visium's override prices.

5   Q.  So the date is December 12, 2011?

6   A.  Yes.

7   Q.  Now can you look at Government Exhibit 657 in evidence.

8   And remind the jury what is in Government Exhibit 257?

9   A.  Excuse me.  657?

10  Q.  657.  I'm sorry.  I apologize.

11          Generally, what's contained in that exhibit?

12  A.  Generally this is a list of broker quotes generally from

13  Matt O'Callaghan at Odeon to Stefan.

14  Q.  What are the dates on those broker quotes?  Have you

15  reviewed this document previously?

16  A.  I have reviewed them.

17  Q.  What are these broker quotes generally from?

18  A.  From what date?

19  Q.  Exactly.

20  A.  They are generally from --

21  Q.  You can just look at any one of them.

22  A.  They are generally from year end of 2011.

23  Q.  So that's the -- meaning December 30, 2011?

24  A.  Correct, within a day or two.

25  Q.  A few weeks after the e-mail that the defendant sends to

 1   try to set up Odeon as a broker?

 2   A.  That's correct.

 3        MR. NAFTALIS:  We can take that down.

 4   Q.  Now, did you ever socialize with Mr. O'Callaghan?

 5   A.  On a few seldom occasions I did.

 6   Q.  Did you socialize with the other brokers as well?

 7   A.  Yes.

 8   Q.  Focusing on Mr. O'Callaghan, after you introduced the

 9   defendant to him, did there come a time that you had drinks

10   with him in the area of Columbus Circle?

11   A.  Yes.

12   Q.  Specifically where?

13   A.  At the Time Warner Center.

14   Q.  Do you remember where in the Time Warner Center?

15   A.  Yes, a lounge called Stone Rose.

16   Q.  And did you discuss the defendant during this meeting?

17   A.  Yes.

18   Q.  What did O'Callaghan say to you?

19   A.  He had brought up that he had concerns about discussing

20   with Stefan about the month-end pricing process and he felt

21   very uncomfortable and was especially concerned about one

22   particular situation.

23   Q.  What was that situation?

24   A.  What he had mentioned was that on one occasion in

25   particular, Stefan had requested Matt O'Callaghan at Odeon to

1   somehow receive, I believe, via a courier, if I am correct

2   about that, in other words, delivery service to Odeon's office,

3   receive a USB device, you know, a memory -- portable disk

4   drive, if you will, which in turn contained a spreadsheet that

5   had a list of securities and prices similar to the spreadsheets

6   that we have discussed previously, the override spreadsheets at

7   Visium; and, again, Matt O'Callaghan of Odeon said this is

8   clearly very disconcerting to him and that he did receive the

9   USB device and, despite his extreme concerns, proceeded to use

10  the device and pull the information up on his computer, follow

11  directions, which was apparently to use that information to

12  provide broker quotes.

13  Q.  Broker quotes to who?

14  A.  To Visium, specifically Stefan.

15  Q.  How, if at all, did Mr. O'Callaghan describe the defendant?

16  A.  I believe the word "sketchy" was used or something to that

17  effect, but "sketchy" comes to mind.

18  Q.  What was your reaction when you heard that the defendant

19  had sent a USB drive with prices to Mr. O'Callaghan, and that

20  Mr. O'Callaghan had then sent back the broker quotes to the

21  defendant?

22  A.  I was mostly surprised because, given the context of what I

23  had learned was going on, this was another level that I did not

24  know existed.  Under many circumstances, a conversation of this

25  matter probably wouldn't shock me, but this was -- things

H1d2lum2                          Thorell - Direct

1   seemed to be escalating to another level of egregiousness that

2   I had no idea was occurring.

3   Q.  Now, did Mr. O'Callaghan say anything about whether -- what

4   you should do with the information that he gave you?

5   A.  Yes, not discuss it with anyone.

6   Q.  I want to go back in time.  You said that the initial

7   meeting with Mr. Plaford in his office --

8                THE COURT:  Counsel, come to sidebar, please.

9                (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          THE COURT:  So the court notes again there was no

3     objection to any of the last testimony; but, once again, the

4     court is concerned both about the timing of these proceedings

5     and about the introduction of possible irrelevancies.

6          So my first question is, why is the conversation with

7     Mr. O'Callaghan not hearsay?

8          MR. NAFTALIS:  He is a coconspirator.

9          THE COURT:  Okay.

10          Then my second question is, what is the relevance --

11     this is what prompted the sidebar -- of this witness's

12     reaction that he was shocked that it was a new level of

13     misconduct or whatever?  What is the conceivable relevance of

14     his state of mind in connection with receiving this

15     information.

16          MR. NAFTALIS:  What we are about to get into next,

17     your Honor, is that he is going to report to Visium and

18     ultimately to the SEC and, I imagine, based on the opening

19     statement that Mr. Creizman called the witness a master

20     manipulator, he is going to argue this is all made up.

21          So this all goes to the state of mind and thinking of

22     the witness, as to who is involved and the steps he takes,

23     because I think that the cross-examination is going to be, This

24     witness is making it up and he is trying to inflate it to make

25     a lot of money from the SEC; and this is all part of the story

1    of how we got to where we are, and it goes to corroborate that

2    this, A, happened and, B, the steps he took, meaning --

3              THE COURT:  All right.  Well, I am glad we had this

4    sidebar, because I am satisfied with the explanation.  Thank

5    you.

6              MR. WILLIAMS:  Your Honor, if I may, just on the last

7    sidebar that we had, first I want to apologize to Mr. Creizman.

8    The witness had never, in our preparations, said what he said

9    on the stand.  It was shocking to the government as well, so

10   that moment was not preplanned.  We obviously would never have

11   done something like that, and so we will all --

12             MR. CREIZMAN:  If I may?

13             THE COURT:  Excuse me.  I appreciate knowing that, and

14   that's good to know, but Mr. Creizman and his colleague were

15   silent throughout.

16             MR. CREIZMAN:  Yes, your Honor.

17             MS. SHOFFEL:  It's my fault, your Honor.

18             MR. CREIZMAN:  No, no, no.  I thought that, to the

19   extent it got a little bit further, that was one thing, but to

20   the extent we could actually say on cross-examination, And you

21   didn't know this sort of thing had nothing to do with Stefan

22   Lumiere, I didn't think it -- I thought that the --

23             THE COURT:  If you made a strategic decision, fine.

24             MR. CREIZMAN:  Absolutely.  And I didn't take any

25   offense by it.

H1d2lum2                              Thorell - Direct

1        THE COURT:  Nevertheless, there comes a point where

2   the court needs to intervene, which is what I finally did, but

3   I am interested to know that defense counsel feels that this

4   was to his benefit.

5        MR. CREIZMAN:  But here is one thing, though, that I

6   am concerned about, though.  The witness continually finds it

7   appropriate, without prompting --

8        THE COURT:  Now we are talking about this witness.

9        MR. CREIZMAN:  This particular witness, this does

10  bother me, though, very much, and I don't know if I should

11  object to --

12       THE COURT:  Excuse me.  I have already instructed him

13  once on this and I will instruct him again, but only upon

14  counsel taking steps.  If you feel that he is -- even though

15  the question may be proper, then in his answer he is going well

16  beyond the scope of the question, then you can do any of the

17  following:  You can object right then and there, cut him off in

18  midstream; you can ask the court to strike portions or the

19  entirety of the previous statement so that they cannot be

20  considered; or you can ask the court to instruct the witness

21  once again not to volunteer.

22       Those options have been available to you and, instead,

23  you seem to want to think that it is something you should

24  kevetch about at sidebar.

25       MR. CREIZMAN:  I don't --

H1d2lum2                         Thorell - Direct

1              THE COURT:  By way it's really pronounced 'vetch.  But

2      I did that for the reporter.

3              MR. CREIZMAN:  But I just didn't want to stand up and

4      tell the witness to be quiet.  Do you know what I mean?

5              THE COURT:  I know.

6              MR. CREIZMAN:  It's disturbing.

7              THE COURT:  If he does it again, I will give him

8      another instruction.

9              (Continued on next page)

```
1              (In open court)

2              THE COURT:  Go ahead, counsel.

3              MR. NAFTALIS:  Thank you, your Honor.

4    Q.  I want to go back a little bit, so we can then make

5    progress.

6              Mr. Plaford called you at his office and said you were

7    going to be involved in the month-end pricing process when?

8    Remind the jury.

9    A.  Mid 2011.

10   Q.  Did there come a time when you began to believe you were

11   involved in some kind of wrongdoing?

12   A.  Yes.

13   Q.  How long did that take you?

14   A.  I don't know exactly, but it was not long.

15   Q.  And you testified that you stayed at Visium through

16   November of 2013?

17   A.  Yes, that's correct.

18   Q.  Did you continue to participate in this mismarking scheme?

19   A.  Through most of that time up until about through June of

20   '13.

21   Q.  Going back in time, after you figured out something was

22   wrong, why did you keep going along with it?

23   A.  In retrospect, I regret that I kept going along with it,

24   especially for that amount of time.  I was concerned about job

25   safety, given the lack of evidence that the communication
```

1   between Plaford and I occurred, and that the job market was

2   very difficult.  I had attempted to eliminate myself or remove

3   myself from the process by finding a new job.  Unfortunately, I

4   was not able to do so.  And that's the context of why.

5   Q.  Did there come a time when you spoke to anyone about your

6   concerns?

7   A.  Yes.

8   Q.  Who did you speak to first?

9   A.  I first consulted with my family.

10  Q.  Why?

11  A.  Given the situation, there was few people I could trust,

12  and naturally my family was one of the few, if not the only,

13  people at that point in my life that I felt that I could

14  confide in.

15  Q.  Does a particular occasion stand out where you consulted

16  with them?

17  A.  Yes.

18  Q.  What was that?

19  A.  At one point, while I was at my family's home in the Boston

20  area, I had -- we collectively as a family sat down with

21  certain members, which include myself, my brother, my

22  brother-in-law, and my sister --

23              MR. CREIZMAN:  Objection, relevance.

24              THE COURT:  Sustained.

25              MR. NAFTALIS:  Your Honor, I will go through it,

H1d2lum2                          Thorell - Direct

```
 1   but --
 2              THE COURT:  No.  Just to move it along, so you
 3   consulted with various relatives and, as a result of that
 4   discussion, what did you do next?
 5              THE WITNESS:  It was established collectively --
 6              THE COURT:  No, I asked you, as a result of that
 7   discussion, what did you do next?  Answer my question.
 8              THE WITNESS:  What I did next was consult with an
 9   attorney.
10              THE COURT:  Okay.
11   BY MR. NAFTALIS:
12   Q.  And who was that?
13   A.  Jo Hamid of Debevoise.
14   Q.  And around when did you speak to Mr. Hamid?
15   A.  Roughly May, early June of 2013.
16   Q.  And what is Debevoise, when you say Debevoise?
17   A.  Debevoise is a large international business law firm.
18   Q.  And did you ultimately consult with Mr. Hamid?
19   A.  Yes.
20   Q.  What did you decide to do after that?
21   A.  Upon his advice, it was agreed that the appropriate next
22   step would be to notify internally to Visium the concerns I
23   had.
24   Q.  And what did you hope would happen by reporting internally
25   at Visium?
```

1    A.  I had hoped that by notifying Visium, they would take the

2    appropriate steps to first verify that there was in fact a

3    pricing issue and, subsequently, to fix the situation.

4    Q.  And did you ultimately report internally to Visium?

5    A.  Yes, I did.

6    Q.  Who did you report to?

7    A.  Jacob Gottlieb.

8    Q.  Again, who is he?

9    A.  The CIO and founder of Visium.

10   Q.  And why did you go to Mr. Gottlieb?

11   A.  Because, in conjunction with my attorney's advice, it was

12   felt that it was appropriate to go to him because Jake Gottlieb

13   was the head of the firm and, given the seriousness of the

14   apparent misconduct going on, that he should be notified.

15   Q.  And did you contact Mr. Gottlieb?

16   A.  Yes, I did.

17   Q.  How did you feel before you contacted him?

18   A.  Very nervous, terrified.

19   Q.  And how did you get in touch with Mr. Gottlieb?

20   A.  I initially sent him a brief e-mail.

21        MR. NAFTALIS:  Ms. Pyun, can you bring up Government

22   Exhibit 158 in evidence, please.

23   Q.  Who is this e-mail from, who is it to, and what is the

24   date?

25   A.  It's from myself to Jacob Gottlieb and the date is Monday,

H1d2lum2                          Thorell - Direct

1    June 24, 2013.

2    Q.  And what does the text of the e-mail say?

3    A.  It says, "Jake, I would like to discuss a serious concern I

4    have about the monthly pricing process at your convenience.

5    Please let me know when you have time to meet.  Thanks, Jason."

6    Q.  Is this the e-mail that you sent to get in touch with

7    Mr. Gottlieb to report your concerns?

8    A.  Yes, it is.

9    Q.  Did you ultimately meet with Mr. Gottlieb?

10   A.  Yes.

11   Q.  When did that occur?

12   A.  Shortly thereafter.  Within a few minutes he had called me

13   and asked if I would come into his office.

14   Q.  Was anyone else present for the meeting?

15   A.  No.

16   Q.  Did you explain your concerns about the pricing process to

17   Mr. Gottlieb?

18   A.  Yes, I did.

19   Q.  And did you tell him that you consulted with a lawyer?

20   A.  I did.

21   Q.  What was Mr. Gottlieb's reaction when you said you

22   consulted with a lawyer?

23   A.  He, from the body language that I read, seemed very

24   stressed and concerned once I mentioned that I had an attorney.

25   And I don't know that he verbalized much to convey those

H1d2lum2                        Thorell - Direct

1    concerns, but it was very transparent in terms of his physical
2    body nature.
3    Q.  What, if anything, did Mr. Gottlieb say he would do after
4    you spoke to him?
5    A.  He ultimately said he would contact compliance, notify
6    them, and that they were to get -- compliance was to get in
7    touch with me about the matter.
8    Q.  Did you make a record of this meeting with Mr. Gottlieb?
9    A.  Yes, I did.
10   Q.  How did you do that?
11   A.  I recorded it.
12   Q.  Did you also subsequently record other meetings you had at
13   Visium?
14   A.  Yes, I did.
15   Q.  And, to be clear, this was before you were working with the
16   F.B.I.?
17   A.  Yes, it was.
18   Q.  Why did you do that?
19   A.  I felt that it was a wise idea, because I did not know --
20   it was a very serious situation, and I did not know which way
21   things would head, and it was, in general, largely a protective
22   measure in case accusations that were false were made towards
23   me, and I also consulted with my attorney, my employment
24   attorney, Jo Hamid, and --
25   Q.  Just stop right there.

H1d2lum2                          Thorell - Direct

1    A.   Okay.

2    Q.   You said Mr. Gottlieb said he would notify compliance and

3    they would get in touch with you?

4    A.   Yes, he did.

5    Q.   Did the compliance department get in touch with you?

6    A.   No.

7    Q.   What did you do next?

8    A.   They -- we ultimately got in touch, but --

9    Q.   What did you do next?

10   A.   What I did next was, so this meeting, this initial meeting

11   was on a Monday, June 24.  That Friday was the 28th, which was

12   month end, and in that time period no one -- compliance did not

13   reach out to me or nobody else, and upon receiving the typical

14   month-end initial pricing process via Plaford and his e-mail

15   sent to me, it was very apparent that nothing had been done.

16   So I initiated -- I proactively sought out compliance, and I

17   couldn't find David Keily, the compliance officer, and because

18   it was last minute and a bit of a fire drill at that point, I

19   called Jake Gottlieb on his cell phone and asked him what I

20   should do, and he suggested I follow up with compliance, and I,

21   again, reverted back to going to compliance and eventually did

22   find Mr. Keily.

23   Q.   Again, who is Mr. Keily?

24   A.   He is the compliance officer, chief compliance officer and

25   general counsel.

1    Q.  Did you meet with Mr. Keily?

2    A.  I did.

3    Q.  Without going into the substance of what you discussed, how

4    were things left at the end of your meeting?

5    A.  There was essentially interim solution that was agreed upon

6    to basically figure out a way to assist in a manner which I was

7    not involved in the process, but assist in getting the

8    necessary information to operations so that the NAV could be

9    calculated for that month, and it was done in a manner that I

10   was not a part of that.

11   Q.  Just briefly, what was the interim solution?

12   A.  I recall that David Keily had served as an intermediary

13   contact to pass on the override spreadsheet to operations

14   rather than myself.

15   Q.  Did Mr. Keily suggest you speak to anybody else?

16   A.  Immediately, no; but he said that -- I believe Steve Ku,

17   who was at that time the CFO of the firm, I believe he had said

18   that he was out of the office and that Steve Ku would follow up

19   with me soon, probably that following Monday.

20   Q.  And did you ultimately meet with Mr. Ku that following

21   Monday?

22   A.  Yes.

23   Q.  What was the date of that Monday?

24   A.  I believe it was July 1.

25   Q.  And who was present for that meeting?

1    A.  Myself, Steve Ku, and David Keily.

2    Q.  Now, again, without going into the substance of what you

3    discussed, how were things left at the end of that meeting?

4    A.  Again, in general terms, the way things were left was a

5    mutually agreed upon solution, in this case more of a permanent

6    solution, that I felt satisfied my needs --

7            THE COURT:  What was the solution?

8            THE WITNESS:  The solution was removing me from the

9    process.

10   Q.  Now, you said this meeting was July 1, right?

11   A.  Yes.

12   Q.  What happened at the end of July with respect to your

13   involvement in the month-end pricing process?

14   A.  At the end of July, again, similar to the prior month,

15   nothing appeared to be done despite prior agreements and

16   solutions, what would appear to be viable solutions --

17   Q.  Let me stop you there.  Let me bring up Government Exhibit

18   226B in evidence and let's zoom in on the top please.

19           Who is this e-mail from and who is it to?

20   A.  From Chris Plaford to myself.

21   Q.  What's the date?

22   A.  July 31 of 2013.

23   Q.  And what is the name of the attachment?

24   A.  It's labeled SJ 7/31/13.

25   Q.  Who is SJ?

H1d2lum2                           Thorell - Direct

1   A.  Sudarshan Jain.

2   Q.  Who is he again?

3   A.  He was a member of the operations team for Visium.

4   Q.  What is attached to that e-mail what is that attachment?

5   A.  It's an Excel attachment.

6        MR. NAFTALIS:  Can we just show that quickly?

7   Q.  Generally, what is this attachment for again?

8   A.  It is a list of pricing overrides.

9   Q.  The subject of the e-mail, let's go back to it and zoom in

10  again, what does he write here?

11  A.  In the subject line he writes "Wait till end of day."

12  Q.  And what time is the e-mail sent?

13  A.  2:23 p.m.

14  Q.  Did anything stand out to you about this?

15  A.  Yes, a couple of things.  First, the subject line where he

16  instructs me to wait till end of day, which means to pass along

17  under my own e-mail, as discussed previously, and he is

18  mentioning wait till end of day, in other words, to close of

19  trading, which in bond trading occurs around roughly 4:00.  And

20  the inference here is clearly to me that, given that bonds are

21  still actively trading, given that it's about 2:30 and there is

22  over an hour or so left in the trading day, it would not be

23  perceived as very conventional way of sending out pricing,

24  while pricings are still moving throughout the day, that's

25  number one.

1           But another thing more, I guess, disconcerting, even

2     frustrating to me was this was now the second month where it

3     was clear that, again, nothing had been done to fix the

4     situation despite prior agreements.

5     Q.   What, if anything, did you do with this e-mail?

6     A.   I then took the e-mail and forwarded it to David Keily and

7     Steve Ku in a way that alerted them just that this is still

8     going on.

9           MR. NAFTALIS:   Ms. Pyun, can you bring up Government

10    Exhibit 616A in evidence.   You can zoom in on the whole thing,

11    please.

12    Q.   So the bottom e-mail we see is at 2:23 and it says "wait

13    till end of day"?

14    A.   Yes.

15    Q.   Is that the e-mail we just looked at?

16    A.   Yes.

17    Q.   What did you do with it?

18    A.   I forwarded it to David Keily and Steve Ku.

19    Q.   And at what time?

20    A.   At 3:24 p.m.

21    Q.   And then above that there is another e-mail from 4:57 p.m.

22    from you to Mr. Keily and Mr. Ku?

23    A.   Yes.

24    Q.   And what is written there?

25    A.   What is written there is, it's -- what I had done was

1    copied and pasted in a Bloomberg chat room it's called instant

2    Bloomberg, or IB, similar to other things, like AOL, a way of

3    communicating, and I included an excerpt where, because it

4    appeared that because Plaford was still waiting on certain

5    things at month end, and I was again stuck in a situation where

6    I didn't know what to do.  I then copied and pasted that into

7    the chain of e-mails here and then sent that along again to

8    David Keily and Steven Ku to point out that I am still waiting

9    for instructions on how to navigate this situation I am stuck

10   in.

11   Q.  So this e-mail, the last one is at 4:57 that day?

12   A.  Yes.

13   Q.  Let's bring up Government Exhibit 161B, please.  This is an

14   e-mail from Mr. Keily to you at 5:31 the same day?

15   A.  Yes.

16   Q.  So less than an hour later?

17   A.  Yes.

18   Q.  What does Mr. Keily write to you?

19   A.  He writes, "Hi, Jason.  I have spoken to Steve Ku about the

20   concerns you raised today.  As I told you, I will be out of the

21   office tomorrow, but Steve will speak to you about this

22   tomorrow."

23   Q.  What was your understanding of what "the concerns you

24   raised today" referred to?

25   A.  It was likely in response to probably a brief conversation

1    I had with David Keily just pointing out there is nothing

2    that's being done and what should I do?

3    Q.  Did you speak to Mr. Ku the next day, which was August 1?

4    A.  I eventually did speak to him.

5    Q.  Let's look at Government Exhibit 162 in evidence, please,

6    and we will start at the bottom and work through this very

7    quickly.

8            So what is the first e-mail?  It's August 1 at 4:03

9    p.m.?

10   A.  It was e-mail is from Chris Plaford to myself, again the

11   next day, which was August 1, and it was -- the subject line

12   body is blank, but it was clearly another spreadsheet, an

13   override spreadsheet sent to myself and another step in the

14   same pricing process.

15   Q.  And you sent it to Mr. Ku and Mr. Keily?

16   A.  Yes, I did.

17   Q.  And this is at 4:07, so the end of the next day?

18   A.  Yes.

19   Q.  And then Mr. Ku writes, "Hi, Jason.  Can you come

20   downstairs in a few minutes?"

21   A.  Yes.

22   Q.  Did you meet with Mr. Ku that day?

23   A.  I did.

24   Q.  How did he behave during that meeting?

25   A.  He behaved overall in what to me was obvious in a very

1    dishonest manner, very elusive, and at times I felt very

2    evasive.

