UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| - v. - | : | 16 Cr. 483 (JSR) |
| STEFAN LUMIERE, | : | |
| Defendant. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S SENTENCING MEMORANDUM

JOON H. KIM
Acting United States Attorney
Southern District of New York
Attorney for the United States of America

Ian McGinley
Damian Williams
Joshua A. Naftalis
Assistant United States Attorneys
- Of Counsel -



U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

May 16, 2017

**BY ECF FILING AND HAND DELIVERY**

The Honorable Jed S. Rakoff
United States District Judge
Southern District of New York
500 Pearl Street, Room 1340
New York, New York 10007

    Re:    *United States* v. *Stefan Lumiere*
             **16 Cr. 483 (JSR)**

Dear Judge Rakoff:

      The Government respectfully submits this letter in connection with the May 31, 2017 sentencing of defendant Stefan Lumiere (the "defendant" or "Lumiere").  As set forth herein, consistent with the position of the United States Probation Office, the Government believes that the applicable sentencing range under the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") is 135 to 168 months' imprisonment.  While under the particular circumstances of this case the Government does not oppose a sentence that includes a term of imprisonment below this range, the Government does strongly believe that a sentence that includes a substantial term of imprisonment is reasonable, appropriate, and necessary given the nature and seriousness of the offense.  As discussed below, such a sentence is sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing

## FACTUAL BACKGROUND

**A.**    **Procedural History**

      On June 15, 2016, Lumiere was arrested on a three-count Complaint charging him with conspiracy to commit securities and wire fraud, securities fraud, and wire fraud, in violation of 15 U.S.C. §§ 78j(b), 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. §§ 371, 1343, and 2.  On July 14, 2016, an Indictment was returned charging Lumiere with these same offenses.

      On January 11, 2017, trial commenced against Lumiere.  On January 19, 2017, the trial concluded when the jury found Lumiere guilty on all counts of the Indictment.

The Honorable Jed S. Rakoff
May 16, 2017
Page 2

**B.     The Offense Conduct**[1]

Lumiere served as an analyst and portfolio manager at Visium Capital Management ("Visium"). From June 2011 until he left Visium in April 2013, Lumiere participated in a scheme to defraud investors in Visium's Credit Fund by deceiving them about how the Credit Fund's monthly net asset value ("NAV") would be calculated, and exploiting that deception to report fraudulently inflated performance results to investors.

By way of background, at all relevant times, Visium was a hedge fund manager and an investment advisor registered with the Securities and Exchange Commission ("SEC"). PSR ¶ 11. Visium's Credit Fund invested principally in bonds, bank debt, and other credit instruments. PSR ¶ 11. Christopher Plaford was the senior portfolio manager for the Credit Fund. PSR ¶ 12. Lumiere was a senior analyst and also a portfolio manager, responsible for between $50 and $100 million of the Credit Fund's portfolio. PSR ¶ 13. Jason Thorell was the main trader for the Credit Fund and executed trades for Plaford and Lumiere. Tr. 241-42.

In 2011, the Credit Fund's performance began to suffer, in part because Lumiere's investments were losing money. PSR ¶ 26. For that reason, Lumiere initially suggested to Plaford that they mismark certain securities in Lumiere's portfolio. *Id*. Over time, Lumiere, Plaford and Thorell mismarked securities throughout the Credit Fund. *Id*. The goal of the scheme was two-fold: (a) to inflate the Credit Fund's NAV, which represented the aggregate market value of each of its holdings minus its liabilities; and (b) to mislead investors about the liquidity of the Credit Fund's holdings. PSR ¶ 21. As established at trial, the NAV was a key metric by which Visium reported its performance to investors. Tr. 60, 662-63. Liquidity was also important to investors, who strongly preferred that the Credit Fund not hold illiquid assets designated as "Level 3" under Accounting Standard Codification 820. Tr. 663, 703-04.[2]

Plaford and Lumiere were incentivized to increase the Credit Fund's NAV because the higher the NAV, the higher their compensation could be. Tr. 248, 664. Lumiere received 3% to 5% of the profits he made on his positions in the Credit Fund. PSR ¶ 38. In contrast, poor performance would have resulted (and ultimately did result) in Lumiere's termination. Tr. 248, 658, 664, 769-70, 780. Additionally, a higher NAV encouraged further investment and deterred existing investors from exercising their redemption rights.