3               MR. NAFTALIS:  Let's bring up Government Exhibit 164

4    in evidence and let's look at the bottom e-mail.

5    Q.  This is an e-mail from August 1, 2013, at 6:49 p.m. from

6    Mr. Ku to Mr. Plaford and you are copied as well as other

7    people, is that right?

8    A.  That's correct.

9    Q.  Mr. Ku writes, "Hi, Chris.  As discussed, the valuation

10   committee has decided to simplify the month end and weekly

11   valuation process.  The desk (you/Jason) will no longer provide

12   a pricing file to Sudarshan for estimates.  All initial pricing

13   will be performed by ops/accounting, using our usual sources,

14   brokers, Reuters, Markit, etc., then you/Jason can review them

15   if you wish before estimates are cut on T+2.  Let me know if

16   you have questions?  Thanks."

17              So we don't need to dissect all of this, but what did

18   you understand this to mean?

19   A.  Generally I had several thoughts.  To me, it was very

20   confusing and ambiguous the wording that was used.

21              THE COURT:  No, no, no.  The question was what you

22   understood it to mean.  If you didn't have an understanding

23   because it was confusing or ambiguous, then you didn't have an

24   understanding.  You need to very carefully parse the questions.

25              THE WITNESS:  Yes, sir.

1    A.  My best take away is that I was being removed from the

2    pricing process.

3    Q.  Now, what was your general reaction to how Visium had

4    handled the concerns you raised about the month-end pricing

5    process?

6    A.  That they didn't address the situation despite very

7    initially appearing that they were going to take it seriously

8    and very well should have, but the progression that ensued was

9    entirely not addressed and dismissive.

10   Q.  Around this time, what else, if anything, did you do next

11   with respect to your concerns about the valuation process at

12   Visium?

13   A.  Around this time, in consultation --

14            MR. NAFTALIS:  Your Honor, I am looking.  We are about

15   to switch topics.  Whatever you want.  We can keep going or we

16   could break.

17            THE COURT:  Well --

18            MR. NAFTALIS:  We are making good time, so whatever

19   you want.

20            THE COURT:  Under your estimate of yesterday, you

21   would have a half hour more, but if you think you can do it in

22   less than a half hour, we will go to the end of his direct,

23   then.

24            MR. NAFTALIS:  I think I am going to look out for the

25   jury in this case and let's take a break.

H1d2lum2                          Thorell - Direct

1             THE COURT:  All right.  Ladies and gentlemen, we will

2        take a 15-minute break at this time.

3             (Continued on next page)

1              (Jury not present)

2              THE COURT:  The witness may step down.

3              (Witness not present)

4              THE COURT:  Please be seated.

5          So just to remind counsel, you gave me a binding

6    estimate yesterday of an hour and a half.  Because of the other

7    witness we didn't start with this witness today until 9:45.

8    It's now 10:45.  So even without counting my fingers, it seems

9    to me you have got no more than a half hour left.

10             All right?  Very good.  We will see you in 15 minutes.

11             (Recess)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           THE COURT:  Let's get the witness back on the stand.

2   Bring in the jury.

3           (Jury present)

4           THE COURT:  Please be seated.  Counsel.

5           MR. NAFTALIS:  Thank you, your Honor.

6   BY MR. NAFTALIS:

7   Q.  Mr. Thorell, I began to ask you around this time, meaning

8   the middle of 2013, what else, if anything, did you do next

9   with respect to your concerns about the valuation process at

10  Visium?

11  A.  In the middle of 2013, I decided, given that my concerns

12  were not being addressed internally, that I would take the

13  matter externally.

14  Q.  Okay.  How did you do that?

15  A.  I -- The first step was, I was referred to a whistleblowing

16  attorney to consult with that attorney.

17  Q.  What do you mean by whistleblowing attorney?

18  A.  An attorney that specializes in SEC whistleblowing cases.

19  Q.  And who was that lawyer?

20  A.  Jordan Thomas at Labaton.

21  Q.  And where did Mr. Thomas work before he went into private

22  practice?

23  A.  The SEC and DOJ.

24  Q.  Did you meet with Mr. Thomas?

25  A.  Yes, I did.

1   Q.  After meeting with him, what, if anything, did you decide

2   to do next?

3   A.  After consulting with him, I decided that it was in my best

4   interest to proceed and proceed externally and notify the SEC.

5   Q.  Did you do that?

6   A.  Yes, I did.

7   Q.  When did you notify the SEC?

8   A.  Initially, September of 2013.

9   Q.  Now, you referenced a whistleblowing attorney?

10  A.  I did.

11  Q.  Are you familiar with the SEC whistleblower program?

12  A.  Yes.

13  Q.  Did you come to have an understanding of how that program

14  was created?

15  A.  Yes.

16  Q.  What's your understanding?

17  A.  It was initially enacted as part of the 2010 Dodd-Frank

18  legislation and implemented by Congress.

19  Q.  What's your understanding of the purpose of the

20  whistleblower program?

21  A.  To encourage employees within companies that fall within

22  the purview of the SEC, to go forward and make known beliefs of

23  wrongdoing.

24  Q.  What's your understanding of whether any -- under the

25  whistleblower program, the SEC is permitted to pay financial

H1DPLUM3                      Thorell - Direct

1    rewards to a whistleblower?

2    A.   My understanding is that sanctions that -- the overall

3    sanctions, as long as it's a million or more in terms of a

4    sanction particular to a company, falls over that amount, that

5    the person submitting the whistleblowing submission is likely

6    entitled to 10 to 30 percent of the final overall amount.

7    Q.   And you said sanctions, sanctions in what case or cases?

8    A.   In general or specific to --

9    Q.   Sanctions brought by whom?

10   A.   By the SEC.

11   Q.   Not by the Department of Justice?

12   A.   Not by the Department of Justice.

13   Q.   Sitting here today, do you know whether or not you will

14   receive any financial reward from the SEC?

15   A.   I do not.

16   Q.   You do hope to receive one?

17   A.   I do.

18   Q.   Do you know how large any reward could be?

19   A.   I do not.

20   Q.   And what's your understanding of who would pay you any such

21   reward?

22   A.   The SEC.

23   Q.   But not the U.S. Attorney's Office?

24   A.   Not the U.S. Attorney's Office.

25   Q.   Not the FBI?

1    A.  Not the FBI.

2    Q.  Do you have any agreements with the SEC?

3    A.  I do not.

4    Q.  Do you have any agreements with the U.S. Attorney's Office?

5    A.  I do not.

6    Q.  Do you have any agreements with the FBI?

7    A.  I do not.

8    Q.  Does the financial reward, if any, from the SEC depend on

9    the outcome of this criminal trial?

10   A.  No.

11   Q.  Now, let's go back to the defendant.  Did there come a time

12   when the defendant left Visium?

13   A.  Yes.

14   Q.  Approximately when?

15   A.  Approximately April of 2013.

16   Q.  And was that before or after you reported your concerns

17   about mismarking internally at Visium?

18   A.  That was before.

19   Q.  And after Mr. Lumiere left Visium, did you stay in touch

20   with him?

21   A.  Periodically.

22   Q.  And just to be clear, when Mr. Lumiere left Visium, how

23   were his positions performing?

24   A.  Very poorly.

25   Q.  Now you said you saw Mr. Lumiere infrequently?

1    A.  I'm sorry, infrequently?

2    Q.  After he left Visium.

3    A.  Did you use the word infrequently?

4    Q.  Yes.

5    A.  Yes, infrequently, yes.

6    Q.  Did you see him in person ever?

7    A.  I did.

8    Q.  Okay.  Let me direct you to July 31st of 2013.  Do you

9    recall if you saw him that day?

10   A.  Yes, I do recall.

11   Q.  On July 31st, how long had it been since you reported your

12   concerns to Visium?

13   A.  It had been over a month, a month-and-a-half.

14   Q.  Did you discuss the fact that you reported your concerns

15   internally at Visium with Mr. Lumiere?

16   A.  I'm sorry, can you repeat the question?

17   Q.  Did you discuss the fact that you had reported your

18   concerns about valuation internally at Visium with Mr. Lumiere

19   on July 31st, 2013?

20   A.  Yes, I did.

21   Q.  How did he react?

22   A.  He seemed very interested, very focused, and it appeared

23   overly -- hyper focused, even a bit stressed.

24   Q.  Now, did there come a time when you left Visium?

25   A.  Yes.

1    Q.  When was that again?

2    A.  Mid-November of 2013.

3    Q.  And you were let go; is that right?

4    A.  That's right.

5    Q.  And was that after you reported your concerns to Visium?

6    A.  Yes, that was after.

7    Q.  And after you had reported to the SEC?

8    A.  Yes.

9    Q.  Now, we talked earlier about how you made certain

10   recordings for the FBI of the defendant?

11   A.  Yes.

12   Q.  And you said certain recordings were of the defendant?

13   A.  I'm sorry?

14   Q.  The recordings were of the defendant?

15   A.  Yes.

16   Q.  How many recordings did you make?

17   A.  Of the defendant, three.

18   Q.  Where were they generally made?

19   A.  Generally at his apartment and on the one occasion, the

20   first occasion, at a restaurant right next to his apartment.

21   Q.  And where does the defendant live?

22   A.  Central Park South.

23   Q.  Let's go in the jury binders to Government Exhibit 219T,

24   please.  Now, what's the date of this recording?

25   A.  The date is July 31st, 2013.

1    Q.  And who are the participants?

2    A.  Stefan and myself.

3    Q.  Now, to be clear, were you working with the FBI at this

4    time?

5    A.  No, not at this time.

6    Q.  Who made this recording?

7    A.  I did.

8           MR. NAFTALIS:  Can we please play this.

9           (Audio played)

10          MR. NAFTALIS:  Can you just stop it for a second.

11   Let's just start over so we can all hear it.

12          (Audio played)

13          MR. NAFTALIS:  Okay.  So let's move through this

14   recording.

15   Q.  In the first line you say:  He said the valuation committee

16   determines the prices?

17   A.  Yes.

18   Q.  And who's "he" there?

19   A.  I was referring to Steve Ku.

20   Q.  And you go on to say:  Every -- we've never had any

21   overrides -- he said this to my face.

22          What did you understand that to mean, when you said

23   that Ku said we've never had any overrides?

24   A.  He's refuting that overrides exist.

25   Q.  Was that what you believed?

1   A.  No.

2   Q.  And then the defendant says:  What do you mean no pricing

3   overrides?  With a question mark.  Do you see that?

4   A.  Yes.

5   Q.  What did you understand the defendant to mean there?

6   A.  He seemed to be as confused as I was.  In other words, in

7   disbelief that Steve Ku was making the assertion that there

8   were no pricing overrides.

9   Q.  And then you say:  What do you think he's sending me that

10  spreadsheet for?

11          Who is the "he" there, he's sending me that

12  spreadsheet for?

13  A.  That's Chris Plaford.

14  Q.  And that's the overriding spreadsheet you're talking about?

15  A.  Yes.

16  Q.  And then you say:  So he goes it's never going to NAV.

17          Who is the "he" there?

18  A.  The "he" there is Steve Ku.

19  Q.  And then the defendant says:  Even though Chris is

20  manipulating the valuation; do you see that?

21  A.  Yes.

22  Q.  What did you understand the defendant to mean there?

23  A.  That the valuation is being manipulated by Chris, and I

24  understood it to mean Stefan as well.

25  Q.  And then at the end, the defendant says:  The valuation

1    committee is Josh Rozenberg, who has never taken fucking

2    finance classes.

3              Do you see that?

4    A.  Yes.

5    Q.  Again, who is Josh Rozenberg?

6    A.  He was a senior accountant.

7    Q.  Did you have an understanding of what the valuation

8    committee was?

9    A.  No.

10   Q.  Did you have an understanding of what, if anything, it did?

11   A.  No understanding at all.

12   Q.  What was your impression, working at Visium, as to what

13   they were doing?

14   A.  I had no understanding.  It was mentioned towards the end,

15   during this reporting process, and prior to that, I'm not even

16   sure it was brought up.  If it was, very seldom, and I didn't

17   even know it existed, if it did.

18   Q.  And the defendant says that the committee is Josh

19   Rozenberg, right?

20   A.  Yes.

21   Q.  Okay.  Who has never taken any finance classes?

22   A.  Yes.

23   Q.  Let's go to Government Exhibit 1221T, and just what's the

24   date of this one?

25   A.  The date is January 3rd, 2014.

1   Q.  And who are the participants?

2   A.  Stefan and myself.

3          MR. NAFTALIS:  Let's play that, please.

4          (Audio played)

5   Q.  Okay.  So who's the "Josh" in this conversation?

6   A.  The same Josh before, Josh Rozenberg, the accountant.

7   Q.  And the defendant says -- you ask:  What's the deal with

8   the valuation committee, is it -- is that even --

9          The defendant says:  Josh, that's Josh Rosenberg.

10         And you say:  It's just him?

11         And the defendant says:  Yeah.

12  A.  Yes.

13  Q.  Let's go to Government Exhibit 1220T.  Okay.  So

14  Exhibit 1220T, and then we're going to play 1220A.

15         What's the date of this exhibit, of this recording?

16  A.  January 3rd, 2014.

17  Q.  And who are the participants?

18  A.  Myself and Stefan.

19         MR. NAFTALIS:  Can we please play this recording.

20         (Audio played)

21  Q.  Let's look in the middle of line 8, where the defendant

22  says -- well, let's start at the top actually.  He says:  From

23  a karma perspective, these guys don't deserve to be where they

24  are.  Like, he doesn't deserve to be in business.

25         Who's the "he" here?

1    A.   Plaford.

2    Q.   And then the defendant continues:  He falsified info, he

3    falsified marks, levels, performance.

4              Who is the "he" there?

5    A.   He is referring to Plaford.

6    Q.   And what did you understand the defendant to mean where he

7    said he falsified marks, levels, performance?

8    A.   He's making insinuation that Plaford falsified that, but in

9    fact, Stefan was involved in this as well.

10   Q.   Now, at the time you were making the recordings, remind the

11   jury what months you were making the recordings of the

12   defendant?

13   A.   Yes, in the context of with the government?

14   Q.   Exactly, I'm sorry.

15   A.   Late December of '13 to early, early '14.

16   Q.   Let's play Government Exhibit -- excuse me.  We'll get

17   there first.  1222T, please.  And what is the date on this one,

18   and who are the participants?

19   A.   The date is January 3rd, 2014, and the participants are

20   myself and Stefan.

21              MR. NAFTALIS:  Okay.  And let's play 1222T, please.

22              (Audio played)

23   Q.   Now, Lumiere says:  You've got a lot of stuff to put him

24   out of business.

25              Do you see that?

1    A.  Yes.

2    Q.  What is he referring to there?

3    A.  He's referring to various forms of evidence of wrongdoing.

4    Q.  That you have?

5    A.  That I have.

6    Q.  And then the defendant says:  Well, first, we can extort

7    him.  I'd love to be able to go get him and say, listen, Jake,

8    Chris, give us $100 million between the both of you.

9            What did you understand the defendant to mean when he

10   said "first, we can extort him"?

11   A.  It was clear that he meant illegally blackmailing.

12   Q.  And who did you understand the defendant wanted to

13   blackmail for $100 million?

14   A.  As per his statement there, Chris Plaford, but he mentions

15   Jake as well; so at least those two.

16           MR. NAFTALIS:  One second, your Honor.

17           (Pause)

18           No further questions, your Honor.

19           THE COURT:  Cross-examination.

20           MR. CREIZMAN:  Yes, your Honor.  Can we have a brief

21   sidebar?

22           THE COURT:  Pardon?

23           MR. CREIZMAN:  A brief sidebar?

24           THE COURT:  Yes.

25           (Continued on next page)

H1DPLUM3                        Thorell - Direct

1                    (At the side bar)

2                    MR. CREIZMAN:  Yes, your Honor, I prepared quite an

3     extensive outline of my cross last night, actually until early

4     this morning, and it appears that the wrong version is here.

5     It would take me about five minutes, really, to just get the

6     right version on.  It seems I'm almost there.

7                    THE COURT:  So you want a five-minute break?

8                    MR. CREIZMAN:  Yes.

9                    THE COURT:  In return, you're going to streamline it?

10                   MR. CREIZMAN:  Oh, yes.

11                   MR. NAFTALIS:  Your Honor, can we discuss scheduling

12    quickly?

13                   THE COURT:  Yes.

14                   MR. NAFTALIS:  The witness has a flight out.

15                   THE COURT:  Let me give the jury a five-minute break,

16    if that's what you want.

17                   MR. CREIZMAN:  Yes.

18                   (Continued on next page)

19

20

21

22

23

24

25

1              (In open court)

2              THE COURT:  So ladies and gentlemen, we're going to

3    give you an extra-special break of five minutes, and not six.

4    So you can go back to the jury room.  We'll see you in five

5    minutes.

6              (Jury not present)

7              THE COURT:  And you can step down for five minutes as

8    well.

9              (Witness temporarily excused)

10             THE COURT:  Okay.  Please be seated.  While defense

11   counsel is working on his streamlining, what is it the

12   government wanted to raise?

13             MR. NAFTALIS:  We had a couple of issues.  One is

14   general timing, to see how long we're going today because we're

15   trying to figure out witnesses for the afternoon and witnesses

16   for Tuesday.

17             THE COURT:  Yes, so, today we will probably break for

18   lunch about 1:00 or 1:05, and I will give the jury until 2:15

19   to complete lunch, and then we will go without a break until

20   approximately 4:15.  Mr. Creizman has another matter before

21   Judge Engelmayer at 4:30 is my understanding, yes?

22             MR. CREIZMAN:  I did not know that.

23             THE COURT:  Oh, that's not right?

24             MR. CREIZMAN:  Well, I had an appearance before him

25   last night.

1           THE COURT:  Okay.  Because --

2           MR. CREIZMAN:  Something may have developed.

3           THE COURT:  I've been told that.  Well, in that case,

4   we will go until 5:00, and then we will take a break, and we'll

5   go from 1:00 to 2:00 for lunch.  We'll have the usual schedule.

6   Go ahead.

7           MR. NAFTALIS:  Mr. Thorell has a flight back to Boston

8   tonight.  We just wanted to see what --

9           THE COURT:  Well, defense counsel can't possibly want

10  more than 15 minutes on cross-examination, maybe a trifle more.

11          While we're talking about the schedule, I want you to

12  think over the three-day weekend of how long you want for

13  summations.  I'm going to adopt the practice of my very great,

14  esteemed colleague Milton Pollack, and so summations will begin

15  ten minutes after the close of all the evidence.  Any motions

16  will be heard during that ten minutes.  I tell you that now so

17  you can start preparing in advance.  Judge Pollack was of the

18  view, which I have come increasingly to share, that shorter is

19  better and that the advantage of not having too long to prepare

20  for summations is that you focus on the real issues.

21          And along the same lines, as soon as the government

22  has completed its first summation, we'll give the jury no more

23  than a ten-minute break and then start defense summation.  If

24  we finish the evidence in the middle of the afternoon, we'll

25  just go as long as we can, and then pick up with the rest the

1    following morning.

2             In terms of a charging conference, I will get you a

3    draft charge no later than Wednesday morning, and then we'll

4    figure out a good time, maybe Wednesday at the close of the

5    day, for a charging conference.

6             Assuming we finish this witness today, how long does

7    the government contemplate for the rest of its case?

8             MR. NAFTALIS:  Your Honor, recognizing we're trying to

9    streamline to meet your Honor's requests, we think it may go

10   through Thursday but we're --

11            THE COURT:  Through Thursday, the whole day?

12            MR. NAFTALIS:  Yes.

13            THE COURT:  No, I think that doesn't sound

14   sufficiently streamlined.  I mean, I could, of course, if you

15   like, tell the jury that they need to come in on Martin Luther

16   King Day so that we can move this along and be true to our

17   pledge to get them out as quickly as possible, but then of

18   course I would explain that that was because the government

19   felt they couldn't adequately complete their case in sufficient

20   time.

21            But let me ask defense counsel, who are you going to

22   call?

23            MR. CREIZMAN:  If anyone, the expert and perhaps --

24            THE COURT:  It will be, sounds like, no more than an

25   hour on direct.

1           MR. CREIZMAN:  Absolutely, and possibly Agent

2      Callahan.

3           THE COURT:  Yes, we still have that open question on

4      Agent Callahan.  That would be two minutes, really.

5           MR. CREIZMAN:  I can't imagine that would be too long.

6           THE COURT:  Okay.

7           MR. NAFTALIS:  Your Honor, just on the schedule, the

8      issue for us is that Mr. Keily went double what any of us

9      thought, and we're not saying you can't cross, but the cross

10     was very lengthy.  And we just don't know how long the cross,

11     for example, Mr. Thorell is.

12          THE COURT:  Let's bear it out.  So I will, if I need

13     to, impose time limits on both sides.  Well, I think what the

14     government should do over the weekend is see if you can make

15     your case such that you complete it by close of business

16     Wednesday or, worst case, Thursday morning, and then we could

17     have the defense case and still start summations Thursday

18     afternoon.

19          MR. NAFTALIS:  Judge, we'll try.  The issue is that we

20     basically have -- we're going to be dropping witnesses.  We've

21     only had about four days of --

22          THE COURT:  You know, I appreciate that, and my

23     concern always is with the jury.  I think this jury now has a

24     very good sense of what the basic disputes in this case are,

25     but I also think that there's a danger of them getting bogged

 1   down with irrelevancies, or at least very minor questions.  My

 2   concern is always to help them remain focused.  So that's

 3   really what's driving this.

 4           All right.  Let's bring in the jury.  Let's get the

 5   witness back on the stand.  How long do you think you'll be on

 6   cross?

 7           MR. CREIZMAN:  This is a tough one.

 8           THE COURT:  I know.  If I only asked the easy

 9   questions, there would be no point in your going to law school.

10           MR. CREIZMAN:  True.

11           THE COURT:  I tell you what, you can give me the

12   answer to that question when we break for lunch.

13           MR. CREIZMAN:  Okay.

14           (Jury present)

15           THE COURT:  Please be seated.  Well, I think that may

16   have been even seven or eight minutes.  I'm just getting so

17   soft.  All right.  Cross-examination.

18           MR. CREIZMAN:  Thank you, your Honor.  Minor technical

19   difficulty.

20   CROSS-EXAMINATION

21   BY MR. CREIZMAN:

22   Q.  Good morning.

23   A.  Good morning.

24   Q.  You've described yourself to my client as someone with

25   the -- as a person with born with the instincts to manipulate;

H1DPLUM3                    Thorell - Cross

1   isn't that true?