To implement this scheme, Lumiere and Plaford obtained inflated price quotes from hand-picked corrupt brokers. It was Lumiere's primary responsibility to dictate the prices that he wanted the friendly brokers to send back to him. PSR ¶ 30. Lumiere personally selected and corrupted the two main brokers used for this purpose: Scott Vandersnow of Princeridge and

---

[1] The information provided in the offense conduct section herein is reflected in paragraphs 11 to 68 of the Presentence Investigation Report ("PSR"), and is also derived from testimony and exhibits admitted at the trial.

[2] Level 3 assets are generally illiquid and not traded in active markets.

The Honorable Jed S. Rakoff
May 16, 2017
Page 3

Jonathan Brook of Janney Montgomery Scott. Tr. 285, 293-94, 305, 483, 680-81. Both brokers were personal friends with Lumiere and worked at firms that did not usually trade the type of securities the Credit Fund held, and thus could not realistically be counted on for objective price quotes. Tr. 314-15, 351; GX 1224; PSR ¶¶ 30-31. Later, at Lumiere's suggestion, Thorell located a third corrupt broker, Matthew O'Callaghan of Odeon Capital Management, who was selected because he worked at another "bucket shop." Tr. 306-09; PSR ¶ 35. As part of the scheme, Lumiere directed Thorell to steer more business to the brokers providing the inflated sham prices. PSR ¶ 36.

Mindful of the wrongful nature of his conduct, Lumiere often used surreptitious means to get these favorable quotes from the friendly brokers. To avoid detection, Lumiere frequently used his personal cell phone to call either Vandersnow or Brook on their personal cell phones, because Lumiere did not want the calls to occur on phone lines that might be recorded by the brokers' employers. PSR ¶¶ 30, 34. On at least two occasions, Lumiere also couriered a thumb drive containing suggested bogus price quotes for hundreds of securities, once to Vandersnow and once to O'Callaghan. PSR ¶ 32.

Lumiere and Plaford also mismarked the value of securities held by the Credit Fund by "painting the tape" – that is, they intentionally paid more than necessary for certain bonds so that they could use that elevated price to mark the value of the Credit Fund. PSR ¶¶ 56-60. Specifically, on at least two occasions, Plaford and Lumiere purchased China Med 4% bonds over their prevailing market price. PSR ¶ 57. These bonds were in Lumiere's portfolio and he found the broker to execute these above market trades.

Investors were misled and harmed as a result of Lumiere's scheme. This was not how the valuation process was supposed to work. Visium represented to investors that it would use independent prices from external sources. GX 906. Visium also represented to investors that the pricing function would be carried out independent of the trading function – meaning that the defendant and Plaford would not be marking their own performance. GX 906. As a portfolio manager, Lumiere was well aware of these representations to investors and Lumiere himself certified repeatedly that he was in compliance with Visium's policies on the proper valuation of securities. GX 1120.

Investors also lost money. Based on documentation provided by Visium, the Government has calculated the loss suffered by investors who invested in the Credit Fund after the defendant's fraud began to be greater than $9,500,000 but less than $25,000,000. Relatedly, by the time the Credit Fund went bust in around June 2013, investors had overpaid $3,156,409 in fees as a result of the mismarking scheme ($533,700 in management fees and $2,622,709 in performance fees).[3] Two of these investor victims testified at trial: Morgan Stanley AIP and William Blair. Morgan Stanley AIP lost approximately $5 million; William Blair lost approximately $500,000. PSR ¶

---

[3] The management fees went to Visium's CIO Jacob Gottlieb; a portion of the performance fees went to Plaford to be distributed among the Credit Fund team. Tr. 653-54.