2   A.  Did you say born with the instincts to manipulate?

3   Q.  Yes.

4   A.  I -- I don't recall saying that.

5   Q.  Do you recall meeting with my client at a bar, while you

6   were still at Visium, in late July of 2013, and you had a

7   discussion about Jacob Gottlieb?

8            MR. NAFTALIS:  Objection, your Honor.

9            THE COURT:  Ground?

10           MR. NAFTALIS:  Hearsay.

11           THE COURT:  Not so far.  If you can, answer that

12   question yes or no.

13   A.  Can you repeat the question?

14   Q.  Sure.  Do you recall meeting with my client at the end of

15   July in 2013?

16   A.  Yes.

17   Q.  At a bar?

18   A.  Yes.

19   Q.  And you sat down for drinks?

20   A.  Yes.

21   Q.  And you had some pasta?

22   A.  I don't remember, but that's quite possible.

23   Q.  It was an Italian restaurant?

24   A.  It seemed to be an Italian restaurant.

25   Q.  And during that discussion, you talked about --

H1DPLUM3                    Thorell - Cross

1            MR. NAFTALIS:  Objection.

2            THE COURT:  I think it's being offered for

3   impeachment, as I understand the prelude.  Overruled.  It's an

4   out-of-court statement, of course, but it's being offered as

5   impeachment for impeachment purposes.  Overruled.  Go ahead.

6   BY MR. CREIZMAN:

7   Q.  And you had a discussion about -- with my client about a

8   recording that you made of Jacob Gottlieb; is that right?

9   A.  Yes.

10  Q.  And you told my client that you felt that you could outwit

11  Jacob Gottlieb; do you recall that?

12  A.  I do.

13           MR. NAFTALIS:  Your Honor, we'll just have a -- I

14  think these are all the same.  We'll leave it to you.  I'm not

15  going to keep objecting, but I think the objection is the same.

16           THE COURT:  Well, let's have a sidebar because there

17  seems maybe we're not on the same wavelength here.

18           (Continued on next page)

19

20

21

22

23

24

25

1          (At the side bar)

2          THE COURT:  So it's extrinsic evidence offered to show

3    bias, and that's a familiar exception to the hearsay rule when

4    it's the witness' own statement.  Now, it's true he's not a

5    party adversary because the party is the government, but I

6    still think it's admissible.  Why do you think it's not

7    admissible?

8          MR. NAFTALIS:  I think this line of questioning is --

9    our concern, we had discussed this with Mr. Creizman, is cross

10   is him simply trying to get in the tapes, which are not

11   admissible.

12         THE COURT:  I haven't heard -- that's a different

13   story.  I assume, and the reason I paused originally when the

14   objection was made is I assume you're not going to go into what

15   your client said.  That would clearly be inadmissible, and so

16   far what you're talking about are things relating to the

17   witness' credibility and bias, prior inconsistent statement or

18   statement of bias or interest, but that's as far as it goes.

19         MR. CREIZMAN:  Right, and that's accurate.  I mean,

20   just to proffer what the evidence will be, so we can try to

21   avoid any objectionable questioning, Mr. Thorell, who the

22   government took great pains on direct examination to bring out

23   the fact that this was a very somber meeting, decision to meet

24   with Jacob Gottlieb, and he was troubled and confused and

25   concerned.

H1DPLUM3                     Thorell - Cross

         At the same time, when he meets with Mr. Lumiere, his

discussion with Mr. Lumiere is, basically, I have the better of

Jacob Gottlieb.  I can outwit him; I look forward to it.  My

client says something along the lines, and I'm not offering it

for its truth because I don't care whether it's true or not,

but the point is --

         THE COURT:  That he said it, thus, showing a different

cast of mind from the one that he has portrayed?

         MR. CREIZMAN:  Not about my client.

         THE COURT:  No, I mean --

         MR. CREIZMAN:  Right.

         THE COURT:  -- that he, meaning the witness, said it

and the statements he made, you say, the jury can infer from

them that he had a very different cast of mind than the

terrified cast of mind that he portrayed to the jury.

         MR. CREIZMAN:  Right.  I don't know if he's actually

born with instincts of a manipulator.

         THE COURT:  We would have to have a Daubert hearing on

that.

         MR. NAFTALIS:  Just to clarify, I don't think that's a

fair characterization of the conversation at all.  I mean, I

know that's what he wants it to be.

         MR. CREIZMAN:  I can play it, and I have a transcript.

I could play that and, I mean, truthfully, there were

characterizations --

H1DPLUM3                     Thorell – Cross

1            THE COURT:  This was a recorded conversation?

2            MR. CREIZMAN:  This is a recorded conversation.

3            THE COURT:  Recorded by your client?

4            MR. CREIZMAN:  By Mr. Thorell.

5            THE COURT:  Oh, I see.  So --

6            MR. CREIZMAN:  Recorded that particular session.

7            THE COURT:  Well, we have to take it one step at a

8   time, but so far, it seems to me that it's admissible, as I

9   say, as a prior inconsistent statement, and it's going to bias.

10           Prior inconsistency, now informed by what defense

11  counsel said, not so much as to the substance but as the

12  attitude presented.  But that doesn't mean you're going to get

13  in everything, but let's take it one question at a time.

14           MR. CREIZMAN:  Okay.

15           (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1              (In open court)

2     BY MR. CREIZMAN:

3     Q.  So we were left discussing the type of pasta you ordered.

4     Actually, there was a discussion -- you talked to my client,

5     Mr. Lumiere, about a conversation that you taped of Jacob

6     Gottlieb, correct?

7     A.  Yes.

8     Q.  Jacob Gottlieb is the head of Visium, correct?

9     A.  He was, yes.

10    Q.  This is the same conversation you discussed in direct

11    testimony with Mr. Gottlieb, where you raised your concerns

12    about Visium's pricing and valuation policies, correct?

13    A.  I believe so, but I also think that there were several

14    conversations -- it was a dinner where it was about two hours,

15    where I referenced a number of conversations with Jake

16    Gottlieb; so that would have been one of them.

17    Q.  Okay, that's fair.  During your conversation with

18    Mr. Lumiere, you told Mr. Lumiere that you believed -- you were

19    looking forward to meeting with Jacob Gottlieb calling you into

20    his office because you thought you could outwit him; is that

21    correct?

22    A.  That seems correct.  I think I did say it, correct.

23    Q.  Do you recall Mr. Lumiere saying, Jacob Gottlieb studies

24    the art of manipulation?  Do you remember that?

25    A.  Yes, I do.

1   Q.  And that he should be careful, correct?

2   A.  Yes, he likely said it during that time, but he had, I

3   think, previously said it as well; so yes.

4   Q.  And you said something, in sum and substance, that he could

5   read all of the books that he wants, but you have to be born

6   with those instincts and I am.  Do you recall saying that?

7   A.  Yes.

8   Q.  Now, you've admitted in this courtroom to committing a very

9   serious crime, would you agree?

10  A.  Yes.

11  Q.  Lying to investors, correct?

12  A.  I did not admit to lying to investors.  What I admitted to

13  was participating in a mismarking scheme, among others.

14  Q.  And participating in a mismarking scheme for the purpose of

15  deceiving investors; isn't that right?

16  A.  My role was participating in the scheme.  My goal was not

17  to lie to investors.  I didn't have a goal.  I participated in

18  the scheme.

19  Q.  Did you know that what you were doing at the time was

20  wrong?

21  A.  I knew it was -- I knew it was wrong.

22  Q.  And you knew it was wrong because your mismarking or

23  your -- or this mismarking scheme that you participated in

24  would result in inflating the prices of the securities to

25  investors, correct?

1   A.  I knew it was wrong, for starters, and as time went along,

2   it was a logical conclusion that that was a likely scenario,

3   but ultimately, I never knew for certain that the overrides and

4   inputs went into the NAV.  Again, it was a logical conclusion,

5   but I never had direct evidence of that.

6   Q.  So you never believed --

7            THE COURT:  Wasn't that the purpose of it?

8            THE WITNESS:  That that's what I felt the purpose was

9   it, that that was a likely scenario, I agree.

10  Q.  But at the time, did you know or did you not know?

11  A.  Can you define "know"?

12  Q.  No.  But I can do this.  Did you believe that you were

13  doing something wrong?

14  A.  Yes.

15  Q.  Okay.  And when I say something wrong, did you believe that

16  what you were doing was resulting in deceiving investors as to

17  the value of the securities in the credit fund?

18  A.  What I knew was what I was doing was wrong.  As a result of

19  that, it did enter my mind that a likely scenario, the end

20  game, if you will, would likely impact investors as a result of

21  that.  But what I knew for sure was that it was wrong, and it

22  was a mismarking scheme, likely it would result in that.

23  Q.  But you -- so you didn't know what -- are you saying that

24  you didn't know what the effect those broker quotes that you

25  were sending on to valuation and operations, you didn't know

1    what effect they would have on month-end pricing to investors?

2    A.  I strongly suspected that they would lead into the

3    calculation of the NAV, which in turn goes to investors.  But

4    again, what I knew for sure was something was wrong, and it was

5    very likely possible that was the ultimate scenario.  But my

6    role was getting the spreadsheet, sending it along and, of

7    course, logically that would be a goal, but what I can say for

8    sure is it was wrong.

9    Q.  But what was wrong about it?  I'm interested in knowing,

10   what was wrong about it?  At the time that you were doing it,

11   what did you think was wrong?

12   A.  Well, for starters, alarm going off of initial conversation

13   with Plaford not to discuss this conversation raises obvious

14   signs of red flags.  And then the -- again, for starters, the

15   unconventional nature of asking someone to take a spreadsheet,

16   sent from someone else and rather than forwarding it,

17   recreating the spreadsheet and attaching it as if it was your

18   own and sending it along.

19          For a starting point, that's what I knew was wrong,

20   and then there was a progression of events, which I didn't know

21   at first but clearly learned that these spreadsheets, which

22   appeared to be overrides, then there was most likely

23   validation.  I don't have proof, but I was convinced that they

24   were overrides into the prices.

25          So again, I knew it was wrong because of the

415

1    progression of events, and I'm not refuting the fact at all

2    that I did not suspect that they went to the NAV. I did

3    suspect that, but I can say with the utmost certainty that

4    there was wrongdoing, and that's what I'm confident of.

5    Q.   Okay.  And while sending an e-mail along from Chris

6    Plaford, and then taking off the header and sort of passing it

7    off as your own, certainly could raise red flags.  It might not

8    be best practices, that has nothing to do -- that, in itself,

9    has nothing to do with deceiving investors, correct?

10   A.   It's a stage.  It doesn't directly, but there's steps

11   involved that lead up to that.  The pricing process is several

12   stages long, and that would be like probably the first step.

13   Q.   I totally understand that, as well.  But my question is, at

14   the time you were doing it, did you think that you -- that the

15   effect of what you were doing -- that sending these e-mails

16   along had the likely effect or the probable effect of the

17   effect of misleading investors, at that time?  Not as you came

18   to learn.  We'll get to that.  At the time?

19   A.   Well, can you just clarify what you mean by "at that time,"

20   which time?

21   Q.   Let's say -- well, let's go through June 2011, because this

22   helps because you said progression, this was a sort of

23   progressing thought that came into your mind.  So in June 2011

24   or July 2011 -- I'm sorry, I don't recall which -- you go in

25   and meet with Chris Plaford in his office?

H1DPLUM3                              Thorell – Cross

1   A.  Correct.

2   Q.  You said that was a seldom occasion, correct?

3   A.  Correct.

4   Q.  And Mr. Plaford said to you, you know, I have a -- there's

5   a new policy on pricing, right?

6   A.  Yes.

7   Q.  And you had been at Visium, at that point, for about six

8   months?

9   A.  Five, six months, yes.

10  Q.  Okay.  So five, six months into your time at Visium, you

11  get this request.  He shuts -- the door shuts, right?

12  A.  That's right.

13              (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1   Q.  And this is a fairly -- at the time, at the very least, he

2   is an imposing figure in a sense, right, an authoritative

3   figure, correct?

4   A.  Correct.

5   Q.  And he says to you, I need you to start sending out e-mails

6   at the end of the month I will send you -- is that right?

7   A.  Essentially, yeah.

8   Q.  In sum and substance.  Tell me when I am wrong.

9   A.  No, not verbatim of course, but yes.

10  Q.  I don't do a good Chris Plaford impression, but we will

11  see?

12          THE COURT:  Counsel.

13          MR. CREIZMAN:  Sorry.

14          THE COURT:  Put a question.

15  BY MR. CREIZMAN:

16  Q.  But at the end of every month, you would say -- so he said,

17  I will forward you an e-mail, you take out my header

18  information that shows it is from me, and you send it to

19  valuation and ops, correct?

20  A.  Yeah, create a new e-mail, take the spreadsheet, reattach

21  it to my own, and send it on.

22  Q.  And don't tell anybody about this?

23  A.  Correct.

24  Q.  And June 2011, you leave his office.  Do you tell anyone

25  about it?

H1d2lum4                          Thorell - Cross

1    A.  No.

2    Q.  Do you tell Mr. Lumiere about it?

3    A.  No.

4    Q.  Now, at the end of the month, you do send out the e-mail,

5    correct?

6    A.  Yes, I believe the conversation, roughly, again, mid '11,

7    the first circumstance was July 1, or somewhere around there.

8    Q.  And this continues to go on.  When does it occur to you in

9    this progression that this may be, as you called them,

10   overrides?

11   A.  I don't know exactly, but I know initially there were, of

12   course, red flags, given the nature of what we talked about.

13   Q.  Sure.

14   A.  And it was I would characterize it as soon, shortly, most

15   likely within a few months.

16   Q.  Okay.  So sometime maybe early 2012, would that be fair to

17   say?

18   A.  That's fair.

19   Q.  The practice of having to send out those monthly quotes

20   basically ended for you at the end of June 2013 or May, is it,

21   more --

22   A.  No, the end of -- it ended after my initial conversation

23   with Jake Gottlieb, which was June 24 of '13, so that month

24   end, despite working around a few solutions, effectively I was

25   no longer involved for June month end and going forward of '13.

H1d2lum4                          Thorell - Cross

1    Q.  Just to be clear, Mr. Plaford continued to ask you to send

2    the monthly pricing e-mails after Mr. Lumiere had already been

3    locked out of Visium, correct?

4    A.  Correct, up until I believe that one exhibit we went over,

5    I think it was August of '13, whereby Ku effectively removed

6    me.

7    Q.  Right.  No, I meant you continued to do it, okay, until

8    between the time that Mr. Lumiere left and you had your

9    conversations with --

10   A.  Correct.

11   Q.  Okay.  So roughly for, would you agree, for about a year

12   and a half, you were involved in a scheme where you were

13   knowingly and intentionally causing false places to be

14   transmitted to investors?

15   A.  Yes.

16   Q.  And that, you understand, causes investor, potentially

17   investor losses, is that right?

18   A.  That would be the ultimate end goal, despite the fact I was

19   not the mastermind of this, but because I was participating in

20   it, I was aware.

21   Q.  And that may have cost investors tens of millions of

22   dollars, fair to say?

23   A.  I don't know.  It is possible.  I haven't done any analysis

24   on it.

25   Q.  Millions?

420

1   A.  Again, I haven't done it.  I don't know.

2   Q.  Now, you understand that this kind of offense, this is

3   illegal, this kind of practice?

4   A.  I grew to learn that it was, yes.

5   Q.  You didn't know at the time that deceiving investors about

6   the prices of securities was illegal?

7   A.  What I am saying is, it's fair to say, day one, being the

8   Plaford initial conversation, I did not know that was illegal

9   at that point is what I am saying.

10  Q.  Sure, but day 120 or day, I don't know, I'm not good at

11  math, day six months later, you knew?

12  A.  Right.  Again, as I stated, I grew to learn that there was

13  wrongdoing, and then eventually I grew to learn that it was

14  illegal, but it took initial steps of seeking counsel to even

15  at that point highly suspect that there could be securities

16  fraud.  I had to engage external counsel to confirm that, to

17  get ultimate clarification because, as I believe you mentioned,

18  the seriousness of it.  And using the term "illegal" is not

19  something that I use lightly.  I needed an attorney's

20  assistance.  And eventually I did know, but it was not soon.

21  Q.  But you understood you were committing a crime, did you

22  not?

23  A.  Again, eventually I did, when ultimate confirmation was

24  realized that this was an illegal activity and by nature of an

25  illegal activity that of course is a crime.

H1d2lum4                          Thorell - Cross

1   Q.  But it is not such a complicated concept.  Ripping off

2   investors, you don't necessarily need an attorney to tell you

3   that that's a crime.  Am I right?

4   A.  It's not a simple process.  In the context you put it

5   possibly, yes.  But in the nature of this case, to learn from

6   the beginning that this doesn't seem right; to put a pattern

7   together; to then, in fact, say, yes, there is wrongdoing, to

8   what degree, I don't know; to then growing concerned enough and

9   troubled enough to consult an attorney; without getting into

10  specifics with conversations with the attorney and I, to

11  realize that this was in fact a likely, after consultation,

12  again, with the attorney, securities fraud.

13          THE COURT:  Wait a minute.  What was it that you were

14  participating in doing that was, in your view, wrongful?

15          THE WITNESS:  Misvaluing securities.

16          THE COURT:  Pardon?

17          THE WITNESS:  Pricing, mismarking scheme.

18          THE COURT:  So lying about what their real value was,

19  yes?

20          THE WITNESS:  Right.

21          THE COURT:  And these were lies that you knew would be

22  ultimately sent or made available to investors, right?

23          THE WITNESS:  I had a strong suspicion that my -- to

24  back up and all that went off to operations and accounting

25  which somehow ended up to investors, that was likely.

H1d2lum4                          Thorell - Cross

1          THE COURT:  So you understood it was likely that these

2    lying statements would be made available to investors, right?

3          THE WITNESS:  Yes.

4          THE COURT:  And are you saying that didn't you know

5    that lying to investors was a crime?

6          THE WITNESS:  No.  I guess what I am saying is it took

7    me a while to get there.

8          THE COURT:  Okay.

9          Go ahead, counsel.

10   BY MR. CREIZMAN:

11   Q.  But you were on the credit desk, weren't you?

12   A.  Yes.

13   Q.  And the credit desk, I mean, part of your job is purchasing

14   and selling the very securities that constitute the Credit

15   Fund, correct?

16   A.  Correct.

17   Q.  So wasn't it obvious to you that this was resulting in

18   mismarking of the securities to investors?

19   A.  I had, again, early on, given the spreadsheet that was sent

20   because I was told to resend it, and naturally I would open it

21   and give it a glimpse and eventually learned that they were

22   seemingly and eventually deemed confirmation level that there

23   were overrides, so, yes, I had a role, if that answers your

24   question.

25   Q.  Who called them overrides?

1   A.   I actually don't recall who -- generally it was a term that

2   was used -- I'm not so sure I would say frequently, but it was

3   not uncommon.  I cannot recall who initially used the term.

4   Q.   Was it your attorney from Debevoise that used that term?

5   A.   No.

6   Q.   Was it your attorney from the whistleblower firm?

7   A.   No.  They may have used it, but they didn't initiate the

8   term.

9   Q.   Was it Christopher Plaford who used the term?

10  A.   He used it.

11  Q.   Of course did my client use it basically about 30 times a

12  day?

13  A.   I doubt he said it 30 times a day.

14  Q.   So when did you first come to learn that these things that

15  you were sending were called overrides?

16  A.   I can't give you a date, but it was not long after I became

17  involved.

18  Q.   So the natural understanding of what overrides means is you

19  are overriding the -- and I am going to use your words -- *de*

20  *facto* benchmark price, correct?

21  A.   Correct.

22  Q.   By overriding the *de facto* benchmark price, are you

23  necessarily mismarking or are you just overriding the *de facto*

24  benchmark price?

25  A.   In general terms or specific to this?  Because I can walk

H1d2lum4                    Thorell - Cross

1    you through the events of my thought process with Visium.

2    Q.  I would like to just try to focus, because I just have some

3    questions that I would like to get at.

4    A.  Okay.  I think I can answer that.

5    Q.  Then perhaps you can, and hopefully we can get there.

6            So but I guess my question is, does the term

7    "override" in and of itself to you, did that mean to you that

8    this was somehow resulting in misrepresenting prices to

9    investors?

10   A.  From, again, like day one, Plaford conversation, let's say

11   perhaps it was mentioned in there, which I don't know, just for

12   the sake of this conversation, no, it didn't mean it to me.

13   Because as I have stated, testified previously, there are

14   certain circumstances on a limited basis where there are

15   legitimate scenarios where overrides can be used.

16   Q.  When did you first retain any attorney in connection with

17   your concerns about overvaluing securities?

18   A.  I looked into a few limited referrals, and that was one

19   firm, I couldn't tell you when, likely early 2013, the first

20   attorney that I engaged with on a formal manner and effectively

21   hired was Jo Hamid at Debevoise, which was late May/early June

22   of '13, I believe.

23   Q.  In late May/early June of 2013 -- I don't want to get into

24   your conversations with your attorney, but is that the time,

25   though, around May, June, 2013, that you realized that you were

1  participating in a criminal enterprise?

2  A.   To clarify, I knew well before that I was participating in

3  some sort of wrongdoing, and likely on a serious level, but

4  wouldn't use the phrase "criminal enterprise," which implies

5  illegality, if I am not mistaken.  I had a strong belief, but

6  at that time not ultimate confirmation.

7  Q.   How was it confirmed to you?

8           MR. NAFTALIS:  Objection, your Honor.

9           THE COURT:  Sustained.

10           By the way, ladies and gentlemen, just, while all of

11  this examination is appropriate, I should let you know that

12  there is no requirement in the law that someone has to know

13  that they were violating a particular criminal statute or

14  anything like that.  They have to know that what they are doing

15  is wrong and, in the case of a fraud case, that they are doing

16  it with the specific intent to defraud some other person of

17  money or property, but they don't have to know that a

18  particular statute, civil or criminal, is involved.

19           Go ahead, counsel.

20  BY MR. CREIZMAN:

21  Q.   Did you ever act with the specific intent to defraud

22  investors?

23           MR. NAFTALIS:  Objection, your Honor.

24           THE COURT:  Overruled.

25           Do you know what is meant by "specific intent"?

1              THE WITNESS:  Would I --

2              THE COURT:  I will put the questions just so we can

3    move this along.

4              I think you told us that you knew that the mismarkings

5    that you were participating in were lies and were likely to be

6    furnished to investors, yes?

7              THE WITNESS:  Yes.

8              THE COURT:  And you understood that they would make

9    investment decisions, at least in part, on that kind of

10   information, yes.

11             THE WITNESS:  Yes.

12             THE COURT:  So you knew that they might invest money

13   or make other economic decisions based in part on the lies that

14   they were receiving as a result of your activities, yes?