The Honorable Jed S. Rakoff
May 16, 2017
Page 4

65. These investors also testified that they would not have invested in the Credit Fund had they known about the defendant's misrepresentations.

In recordings he made of himself, the defendant discussed his brazen scheme and his blatant disregard for the law. In one of these conversations, he tells a friend not to tell anyone about "the way Visium portrays it's P&L," about the "fucking mismarking of the book." GX 1231. In another conversation, the defendant also stated that, based on his knowledge of the mismarking fraud at Visium, he could extort Plaford and Visium's CIO Jacob Gottlieb for $100 million. GX 1222.

## APPLICABLE LAW

The advisory Sentencing Guidelines promote the "basic aim" of Congress in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways." *United States* v. *Booker*, 543 U.S. 220, 252 (2005). Thus, the Guidelines are more than "a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge." *United States* v. *Crosby*, 397 F.3d 103, 113 (2d Cir. 2005). The applicable Sentencing Guidelines range "will be a benchmark or a point of reference or departure" when considering a particular sentence to impose. *United States* v. *Rubenstein*, 403 F.3d 93, 98-99 (2d Cir. 2005). In furtherance of that goal, a sentencing court is required to "consider the Guidelines 'sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant,' the pertinent Sentencing Commission policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims." *Booker*, 543 U.S. at 259-60 (citations omitted).

Along with the Guidelines, the other factors set forth in Section 3553(a) must be considered. Section 3553(a) directs the Court to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes set forth in paragraph two. That sub-paragraph sets forth the purposes as:

>  (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> 
>  (B) to afford adequate deterrence to criminal conduct;
> 
>  (C) to protect the public from further crimes of the defendant; and
> 
>  (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. . . .

The Honorable Jed S. Rakoff
May 16, 2017
Page 5

Section 3553(a) further directs the Court – in determining the particular sentence to impose – to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a).

The Second Circuit has instructed that district courts should engage in a three-step sentencing procedure. *See Crosby*, 397 F.3d at 103. First, the Court must determine the applicable Sentencing Guidelines range, and in so doing, "the sentencing judge will be entitled to find all of the facts that the Guidelines make relevant to the determination of a Guidelines sentence and all of the facts relevant to the determination of a non-Guidelines sentence." *Crosby*, 397 F.3d at 112. Second, the Court must consider whether a departure from that Guidelines range is appropriate. *Id*. Third, the Court must consider the Guidelines range, "along with all of the factors listed in section 3553(a)," and determine the sentence to impose, whether it be a Guidelines or non-Guidelines sentence. *Id.* at 113. In so doing, it is entirely proper for a judge to take into consideration his or her "own sense of what is a fair and just sentence under all the circumstances." *United States* v. *Jones*, 460 F.3d 191, 195 (2d Cir. 2006).

## DISCUSSION

As discussed below, the Government respectfully submits that after applying the sentencing factors set forth in 18 U.S.C. § 3553(a) to Lumiere's conduct, a sentence that includes a substantial term of imprisonment is reasonable and appropriate.

A.   **Application of the Sentencing Guidelines**

1.   **The PSR's Calculation**

The Government agrees with the Guidelines calculation set forth in the PSR. Pursuant to Section 3D1.2(d) of the Guidelines, Counts One through Three are grouped together. PSR ¶ 74. Because the offense of conviction is fraud-related, Section 2B1.1 of the Guidelines determines the applicable offense level.

As set forth in more detail below, under Section 2B1.1, the PSR calculates the defendant's offense level as follows:

- The base offense level is seven (§ 2B1.1(a)(1));

- Because the loss exceeded $9,500,000 but did not exceed $25,000,000, the base offense level is increased by 20 offense levels (§ 2B1.1(b)(1)(K));

- Because the offense involved 10 or more victims, the base offense level is

The Honorable Jed S. Rakoff
May 16, 2017
Page 6

        increased by two levels (§ 2B1.1(b)(2)(A)(i));

- Because the offense involved a violation of securities law and, at the time of the offense, the defendant was a an investment adviser, or a person associated with an investment adviser, the base offense level is increased by four levels (§ 2B1.1(b)(19)(A);

Accordingly, Lumiere's total offense level is 33. PSR ¶ 82. Although Lumiere has been arrested on two occasions, he has no prior criminal convictions and is thus in Criminal History Category I. PSR ¶¶ 86-95. Accordingly, the Guidelines sentencing range is 135 to 168 months' imprisonment. PSR ¶ 138.