15             THE WITNESS:  I knew that was a likely result.

16   BY MR. CREIZMAN:

17   Q.  And you knew that before you retained an attorney?

18   A.  I suspected that.  I knew that it was likely that that was

19   a result of mismarking.

20   Q.  As a result of your testifying here today under an immunity

21   order, you won't have to spend a second in jail for your

22   participation in this mismarking scheme, correct?

23   A.  Essentially as long as I do not lie, correct.

24   Q.  As long as you do not lie?

25   A.  Correct.

H1d2lum4                           Thorell - Cross

Q.  Who decides whether you are lying or not?

            THE COURT:  Counsel -- well, you can ask that

question, but then we will need a sidebar for a minute.  But

let's have that question asked and answered.

A.  I'm not sure.

            THE COURT:  Okay.  Come to the sidebar.

            (Continued on next page)

1             (At the sidebar)

2             THE COURT:  Just so I can rule on any objections that

3    may be made, do I understand -- I just want to be sure, I think

4    this is correct -- that there are no agreements with the

5    government other than the immunity agreement, right?

6             MR. NAFTALIS:  Correct, and no agreements with the SEC

7    either.

8             THE COURT:  Excuse me?

9             MR. NAFTALIS:  Nothing with the SEC, anybody.

10            THE COURT:  So it is not like a cooperation agreement.

11            MR. CREIZMAN:  I understand.

12            THE COURT:  So the person who would determine whether

13   he lied or not would be either a judge or a jury, not the

14   government.  It's not like a cooperation agreement.  That's why

15   I wanted to make sure you understood that before you go down

16   this road.

17            MR. CREIZMAN:  No, I do understand that, and I was not

18   implying that it would be Judge Rakoff either.

19            THE COURT:  That was part of my concern.

20            MR. CREIZMAN:  I would never.  But I actually thought,

21   though, that my -- it's hard to really -- I mean really -- who

22   would enforce such a thing?

23            THE COURT:  Actually, believe it or not, I have had

24   cases like this.  So if the government believes that someone

25   has lied after receiving immunity, they can then bring an

H1d2lum4                          Thorell - Cross

1    action for contempt, because it is a court order.  They can, if

2    they think they have independent evidence, they of course can

3    bring a perjury prosecution.  There are a number of different

4    ways they can use it.  They can charge him with the crimes that

5    he was otherwise immunized for.  But in none of those

6    situations do they make the final determination in a way.

7              MR. CREIZMAN:  I understand.

8              THE COURT:  In a cooperation agreement they have a

9    final say whether to move or not for a 5K1, so I want to make

10   sure you understand.

11             MR. CREIZMAN:  I, do and I won't go much further.

12             THE COURT:  Very good.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                 (In open court)

 2    BY MR. CREIZMAN:

 3    Q.  You won't have any criminal record as a result of

 4    testifying today, correct?

 5    A.  I have every reason to believe I will not.

 6    Q.  You won't pay a single dollar in fines.

 7    A.  Not to my knowledge.

 8    Q.  You won't pay even a dollar back to the investors whose

 9    money was presumably lost as a result of your scheme.

10    A.  I do not believe so.  The scheme I was involved in.

11    Q.  I didn't mean to suggest that it was your scheme or that

12    you were the mastermind.  I apologize for that.

13                 But, regardless, you still won't have to pay back a

14    single investor, correct?

15    A.  That's my understanding, yes.

16    Q.  And not only that, you potentially, down the road, if the

17    SEC is successful in its investigation, based on the

18    information you have provided, you might be able to collect 10

19    to 30 percent of any recovery, correct?

20    A.  Under the SEC whistleblowing program.

21    Q.  Yes.

22    A.  That falls in lines with the terms of the program.  There

23    is a potential there, yes.

24    Q.  So you may actually be able to make some money from all of

25    this episode that you have been involved in over the past
```

H1d2lum4                          Thorell - Cross

1   couple of years.

2   A.  There is a possibility under the SEC whistleblowing program

3   I could.

4   Q.  Now, you may recall during that dinner at the Italian

5   restaurant with Mr. Lumiere, you mentioned to Mr. Lumiere that

6   a whistleblower -- that your whistleblower attorneys -- strike

7   that.

8           You may recall that during one of the recorded

9   conversations that you had with Mr. Lumiere that you made for

10  the F.B.I. -- do you recall making any conversations with

11  Mr. Lumiere --

12  A.  If I understand you correctly, you are referring to the

13  meeting I had July 31 or --

14  Q.  No, I am off of that.  I was mixed up.

15  A.  I'm sorry, okay.

16  Q.  No, there was a meeting that you had sometime in mid

17  December with Mr. Lumiere that you recorded?

18  A.  With the F.B.I.

19  Q.  In December of 2013.

20  A.  With the F.B.I.?

21  Q.  No, with Mr. Lumiere.  You met with Mr. Lumiere at some

22  sort of establishment in December of 2013.

23  A.  And, again, not with the assistance of the government?

24  Q.  No.  You were recording it at the behest of the government.

25  A.  Okay.  Late December '13, early '14, yes.

H1d2lum4                         Thorell - Cross

1   Q.  You had about three conversations with him --

2   A.  Three.

3   Q.  -- that you recorded.

4   A.  With the assistance of law enforcement.

5   Q.  Right, with the assistance of law enforcement, for law

6   enforcement.

7   A.  Correct.

8   Q.  And during those conversations with Mr. Lumiere, you

9   discussed getting into a whistleblower lawsuit -- actually

10  pooling your resources together for a whistleblower lawsuit,

11  correct?

12  A.  That conversation did come up, yes.

13  Q.  Obviously you did not intend to enter into a whistleblower

14  agreement with Mr. Lumiere, correct?

15  A.  Correct.

16  Q.  That had already been -- you had already pursued that route

17  on your own?

18  A.  That's correct.

19  Q.  Now, during the conversation you had with Mr. Lumiere, you

20  told Mr. Lumiere that a good whistleblowing firm takes a case

21  on contingency fees.

22          Do you recall saying that?

23  A.  I don't exactly recall but I am not refuting it, it sounds

24  like something I would say.

25  Q.  Is the arrangement that you have with your current

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    whistleblowing law firm, is that a contingency fee basis?

2    A.  Yes.

3    Q.  That means that you don't have to pay anything to your

4    whistleblowing firm unless it collects, unless you collect a

5    reward from your whistleblowing activity, correct?

6    A.  Correct, as a result of the SEC whistleblowing program,

7    that's correct.

8    Q.  And the whistleblowing law firm that you retained is one of

9    the most prominent whistleblowing law firms in the country,

10   isn't that right?

11   A.  I would agree with that.

12   Q.  And the name of that firm is Louboutin Sucharow?

13   A.  Labaton.

14   Q.  My wife is into Louboutin Sucharow.  Okay.

15          So Labaton Sucharow.

16   A.  Labaton Sucharow.

17   Q.  Labaton Sucharow.  And the name of your lawyer is Jordan

18   Thomas, is that right?

19   A.  That's right.

20   Q.  And Mr. Thomas is actually sitting in this courtroom, is

21   that correct?

22   A.  No, it is not correct.

23   Q.  But he was in this courtroom earlier, is that right?

24   A.  Can you define "earlier," as in today?

25   Q.  As in today.

1   A.  Not to my knowledge, no.

2   Q.  He wasn't in the courtroom while you were testifying today?

3   A.  No, he was not.

4   Q.  Was he in the courtroom yesterday while you were

5   testifying?

6   A.  Yes, he was.

7   Q.  And was he there because he was your friend?

8   A.  No.

9   Q.  He was there to see how you did, correct?

10  A.  Yes.

11  Q.  Maybe to assist you in any questions you might have about

12  testimony, correct?

13  A.  He wasn't necessarily here as a friend.  We have known each

14  other a long time but it was more a matter of moral support in

15  terms of assistance, that's -- we have been in contact for

16  years, over three years.  There has been plenty of assistance

17  and consultation with Jordan.  Him being here was -- I don't

18  want to speak for him but --

19          THE COURT:  Sustained.

20  Q.  Jordan and his law firm, if you are successful in this

21  whistleblowing -- this whole whistleblowing investigation and

22  you collect money, your lawyer, Jordan and his firm, will

23  collect money as well, correct?

24  A.  If a reward is given, then as part of my hiring of Jordan

25  and his law firm, they would in fact, yes, collect money.

H1d2lum4                          Thorell - Cross

1    Q.  And Jordan's law firm, because I'm still not sure I could

2    pronounce it correctly, but Jordan's law firm has made some

3    expenses on your behalf, isn't that right?

4    A.  Expenses in what terms?

5    Q.  Well, they hired a -- I believe they hired an expert

6    valuation firm to basically look at the securities in the

7    Credit Fund portfolio, isn't that right?

8    A.  It's possible.  I'm not positive.  It's possible.

9    Q.  They have done some work for you, though?

10   A.  Of course.

11   Q.  What's that?

12   A.  Of course.

13           "They" being Labaton or...

14   Q.  "They" being Labaton.

15   A.  Of course.

16   Q.  And Labaton submitted a pretty lengthy submission to the

17   SEC, correct, on your behalf?

18   A.  Yes.

19   Q.  To get you into the whistleblower program, correct?

20   A.  Right.  There is an initial submission that led up to a

21   more thorough submission to get me into the program, yeah.

22   Q.  And you didn't have to pay them a dollar for that?

23   A.  "They" being Labaton?

24   Q.  "They" being Labaton.

25   A.  No, I did not.

H1d2lum4                          Thorell - Cross

1    Q.  I want to ask you some questions about your experience at

2    Visium.  Do you understand?

3    A.  I understand.

4    Q.  Is it fair to say that you complained to people at Visium,

5    your coworkers, that you weren't given your proper due?

6    A.  What do you mean by "due"?

7    Q.  You weren't recognized for your achievements, for your

8    skills?

9    A.  Yes, that's fair to say.

10   Q.  You were underappreciated.

11   A.  Yes.

12   Q.  I think there was a time in early 2012, if I'm not

13   mistaken, that you complained about your bonus that you

14   received, is that correct?

15   A.  Yes, I brought it to the attention of people internally

16   that it didn't -- the amount I was paid did not coincide with

17   what the initial agreement was.

18   Q.  The initial agreement was between -- was hashed out between

19   you and Chris Plaford, correct?

20   A.  By "hashed out," if I'm not mistaken, it was a verbal

21   agreement between myself and Plaford, yes.

22   Q.  It was your understanding that Plaford said to you -- that

23   Plaford was going to pay you more than he ended up paying you,

24   correct?

25   A.  That's what he told me.  Being in the industry a little

1   bit, I had a degree of skepticism with that, without really

2   knowing Plaford, and as part of the terms of me joining Visium,

3   I did not sign a guarantee, which is not uncommon to sign,

4   where you are guaranteed you will be paid this.  So without a

5   guarantee, despite the fact that he told me I would get what I

6   would get, I was not completely shocked that, referring to the

7   June time period, I did not get paid what I was told and had no

8   legal recourse for that.

9   Q.  Now, you said yesterday that Stefan Lumiere had a lot of

10  influence in determining your compensation, is that right?

11  A.  I don't know if I used the word "a lot."  I know that I

12  said he had influence.

13  Q.  Did you complain to Mr. Lumiere about your bonus?

14  A.  At some point I am fairly certain I did.

15  Q.  Were you angry at Mr. Lumiere because of your bonus?

16  A.  No, no.

17  Q.  And that's because Mr. Lumiere didn't make the decision to

18  hire you, isn't that right?

19  A.  Not the ultimate decision, but I would say, similar to

20  having some degree of input into my pay, he was part of the

21  interview process and, naturally, being part, you have

22  feedback.

23  Q.  Sure.  He was one of the people you interviewed with.

24  A.  Correct.

25  Q.  But the boss, the one who made the decision, was Chris

1    Plaford, correct?

2    A.  He made the ultimate decision.

3    Q.  He made the ultimate decision on your pay as well, right?

4    A.  As far as I know, yes.

5    Q.  And you were mad at Mr. Plaford, correct?

6    A.  Yes.

7    Q.  Not Mr. Lumiere.

8    A.  No, because, again, Mr. Lumiere was not the ultimate

9    arbiter of what I got paid.  He, in my view, had influence, but

10   he did not make the final decision.

11   Q.  Mr. Plaford was Mr. Lumiere's boss, yes?

12   A.  Yes.

13   Q.  Just like Mr. Plaford was your boss, yes?

14   A.  Yes.

15   Q.  But going back to our earlier discussion, you actually --

16   you talked about Matt Callahan earlier today.

17   A.  O'Callaghan?

18   Q.  Sorry, Matthew O'Callaghan.

19   A.  Yes, I did talk about him.

20   Q.  And Matthew O'Callaghan is from Odeon, correct?

21   A.  Correct.

22   Q.  He is a broker.

23   A.  I don't know.

24   Q.  At the time?

25   A.  At the time.

1    Q.  At the time he was a broker?

2    A.  In some form, yes.

3    Q.  And he was your friend.

4    A.  He was not my friend.  I didn't dislike him.  I wasn't on

5    bad terms.  But my definition of a friend is, go to a wedding.

6    I knew about him, his personal life, but I didn't view that in

7    my opinion as a friend.

8    Q.  Would you say telephone pals?

9    A.  No.  What I would say is we talked business on the phone.

10   It's possible, although with him unlikely, he may have asked

11   how was my weekend.  I may have answered, Fine, let's move on.

12   Q.  So he was not a -- you didn't like to chitchat with

13   Mr. O'Callaghan?

14   A.  I didn't look forward to it.

15   Q.  As part of your work for the Department of Justice in the

16   criminal investigation, you recorded two conversations with

17   Mr. O'Callaghan, correct?

18   A.  Correct.

19   Q.  And if I am also not mistaken, the subject matter of your

20   conversations with Mr. O'Callaghan would be the premise that --

21   the premise was that I need help finding a job, correct?

22   A.  That was one of the subjects and probably one the main

23   subjects.  It was a premise.  There were other things

24   discussed, you know, what are my job leads, but that's fair to

25   say.

```
1    Q.  And there were -- but the purpose of it was to get

2    information for law enforcement relevant to its investigation,

3    correct?

4    A.  Correct.

5    Q.  So naturally the -- I'm sorry.

6            So naturally the topic of Visium came up, correct?

7    A.  I'm trying to recall the conversation.  That sounds

8    correct, from recollection, yes.

9    Q.  You had a conversation -- there was a discussion that you

10   had about Chris Plaford in which you said he doesn't know

11   credit?

12           MR. NAFTALIS:  Objection, your Honor.

13           THE COURT:  Hang on.

14           Sustained.

15           MR. CREIZMAN:  Your Honor, could I have a brief

16   sidebar on that?

17           THE COURT:  Sure.

18           (Continued on next page)

19

20

21

22

23

24

25
```

H1d2lum4                    Thorell - Cross

1          (At the sidebar)

2          THE COURT:  So it doesn't sound to me like this falls

3     within any hearsay exception.

4          MR. CREIZMAN:  Well, I think that it is not hearsay at

5     all, because I am not introducing whether he thought Chris

6     Plaford -- what I am actually going to -- I think I asked him

7     that he talked about Chris Plaford and what he thought Chris

8     Plaford's talents were as a credit, in terms of credit, and the

9     answer is that he said -- he basically made a joke to

10    O'Callaghan that he thought that Plaford couldn't spell credit.

11    He spells credit with a "K."

12         This goes to his credibility and his sort of, you

13    know, this kind of attitude that he is trying to convey to the

14    jury versus, I think, what he is after.

15         THE COURT:  No, no.

16         So, I don't see that this falls -- let me just

17    rehearse where we stand.  Previously you offered his statement,

18    his out-of-court statement about he was a born manipulator, or

19    words to that effect, although you made an argument, which may

20    be valid, that that was admissible to show that his state of

21    mind at that time was different from the state of mind he was

22    portraying to the jury as being a state of mind, and therefore

23    wasn't so much offered for its truth as to what it showed by

24    the very fact of utterance of his state of mind, and that may

25    have been a valid basis.

1              I admitted, in addition, on a different basis which I

2      might as well now give way more precise explanation of, I

3      admitted it under 803(3), which you all of course know

4      precisely what I am talking about, but just in case you don't,

5      it is an exception to the hearsay rule.  It is actually

6      considered -- well, the following are not excluded by the rule

7      against hearsay, and 3 is "a statement of the declarant's then

8      existing state of mind or emotional, sensory, or physical

9      condition," and they give both physical and mental examples of

10     that.

11             So that came in, in my view, both for the reasons you

12     stated and also for its truth, and it is a statement of his

13     mental condition, namely, he is a born manipulator.

14             This is now totally different.  Now you are saying

15     because in a conversation with someone else, not the defendant,

16     he cracked a joke, one should infer from that instance

17     something about his general attitude.

18             MR. CREIZMAN:  Yes, no, no.  Let me actually be more

19     precise.  Okay.  The government brought out my client's big ego

20     and his obviously terrible trading qualities.  Now, for

21     whatever reason those are relevant, I could see somewhat how

22     they might be relevant here.  What I am actually bringing this

23     in for is that is his ego, is this man believes that he is

24     smarter than everybody, that he can manipulate everybody.

25             THE COURT:  This sounds to me like an out-of-court

1    instance of a character trait, a specific instance of a

2    character trait offered to show the more general character,

3    which is forbidden by the character rules of the Federal Rules

4    of Evidence.

5           MR. CREIZMAN:  I tend to think that it falls under

6    Rule 803(3), if it is even hearsay, which I don't think it is.

7    I think it is nonhearsay.

8           THE COURT:  We don't even get there before we get to

9    the hearsay issue.  Now that I understand what you are asking,

10   you are seeking to do, I think the relevant rule, which is part

11   of the rules on relevance, is Rule 404, first, prohibited use

12   as evidence of a person's character or character trait is not

13   admissible to prove that on a particular occasion the person

14   acted in accordance with a character or trait.

15          Then they have exceptions.  In a criminal case, a

16   defendant may offer evidence of the defendant's pertinent

17   trait.  That's not what we are talking about here.  They have

18   other exceptions for homicide cases and so forth.  And that is

19   pretty much it.  And then I guess maybe also possibly

20   applicable is also Rule 406, evidence of a person's habit,

21   habit or practice, but I will stick with 404.

22          Why isn't it excluded by 404?  Isn't that what you are

23   trying to offer?

24          MR. CREIZMAN:  I don't think so.  I think it goes to

25   that this is a person who is basically driven --

1          THE COURT:  You say this is to show that --

2          MR. CREIZMAN:  He is manipulative.

3          THE COURT:  -- he is an egotist.

4          MR. CREIZMAN:  And he is manipulative.

5          THE COURT:  You have manipulative.  I allowed that.

6          MR. CREIZMAN:  I know, but only one, and I think I

7    should have a little more, just, Judge, for --

8          THE COURT:  Because manipulative, the reason I

9    admitted it, as I made clear at the time, it goes directly to

10   his credibility as well as all the other things we discussed.

11         This, being an egotist, doesn't go to credibility.  I

12   have known people who have been elected president who might be

13   said to be egotists.

14         MR. CREIZMAN:  That's true.

15         THE COURT:  All right.  Anyway the objection is

16   sustained.

17              (Continued on next page)

18

19

20

21

22

23

24

25

1              (In open court)

2    BY MR. CREIZMAN:

3    Q.  You were fired at Visium?

4    A.  Laid off, fired, yeah.

5    Q.  Without cause, no cause was given for your termination,

6    correct?

7    A.  According to Visium, it was just a matter of reducing head

8    count because of the Credit Fund winding down to essentially

9    closing.

10   Q.  And you were laid off in November of 2013, is that right?

11   A.  '12, '13, that sounds right.

12   Q.  You had already reported to the SEC about Visium and the

13   pricing situation in September of 2013, correct?

14   A.  That's correct.

15   Q.  So you were there for two months roughly after that report

16   went to the SEC, is that correct?

17   A.  That's right.

18   Q.  Is it fair to say that you never told anyone at Visium that

19   you had reported the company to the SEC, correct?

20   A.  Are you speaking in terms of that time frame from --

21   Q.  Yes.

22   A.  -- up until I got fired.

23   Q.  Yes.  I'm sorry.  From September -- from the time -- from

24   the date in September that the SEC whistleblower application

25   was submitted, to the date that you were laid off, did you

1    inform anyone at Visium that you had reported Visium and its

2    employees to the SEC?

3    A.  I did not inform anyone at Visium that I reported them to

4    the SEC, no.

5    Q.  And during the month of September, how often did you get

6    paid at Visium, your salary?

7    A.  My salary was paid, I believe it was biweekly.

8    Q.  So did you take every biweekly check that you were given

9    until you were laid off at Visium in November 2013?

10   A.  Yes, ACH direct deposited it, yes, so I think so.

11   Q.  You didn't go to the bank and say, Send it back to Visium,

12   right?

13   A.  I did not.  I did not look into that, no.

14   Q.  And by that time, you had retained your attorneys, correct?

15   A.  By the time of --

16   Q.  By the time you were fired in November or laid off in

17   November of 2013, correct?

18   A.  Yes, that's correct.

19   Q.  And at that point when you laid off your attorneys, we can

20   all agree that you knew it was a crime what you had done?

21           MR. NAFTALIS:  Objection to form.

22           THE COURT:  Sustained as to form.

23   BY MR. CREIZMAN:

24   Q.  You were aware at that time that what you had done in terms

25   of the -- what you had testified about in terms of pricing and

1    your sending e-mails, you knew that was a crime, correct?

2    A.  At the time of my firing?

3    Q.  Correct.

4    A.  I knew that it was a mismarking scheme that I participated

5    in and at that time it was likely that, among others, it was an

6    illegal activity, yes.

7    Q.  And you were aware at that time, at that point, that

8    investors had been defrauded as a result of your participation

9    in the scheme, correct?

10   A.  Again, I didn't think about it much, but that's the

11   ultimate result.  I had nothing to -- no facts to confirm that,

12   but logically speaking, I would think that would have been the

13   case.

14   Q.  But you submitted a document to the SEC reporting Visium

15   and its employees, or certain of its employees, for doing

16   something wrong, correct?

17   A.  Yes.

18   Q.  So at that point you didn't think that what you were

19   reporting was that investors were being defrauded?

20   A.  No.  What I said was I thought they were.  I did not have

21   any factual backing, but I had all -- every reason to believe

22   that that was, the result was that investors would, that's what

23   I had said, yes.

24   Q.  So it's fair to say that at that point you had a greater

25   than 75 percent conviction that --

1              MR. NAFTALIS:  Objection.

2     Q.  -- what you had done --

3              MR. NAFTALIS:  Objection.  Asked and answered and

4     relevance.

5              THE COURT:  Sustained.

6     Q.  Now, the money that Visium generates --

7              THE COURT:  Counsel, I don't know if this is a good

8     time to break for lunch or not, but we need to break for lunch

9     at least in the next few minutes.

10             MR. CREIZMAN:  I can come back to this.

11             THE COURT:  Very good.

12             So, ladies and gentlemen, we will break for lunch and

13    reconvene at 2:00.

14             (Continued on next page)

```
 1              (Jury not present)

 2              (Witness not present)

 3              THE COURT:  So now I will ask defense counsel how much

 4     longer will you be on cross?