The PSR recommends that Lumiere be sentenced to 135 months' imprisonment. PSR at 38. In its sentencing recommendation, the Probation Office notes that it disagrees with "defense counsel's contention that the applicable guideline range is vastly disproportionate to Lumiere's role in the offense." PSR at 39. Rather, Lumiere "was an active participant in the fraud, which caused a loss of more than $23 million to investors." *Id*. The Probation Office concludes that "[b]ased on the nature of the fraud, we infer that financial gain was the impetus for his conduct, which, considering that he was a well-compensated employee of Visium, suggests that he was motivated by greed." *Id*.

    **2.**    **Defendant's Objections to the PSR's Guidelines Calculation**

As noted in the defendant's objections to the PSR, the defendant contests Guidelines enhancements for (1) loss amount, (2) number of victims, and (3) the defendant being associated with an investment adviser at the time of the offense.

    **a.**    **Loss amount**

The defendant claims that the loss amount is both unsubstantiated and overstated. On March 15, 2017, the Government provided its loss calculations to defense counsel. Later, on April 4, 2017, the Government provided to defense counsel the underlying documentation, which consisted of spreadsheets from Visium. These documents show that the loss fairly attributable to the defendant is greater than $9,5000,000 but less than $25,000,000  This number represents the performance of investments made after the fraud began, based on the defendant's misrepresentations, and the amount of money these investments lost when the Credit Fund was shut down. The Government's basis for calculating this loss amount is straightforward: no investors would have invested in the Credit Fund had they known of the fraud.

Specifically, by virtue of the fraud, investors were induced to purchase a security – units in a hedge fund – that was in reality far different from the one described to them. In short, the fund was far more illiquid and worth far less than represented, and, critically, marks for the individual securities held by the fund were made up by self-interested insiders, rather than provided in good faith by independent external sources.

The Honorable Jed S. Rakoff
May 16, 2017
Page 7

The Government theory of loss is supported by common sense, the trial record, and the relevant case law. *See United States* v. *Balboa*, 622 F. App'x 31, 32 (2d Cir. 2015) (summary order) (in hedge fund mismarking case, rejecting Balboa's challenge to the loss determination, "which was based on the total sum of money that victims of Balboa's scheme were fraudulently induced to invest in the Hedge Fund"). The defendant's misrepresentations about the inflated value of the Credit Fund, and the methods that were to be utilized to ensure fair and accurate valuation, fraudulently induced investors to invest. Had investors known the truth, they obviously would not have invested. The Morgan Stanley AIP and William Blair witnesses both testified to that. In *Balboa*, a similar mismarking case, the Second Circuit rejected the argument — also advanced by the defendant here — that outside economic factors, "rather than his fraudulent scheme, was the ultimate cause of the victims' loss and therefore, the actual loss attributable to the fraud was $0." *Id*. Instead, the Court found the defendant responsible for all losses on principal invested after the fraud began. *Id*. This is because "[t]he guidelines provide that when an investor puts money into a fraudster's hands, and ultimately receives nothing of value in return, his loss is measured by the amount of principal invested . . ." *United States* v. *Hsu*, 669 F.3d 112, 121 (2d Cir. 2012); *see also United States* v. *Stitsky*, 536 F. Appx' 98, 112 (2d Cir. 2013) ("[T]he district court reasonably determined that no offset was warranted for losses resulting from changed economic circumstances because . . . investors would not have been exposed to such risks had defendants not fraudulently induced them to invest in the first place.").

In addition, two victims testified about their losses. These losses were undisputed at trial. Thus, the total loss amount is $23,422,874.77. PSR ¶ 69. Accordingly, there is a 20 level increase in the offense level, pursuant to U.S.S.G. § 2B1.1(b)(1)(K).