 5              Please be seated.

 6              MR. CREIZMAN:  I believe through the end of the day

 7     and sometime into the morning of Monday, if possible.

 8              THE COURT:  I think that's excessive.  I will give you

 9     until the end of today and not beyond.

10              MR. CREIZMAN:  Well, don't -- I mean, let me ask you

11     this --

12              THE COURT:  And the reason I say that is now many of

13     the questions you have asked have been repetitive.  Many of the

14     questions have been largely irrelevant, and you need to, for

15     your benefit -- but all I am concerned about is the jury's

16     benefit -- you need to focus more.

17              But I will tell you what, I will let you revisit your

18     outline over lunch, and I will ask you the same question at

19     2:00.  If you feel that you have to go beyond today, then you

20     will be in a position to tell me why.

21              MR. CREIZMAN:  All right.

22              THE COURT:  Very good.  I will see you at 2:00.

23              MR. NAFTALIS:  Your Honor can we raise a couple of

24     things, housekeeping things?  One of them, we passed out some

25     binders to the jury.
```

1              THE COURT:  Yes.

2              MR. NAFTALIS:  In discussing with your deputy, when we

3      were retrieving the binders, it came to our attention that an

4      incorrect binder went to one of the jurors.  It was a binder of

5      exhibits that will be admitted.  They are not yet admitted.

6      They are summary charts of phone records.  So I don't know

7      which one --

8              THE COURT:  Show it to defense counsel and if there is

9      any problem, if the exhibits are going to come in anyway, it

10     won't matter.  The juror may not have looked at it at all.  But

11     we don't need to inquire if it is not of any consequence.  So

12     when my courtroom deputy shows you which binder it was, show it

13     to defense counsel.  If there is any problem defense counsel

14     can raise it.

15             MR. NAFTALIS:  Great.  And then one other issue is...

16             MR. McGINLEY:  One other issue, your Honor, there was

17     a stipulation yesterday that was read into the record.  It is

18     GX1403.  It was with the recordings.  We have added a defense

19     recording now which had that clip to it.  We put that in a new

20     stip and we just fixed up some language.  Both parties have

21     signed it.  We were going to insert that as 1403.

22             THE COURT:  Yeah, I think that's fine.  So that will

23     be the new 1403, and that's received, and all the things

24     referenced in it are received.

25             MR. McGINLEY:  Thank you.

H1d2lum4                        Thorell - Cross

1                   (Government's Exhibit 1403 received in evidence)

2                   THE COURT:  Very good.  We will see you at 2:00.

3                   (Luncheon recess)

H1DPLUM5

1                      A F T E R N O O N   S E S S I O N

2                               2:18 P.M.

3            (In open court; jury not present)

4            THE COURT:  So just before we bring in the jury --

5    please be seated -- my courtroom deputy reported to me that as

6    the jury was going into the jury room, one of the jurors said:

7    God -- and I don't think she used the word God -- gee, I wish

8    we could move things along.  It's really getting kind of slow,

9    and several other jurors then joined in and said:  Boy, it's so

10   much.  It doesn't seem very relevant.

11           Now, I want you to know that I didn't put them up to

12   that, and I don't know whether they were commenting on one side

13   or the other, or maybe both, but it reinforces what I was

14   trying to get across to all of you before, which is eventually

15   a jury that loses focus, loses interest and that's not good for

16   either side.

17           So now, with that introduction, how long are you going

18   to be on cross?

19           MR. CREIZMAN:  I actually do think I will be done

20   before the end of the day, if not --

21           THE COURT:  All right, then.

22           MR. CREIZMAN:  I actually do think that, and not

23   solely because your Honor just told us that.

24           THE COURT:  It was independent minds often come to the

25   same conclusions.  Very good.  Let's bring in the jury and

1    let's bring in the witness.

2              (Jury present)

3              THE COURT:  Please be seated.  All right, yes.

4              MR. CREIZMAN:   Thank you.

5    BY MR. CREIZMAN:

6    Q.  Good afternoon.

7    A.  Good afternoon.

8    Q.  In June 2014 you signed a severance agreement with Visium,

9    correct?

10   A.  I actually don't know the date of that, of when I signed

11   the severance agreement.  As I stated, I was laid off in

12   November of '13, and sometime thereafter I signed that.  I

13   don't recollect the date.

14   Q.  But you do recall signing a severance agreement, correct?

15   A.  A severance agreement from Visium?

16   Q.  Yes.

17   A.  I'm not so sure I actually signed that because that was in

18   the midst of negotiations with my employment attorney at the

19   time, and it's a very good possibility, for obvious reasons,

20   that we held off on signing that.

21   Q.  All right.  Now, as a result of that, under that agreement

22   you were entitled to a payout; is that correct?

23   A.  From what I recollect, as part of that severance agreement,

24   there was a minuscule amount that was, if I had signed it, to

25   be paid out to me.

1           MR. CREIZMAN:  Your Honor, can I show the witness what

2     has been marked as Defense Exhibit 206?

3           THE COURT:  Yes.

4     Q.  Take your time, if you've had a chance to look at the

5     document.

6           THE COURT:  Are you going to be offering this?

7           MR. CREIZMAN:  I do plan to offer that.

8           THE COURT:  So, Mr. Thorell, look at Page 12.  Is that

9     your signature?

10          THE WITNESS:  Yes, it is.

11          THE COURT:  All right.  Any objection to its receipt?

12          MR. NAFTALIS:  No, your Honor.

13          THE COURT:  So Defendant's Exhibit 206 is received.

14          (Defendant's Exhibit 206 received in evidence)

15          MR. CREIZMAN:  Thank you.  And may we publish to the

16    jury?

17          THE COURT:  Yes.

18    BY MR. CREIZMAN:

19    Q.  Starting on -- well, the first page, at the top, it says

20    Confidential Settlement Agreement between Jason Thorell and

21    Visium Asset Management, correct?

22    A.  Correct.

23    Q.  Then, scrolling all the way to Page 12, quickly, would be,

24    just looking at the date, June 13th, 2014; do you see that?

25    A.  I do.

1   Q.  Okay.  Does that help refresh your recollection at all?

2   A.  Yes, it does.

3   Q.  Okay.  Now, during this six-month period between

4   November 2013, when you were terminated from Visium, and June

5   of 2014, when you signed this agreement, you were already

6   assisting and cooperating with the United States Attorney's

7   Office and the Securities and Exchange Commission in connection

8   with an investigation of practices at Visium; is that correct?

9   A.  Yes, in addition to -- of two of my attorneys, that's

10  correct.

11  Q.  Meaning you and two of your attorneys?

12  A.  Both, yes.

13  Q.  Okay.

14  A.  Alongside the government bodies, I was in communication

15  with two of my personal attorneys.

16  Q.  Okay.  Not an investigation of them?

17  A.  No.

18  Q.  Okay.  And at that point, you had turned over a substantial

19  number of documents that you had from Visium, correct, to the

20  U.S. Attorney's Office and the Securities and Exchange

21  Commission?

22  A.  At the point that I was in communication with the

23  government.

24  Q.  Okay.  Visium was aware of this or not, aware that you had

25  documents?

1    A.  I'm sorry, I'm not sure I answered your question.

2    Q.  I'm sorry.  Go ahead.

3    A.  So was the question, at this time I had turned over the

4    documents, and my question back was, when you say this time,

5    was it when I was communicating with the government?

6    Q.  Yes.

7    A.  Okay.  Yes.

8    Q.  Okay.  Now, going back to the minuscule amount under the

9    agreement, as you recall it, let's turn to Page 1, paragraph 2.

10   Okay, there it is.  Okay.  Subject to the terms set forth

11   herein, within five business days of the effective date, the

12   company shall pay to Thorell, the sum of $175,000, less

13   applicable deductions and withholdings, in full and final

14   settlement of Thorell's claims.

15          Is the $175,000 what you ultimately received?

16   A.  Yes, but if I may back up for a second.  I believe you used

17   the term originally as part of the severance agreement, which

18   confused me a bit, which is why I wasn't able to reconcile to

19   this document.  This was the settlement agreement.

20   Q.  Okay.  You didn't have that in front of you either, just to

21   be fair.  Meaning you didn't have the agreement in front of you

22   either.

23   A.  No, but I had the terminology presented to me, which was --

24          THE COURT:  No, no.  I think we're all --

25          MR. CREIZMAN:  We're on the same page.

1           THE WITNESS:  We're on the same page.

2           MR. CREIZMAN:  Absolutely.

3    BY MR. CREIZMAN:

4    Q.  Now, you said that you had first reported your concerns to

5    the head of Visium in June of 2014.  That's right?

6    A.  '13.

7    Q.  '13.

8    A.  Yes, that's right.

9    Q.  Okay.  And that's Jake Gottlieb, correct?

10   A.  Correct.

11   Q.  Now, when you met with Mr. Gottlieb, you said -- I think

12   you described the meeting as -- well, that he didn't take

13   your -- in sum and substance, and tell me if I'm wrong, that he

14   didn't take your concerns seriously; is that fair to say?

15   A.  What I recall in terms of what I said in this courtroom?

16   Q.  Yes.

17   A.  Yes.  What I recall saying is kind of the opposite, that he

18   seemed to address that it was a problem.  Eventually, what I

19   did say, in conclusion, throughout the subsequent months, it

20   was not -- I don't know if it was him or not, but overall,

21   Visium did not take them seriously.  He used the word that it

22   was problematic, it was a problem.  He didn't seem to address

23   that it was an issue.

24   Q.  But your conclusion was that Visium itself, after you

25   raised the issue with Visium, didn't take your concerns

1   seriously ultimately?

2   A.   Right.   After two months of nothing being done, yes.

3   Q.   Now, you never told anyone there that you knowingly were

4   involved in mismarking; isn't that right?

5   A.   I had certain discussions that I'm not so sure are allowed

6   at this point because of -- they were with the compliance

7   officer.

8   Q.   Okay.

9            MR. NAFTALIS:   Your Honor, that's --

10  Q.   But other than those conversations.   What I'm asking is you

11  never told Visium management that you were knowingly engaging

12  in an effort to deceive investors; is that fair to say?

13           MR. NAFTALIS:   Your Honor, objection.

14           THE COURT:   Ground?

15           MR. NAFTALIS:   Many of these conversations, Visium has

16  a sort of privilege over; so it's not really a fair question

17  for the witness.

18           THE COURT:   Well, putting aside any conversations that

19  you had with any Visium lawyer, or any other lawyer, did you

20  tell anyone at Visium, any of these people that you were

21  raising your concerns with, that you were knowingly engaged in

22  an effort to deceive investors?   Is that the question you

23  wanted to ask?

24           MR. CREIZMAN:   Yes, your Honor.

25  A.   Sure, I think I can answer that.   Putting aside, like we

1    said, the compliance officer conversations, sticking to a

2    conversation with Jake Gottlieb, there was one conversation

3    where it was just Steve Ku.  I consistently presented the facts

4    as they were, which is what occurred, you know, from I guess

5    I'll put it day one, that conversation with Plaford, what he

6    asked me to do, and this list of what it appeared to me to be

7    overrides.

8           I explained that I was uncomfortable with it and it

9    concerned me, troubled me and it appeared that this looked like

10   it could be some -- something insidious in nature and I wanted,

11   obviously, to be eliminated from it.  But clearly, I wanted to

12   be -- I made it very clear I wanted the situation to be fixed.

13          Now, I know that you had said did I -- correct me if

14   I'm wrong, did I say I knowingly participated or was involved

15   with the intent of defrauding investors.  No.  I presented the

16   facts as they were.  As I stated in a little bit more detail

17   than that, but in specific to the Ku conversation, without

18   David Keily present, Ku had -- even if I were intending to make

19   that statement, it wasn't even really possible because Steve Ku

20   preemptively initially told me I have nothing to worry about.

21          Now, I didn't believe him, but as a senior manager,

22   partner, CFO of the company, I wasn't -- without a lawyer

23   present and just common sense, I'm not going to argue with him

24   as he laid out an audit report, laid out an administrator

25   report saying, none of this goes in to the NAV.  Again, I

1   didn't believe him, but I'm not going to have an argument about

2   that that's not correct.  I mean, I did everything possible up

3   until that point --

4   Q.  Are you talking about a conversation you had with Steve Ku,

5   marked and any separate from any counsel being there?

6   A.  Yes.

7   Q.  At your meeting with Steve Ku, are you saying that Mr. Ku

8   told you, what, that you had done nothing wrong?

9   A.  He said -- yes, he said I've done nothing wrong; I had

10  nothing to worry about.  He was empathetic to my situation.  He

11  said, I wish you hadn't even had to worry about this.

12  Q.  And he told you that you didn't have to worry about it

13  because --

14              MR. NAFTALIS:  Objection.  This is all hearsay.

15              THE COURT:  No, I don't think it's being offered for

16  its truth.  I think it's being offered to suggest that what the

17  witness may have arguably admitted from his presentation.  So

18  for that purpose, it will be received.

19  Q.  At that point, did you feel better, did your conscience

20  feel better that, indeed, perhaps I had not been doing anything

21  wrong?

22  A.  No.

23  Q.  Did you feel that perhaps I had not been defrauding

24  investors?

25  A.  The wrongdoing was something that I was aware of.  Again, I

1   don't mean to be repetitive but defrauding investors, probably

2   I was more concerned with general wrongdoing.  With that said,

3   yes, that remained a consistent theme.  That's why I went

4   forward to rectify the situation, but in terms of what my

5   feelings were with that meeting, it wasn't any change to my

6   consciousness.  It was, if I'm in a -- I was pissed off for

7   being lied to, and I took it personally.

8   Q.  That's understandable.  And it may not have been important

9   to you, but it is important here because --

10         THE COURT:  Counsel, just ask the question.

11  Q.  Sorry.  What I'm trying to ask is not whether you were

12  uncomfortable with the practice itself of sending those

13  e-mails, but whether you thought those e-mails were going --

14  were actually having an effect of falsely inflating the value

15  of the securities.  That's the question I'm asking.

16  A.  Nothing has changed from my prior statement today.  If

17  you'd like me to reiterate, I will.

18  Q.  Well, I don't think I have a clear answer.  That's the

19  issue.

20         THE COURT:  You know, I wanted to instruct both the

21  counsels, ask the questions and the witness is answering them.

22  You may be under the illusion that you're having a conversation

23  in a bar, in a home, and if you want to terminate this case and

24  go to a bar, I will allow you to do that, but assuming you're

25  not interested in wasting the time of the jurors, I do not want

1    colloquy.

2            I want questions from the questioner and I want

3    answers from the witness.  It's not your job to say, I stick by

4    my prior testimony.  It's not your job to say, let me tell you

5    the history of the world, or what was going through my psyche

6    at the time.  And it's not your job to be saying, well, what

7    I'm really trying to get at is this or that or the other.

8            I've about had it with the imposition on this fine

9    jury from two people who can't follow the rules.  So please

10   proceed according to the rules, both of you.

11           MR. CREIZMAN:  Yes, Judge.

12   BY MR. CREIZMAN:

13   Q.  Did you have any clarity as to whether or not the e-mails

14   you were sending affected the representations that were made to

15   investors?

16           THE COURT:  Sustained, ambiguous.  Put another

17   question.

18   Q.  At the time that you were sending -- at the time of these

19   discussions in August of 2013, around that time period, you

20   sent certain e-mails to ops and valuation, correct?

21   A.  Yes.

22   Q.  Do you understand that those e-mails contained price values

23   for securities that would override the valuations of -- that

24   were currently provided by the administrator?

25           MR. NAFTALIS:  Objection, your Honor.  I think the

1    time frame is wrong.

2              THE COURT:  Yes, I think --

3              THE WITNESS:  Yeah --

4              THE COURT:  Excuse me.  I think what you meant to ask

5    was, did he understand at the time --

6              MR. CREIZMAN:  Yes.

7              THE COURT:  -- those things?  Okay.  So what's the

8    answer to that, yes or no?

9              THE WITNESS:  Yes.

10   BY MR. CREIZMAN:

11   Q.  So you did understand that those prices --

12             THE COURT:  We don't have time to ask the same

13   question twice.

14             MR. CREIZMAN:  Okay.  I just --

15             THE COURT:  It sounded like you were just going to

16   repeat the question.

17             MR. CREIZMAN:  No, no.

18             THE COURT:  My apologies.  Put another question.

19             MR. CREIZMAN:  Thank you.

20   BY MR. CREIZMAN:

21   Q.  The next question was simply, if you understood that those

22   valuations were overriding the valuation provided by the

23   administrator, did you also understand that the values that you

24   were providing to the administrator were false?

25   A.  Eventually, along that time frame, what I came -- the

1    closest I came to ultimate validation, which was pretty --

2            THE COURT:  No, no, no.  At the time that he's asking

3    you about, did you understand that they were false, yes or no?

4            THE WITNESS:  I'm sorry, can you -- the exact time was

5    which month?

6    BY MR. CREIZMAN:

7    Q.  August 2013.

8    A.  Yes, I did --

9            THE COURT:  You've answered the question.  Put another

10   question.

11   BY MR. CREIZMAN:

12   Q.  One way or another, you didn't like the practice of sending

13   e-mails to valuation and ops, correct?

14   A.  Correct.

15   Q.  But you did it because you were worried about losing your

16   job, fair to say?

17   A.  That's fair.

18   Q.  And the person who asked you to do it was Chris Plaford,

19   correct?

20   A.  Right.

21   Q.  And then Chris Plaford was your boss, correct?

22   A.  Correct.

23   Q.  And if you didn't send those e-mails out, you thought he

24   might fire you, correct?

25   A.  Correct.

1   Q.  Now, you said yesterday that Mr. Lumiere was also your

2   boss; is that accurate?

3   A.  I recollect that I said that he said he was my boss.

4   Q.  But he wasn't your boss, correct?

5   A.  I don't know the technical answer.  If you look at the

6   hierarchy on the organizational structure, formally Chris

7   Plaford was my boss.

8   Q.  Right.  But did you report to Mr. Lumiere?

9   A.  Formally, no, but I took instructions and had directions

10  from him.

11  Q.  You said that Mr. Lumiere directed you to trade with

12  Princeridge; is that right?

13  A.  Yes.

14  Q.  And he directed you to trade with Janney; is that right?

15  A.  Yes.  At times, he emphasized that I try and give them

16  business, and at times, he even directed me to do so.

17  Q.  But nevertheless, you very seldom followed that

18  instruction, correct?

19  A.  That's correct.

20  Q.  That's because, you said that your fiduciary obligation was

21  to provide the investors with best execution, correct?

22  A.  Right.

23  Q.  So can we agree that making false statements to investors

24  about the value of their securities is a greater violation of

25  the fiduciary obligation to investors than the best execution

1   of trading?

2              MR. NAFTALIS:  Objection.

3              THE COURT:  Well, sustained as to the form.

4   Q.  Getting the best execution price on a trade is an important

5   fiduciary obligation to one's shareholders, correct?

6   A.  Yes.

7   Q.  Being truthful in representations to shareholders about the

8   value of their holdings in securities is also an important

9   fiduciary obligation to shareholders, correct?

10  A.  Yes.

11  Q.  Do you view them with equal importance, both of those

12  fiduciary obligations?

13  A.  I view them both with importance.  I don't make a -- I

14  can't weight one importance over the other.  They're both very

15  important.

16  Q.  So lying to investors is no more, no less important than

17  getting the best execution of a trade; is that your testimony?

18  A.  Well, if it's in the form of an outright lying to

19  investors, in that context, that would be worse than the

20  alternative.

21  Q.  Isn't inflating the value of the securities that your

22  investors hold in the credit fund, isn't that outright lying to

23  investors?

24  A.  Yes, that would be.

25  Q.  So that would be a more serious violation of your fiduciary

1    obligations, in your opinion?

2              THE COURT:  Asked and answered.  Sustained.

3    Q.  You started in year 2011; is that correct?

4    A.  Correct.

5    Q.  Right.  Now, during the years that you were at Visium,

6    basically your full years at Visium were 2012 and part of --

7    I'm sorry, 2011 and 2012, correct?

8    A.  Yes, very early January of '11 and then full 2012.

9    Q.  Your compensation for each year, those two years, your

10   total compensation was between $280,000 and $350,000, correct?

11   A.  Correct.

12   Q.  Are you aware whether Mr. Lumiere made more or less money

13   during each of those years than you did?

14   A.  I recollect him telling me what he got paid on one of the

15   recordings.  I actually forget the amount that he said.  I

16   believe it was more, but the context of complaining, it wasn't

17   much but more than what I make, from what I recollect.

18             MR. CREIZMAN:  Can we show the witness Government

19   Exhibit 106 in evidence, and can we turn the page to the

20   organizational chart or the hierarchy that we looked at

21   yesterday?  Okay.  There we go.

22   Q.  Now, I'm pointing to what I look at on my left-hand side.

23   I'm not sure, I think you probably see it the same way.

24   A.  Yes, I do.

25   Q.  The person at the top is Chris Plaford, CFA.  His title is

1   portfolio manager, correct?

2   A.  Right.

3   Q.  Below that is Stefan Lumiere.  He is also the same, he has

4   a CFA, and his title is analyst, correct?

5   A.  Correct.

6   Q.  And below, the two individuals below him, they were also on

7   the credit desk; is that right?

8   A.  That's right.

9   Q.  And their names were Lee Brown and Ameesh Shah; is that

10  right?

11  A.  Yes.

12  Q.  And their titles were senior analyst, correct?

13  A.  Correct.

14  Q.  You discussed a conversation, a recorded conversation that

15  you had with Matt O'Callaghan in which you said that

16  Mr. O'Callaghan said that Stefan Lumiere was, I think you used

17  the word, sketchy?

18  A.  Yes.  I said that he likely is sketchy or some similar

19  term.

20  Q.  Well, I'm saying that Mr. -- you said that Mr. O'Callaghan

21  used that term?

22  A.  Yes, or Mr. O'Callaghan used something like that term, yes.

23  Q.  Is it fair to say, though, that you were the first person

24  to say to Mr. O'Callaghan that Stefan Lumiere was sketchy?

25  A.  I don't know.

1   Q.  That conversation that you had with Mr. O'Callaghan, was

2   that a conversation you were recording for the Federal Bureau