        **b.**      **Number of victims**

The defendant contends there are no identifiable victims for the same reason there is no loss – namely that any loss on investments in the Credit Fund was unrelated to the defendant's scheme. As noted above, the defendant is wrong. Based on the above, the Government has identified 15 victims. Because the offense involved 10 or more victims, the base offense level is properly increased by two levels.

        **c.**      **Investment Adviser Enhancement**

The defendant contends that this enhancement is inapplicable because the defendant did not discuss with or contact investors or clients to review valuation, and, according to the defendant, received no compensation in connection with the Credit Fund while he was committing his crimes. PSR at 34-35. The defendant is wrong, both legally and factually. First, it does not matter that the defendant himself did not directly interact with investors. The enhancement applies to a defendant "associated with an investment adviser" who violates the securities laws. U.S.S.G. § 2B1.1(19)(A)(iii). Under the Investment Advisers Act of 1940, "a person associated with an investment adviser" includes "any employee of such investment adviser," excluding clerical or ministerial staff. 15 U.S.C. § 80b-2(a)(17). It is undisputed that, at

The Honorable Jed S. Rakoff
May 16, 2017
Page 8

the time of these offenses, Visium was a registered investment adviser and that the defendant was a senior member of the Credit Team.  Further, as the jury found, the defendant knew that the mismarked values he dictated and received would ultimately go to investors and would be relied upon by these investors.  Second, the defendant benefitted financially from the crimes — because of his fraud, he kept a plum job paying him approximately $200,000 a year.  Tr. 101.[4]

### 3. Applicable Guidelines Range

Because the defendant's offense level is 33 and his Criminal History Category is I, the applicable Guidelines range is 135 to 168 months' imprisonment, as the PSR provides.[5]

### B. The Section 3553(a) Factors

For the reasons set forth herein, the Government believes that a sentence within the Guidelines range is reasonable and appropriate given the factors set forth in 18 U.S.C. § 3553(a).

### 1. Nature and Circumstances of the Offense

For over two years, Lumiere systematically engaged in deceptive conduct that defrauded the Credit Fund's investors out of millions of dollars.  These investors included "fund of funds" that invested money on behalf of others, such as endowments and pension funds.  Tr. 848, 873.  Two of these victim investors testified at trial that they never would have entrusted their money with the Credit Fund had they known that Lumiere and his co-conspirators were falsely inflating

---

[4] In this way, the defendant is not like the defendant in *United States* v. *Regensberg*, 635 F. Supp. 2d 306, 311-12 (S.D.N.Y. 2009), where the Court found that this enhancement did not apply because the defendant in that case did not receive any compensation for his crimes.  Further, at the time *Regensberg* was decided, this enhancement did not apply to persons "associated with an investment adviser," only to actual investment advisers.  In 2003, the Sentencing Commission amended the Guidelines to expand the scope of the enhancement to those associated with investment advisors, which plainly captures the defendant's conduct here.  *See United States* v. *Longo*, 184 F. App'x 910, 915 (11th Cir. 2006) (holding that because the undisputed facts establish that Longo violated a securities law and was a person associated with an investment advisor, the district court did not err in applying the enhancement).

[5] Even if the Court were to reject the PSR's and the Government's position on loss, and find that loss is not readily calculable — which the Government respectfully submits it should not do — "gain resulting from the offense" (U.S.S.G. § 2B1.1, App. Note (3)(B)) is approximately $3,156,409, warranting a 16-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(1)(I).  That the defendant's fraud generated these excess management and performance fees was undisputed at trial.  The Government's summary witness testified to this number and it is reflected in the summary chart admitted during the summary witnesses' testimony.  Tr. 927; GX 18, p. 35.  It is undisputed that the Credit Fund had well over ten investors.  *See* GX 760-A though GX 760-K (listing investors and their performance).  Thus, using gain as a measure of loss would result in an adjusted offense level of 29 and a Guidelines range of 87 to 108 months' imprisonment.