3   of Investigation?

4   A.  I'm sorry, did you say reporting?

5   Q.  Recording.

6   A.  Reporting?

7   Q.  Recording.

8   A.  Oh, recording.  No.

9   Q.  You were not recording that conversation for the --

10  A.  Oh, the one that we're referring to at Stone Rose?

11  Q.  Yes.

12  A.  No, I was not.

13  Q.  So that one was not a recorded conversation, the one that

14  you were discussing on direct testimony was not a recorded

15  conversation?

16  A.  No.

17  Q.  You did have two recorded conversations with

18  Mr. O'Callaghan, though, right?  Do you recall that?

19  A.  Yes.  As part of assisting the government, yes.

20  Q.  Okay.  And as part of assisting the government, do you

21  recall discussing whether Mr. Lumiere was shady or not?

22  A.  I'm trying to remember.  It's a good possibility.  I think

23  I may have.

24          MR. CREIZMAN:  No further questions.

25          THE COURT:  Redirect?

H1DPLUM5                        Thorell - Cross

1              MR. NAFTALIS:  Your Honor, we have no further

2     questions.

3              THE COURT:  Thank you very much.  You may step down.

4              (Witness excused)

5              THE COURT:  Please call your next witness.

6              MR. NAFTALIS:  Your Honor, could we have a brief

7     sidebar?

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (At the side bar)

2              MR. NAFTALIS:  I know we're going to get what we're

3    going to get, but since Mr. Creizman said he was going to be

4    until the end of the day, our witness is nearby but he's not

5    literally sitting --

6              THE COURT:  Where is he?

7              MR. WILLIAMS:  He's outside the local area.

8              MR. McGINLEY:  He went to a Starbucks right near here.

9    We're telling him right now to run over.

10             THE COURT:  He went to a Starbucks without asking me

11   if I wanted coffee?  All right.

12             MR. NAFTALIS:  So he's here, but --

13             THE COURT:  We will give the jury their mid-afternoon

14   break now, and so you can go find him, and we'll have him right

15   after the break.

16             MR. CREIZMAN:  Your Honor, could I put one thing on

17   the record?

18             THE COURT:  Yes.

19             MR. CREIZMAN:  This is out of great respect for your

20   Honor, and I'm sure I can understand your frustration, but at

21   the same time, I was simply trying to conduct what I thought

22   was an effective line of cross.  Whether your Honor agreed or

23   not, I do think it was relevant as to whether he was -- whether

24   he believed or not that the items he was sending to valuation

25   and ops were basically going to investors, and I think it's

1   important --

2              THE COURT:  He already testified to that.

3              MR. CREIZMAN:  But he was both ways on the subject,

4   and I think that --

5              THE COURT:  I don't think he was both ways.  Assuming

6   both ways, what greater gift could you have?

7              MR. CREIZMAN:  That's true, but that great gift that I

8   did receive was somewhat tempered by your Honor's raising your

9   voice at me.  And while I have received much, much worse and

10  from much less respected Honors, I would just appreciate if

11  your Honor could make some kind of statement to the jury

12  that --

13             THE COURT:  I will.  I will do that, and it's only

14  because I have great respect for you.  But the record should

15  reflect that I had admonished very quietly both the witness and

16  counsel previously to, on the one hand, just ask questions and,

17  on the other hand, just give direct answers.

18             Indeed, in the latter regard, I was doing so not only

19  on my own instance, but at the instance of defense counsel.

20  And when, despite those repeated admonitions, both counsel and

21  the witness continued to make statements, in the case of

22  defense counsel, and give irrelevant or over-volunteered

23  answers in the case of the witness, I felt that I had no

24  alternative but to make my message clear.

25             MR. CREIZMAN:  Yes.

1           THE COURT:  But I will find a good opportunity, not

2      right this second because I think that would just recall to the

3      jury the events of a few minutes ago, but I will find some

4      opportunity this afternoon to express my genuine admiration for

5      all counsel in this case --

6           MR. CREIZMAN:  Thank you.

7           THE COURT:  -- and the job they're doing.  Okay?

8           MR. CREIZMAN:  Thank you.

9           (Continued on next page)

H1DPLUM5                          Thorell - Cross

1          (In open court)

2          THE COURT:  All right.  So ladies and gentlemen, I'm

3     told that the next witness, in a moment of weakness, went to

4     get himself a cup of coffee.  Now, I know you wanted to do the

5     same thing; so what we're going to do is we're going to take

6     our mid-afternoon break a little early.  We'll take it now for

7     15 minutes.  We will send out the National Guard to find this

8     witness and bring him back.  We'll see you in 15 minutes.

9          (Jury not present)

10          THE COURT:  All right.  We'll see you in 15 minutes.

11          (Recess)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H1d2lum6

1          THE COURT:  Let's get the witness on the stand and

2     let's bring in the jury.

3          MR. NAFTALIS:  Can we flag one issue?

4          THE COURT:  Yes.

5          MR. NAFTALIS:  Because defendant finished so much

6     earlier, we have the witness who is here.  If we finish, we are

7     prepared to call another witness who we have not prepared.  It

8     is Agent Callahan, who did not expect to testify.

9          THE COURT:  That's the best type.

10         MR. NAFTALIS:  But we would do it on the condition --

11    there was no 3500 for him and that nothing about the

12    investigation is fair game.  He is a summary witness about cell

13    phone --

14         THE COURT:  Let's see how we do, anyway.

15         MR. NAFTALIS:  He was not supposed to be the witness,

16    I should say.

17         THE COURT:  I understand.

18         (Continued on next page)

19

20

21

22

23

24

25

1           (Jury present)

2                THE COURT:  Please be seated.

3                Please call your next witness.

4                MR. WILLIAMS:  Your Honor, the government calls David

5      Scott Vandersnow.

6       DAVID SCOTT VANDERSNOW,

7           called as a witness by the government,

8           having been duly sworn, testified as follows:

9                THE COURT:  Counsel.

10     DIRECT EXAMINATION

11     BY MR. WILLIAMS:

12     Q.  Good afternoon, Mr. Vandersnow.

13     A.  Good afternoon.

14     Q.  What do you do for a living?

15     A.  Currently I have two businesses.  One is an indoor sports

16     facility.  The other is a special real estate finance firm.

17     Q.  If you don't mind just coming a little bit closer to the

18     microphone so we can hear you a little better.

19     A.  Is that better?

20     Q.  Yup.

21          Was there a point in time when you worked as an

22     investment professional?

23     A.  There was.

24     Q.  And where did you get your start as an investment

25     professional?

1    A.  I worked at a bank called USB.

2    Q.  Can you tell the jury what USB is?

3    A.  USB is a large Swiss investment bank.

4    Q.  What did you do at UBS?

5    A.  At UBS I worked -- I started as just on the trading desk

6    and then worked my way up to junior PM on the high yield

7    distressed desk.

8    Q.  Does could you explain to the jury what high yield

9    distressed is?

10   A.  High yelled distressed securities are securities that are

11   for companies that have so-so financials and are not a blue

12   chip company, like Home Depot or IBM or the like.

13   Q.  What kind of securities are high yield securities?

14   A.  There is high yield bonds and bank debt.

15   Q.  Where did you go after you left UBS?

16   A.  I went to a firm called Princeridge.

17   Q.  What is Princeridge?

18   A.  Princeridge is a small investment -- small start-up

19   investment bank.

20   Q.  Are you familiar with the term broker/dealer?

21   A.  I am.

22   Q.  Was Princeridge also a broker/dealer?

23   A.  They were.

24   Q.  What year did you start working at Princeridge?

25   A.  I started working at Princeridge in 2009.

1   Q.  What was your job title there?

2   A.  I was a salesman on the high yield distressed desk.

3   Q.  What did your job entail as salesman?

4   A.  To go out and talk to clients, talk to hedge funds and

5   private equity firms to solicit business who are trading in

6   high yield bonds.

7   Q.  Now, are you familiar with the term "broker"?

8   A.  I am.

9   Q.  Were you a broker?

10  A.  I was.

11  Q.  Can you explain to the jury what does it mean to be a

12  broker?

13  A.  A broker is someone who buys and sells securities on behalf

14  of their customers.

15  Q.  Have you held any professional licenses?

16  A.  I do.

17  Q.  Which ones?

18  A.  In the investment World, Series 7 and 63.

19  Q.  Do you have a CFA?

20  A.  I do not.

21  Q.  Compared to UBS, how well resourced was Princeridge?

22  A.  Princeridge did not have many resources.

23  Q.  For example, have you heard of Reuters pricing service?

24  A.  I have.

25  Q.  And what was it?

1    A.  It's a service where you can go and get prices for

2    securities.

3    Q.  Did you have access to Reuters pricing service at

4    Princeridge?

5    A.  I did not.

6    Q.  Why not?

7    A.  I am assuming it was too expensive for the firm to

8    purchase.

9    Q.  Are you familiar with Bloomberg?

10   A.  I am.

11   Q.  What is Bloomberg?

12   A.  Bloomberg is a service that people in our business used to

13   get data and also to communicate with other customers or

14   clients.

15   Q.  As a Princeridge employee, did you have free access to

16   Bloomberg?

17   A.  No, we had to pay for it.

18   Q.  Did you have to pay for Bloomberg while you were at UBS?

19   A.  I did not.

20   Q.  Did your high yield desk at Princeridge have a sector

21   specialty?

22   A.  We were mostly retail and consumer focused.

23   Q.  Can you just explain to the jury what retail and consumer

24   means?

25   A.  Neiman Marcus, Sears, that's on the retail side.

1    Q.  What about on the consumer side?

2    A.  Best buy and -- I'm not sure of other ones right now.

3    Q.  Did Princeridge trade in healthcare securities frequently?

4    A.  Not frequently.

5    Q.  So regardless of sector, what type of securities did

6    Princeridge trade in?

7    A.  We mostly traded in high yield -- we mostly traded in

8    bonds.

9    Q.  What about bank loans?  Did you trade in bank loans?

10   A.  We did not.

11   Q.  So let's talk about how Princeridge got clients.  How did

12   Princeridge get clients typically?

13   A.  You would either have your clients when you came to

14   Princeridge from previous institutions or you were given a list

15   of people to call and go solicit.

16   Q.  Are you familiar with the term "cold call"?

17   A.  I am.

18   Q.  Did you have to cold call people?

19   A.  On some of them, yes.

20   Q.  So would clients typically come to Princeridge?

21   A.  No.

22   Q.  Princeridge would have to come to clients?

23   A.  Yes.

24   Q.  So by 2011, approximately how many clients did you have at

25   Princeridge?

1    A.  About 20.

2    Q.  What kinds of clients were they?

3    A.  They were mostly hedge funds.

4    Q.  Generally speaking, how did you go about landing those

5    clients?

6    A.  I either had a previous relationship with someone over

7    there or I was given a list to cold call and speak to.

8    Q.  What, if anything, did you do to maintain those clients?

9    A.  You know, besides daily conversations and keeping

10   information in front of them, entertainment, you know, dinner,

11   drinks, those types of things.

12   Q.  Are you familiar with a hedge fund called Visium Asset

13   Management?

14   A.  I am.

15   Q.  How are you familiar with them?

16   A.  They were one of my clients.

17   Q.  How did Visium become one of your clients?

18   A.  I cold called them when I was given them on a list.

19   Q.  As far as you understood, did Visium have a specialty or

20   sector focus?

21   A.  Yeah, they were primarily healthcare.

22   Q.  You testified earlier that Princeridge was mostly focused

23   on retail and consumer.  Why did you contact a healthcare hedge

24   fund to develop business?

25   A.  Maybe there is some crossover, there were names that were

1    traded we can get business from.

2    Q.  So after cold calling Visium, did you eventually get

3    someone on the phone to speak with you?

4    A.  I did.

5    Q.  Who was willing to speak with you?

6    A.  Stefan Lumiere.

7    Q.  As far as you understood, what was his role at Visium?

8    A.  He was a PM.

9    Q.  What is a PM?

10   A.  A portfolio manager for the fund.

11   Q.  What kind of services generally did you provide Visium?

12   A.  We would provide them markets in the securities that we

13   traded.

14   Q.  And how frequently -- when you say markets, what do you

15   mean?

16   A.  Bids and offers, bids and offers in the security where we

17   would buy them or sell them.

18   Q.  Is that similar to providing a price?

19   A.  Correct.

20   Q.  Or a level?

21   A.  Correct.

22   Q.  Or an indication?

23   A.  Correct.

24   Q.  How frequently would you provide these kinds of pricing

25   services for Visium?

1   A.  We would send out daily -- every ten minutes or so we would

2   send out new markets or runs or more information to stay in

3   front of them.

4   Q.  What about at month end?

5   A.  At month end we would provide month-end marks.

6   Q.  Is providing month-end marks something that you did for

7   other clients?

8   A.  It is.

9   Q.  Have you met Stefan Lumiere in person?

10  A.  I have.

11  Q.  What, if anything, did you do with him when you met with

12  him in person?

13  A.  We would go out for dinner, drinks, strip clubs, just

14  entertaining.

15  Q.  And generally during those times when you saw him, did you

16  pay or did he pay?

17  A.  I would pay.

18  Q.  So would you recognize Stefan Lumiere if you saw him again?

19  A.  I would.

20  Q.  Do you see him in this courtroom today?

21  A.  I do.

22  Q.  Can you identify him by pointing to him and identifying an

23  item of clothing he is wearing?

24  A.  Dark suit and light tie over there in the second table.

25          MR. WILLIAMS:  Identifying the defendant, your Honor.

1           THE COURT:  Yes.

2    Q.  Mr. Vandersnow have you participated in any schemes with

3    Stefan Lumiere?

4    A.  I have.

5    Q.  What did you do?

6    A.  I provided unverified levels at month end to Stefan.

7    Q.  When you say "levels," what do you mean?

8    A.  Bids and offers or prices for securities.

9    Q.  And when you say "unverified," what do you mean?

10   A.  Meaning that I did not verify them when I sent them to him.

11   Q.  Meaning verify that they were correct?

12   A.  Correct.

13   Q.  What was your understanding of what these prices were going

14   to be used for?

15   A.  For month-end marks.

16   Q.  Where?

17   A.  In his portfolio.

18   Q.  At what hedge fund?

19   A.  Visium.

20   Q.  How long did you participate in the scheme?

21   A.  Two years.

22   Q.  Was anyone at your company, Princeridge, aware that you

23   were involved in this scheme?

24   A.  They were not.

25   Q.  Mr. Vandersnow, did there come a time when the F.B.I. came

H1d2lum6                          Vandersnow - Direct

1   to your home to speak with you about your involvement in the

2   scheme?

3   A.   There was.

4   Q.   What year was that?

5   A.   2014.

6   Q.   Were you completely honest with the F.B.I. during that

7   interview?

8   A.   I was not.

9   Q.   What did you say that was not truthful?

10  A.   At one point I said that I verified the marks before I sent

11  them over to Visium.

12  Q.   And that was false?

13  A.   Correct.  It was false.

14  Q.   After your initial meeting with the F.B.I., have you

15  continued to meet with the government?

16  A.   I have.

17  Q.   Have you been truthful in those subsequent meetings?

18  A.   I have.

19  Q.   Mr. Vandersnow, do you have any agreements with the

20  government?

21  A.   I do.

22  Q.   What kind of agreement do you have?

23  A.   I have a nonprosecution agreement.

24  Q.   And can you explain to the jury what that agreement

25  requires you to do.

1   A.  It requires me to be here today and testify, tell the

2   truth, and not commit a crime.

3   Q.  And if you live up to your end of the agreement, what will

4   the government promise to do?

5   A.  Not prosecute me.

6   Q.  So what happens to your agreement if you don't tell the

7   truth?

8   A.  It's void.

9   Q.  And what happens if your agreement is void?  What can the

10  government do?

11  A.  They can prosecute me.

12  Q.  Did there come a time when you were contacted by the media

13  about this case?

14  A.  Yes, once.

15  Q.  And was that before or after Stefan Lumiere had been

16  charged?

17  A.  It was after.

18  Q.  And what did the reporter want to know?

19  A.  He wanted to know if he could ask me questions or if I was

20  involved.

21  Q.  And what did you tell the reporter?

22  A.  I told him I was not involved and I hung up the phone.

23  Q.  Was that the truth?

24  A.  It was not.

25  Q.  Why weren't you honest with the reporter?

1   A.   Uhm, I'm not sure.

2   Q.   Let's talk about what you did with the defendant.

3           Are you familiar with what's called the month end

4   valuation process?

5   A.   I am.

6   Q.   And, generally speaking, what is it?

7   A.   It's a process where you mark your portfolio with prices

8   for -- to calculate profit and loss or net asset value of the

9   portfolio.

10  Q.   And what's your understanding of why a fund values its

11  portfolio at the end of the month?

12  A.   So they can report back to their investors on the profit

13  and loss.

14  Q.   So did any of your clients ask for your help as part of

15  their month end valuation process?

16  A.   Yeah, there were some that did.

17  Q.   And other than Visium, what kind of help would your clients

18  typically ask you for?

19  A.   They would ask me for marks on securities that we traded or

20  give us a list and we would go fill in the ones that we knew

21  where they were trading.

22  Q.   So let's break that down.

23          So your clients would ask you -- would give you a list

24  of securities.

25  A.   Correct.

1    Q.   And they were asking you for what in return?

2    A.   Where we thought they were priced.

3    Q.   When you say "we," what are you referring to?

4    A.   The trading desk.

5    Q.   Would you provide prices to those clients?

6    A.   On the ones that I knew where they were trading, correct.

7    Q.   And so let me ask you this, as far as you knew, why did

8    your clients need quotes from brokers?

9    A.   They needed quotes, it was part of the process to verify

10   their prices.

11   Q.   And why come to a broker as opposed to some other source?

12   A.   I'm not sure individually why they would do that.  Maybe

13   because we knew where they were trading.

14   Q.   And what role, if any, did independence play in this

15   process?

16   A.   I'm sorry, I don't understand.

17   Q.   What role, if any, did independence, Princeridge's

18   independence from your clients, play in this process?

19   A.   I'm sorry.  I'm not following.

20   Q.   Understood.

21        When your clients asked you for quotes, would they

22   tell you what price they wanted?

23   A.   They would not.

24   Q.   So, for instance, if a client gave you a list with ten

25   securities on it and asked you for prices for each security,

1   would you provide a price for each security on that list?

2   A.  I would only provide the prices if I knew where they were

3   trading or if we were involved in the name.

4   Q.  And how would you know how much something was trading?

5   A.  You would ask the trader or you would be able to go

6   research it.

7   Q.  So if you didn't have personal knowledge or do research,

8   what would you do if a client asked you for a price and you

9   didn't know it?

10  A.  I would just leave it blank.

11  Q.  Is that the way the process worked with every single client

12  you worked with?

13  A.  All of them except Visium.

14  Q.  So let's talk about the month-end valuation process with

15  Visium.  What would typically happen at the month end with

16  Visium?

17  A.  They would call up or Stefan would call up and give me a

18  list of names and tell me what prices he wanted for those

19  names.

20  Q.  And did any of your other clients do that?

21  A.  No.

22  Q.  What did your employer, Princeridge, expect you to do

23  before providing the quote to the client?

24  A.  To research them or verify that they were correct.

25  Q.  Generally speaking, were you familiar with the securities

1   that Stefan Lumiere was asking you for prices about?

2   A.  The majority of them I was not.

3   Q.  Are you familiar with the term "market maker"?

4   A.  I am.

5   Q.  And can you tell the jury what it means to be a market

6   maker?

7   A.  A marker maker is someone who has the ability to provide a

8   bid and offer for a security.

9   Q.  Is that similar to a dealer?

10  A.  Yes.

11  Q.  And was Princeridge a market maker for any of the

12  securities that Stefan Lumiere was asking for quotes on?

13  A.  I'm sure they were for a few of them, yes.

14  Q.  But in terms of the percentage, for instance, if you could

15  estimate?

16  A.  Less than 10 percent.

17  Q.  So when Stefan Lumiere would ask you for prices for

18  securities for month-end valuation, what did you do?  Did you

19  give him the prices that he asked for?

20  A.  I gave him the prices that he gave me.

21  Q.  Did you perform any due diligence or research on the prices

22  that you gave him before you gave them to him?

23  A.  I did not.

24  Q.  Generally speaking, did you have any understanding, based

25  on the work that you did at Princeridge, whether the prices you

1   were providing were accurate?

2   A.  I had no understanding.  I just sent back what he told me.

3   Q.  When you say "he," who do you mean?

4   A.  I'm sorry, I just sent back what Stefan told me.

5   Q.  And how would you go about sending back prices to Stefan

6   Lumiere?

7   A.  Electronically, either through e-mail or Bloomberg.

8   Q.  What was your understanding of what Stefan Lumiere was

9   doing with the prices that you were providing him?

10  A.  He was using them to help prices -- price the securities in

11  his portfolio.

12  Q.  So let's look at an example.  It is Government Exhibit 737,

13  which is already in evidence.  There is a hard copy in front of

14  you, Mr. Vandersnow, also on the screen in front of you, as

15  well.

16          MR. WILLIAMS:  Ms. Meister, can you blow that up by

17  skipping the disclaimer language at the bottom and focusing on

18  the e-mail at the top.

19  BY MR. WILLIAMS:

20  Q.  So, Mr. Vandersnow, what is this?

21  A.  This is an e-mail from Stefan to myself, asking me to get

22  month-end levels for the following names.

23  Q.  And I think you testified to this before, but "level" is a

24  synonym for what?

25  A.  "Price."

1    Q.  What time did you receive this e-mail?

2    A.  At 8:08 p.m.

3    Q.  Now, there are 23 securities on this list.  Of the 23

4    securities, how many of these did you trade at Princeridge?

5    A.  One or two.

6    Q.  Which ones or two?

7    A.  To the best of my recollection, RURL and FriendFinder,

8    which is FFN.

9    Q.  What was RURL?  What kind of company was that?

10   A.  Some medical company, ambulatory company maybe.

11   Q.  And what kind of company was FriendFinder?

12   A.  FriendFinder was an online dating service of some sort.

13   Q.  So were you personally familiar with Bios 10.25 at the very

14   top?

15   A.  No, I was not.

16   Q.  What about USON Escrow?  Do you know what kind of company

17   that is?

18   A.  I don't.  I don't know what it is.

19   Q.  Let's look at CMED Directing Class.  Do you know what that

20   is?

21   A.  I don't.

22   Q.  Let's go down, SVNT 3, do you know what that is?

23              MR. CREIZMAN:  Objection: cumulative.

24              THE COURT:  Excuse me?

25              MR. CREIZMAN:  Cumulative.