The Honorable Jed S. Rakoff
May 16, 2017
Page 9

the fund's performance. Lumiere committed his crimes not out of desperation but to keep his well-paying job and protect his professional reputation. Lumiere's serious criminal conduct therefore speaks to his arrogance and willingness to enrich himself and to enhance falsely his own performance record to the detriment of his investors.

Significantly, Lumiere initially conceived of the scheme when his own investments began performing poorly. He found the corrupt brokers; he spoke with them on his personal cellphone to avoid detection; and he sent the brokers thumb drives containing hundreds of bogus broker quotes. Lumiere's criminal conduct was carefully conceived and involved a series of manipulative acts over a lengthy period of time. Indeed, throughout the course of the scheme, Lumiere continuously instructed Vandersnow and Brook what marks they should provide — including for securities they did not actively trade in. Accordingly, Lumiere's conduct weighs heavily in favor of a substantial term of imprisonment.

2.      **History and Characteristics of the Defendant**

Lumiere's history and characteristics also support a substantial term of imprisonment in this case.

Unlike many criminals who come before the Court with difficult backgrounds, Lumiere has enjoyed significant advantages in life. He comes from a stable, loving, and providing family. PSR ¶¶ 96-97. He is well educated and has had well-paying jobs and employment opportunities on Wall Street that others have not. PSR ¶¶ 126-131. Notwithstanding this privileged background, Lumiere turned to fraud and deceit in 2011. This was a path Lumiere clearly did not have to take given his background, family, and resources, including a total current net worth of almost $2 million. PSR at 24. Instead, it was a path he chose out of greed and self-interest.

Further, as discussed above, Lumiere's criminal conduct was not an isolated, aberrant act, or the result of following orders. Lumiere came up with the idea to commit the fraud. Lumiere's crimes were committed through a series of deceptive acts, including the use of friendly brokers that he found to regurgitate favorable prices to him, over an extended period of time. Accordingly, and on this record, Lumiere's history and characteristics militate in favor of a substantial term of imprisonment.

3.      **Need to Afford Adequate Deterrence**

Under Section 3553(a), the need for a sentence to "afford adequate deterrence to criminal conduct," 18 U.S.C. § 3553(a)(2)(B), must also be considered. This factor also strongly counsels in favor of a substantial sentence.

The legislative history of 18 U.S.C. § 3553 demonstrates that "Congress viewed deterrence as 'particularly important in the area of white collar crime.'" *United States* v. *Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (citing S. Rep. No. 98-225, at 76 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3259); *see also United States* v. *Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006)

The Honorable Jed S. Rakoff
May 16, 2017
Page 10

(deterrence of white-collar crime is "of central concern to Congress").  As the *Martin* Court noted:  "Congress was especially concerned that prior to the Sentencing Guidelines, '[m]ajor white collar criminals often [were] sentenced to small fines and little or no imprisonment. Unfortunately, this creates the impression that certain offenses are punishable only by a small fine that can be written off as a cost of doing business.'" *Martin*, 455 F.3d at 1240 (citation omitted).

Indeed, general deterrence is an important sentencing factor in fraud and white-collar cases because it is effective.  *See Martin*, 455 F.3d at 1240 ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence.") (internal quotation marks and citation omitted).  Unlike defendants in a firearms or drug case, who often act without reflection, there is reason to believe that individuals who engage in financial fraud can be deterred by a substantial threat of penalties.  Their actions are calculated.  They choose to engage in such white-collar crime because they believe that the potential for significant financial benefits outweighs the risk that they will be punished.  General deterrence is achieved by sending a message that such outrageous acts of fraud will result in real penalties.  This Court's sentence should send the important message that when you get caught for engaging in fraud, you will go to prison. Moreover, the deliberate nature of fraud often renders it more difficult to uncover because individuals engaged in fraud often take affirmative steps to conceal their conduct.  Accordingly, additional sanctions are necessary to counterbalance the lower risk of apprehension.