```
 1              THE COURT:  Sustained.  I think he already indicated,
 2    unless I misunderstood, that he only had familiarity with two,
 3    yes?
 4              MR. WILLIAMS:  Your Honor, I had asked whether they
 5    traded any of them.  I have been asking what kind of companies
 6    these are.
 7              THE COURT:  I see.
 8              Did you have any familiarity with these other than the
 9    two you mentioned before?
10              THE WITNESS:  I did not.
11              THE COURT:  Okay.
12    BY MR. WILLIAMS:
13    Q.  Mr. Vandersnow, given your lack of familiarity, what should
14    you have done when Mr. Lumiere asked you for month-end prices
15    for these securities?
16    A.  The ones I didn't know I should have left blank.
17    Q.  What did you do instead?
18    A.  I sent back levels on all of them.
19              MR. WILLIAMS:  Your Honor, at this time the parties
20    have stipulated that Government Exhibit 738 is admissible and
21    the government offers the exhibit.
22              THE COURT:  Received.
23              (Government's Exhibit 738 received in evidence)
24              MR. WILLIAMS:  Ms. Meister, would you publish
25    Government Exhibit 738 and zoom in on the top half of it.
```

1    BY MR. WILLIAMS:

2    Q.  Mr. Vandersnow, what is this?

3    A.  These are the -- an e-mail or Bloomberg from myself to

4    Stefan and Sudarshan with prices on it.

5    Q.  And the prior e-mail or Bloomberg that we were looking at

6    was at 8:08 p.m.  What time did you send this response to

7    Stefan Lumiere?

8    A.  8:23 p.m.

9    Q.  And between 8:08 and 8:23 p.m. did you do any research on

10   any of these prices before you gave it back to him?

11   A.  I did not.

12           MR. WILLIAMS:  So if we could just put Government

13   Exhibit 738 alongside Government Exhibit 737 and just zoom in.

14   Can you zoom in on both side by side or no?

15           That's fine.  We can just look at the left-hand side.

16   Q.  So, for instance, at the e-mail on the left, it says Bios

17   10.25, and then you provide a price of 108 to 109.  Do you see

18   that?

19   A.  108 to 109.5, correct.

20   Q.  Thank you.

21           So where did that price come from?

22   A.  From Stefan.

23   Q.  Now, there are 23 prices on this list.  Where did every

24   single price come from?

25   A.  They came from Stefan.

1          MR. WILLIAMS:  Ms. Meister, we can take this down.

2          If we can publish Government Exhibit 718, which is in

3    evidence.

4    Q.  Mr. Vandersnow, this is a little hard to read, because of

5    the light font, but this is an e-mail from -- or Bloomberg from

6    Stefan Lumiere to you on April 2.  Can we hold one second?  The

7    font is so light, we might actually need to publish this in a

8    physical exhibit to the jury, your Honor.

9    BY MR. WILLIAMS:

10   Q.  Mr.  Vandersnow, we are going to attempt to do this a

11   little old school, if we can.  It is apparently not working.

12         THE COURT:  Let me see the exhibit, please.

13         (Pause)

14         THE COURT:  Why don't you question the witness about

15   it; and, if you wish, you can distribute it to the jury.

16         JURORS:  This is better.

17         JUROR:  We can see it.

18         THE COURT:  Okay.  Excellent.  You are hired.

19   BY MR. WILLIAMS:

20   Q.  Mr. Vandersnow, what is Government Exhibit 718?

21   A.  It is a Bloomberg from Stefan to myself with a list of

22   securities on it.

23   Q.  And this was sent at 2:03 p.m.

24         Now, at this point, Mr. Vandersnow, there is a CD with

25   two transcripts to your right.  Do you see that?  Have you seen

 1    that CD before?

 2    A.  I have.

 3    Q.  And how do you recognize it?

 4    A.  It was played for me and I initialed it.

 5    Q.  And the two transcripts that are in front of you that are

 6    marked Government Exhibits 1209T and 1227T, have you seen those

 7    before?

 8    A.  I have.

 9    Q.  And are those transcripts a fair and accurate

10    representation of the conversations that are on the government

11    exhibit that is the CD?

12    A.  They are.

13              MR. WILLIAMS:  Your Honor, we offer Government

14    Exhibits 1209T and 1227T as aid to the jury.

15              THE COURT:  Any objection?

16              MR. CREIZMAN:  No, no objection.

17              THE COURT:  Received.

18              (Government's Exhibit 1209T and 1227T received in

19    evidence)

20    BY MR. WILLIAMS:

21    Q.  Mr. Vandersnow, we are now going to listen to a

22    conversation between you and Stefan Lumiere.

23              MR. WILLIAMS:  The jury should turn to tab 1209T in

24    your binders.

25    Q.  Before we play the audio, Mr. Vandersnow, were you aware

1  that Stefan Lumiere was recording your conversations?

2  A.  I was not.

3          MR. WILLIAMS:  All right.  Let's play the audio.

4          (Audiotape played)

5  BY MR. WILLIAMS:

6  Q.  Mr. Vandersnow, from time to time on that call you say

7  "uh-huh" in response to the prices that Stefan Lumiere is

8  telling you.  What were you doing while Stefan Lumiere was

9  talking?

10 A.  I was writing them down or transcribing them on to

11 Bloomberg.

12 Q.  Writing what down?

13 A.  I'm sorry, writing the levels down that he was giving to me

14 for each security.

15         MR. WILLIAMS:  If we can now publish Government

16 Exhibit 658 and go to page 44 of that, Ms. Meister, if you

17 don't mind, and then just blow up that part.  Thank you.

18 BY MR. WILLIAMS:

19 Q.  Now, Mr. Vandersnow, you sent this, this is a Bloomberg

20 message from you to Stefan Lumiere.

21         MR. WILLIAMS:  And if you can just highlight "Scott

22 Vandersnow," Ms. Meister.

23 Q.  Had you done any research on these securities before

24 sending this Bloomberg?

25 A.  I did not.

H1d2lum6                          Vandersnow – Direct

1    Q.  And these prices, where did we hear these prices before?

2    A.  On the recording.

3              (Continued on next page)

1              MR. WILLIAMS:  At this point, we want to play another

2     recording.  This is Government Exhibit 1227, and if you flip to

3     Tab 1227T.

4              Okay.  Ms. Meister, please play the recording.

5              (Audio played)

6              MR. WILLIAMS:  One moment.

7              (Pause)

8              All right.  Ms. Meister, would you please publish Page

9     38 of Government Exhibit 658, and if we could zoom in on the

10    bottom e-mail, starting with "From."  Okay.  So if we can

11    actually just blow up the bottom message.

12    BY MR. WILLIAMS:

13    Q.  Okay.  Mr. Vandersnow, these are the same prices that you

14    had provided or that Mr. Lumiere provided you over the phone.

15    Did you do any research on these prices before you sent them?

16    A.  No.

17             MR. WILLIAMS:  Okay.  And if we zoom out, Ms. Meister,

18    just a little bit, and zoom in on the top part that ends with

19    the quote from George Bernard Shaw.  No, the top part that ends

20    with it.  From Stefan Lumiere CFA, all the way down.  Thank

21    you.  Where did it go?

22             THE COURT:  That's what happens when you quote a

23    deceased person.

24             MR. WILLIAMS:  Okay.  Thank you so much.

25    BY MR. WILLIAMS:

1   Q.  Mr. Vandersnow, can you please read what Mr. Lumiere's

2   signature block says?

3           MR. CREIZMAN:  Objection.  I'm not sure what -- I'm

4   sorry, relevance.

5           THE COURT:  Overruled.

6   Q.  You can answer.

7   A.  Okay.  Starting from the top?

8   Q.  Yes.

9   A.  Stefan Lumiere CFA, PM:  Distressed and special situations.

10  Visium Asset Management.

11  Q.  That's enough.  So is that consistent with your

12  understanding of his title and role at Visium?

13  A.  It is.

14          MR. WILLIAMS:  All right.  We can take that down.

15  Q.  And what was the date on that document?

16  A.  I lost it.  What page?  January 2nd, 2013.

17  Q.  All right.  Mr. Vandersnow, you testified that you were

18  familiar with a company called FriendFinder; is that right?

19  A.  Right.

20  Q.  Did Princeridge transact in FriendFinder securities?

21  A.  When they first issued securities, we transacted in there

22  personally.

23  Q.  And based on that experience with FriendFinder, did you

24  provide Stefan Lumiere with a price or prices that you believe

25  reflected what Princeridge thought FriendFinder was worth?

1   A.  I did not.

2   Q.  So what would happen when Stefan Lumiere would ask you for

3   a price for FriendFinder; what price would you provide him

4   with?

5   A.  I would just provide the price that he gave me.

6   Q.  Even if you, meaning Princeridge, disagreed with that

7   price?

8   A.  Correct.

9   Q.  Did you ever tell Stefan Lumiere that you disagreed with

10  his price?

11  A.  I did not.

12          MR. WILLIAMS:  All right.  Let's go back to the prior

13  exhibit, the same page that we were looking at, Page 44, I

14  believe it was.  Thank you, and if you could just zoom in on

15  the quote and highlight FriendFinder 2nd, 33 to 35.

16  Q.  So, Mr. Vandersnow, this is a Bloomberg from you to Stefan

17  Lumiere quoting FriendFinder, second lien, at 33 to 35.  Was

18  that quote based on Princeridge's knowledge of FriendFinder?

19  A.  It was like the rest of them, they were just provided to me

20  from Stefan.  So the answer is no.

21  Q.  All right.  So you testified earlier that you participated

22  in this process with Stefan Lumiere for years.  Have you

23  reviewed a stack of quotes that you provided him over those

24  years?

25  A.  Yes, I have.

1   Q.  Generally, did you do any research on any of those quotes

2   from any of those years?

3   A.  I did not.

4   Q.  And what did you base those quotes on?

5   A.  The quotes were provided from Stefan.

6   Q.  Now, over the years in which you were engaged in this

7   scheme, do you recall ever refusing to give Stefan a price that

8   he asked you for?

9   A.  I don't recall.

10  Q.  Now, Mr. Vandersnow, do you recall ever speaking with

11  Stefan Lumiere about any of the models that he may have worked

12  on on these securities?

13  A.  I do not.

14  Q.  Do you recall ever speaking with Stefan Lumiere about any

15  research that he personally had done backing up the price that

16  he was telling you to provide him?

17  A.  I do not.

18  Q.  Do you recall ever having a conversation with Stefan

19  Lumiere in which he ever discussed why he believed a security

20  was worth a certain amount of money?

21  A.  I do not.

22          MR. WILLIAMS:  All right.  Your Honor, at this time,

23  we want to read a very short stipulation.

24          THE COURT:  Okay.

25          MR. WILLIAMS:  If called as a witness, a record

1     custodian from Ernst & Young would testify that Government

2     Exhibits 739 through 741 are true and correct copies of records

3     from E&Y.  The record reflected on Government Exhibit 739

4     through 741 were retrieved from the computer archive system of

5     E&Y.

6              The records reflected on Government Exhibit 739

7     through 741 were created by a person with knowledge of, or

8     created from information transmitted by a person with knowledge

9     of the information that's shown, were created at or near the

10    time the information became available to E&Y, and were created

11    and maintained by E&Y as part of its regularly conducted

12    business activities.

13             It's further stipulated and agreed that this

14    stipulation may be received in evidence at trial.

15             Your Honor, at this time, the government offers

16    Government Exhibit 1406, which is the stipulation, as well as

17    Government Exhibit 739 through 741 into evidence.

18             MR. CREIZMAN:  No objection.

19             THE COURT:  Received.

20             (Government's Exhibits 1406, 739 through 741 received

21    in evidence)

22    BY MR. WILLIAMS:

23    Q.  Mr. Vandersnow, did you have any interaction with Ernst &

24    Young, the accounting firm?

25    A.  I did.

1    Q.  In what capacity?

2    A.  In the capacity of this e-mail.

3    Q.  We'll get to that in one second.

4    A.  Sorry.

5    Q.  If we could publish Government Exhibit 740.  Was this the

6    e-mail that you were just referring to?

7    A.  It is.

8    Q.  Okay.  And what is this document?

9    A.  This is an e-mail exchange between myself and George

10   Mervitz of E&Y.

11          MR. WILLIAMS:  Ms. Meister, if we can zoom out and

12   just flip through the pages that come after this and keep

13   flipping.  Keep going.

14   Q.  What are these pages that we're looking at now?

15   A.  These pages are quotes or levels that I provided to Stefan.

16          MR. WILLIAMS:  If we can keep flipping, Ms. Meister.

17   If we can go back, sorry, one.  If you can go back a couple.

18   Right there, and zoom in on the quotes that were provided.  So,

19   for instance, if you can highlight FriendFinder, there are two

20   of them there.

21   Q.  So, Mr. Vandersnow, these are Bloombergs and quotes that

22   you provided to Stefan Lumiere?

23   A.  They are.

24          MR. WILLIAMS:  Okay.  If we go to the first page of

25   the exhibit, Ms. Meister, and if you could just highlight --

1   or, I'm sorry, zoom in on the bottom-most e-mail, which is from

2   Mr. Vandersnow to Ernst & Young.

3   Q.  So, Mr. Vandersnow, we just looked through some of the

4   Bloomberg messages at the back of this exhibit.  Did you do any

5   research on any of these prices before you gave them to Stefan

6   Lumiere?

7   A.  No.

8   Q.  Where did those prices come from?

9   A.  They came from Stefan.

10  Q.  Okay.  So this e-mail from you to Ernst & Young says:

11  "Yes, that's we were seeing as indications of interest from our

12  clients."  Do you see that?

13  A.  I do.

14  Q.  First of all, is there a typo in that sentence?

15  A.  Yes.

16  Q.  What did you mean to say?

17  A.  I believe I meant to say, yes, that's where we are seeing

18  indications of interest from our clients.

19  Q.  What was the purpose of this exchange from Ernst & Young,

20  as far as you recall?

21  A.  It was in response to a question that he asked.

22  Q.  Which was what, if we can zoom out?

23  A.  Are these prices listed in the attachment based on

24  indicative prices or trade prices?

25  Q.  If we can go to the next page, I believe, and if we zoom up

1   on the top.

2            Mr. Vandersnow, is this the original inquiry that came

3   in --

4   A.  It is.

5   Q.  -- from Ernst & Young?

6   A.  It is.

7   Q.  So your response to him about these prices being based on

8   indications of interest from your clients, was that a true

9   statement or a false statement?

10  A.  That was false.

11  Q.  Can you explain to the jury what about that statement was

12  false?

13  A.  They were not where I had indications of interest from my

14  clients.  They were quotes provided to me from Stefan.

15  Q.  We can take that exhibit down.

16           Mr. Vandersnow, did there come a time when you

17  received a thumb drive from Stefan Lumiere?

18  A.  There was.

19  Q.  How did that thumb drive arrive?

20  A.  I found it in a UPS, or some sort of envelope, on my desk

21  when I came in to the office in the morning.

22  Q.  Can you tell the jury what that thumb drive looked like?

23  A.  Physically what it looked like?

24  Q.  Yes.

25  A.  It was small, the size of your thumb, red.  I think it was

1   from Staples.

2   Q.  Did you open that thumb drive?

3   A.  I did.

4   Q.  What was on that thumb drive?

5   A.  There was a list of -- a large list of securities with

6   prices on it.

7   Q.  Approximately how many securities?

8   A.  50?  I'm guessing.

9   Q.  Compared to the month-end list that you would typically

10  receive from Mr. Lumiere, how big was this list?

11  A.  It was substantially larger.

12  Q.  Mr. Vandersnow, had you ever received a thumb drive with a

13  list of securities and their prices from any other client that

14  you've ever had?

15  A.  I have not.

16  Q.  What did you understand that Stefan Lumiere wanted you to

17  do with those prices that he provided you on that thumb drive?

18  A.  My understanding was he wanted me to send them back to him.

19  Q.  For what purpose?

20  A.  To use to price securities in his portfolio.

21  Q.  What, if anything, happened after you received that thumb

22  drive?

23  A.  I received a phone call from Stefan asking if I received

24  it.

25  Q.  Mr. Vandersnow, did there come a time when Stefan Lumiere

1  stopped being your primary contact at Visium?

2  A.  Yes.

3  Q.  Who became your primary contact after Stefan Lumiere was no

4  longer your primary contact?

5  A.  Jason Thorell and Chris Plaford.

6  Q.  Did Chris Plaford contact you at all about month-end

7  valuations?

8  A.  He did.

9  Q.  What would happen with him at month-end for valuations?

10  A.  It was the same process, where he would call and give me

11  securities and their prices, and I would send them back to

12  them.

13  Q.  What, if any, research or due diligence would you perform

14  before giving Chris Plaford the prices he requested?

15  A.  Zero.

16          MR. WILLIAMS:  I have nothing further, your Honor.

17          THE COURT:  Cross-examination.

18  CROSS-EXAMINATION

19  BY MR. CREIZMAN:

20  Q.  Good afternoon.

21  A.  Good afternoon.

22  Q.  You were in the securities industry for 18 years; is that

23  correct?

24  A.  I was in from 1999 to 2014.  I don't think that's 18 years.

25  Q.  Then you're right.  15 years?

1   A.  Somewhere in that vicinity, yes.

2   Q.  Okay.  So you were in the securities industry for 15 years.

3   Part of that time you worked for UBS, correct?

4   A.  I did.

5   Q.  And UBS is a well-known, large, prestigious bank, fair to

6   say?

7   A.  Fair enough.

8   Q.  At some point, you and colleagues of yours decided to start

9   your own investment bank; is that accurate?

10  A.  Correct, after we left UBS.

11  Q.  And that investment bank was Princeridge?

12  A.  Correct.

13  Q.  The idea was that you had something to offer, as a smaller

14  investment bank, to customers that perhaps people might not get

15  from a UBS, correct?  You served a certain market; is that fair

16  to say?

17  A.  We tried to figure out which market we were going to serve,

18  correct.

19  Q.  During the 15 years or so that you were in the securities

20  industry, you've never had a single infraction, other than this

21  particular issue, correct?

22  A.  Single infraction on my license?

23  Q.  On your license, disciplinary action by the securities

24  industry?

25  A.  That's correct.

1    Q.  You were truthful with the government when you talked to

2    them about your dealings in the past in the securities

3    industry; is that fair to say?

4    A.  With Stefan or previous?

5    Q.  No, in general.  As in --

6    A.  I don't believe that question was ever asked of me.

7    Q.  Were you ethical and honest in your other dealings in the

8    securities industry?

9    A.  I was, yes.

10   Q.  Okay.  You haven't committed any other wrongdoing or

11   anything questionable, the way this was, correct?

12   A.  Correct.

13   Q.  All right.  Now, you understand, as a veteran of this

14   industry, that you have certain ethical obligations as a

15   professional, licensed securities broker, correct?

16   A.  Correct.

17   Q.  And that includes providing accurate quotes, correct?

18   A.  Correct.

19   Q.  Now, the penalty for providing false quotes, or quotes that

20   you don't actually know whether true or false or accurate or

21   justifiable, that can result in being banned from the industry,

22   correct?

23   A.  I didn't do any research.  I'm not sure what the result

24   could be, but I'll take your word for it.

25   Q.  Well, no need to take my word for it.  It could result in a

1    disciplinary action; is that fair to say?

2    A.  Fair.

3    Q.  Okay.  And in some cases, it might result in, say, the FBI

4    coming to your house; is that fair to say?

5    A.  Very fair.

6    Q.  That's actually what happened in April or, I'm sorry, in

7    2014?  I don't know whether it was April.

8    A.  Me either, but it was 2014, correct.

9    Q.  2014.  At the time when the FBI came to your house and

10   visited you that day, they hadn't called you in advance, did

11   they?

12   A.  They did not.

13   Q.  No idea that they were coming, correct?

14   A.  I had no idea they were coming.

15   Q.  What time of day did they arrive?

16   A.  Late afternoon, evening.

17   Q.  I imagine it's not your regular practice to have

18   unannounced visits by law enforcement?

19   A.  I actually called the town police because I didn't believe

20   it was the FBI, to verify it.

21   Q.  And you have a family?

22   A.  I do.

23   Q.  Now, fair to say that Stefan Lumiere never told you to lie

24   about -- provide a false quote, never said I need you to

25   provide a false quote or else, right?

1   A.  I don't believe I was ever threatened by Stefan.

2   Q.  Fair enough.  And you never said to him, I refuse to

3   provide this quote to you, correct?

4   A.  Correct.

5   Q.  You never told Mr. Lumiere you had any disagreement with

6   the price at which he believed the security to be, correct?

7   A.  Correct.

8   Q.  Or that he represented Chris Plaford to see the security

9   where it was?

10  A.  I'm sorry?

11  Q.  Chris Plaford.

12  A.  Can you repeat?

13  Q.  I believe we heard a call --

14          THE COURT:  No, he doesn't understand the question.

15  A.  I don't understand the question.  Thank you.

16  Q.  Oh, I'm sorry.  Do you recall there was a recorded

17  conversation between you and Mr. Lumiere?

18          THE COURT:  I think the question was, you never

19  expressed any disagreement with the prices that were suggested

20  from Mr. Lumiere, regardless of whom he said the price was

21  coming from.  Is that the question?

22          MR. CREIZMAN:  Yes.

23  A.  That's right.

24  Q.  You never told Mr. Lumiere that you did no research on the

25  quotes he asked you to provide?

1   A.  I never told him that.

2   Q.  Okay.  You did socialize on occasion?

3   A.  We did.

4   Q.  And you socialized with Mr. Jason Thorell?

5   A.  I did.

6   Q.  Mr. Lumiere never pressured you to say -- never pressured

7   you, in terms of coming back with the quote that he wanted,

8   correct?

9   A.  I do not recall ever being pressured.

10  Q.  And you don't -- strike that.

11          MR. CREIZMAN:  No further questions.  Thank you.

12          THE COURT:  Any redirect?

13          MR. WILLIAMS:  No, your Honor.

14          THE COURT:  Thank you so much.  You may step down.

15          THE WITNESS:  Thank you.

16          (Witness excused)

17          THE COURT:  All right.  Counsel, come to the sidebar.

18          (Continued on next page)

19

20

21

22

23

24

25

1              (At the side bar)

2              THE COURT:  So now that the case is finally moving at

3      a reasonable pace, I'm of course tempted to sit until midnight

4      tonight so we can complete the case in its entirety.  But

5      getting to the point at hand, so you would be calling the agent

6      as a summary witness?

7              MR. McGINLEY:  It's the case agent, your Honor,

8      sitting at counsel table.

9              THE COURT:  Okay.  You haven't turned over the 3500?

10             MR. McGINLEY:  No.  He was not the witness for the

11     phone records.  He would be standing in the place of the phone

12     records.

13             THE COURT:  I see.

14             MR. NAFTALIS:  He is totally unprep'd.

15             THE COURT:  You keep tempting me with that.

16             MR. NAFTALIS:  Let's just say he's not dying to do it.

17             THE COURT:  Is there going to be an issue on the phone

18     records?

19             MR. CREIZMAN:  I don't think so.

20             THE COURT:  So why don't we do it and get it over

21     with.

22             MR. CREIZMAN:  I mean, I don't see much action going

23     on.  I'm not going to take my opportunity to cross-examine

24     Mr. Callahan on this occasion.

25             THE COURT:  Right.  There was one question that you

1  had raised with the Court that you wanted to put to him, if I

2  remember, that I had left open, which was:  Did you get some of

3  the tapes from my client, or words like, from my client's

4  counsel.

5          MR. CREIZMAN:  Yes.

6          THE COURT:  Okay.  I mean, if I am going to allow

7  that, we may as well take care of it now and not have to recall

8  him.  Right?  Are you going to be recalling him for any other

9  reason?

10         MR. CREIZMAN:  I don't think so, unless -- I mean,

11  unless there's some reason to.  If it comes up.

12         THE COURT:  To the best of your current --

13         MR. CREIZMAN:  Yes.  To the best of my current

14  knowledge.  I don't remember my --

15         THE COURT:  All right.  So I'm inclined to allow that

16  single question and answer to be asked, but if the government

17  wants to say anything further on it, now is your time.  Okay.

18         MR. WILLIAMS:  What is it?

19         MR. NAFTALIS:  I'm not clear what the relevance of it

20  is.

21         THE COURT:  The relevance is, he's going to argue,

22  that it's an indication of consciousness of innocence is what

23  this is.

24         MR. NAFTALIS:  We don't think that's fair.  The whole

25  point is this just opens the sort of door that he wants.  He

1    didn't volunteer to do anything until the FBI raided his

2    apartment.  So this is just sort of a backdoor into the whole

3    situation.

4              THE COURT:  So --

5              MR. NAFTALIS:  So we do object.

6              THE COURT:  Maybe the question would have to be two

7    parts.  Did the FBI raid your apartment?  Yes.  Did they take

8    some tapes?  Yes.  Were there some other tapes they didn't take

9    that you knew about?  Yes.  Did you subsequently provide them

10   to the -- I mean, this is to the agent.  Did he subsequently

11   provide them to you?  Yes.  Those would be the four questions.

12             MR. WILLIAMS:  Your Honor, we would just ask, under

13   these circumstances, given that we haven't been able to prepare

14   the agent either for his testimony or the possibility that he

15   was going to be asked these questions --

16             THE COURT:  All right.  I tell you what, we will just

17   ask him now for the phone records, and if we have to re-call

18   him, then we will.

19             MR. WILLIAMS:  Thank you, your Honor.

20             MR. CREIZMAN:  Thank you, your Honor.

21             (Continued on next page)

22

23

24

25

 1               (In open court)

 2               THE COURT:  All right.  Please call your next witness.

 3               MR. NAFTALIS:  Your Honor, the government calls

 4    Special Agent Matthew Callahan.

 5     MATTHEW CALLAHAN,

 6          called as a witness by the Government,

 7          having been duly sworn, testified as follows:

 8               THE COURT:  Please be seated.  State your full name

 9    and spell your last name.

10               THE WITNESS:  Matthew Callahan, C-a-l-l-a-h-a-n.

11               THE COURT:  Counsel.

12    DIRECT EXAMINATION

13    BY MR. NAFTALIS:

14    Q.  Agent Callahan, where do you work?

15    A.  The Federal Bureau of Investigation.

16               MR. WILLIAMS:  May I approach, your Honor?

17               THE COURT:  Yes.

18    Q.  What's your title at the FBI?

19    A.  I'm a special agent.

20    Q.  Are you assigned to any particular squad?

21    A.  Yes, I am.

22    Q.  What squad is that?

23    A.  It's called squad C1.

24    Q.  What does squad C1 work on?

25    A.  It's a white collar squad that specializes in securities

1    fraud.

2    Q.  How long have you been with the FBI for?

3    A.  Almost eight years.

4              MR. NAFTALIS:  Your Honor, at this time, I'd like to

5    read a stipulation.  It's Government Exhibit 1405.  It reads:

6    It is hereby stipulated and among the parties that on

7    February 26th, 2014, the Federal Bureau of Investigation

8    conducted a search, pursuant to a lawfully obtained search

9    warrant, of Stefan Lumiere's apartment located at 150 Central

10   Park South, Apartment 406, New York, New York, 10019.

11             During the course of that search, the FBI recovered

12   Government Exhibits 1000 through 1027.  It is further

13   stipulated and agreed that this stipulation may be received in

14   evidence at the trial.

15             We offer Exhibit 1405 and 1000 through 1027.

16             THE COURT:  Received.

17             (Government's Exhibits 1405 and 1000 through 1027

18   received in evidence)

19             MR. NAFTALIS:  Your Honor, we also have stipulated

20   with the defense that Government Exhibits 661 and 662 are

21   authentic, and we offer them.

22             THE COURT:  Received.

23             (Government's Exhibits 661 and 662 received in

24   evidence)

25             MR. NAFTALIS:  Ms. Meister, can you please bring up

1   Government Exhibit 1010 in evidence.

2   BY MR. NAFTALIS:

3   Q.  Where was this item recovered from, Agent Callahan?

4          THE COURT:  It's not on the screen yet.

5          MR. NAFTALIS:  Let's try it again.

6   Q.  Agent Callahan, where was this materiel recovered from?

7   A.  From Mr. Lumiere's apartment.

8          MR. NAFTALIS:  And if you could just zoom in on the

9   top.  Just the handwriting on the very stop.  Perfect.

10  Q.  What does it say there?

11  A.  It says:  March 2013, month-end, dictated by Plaford,

12  Chris.

13  Q.  Okay.  Let's look at the body of the piece of paper.

14         MR. NAFTALIS:  The middle portion, Ms. Meister,

15  please.

16  Q.  And do you see what is here?

17  A.  Yes, I do.

18  Q.  Generally, based on this investigation, what are these?

19  A.  These appear to be bonds.

20  Q.  And with prices?

21  A.  Yes.

22         MR. NAFTALIS:  Can we please bring up -- can the jury

23  please go to government 1209T in their binders.

24  Q.  Agent Callahan, you can see on the screen.  What is the

25  title of this call -- this recording, excuse me?

1    A.  Can you zoom in on the title, please.  CP levels to Prince.

2              MR. NAFTALIS:  Okay.  Can we please play that.  Is

3    everyone there?  It's 1209, everyone.

4              So let's play this.

5              (Audio played)

6              MR. NAFTALIS:  Okay.  Ms. Meister, can you bring up

7    1209T, which is the transcript of this, and put it side by side

8    with government about 1010 that we just looked at.  Go to the

9    first page of the transcript, and if we can just zoom in on the

10   top third of the -- go to 1010, please, and move it over so the

11   jury can see the transcript.  You can move it all the way over.

12   Have it just on the left-hand side of the blowup.

13             Well, the jury has the binder, so it will be fine.

14   Ms. Meister, can you reduce the zoom so that the Agent can see

15   the -- I just need the left-hand side where it says --

16             THE COURT:  I take it the question is, do the

17   notations in the handwriting correspond to what was said in the

18   tape?  Yes?

19             MR. NAFTALIS:  That was my attempt, your Honor.

20             THE COURT:  Yes.  So do they?

21             THE WITNESS:  Yes, they do.

22             MR. NAFTALIS:  Okay.  Then can we bring up --

23   Ms. Meister, let's bring down the transcript and bring up

24   Exhibit 658, page 44.

25   Q.  Again, reusing the Judge's question, do the prices in these

1   two documents correspond to each other?

2   A.  Yes, they do.

3   Q.  The e-mail, the Bloomberg on the right is from Scott

4   Vandersnow to Stefan Lumiere; is that right?

5          MR. NAFTALIS:  Ms. Meister, can you blow it up,

6   please?

7   A.  Yes, please.  Yes, it's from Scott Vandersnow.

8   Q.  Okay, great.  We can take all that down.

9          Agent Callahan, did there come a time when you were

10  asked to examine certain records in connection with an

11  investigation of Stefan Lumiere?

12  A.  Yes, I was.

13  Q.  What types of records, generally?

14  A.  Telephone records.

15  Q.  Okay.  Any other types of records?

16  A.  Bloomberg correspondence.

17  Q.  All right.  With respect to the phone records, what were

18  you asked to do?

19  A.  I was asked to identify any calls between Mr. Lumiere and

20  any of the three brokers we've discussed, as well as calls

21  between Mr. Plaford and Mr. Thorell and any of the three

22  brokers.

23  Q.  Were you also asked to identify phone numbers that

24  corresponded to these people?

25  A.  Yes.

1    Q.   How did you identify the phone numbers?

2    A.   Through e-mails and through talking with witnesses.

3              MR. NAFTALIS:  Can we bring up Government Exhibit --

4              Your Honor, we're going to just offer, to make it

5    faster, Government Exhibits 1 through 17.

6              THE COURT:  Received.

7              (Government's Exhibits 1 through 17 received in

8    evidence)

9              MR. NAFTALIS:  Thank you, your Honor.

10             Let's bring up Government Exhibit 6, for example.  Can

11   we zoom in on that.

12   BY MR. NAFTALIS:

13   Q.   So just generally, explain to the jury what's on this

14   exhibit?

15   A.   This is a table of the phone numbers that were identified

16   to be associated with Stefan Lumiere.

17   Q.   Okay.  For example, you have his cell phone number and his

18   work number, et cetera?

19   A.   Yes.

20   Q.   Okay.  You said you did it for other people, including

21   Mr. Vandersnow, Mr. Brook, Mr. O'Callaghan and others?

22   A.   Yes.

23             MR. NAFTALIS:  You can take that down.

24   Q.   You said you were asked to analyze or look for calls

25   between certain individuals?

1    A.  Yes.

2           MR. NAFTALIS:  Can you bring up Government Exhibit 12

3    in evidence, please, and let's just zoom in on the top half so

4    the jury can understand what this is.  Also, a little more on

5    the top, the title.

6    Q.  What is this, generally?

7    A.  This is a table that identifies all of the calls between

8    Stefan Lumiere and Scott Vandersnow.

9    Q.  How did you make this table?

10   A.  I went through his cell phone records, line by line, and

11   identified who the callers were.

12   Q.  So in this case, this exhibit summarizes phone calls

13   between Mr. Lumiere and Mr. Vandersnow, correct?

14   A.  Yes.

15   Q.  You basically went through the phone bills for these phone

16   numbers?

17   A.  Exactly.

18   Q.  Okay.  The columns are pretty self-explanatory?

19   A.  I think so.

20   Q.  We won't spend too much time on it.  You did the same for

21   between Mr. Lumiere and Mr. Brook, and Mr. Lumiere and

22   Mr. O'Callaghan, among others?

23   A.  Yes.

24   Q.  You can take that down.

25           And with respect to the Bloomberg e-mails, what were

1   you asked to do?

2   A.  I was asked to go through the Bloombergs and identify

3   e-mails between Mr. Lumiere and the three brokers at around the

4   period of month end.

5           MR. NAFTALIS:  So let's pull one up so we can see it.

6   For example, Government Exhibit 17, please.  Let's again,

7   Ms. Meister, you did it perfectly the last time.  There we go.

8   Q.  Explain to the jury what this is?

9   A.  This is a table that shows e-mail communications --

10  Bloomberg e-mail communications between Stefan Lumiere and

11  Scott Vandersnow.

12  Q.  So there's, obviously, date, time, from, to, and then just

13  to be clear, the subject is the re: line?

14  A.  Yes.

15  Q.  And the message is what's in the body of the Bloomberg?

16  A.  Exactly.

17  Q.  Okay.  Now, you said you were asked to look at

18  communications around month end?

19  A.  Yes.

20          MR. NAFTALIS:  Can we bring up Government Exhibit 12,

21  Ms. Meister, side by side with this?  We'll do it one at a

22  time.  Bring up Government Exhibit 12 and go to the entry for

23  September 30th, 2011.

24  Q.  Looking at the first one, at 1:28 p.m, Agent Callahan, this

25  is at the end of September; is that right?

1   A.  That's correct.

2   Q.  Who calls who in this case, and what phone numbers were

3   used?

4   A.  Mr. Lumiere on his personal cell phone calls

5   Mr. Vandersnow's cell phone.

6   Q.  Okay.  And that call lasts for how long?

7   A.  Nine minutes.

8   Q.  All right.  So if the call starts at 1:28, it goes until

9   approximately when?

10  A.  Approximately 1:37 p.m.

11  Q.  So let's keep September 30th at 1:37 in our head.

12          MR. NAFTALIS:  And, Ms. Meister, can you bring up

13  Government Exhibit 17 again, and let's look at the top portion,

14  all the way down, a little more.  Up at the beginning, between

15  1:30 p.m.  Go a little higher, Ms. Meister.  There you go.

16  Q.  From 1:30 p.m. and 1:44 p.m. on September 30th, how many

17  Bloomberg e-mails does Mr. Vandersnow send to Mr. Lumiere?

18  A.  Seven.

19  Q.  Again, what time did the phone call begin?

20  A.  I believe it was 1:28 p.m.

21  Q.  So the Bloombergs start coming while they're on the phone?

22  A.  Yes.

23  Q.  All right.  And the phone call ended at about what time?

24  A.  Approximately 1:37 p.m.

25  Q.  Okay.  Generally, what is reflected in the subject and the

1   messages of these?

2   A.  They are bonds.  The bonds are listed in the subject, and

3   then in the message, it's the bonds and their price quotes.

4           MR. NAFTALIS:  Ms. Meister, let's go back to

5   Government Exhibit 12.  Go to the next September 30th call.

6   Q.  Okay.  This one is at what time?

7   A.  3:21 p.m.

8   Q.  Again, Mr. Lumiere calls from his personal cell phone to

9   Mr. Vandersnow's cell phone, right?

10  A.  That's correct.

11  Q.  It lasts for how long?

12  A.  Three minutes.

13  Q.  So the call begins at 3:21 and ends at what time?

14  A.  Approximately 3:24 p.m.

15  Q.  Let's go back to Government Exhibit 17, please, and let's

16  look starting at the Bloomberg messages beginning at 3:22 p.m.

17  through 3:26 p.m.  It actually spills over; so we're going to

18  have to do two.

19          MR. NAFTALIS:  Let's start there, Ms. Meister.

20  Q.  So starting there, there are how many Bloombergs?

21  A.  Two.

22  Q.  They include broker quotes for ATI; is that right?

23  A.  Yes.

24  Q.  And one of the first SIZPLT?

25  A.  That's correct.

1              MR. NAFTALIS:  Going onto the next page, at the top

2     there, Ms. Meister, that would be great.

3     Q.  Okay.  And here there's another one; is that right?

4     A.  Yes.

5     Q.  Again, was this during the time period of the phone call?

6     A.  I believe it was just after the phone call.

7     Q.  Okay.  Now, did the same pattern -- is that how you

8     generally put together the pattern of the Bloomberg messages?

9     A.  Yes.

10    Q.  Okay.  So let's just skim through the Bloombergs, rather

11    than going back and forth.  Fair to say if we spent the time,

12    we could do that same exercise?

13    A.  It's fair to say, yes.

14    Q.  Let's just look at the Bloomberg messages.  Just show the

15    whole exhibit so the Agent can just read off the dates and

16    summarize what's there, but just scroll through it.

17              So on January 1st, can you estimate how many

18    securities are listed there that Mr. Vandersnow sends?

19    A.  You mean January 3rd?

20    Q.  Yes.  Then just keep scrolling for the jury, and we'll just

21    have the agent -- what's the date there?

22    A.  March 30th.

23    Q.  Okay.  Again, quotes for various securities?

24    A.  Yes.

25    Q.  These are all from Vandersnow to Lumiere?

1    A.  Yes.

2    Q.  Okay.  And then what's the next date?

3    A.  October 9th, 2012.

4    Q.  Keep scrolling.  February 4, 2013?

5    A.  Yes.

6    Q.  Okay.  You said this is just a selection you made?

7    A.  Yes.

8    Q.  Did you do the same thing with respect to Mr. Brook and

9    Mr. Lumiere?

10   A.  Yes, I did.

11   Q.  Let's just pull up Mr. Brook's quickly.  That's Government

12   Exhibit 16, and let's just look at the tops of this.

13   A.  Again, this is a table that shows certain Bloomberg e-mails

14   between Stefan Lumiere and Jonathan Brook.

15   Q.  Okay.  Let's, just to give an example of the Brook one,

16   let's go to Government Exhibit 10, please, and can you go to

17   the April 30th, 2012, section.  So just so the jury understands

18   the phone calls, that was your attempt to be comprehensive in

19   all the calls between the two individuals?

20   A.  From cell phone records, yes.

21   Q.  Okay.  And the Bloombergs are just a selection?

22   A.  Correct.

23          (Pause)

24   Q.  We're almost there.  Perfect.  Do you see a call that is at

25   10:23 p.m.?  Let's zoom in on those three April 30th calls.

1    Right there, perfect.  Okay.

2            So what are the three calls that are there, Agent

3    Callahan?

4    A.  The first call was at 10:23 a.m., the second call was at

5    11:33 a.m. and the third call is at 11:37 a.m.

6    Q.  So the first one, Mr. Lumiere uses his work cell phone to

7    call Mr. Brook; is that right?

8    A.  That's correct.

9    Q.  Then he switches over to his personal cell phone; is that

10   right?

11   A.  That's correct.

12   Q.  For the next two calls?

13   A.  Yes.

14   Q.  Those calls, basically one of them is from 11:33, is four

15   minutes; so that goes through what time?

16   A.  Approximately 11:37 a.m.

17   Q.  And then they pick up again with another call?

18   A.  Yes.

19   Q.  Let's go to Government Exhibit 16, please, and let's go at

20   the very top.  You see there's an e-mail to Bloomberg, those

21   top two?

22   A.  Yes.

23   Q.  And what do we see here at 11:43?

24   A.  There's an e-mail from Jonathan Brook to Jason Lumiere and

25   Jason Thorell.

1    Q.  How soon after those series of phone calls is the first

2    message sent?

3    A.  Approximately five or six minutes.

4    Q.  Okay.  And what's the subject of this e-mail?

5    A.  Janney month-end closing indicative levels, April 30th,

6    2012.

7    Q.  We see quotes, for example, for Nebraska, ATI, Sevan and

8    C-Med; is that correct?

9    A.  I do not see C-Med there, but that is accurate.

10   Q.  Below that.

11   A.  Oh, below that, in the next e-mail, yes.

12   Q.  If we went back and forth, would we see a similar pattern?

13   A.  Yes.

14   Q.  Where there are Bloomberg messages following or shortly

15   after phone calls?

16   A.  Yes.

17   Q.  Who generally initiated these phone calls?

18   A.  Mr. Lumiere.

19   Q.  Using what type of phone?

20   A.  His personal cell phone.

21   Q.  Calling Mr. Brook on what type of phone?

22   A.  His cell phone.

23          MR. NAFTALIS:  Ms. Meister, can you just zoom out and

24   just scroll through this so the jury just gets a general sense

25   of this exhibit.

1    Q.  And again, this was just a selection?

2    A.  Yes.

3              MR. NAFTALIS:  One second, your Honor.

4              No further questions.

5              THE COURT:  Cross-examination.

6              MR. CREIZMAN:  No questions, your Honor.

7              THE COURT:  Very good.  Thank you very much.  You may

8    step down.

9              (Witness excused)

10             THE COURT:  All right.  So, ladies and gentlemen, of

11   course it goes against my grain to let you go five minutes

12   early, but it is Friday.

13             A couple of things.  First, I want to point out that

14   we have made great progress this afternoon, and you should know

15   that's due to the very excellent efforts of counsel for both

16   sides, who are really excellent attorneys and have helped this

17   along.

18             We are now fully back on schedule.  But, of course, to

19   remain on schedule, we need you to be here at 9:00 a.m. but not

20   on Monday, which is a holiday, but on Tuesday.  So have a very

21   good weekend.  Do not discuss the case.  Don't even think about

22   the case, and why would you?  But we will see you again at 9:00

23   on Tuesday, and you're excused until then.  Thanks so much.

24             (Jury excused)

25             THE COURT:  Please be seated.  All right.  So anything

H1DPLUM7                        Callahan - Direct

1    further that counsel needs to raise with The court?  Okay.

2    Just so I know the lineup for Tuesday, who's the first witness

3    on Tuesday?

4              MR. WILLIAMS:  Your Honor, to be perfectly honest, we

5    are editing on the fly here, trying to move things around.

6              THE COURT:  That's fine and much appreciated.  Just be

7    sure that you send, via e-mail to your adversary and to the

8    Court sometime on Monday what the lineup will be on Tuesday so

9    that everyone will know.

10             MR. WILLIAMS:  We will, your Honor.

11             THE COURT:  Very good.  Have a good weekend, and we'll

12   see you Tuesday.

13             (Adjourned until 9:00 a.m. on Tuesday, January 17,

14   2017)

15

16

17

18

19

20

21

22

23

24

25