Deterrence also works.  As at least one study has found:  "Our findings provide credible evidence that a one-month increase in expected punishment lowers the probability of committing a crime.  This corroborates the theory of general deterrence."  *See* Francesco Drago, Roberto Galbiati & Pietro Vertova, "The Deterrent Effects of Prison: Evidence from a Natural Experiment," Vol. 117, No. 2 J. POL. ECON. 257, 278 (Univ. of Chicago) (2009).  Any defense argument that deterrence does not require lengthier terms of incarceration for more culpable conduct conflicts with Congress's directive to the Sentencing Commission to consider, among other things, the deterrent effects of the "length of a term of probation, imprisonment, or supervised release."  28 U.S.C. § 994(c).  Further, such a defense argument would counsel in favor of similarly short sentences in all fraud cases, regardless of the size and scope of the fraud, which would directly frustrate proportionality, an important goal of sentencing.  *See Booker*, 543 U.S. at 264.

Here, the Government respectfully submits that a substantial sentence is necessary to serve general deterrence.  There are financial professionals in this and other jurisdictions who are similarly situated to Lumiere.  Those professionals are equally well-situated to exploit their positions, lie to investors and clients, and deceive for personal gain.  Imposing a substantial sentence in this case will deter others from engaging in similar fraudulent schemes and send an appropriate message that this type of fraud will not be countenanced.  Anything but a serious sentence will send a message to those executives, entrepreneurs, or financial professionals that there is a high potential upside to manipulating a fund's reported performance, but limited downside if one's fraud is uncovered.

The Honorable Jed S. Rakoff
May 16, 2017
Page 11

Accordingly, pursuant to 18 U.S.C. § 3553(a)(2)(B), the need for general deterrence militates in favor of a substantial term of imprisonment for Lumiere's conduct.

**C.     Restitution and Forfeiture**

The Government has identified 15 victims of Lumiere's fraud and those victims are entitled to restitution.

The Mandatory Victims Restitution Act, 18 U.S.C. § 3663A ("MVRA"), applies to the offense at issue because Lumiere's offenses against property were committed by fraud or deceit. *See* 18 U.S.C. § 3663A(c)(1)(A)(ii). The MVRA provides that, regardless of a defendant's economic circumstances, the Court, in its order of restitution, "shall order restitution to each victim in the full amount of each victim's losses as determined by the court." 18 U.S.C. § 3664(f)(1)(A); *see United States* v. *Coriaty*, 300 F. 3d 244, 253 (2d Cir. 2002) (observing "the statutory focus on the victim's losses and upon making victims whole").

Restitution may only be ordered "for losses that [were] . . . directly caused by the conduct composing the offense of conviction," *United States* v. *Silkowski*, 32 F.3d 682, 689 (2d Cir.1994), and then, only for the victim's "actual loss," *United States* v. *Germosen*, 139 F.3d 120, 130 (2d Cir.1998); *see also United States* v. *Carboni*, 204 F.3d 39, 47 (2d Cir. 2000).[6] As a Court in this District has stated, "Restitution is limited to the out-of-pocket loss that resulted from the offense on which a defendant is convicted ... [b]y contrast, 'loss' under the Sentencing Guidelines is a broader concept, and encompasses all relevant conduct." *Contino* v. *United States*, 2007 WL 4591999, at *11 (S.D.N.Y. Dec. 28, 2007).

The Government bears the burden of demonstrating the loss amount sustained by the victim as a result of the offense. 18 U.S.C. § 3664(e). Any dispute as to the proper amount or type of restitution is to be resolved by the court by a preponderance of the evidence. *Id.* "Findings of the amount of loss may be based upon reasonable estimates." *United States* v. *Agate*, 613 F. Supp. 2d 315, 323 (E.D.N.Y. 2009) (citing *United States* v. *Uddin*, 551 F.3d 176, 180 (2d Cir. 2009)); *United States* v. *Fogel*, 494 F. Supp.2d 136, 138-39 (D. Conn. 2007) (accepting restitution methodology that "reasonably approximate[d]" actual loss). At the same time, however, a restitution award must be based on "more than mere speculation about a victim's actual loss." *United State* v. *Donaghy*, 570 F. Supp. 2d 411, 423 (E.D.N.Y. 2008).