```
1                     INDEX OF EXAMINATION

2    Examination of:                           Page

3    CHRISTOPHER WIESE
     Direct By Mr. Williams . . . . . . . . . . . 333
4    Cross By Ms. Shoffel . . . . . . . . . . . . 349

5    JASON THORELL
     Direct (Resumed) By Mr. Naftalis . . . . . . 350
6    Cross By Mr. Creizman . . . . . . . . . . . 405

7    DAVID SCOTT VANDERSNOW
     Direct By Mr. Williams . . . . . . . . . . . 476
8    Cross By Mr. Creizman . . . . . . . . . . . 508

9    MATTHEW CALLAHAN
     Direct By Mr. Naftalis . . . . . . . . . . . 517

10

11                    GOVERNMENT EXHIBITS

12   Exhibit No.                            Received

13    800 through 808, 817 through 819, 809 . . . . 334

14           through 815

15   1402    . . . . . . . . . . . . . . . . . . 335

16   1403    . . . . . . . . . . . . . . . . . . 451

17   738    . . . . . . . . . . . . . . . . . . 493

18   1209T and 1227T   . . . . . . . . . . . . . 496

19   1406, 739 through 741   . . . . . . . . . . 503

20   1405 and 1000 through 1027   . . . . . . . . 518

21   661 and 662   . . . . . . . . . . . . . . . 518

22   1 through 17 . . . . . . . . . . . . . . . . 522

23                     DEFENDANT EXHIBITS

24   Exhibit No.                            Received

25    206    . . . . . . . . . . . . . . . . . . 454
```