---

[6] Actual loss is defined under the Sentencing Guidelines as "the reasonably foreseeable pecuniary harm that resulted from the offense." U.S. Sentencing Guidelines Manual § 2B1.1, cmt. n. 3(A)(i) (2012). Reasonably foreseeable pecuniary harm means harm "that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." *Id.* n. 3(A)(iv).

The Honorable Jed S. Rakoff
May 16, 2017
Page 12

The process of determining restitution is not intended to, and should not, overwhelm the sentencing proceeding itself. The MVRA explicitly provides that, not only may courts employ reasonable approximations to calculate restitution, but also that courts need not impose restitution at all if the calculations would require unduly complicated determinations of fact. *See* 18 U.S.C. § 3663A(c)(3). In imposing restitution, courts should also take into account principles of fairness and proportionality with respect to each defendant. *Fogel*, 494 F. Supp. 2d at 139.

A district court's order of restitution is reviewable generally for abuse of discretion, and the court's findings of fact are reviewable for clear error. *See United States* v. *Reifler*, 446 F.3d 65, 120 (2d Cir. 2006).

As discussed above, the victims of Lumiere's fraud are those individuals who invested in the Credit Fund after the fraud began in June 2011 based on Visium's misrepresentations, as well as the trial testimony of two victim witnesses. The Government is assembling a schedule of those victims who are entitled to restitution under the MVRA, which will be submitted to the Court before sentencing.

Finally, the Government submits that forfeiture is mandatory in this case. As set forth in the proposed Preliminary Order of Forfeiture/Money Judgment (the "Forfeiture Order," attached as Exhibit A), Lumiere should be ordered to forfeit $2,622,709, representing the amount of excess fees that Lumiere and his co-conspirators gained from the offense. GX 18, at 35. Although Lumiere did not receive all of this money, it is clear from the trial testimony that these fees were paid to Visium and shared with Plaford, one of Lumiere's co-conspirators and the leader of the Credit Fund. Such a forfeiture order is consistent with the principles laid out in *United States* v. *Contorinis*, 692 F.3d 136, 145 (2d Cir. 2012), and its progeny. In *Contorinis*, the Second Circuit held that, while a defendant cannot be ordered to forfeit profits that he never received or possessed, a defendant may still be ordered to "forfeit proceeds received by others who participated jointly in the crime." *Contorinis*, 692 F.3d at 147. Here, unlike in *Contorinis*, the property at issue was under the control of Visum and Plaford, one of Lumiere's co-conspirators. *See United States* v. *Reese*, 36 F. Supp. 3d 354, 364-65 (S.D.N.Y. 2014) (noting that "*Contorinis* does not limit the Court's ability to order forfeiture of all proceeds of [the defendant's] actions, even if he ultimately did not profit from each of those actions"). Accordingly, the Government respectfully requests that the Court order at the time of sentencing that Lumiere shall forfeit $2,622,709 as set forth in the Forfeiture Order.[7]

---

[7] If the Court were to reject the Government's position that the defendant must forfeit all of the performance fees, the Government maintains that the defendant must still forfeit the salary (approximately $200,000 per year) he earned while he was committing this fraud.

The Honorable Jed S. Rakoff
May 16, 2017
Page 13

## CONCLUSION

For the reasons set forth above, the Government respectfully submits that Lumiere has committed serious offenses that must be penalized appropriately. While under the particular circumstances of this case the Government does not oppose a sentence that includes a term of imprisonment below the Guidelines range, the Government does strongly believe, as the PSR does, that a sentence that includes a substantial term of imprisonment is reasonable and appropriate to serve the legitimate purposes of sentencing.

Respectfully submitted,

JOON H. KIM
Acting United States Attorney

By: _____/s/_____
Ian McGinley
Damian Williams
Joshua A. Naftalis
Assistant United States Attorneys

cc: Jonathan N. Halpern, Esq. (by email)
Counsel for Stefan Lumiere