**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X

UNITED STATES OF AMERICA,

     -v-                               1:16-CR-00483-JSR

STEFAN LUMIERE,

          Defendant.

-------------------------------------------------------------X


**DEFENDANT STEFAN LUMIERE'S
SENTENCING SUBMISSION**


FOLEY & LARDNER LLP

Jonathan N. Halpern
Jonathan H. Friedman
90 Park Avenue
New York, NY 10016
(212) 682-7474
jhalpern@foley.com
jfriedman@foley.com

# CONTENTS

PRELIMINARY STATEMENT .................................................................................. 1

I.   PERSONAL BACKGROUND OF THE DEFENDANT ................................. 6

    **A.**   Early Life .................................................................................................. 6

    **B.**   Relationship with Family ....................................................................... 7

    **C.**   Relationships with Friends and Colleagues ........................................ 9

    **D.**   Education and Employment .................................................................. 12

    ██   ██████████ .................................................................................. 14

    ██   ██████████ .................................................................................. 16

ARGUMENT ........................................................................................................... 18

II.  CONSIDERATION OF SECTION 3553(A) FACTORS MERIT A LENIENT
    SENTENCE ...................................................................................................... 19

    **A.**   History and Characteristics of the Defendant ................................... 19

    **B.**   Nature and Circumstances of the Offense .......................................... 22

    **C.**   Need To Protect the Public ................................................................... 24

    **D.**   Need To Afford Adequate Deterrence ................................................. 25

    **E.**   Need To Avoid Unwarranted Sentencing Disparities ...................... 26

    **F.**   Need To Provide Medical Care and Vocational Training ................. 26

    **G.**   A Non-Custodial Sentence Is Available .............................................. 27

III. A LENIENT SENTENCE IS WARRANTED UNDER THE SENTENCING
    GUIDELINES .................................................................................................. 27

    **A.**   The PSR's Sentencing Guidelines Calculation .................................. 28

    **B.**   No Loss Resulting from the Offense Has Been Proved .................... 28

        1.   The Government's Evolving Positions on Claimed Loss Amounts
           and Victims ................................................................................... 28

    **C.**   Credit Fund Performance in 2011 and 2012 ....................................... 30

| | | |
|---|---|---|
| **D.** | Actual Loss: The Government's Theory: Investor Loss | 32 |
| **E.** | The Applicable Legal Standard for Establishing Actual Loss | 34 |
| **F.** | No Causal Link Between Any Decline in Investment Value and Offense Conduct | 36 |
| **G.** | Investment Risks and Other Factors | 36 |
| **H.** | The Evidence of Investor Loss at Trial | 37 |
| **I.** | Additional Reasons That Losses Were Not Reasonably Foreseeable | 38 |
| **J.** | The Proposed 20-Level Enhancement Overstates The Seriousness of the Offense And Disproportionately Affects the Sentencing Guidelines Range | 39 |
| **K.** | The Government's Alternative Approach to Loss | 40 |
| | 1. Treatment of Loss Carryforwards:  Roll-Forward Analysis of Investor Capital | 41 |
| | 2. Treatment of Different Share Classes | 42 |
| | 3. Treatment of Subscriptions and Redemptions | 42 |
| | 4. Treatment at the Individual Investor Level | 42 |
| **L.** | No Intended Loss Results from the Offense Conduct | 43 |
| **M.** | Victims Under the Guidelines Have Not Been Established | 44 |
| **N.** | A Four-Level Increase is Unwarranted Because Stefan Was Not an Investment Adviser | 45 |
| **IV.** | A RESTITUTION ORDER IS INAPPLICABLE | 46 |
| **V.** | A FORFEITURE ORDER IS NOT WARRANTED FOR LUMIERE | 47 |
| | CONCLUSION | 51 |

## TABLE OF AUTHORITIES

**Cases**                                                      **Page(s)**

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005) ........................................................................................................35

*Gall v. United States*,
   552 U.S. 38 (2007) ....................................................................................................18, 27

*United States v. Adelson*,
   441 F. Supp. 2d 506 (S.D.N.Y. 2006) ............................................................................25

*United States v. Balboa*,
   622 F. App'x 31 (2d Cir. 2015) ...............................................................................32, 33

*United States v. Boccagna*,
   450 F.3d 107 (2d Cir. 2006) ...........................................................................................47

*United States v. Butler*,
   264 F.R.D. 37 (E.D.N.Y. 2010) .....................................................................................19

*United States v. Butler*,
   970 F.2d 1017 (2d Cir. 1992) .........................................................................................28

*United States v. Capoccia*,
   503 F.3d 103 (2d Cir. 2007) ...........................................................................................47

*United States v. Carboni*,
   204 F.3d 39 (2d Cir. 2000) .............................................................................................46

*United States v. Catoggio*,
   326 F.3d 323 (2d Cir. 2003) ...........................................................................................47

*United States v. Cavera*,
   550 F.3d 180 (2d Cir. 2008) (en banc) ..........................................................................27

*United States v. Contorinis*,
   692 F.3d 136 (2d Cir. 2012) .....................................................................................48, 50

*United States v. Ebbers*,
   458 F.3d 110 (2d Cir. 2006) ...........................................................................................34

*United States v. Ferguson*,
   584 F. Supp. 2d 447 (D. Conn. 2008) .................................................................34, 35, 36

*United States v. Gupta*,
   904 F. Supp. 2d 349 (S.D.N.Y. 2012) .......................................................................5, 18

*United States v. Gushlak,*
  728 F.3d 184 (2d Cir. 2013) ........................................................................36

*United States v. Harding,*
  No. 05 CR. 1285-02 (RWS),
  2006 WL 2850261 (S.D.N.Y. Sept. 28, 2006) ............................................19

*United States v. Hertular,*
  562 F.3d 433 (2d Cir. 2009) ........................................................................27

*United States v. Hsu,*
  669 F.3d 112 (2d Cir. 2012) ........................................................................32

*United States v. Leonard,*
  529 F.3d 83 (2d Cir. 2008) ....................................................................33, 34

*United States v. Longo,*
  184 F. App'x 910 (11th Cir. 2006) ..............................................................46

*United States v. Manatau,*
  647 F.3d 1048 (10th Cir. 2011) .............................................................43, 44

*United States v. Mi Sun Cho,*
  713 F.3d 716 (2d Cir. 2013) ........................................................................28

*United States v. Nacchio,*
  573 F.3d 1062 (10th Cir. 2009) ...................................................................35

*United States v. Nicolo,*
  597 F.Supp.2d 342 (W.D.N.Y. 2009) ..........................................................48

*United States v. Olis,*
  429 F.3d 540 (5th Cir. 2005) .................................................................34, 35

*United States v. Pereira,*
  465 F.3d 515 (2d Cir. 2006) ........................................................................33

*United States v. Reese,*
  36 F. Supp.3d 354, 364-65 (S.D.N.Y. 2014) ..............................................49

*United States v. Regensberg,*
  635 F. Supp. 2d 306 (S.D.N.Y. 2009) .........................................................45

*United States v. Rutkoske,*
  506 F.3d 170 (2d Cir. 2007) ..............................................................34, 35, 36

*United States v. Selioutsky,*
  409 F.3d 114 (2d Cir. 2005) ........................................................................33

iv

*United States v. Silkowski*,
    32 F.3d 682 (2d Cir. 1994) ...............................................................................46

*United States v. Skys*,
    637 F.3d 146 (2d Cir. 2011) ..............................................................................44

*United States v. Speight*,
    75 F. App'x 802 (2d Cir. 2003) .........................................................................40

*United States v. Stitsky*,
    536 F. App'x 98 (2d Cir. 2013) ....................................................................32, 33

*United States v. Streich*,
    987 F.2d 104 (2d Cir. 1993) ..............................................................................28

*United States v. Thurston*,
    544 F.3d 22 (1st Cir. 2008) ...............................................................................20

*United States v. Whiting*,
    471 F.3d 792 (7th Cir. 2006) .............................................................................36

## Statutes

15 U.S.C. Section 80b-2 (a)(11) .................................................................................45

18 U.S.C. 3553(a) .....................................................................................................19

18 U.S.C. § 3663A *et seq* .........................................................................................46

18 U.S.C. § 3664(e) ..................................................................................................47

U.S.S.G. § 2B1.1, App. Note (3)(B) .........................................................................40

U.S.S.G. § 2B1.1, cmt 1 ...........................................................................................34

USSG § 2B1.1(b)(19)(A)(iii) .....................................................................................44

USSG § 3D1.2(d) ......................................................................................................28

Defendant Stefan Lumiere respectfully submits this memorandum to aid the Court in his sentencing, currently scheduled for May 31, 2017.

## PRELIMINARY STATEMENT

The scores of letters that follow powerfully testify to the honesty, selfless giving, devotion, and trusting nature -- and goodness -- of the man who stands humbly before Your Honor awaiting to be sentenced. (Ex. A.) These observed virtues extend over decades of Stefan's lifetime. ████████████████████████████████, Stefan routinely has acted honorably, admirably, and selflessly: tending to ill family members and friends, saving a drowning niece, providing comfort and support to friends in need, and standing up for what is right. As the witnesses attest, Stefan is a good and decent, hard-working, devoted and dedicated son, brother, uncle and friend who stands humbly before this Court to request mercy and leniency.

These witnesses know Stefan longest and best. Their assessments reflect their firsthand observations, their abiding belief in Stefan's good character and integrity, and their shock and horror at this tragedy. His family and enduring friendships, developed and maintained over decades from virtually all walks of his life, are a testament to Stefan.

To be certain, Stefan understands and acknowledges the jury's verdict and its significance. The allegations, trial, and jury verdict already have taken a tremendous toll on this decent, trusting and good man whose selfless giving and devotion have been a blessing to so many. And equally certain, Stefan understands that punishment must follow. But he humbly seeks leniency, as Your Honor takes stock of the full measure of the man – and the special circumstances here – in fashioning an appropriate sentence. In addition to Your Honor's sentence, Stefan will bear the perpetual and indelible consequences of this experience for the rest

of his life.  He is a relatively young man, still unmarried, and ████████████████████

██████████, still harboring hope and seeking to hit his stride.  ████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████

    The composite testimonials present a clear picture of Stefan's selfless giving and trusting

nature.  ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████.  The character testimonials make plain the deep

and abiding humanity of Stefan in stark contrast to the portrayal of Stefan at trial.  While the

excesses of Wall Street have been commonly caricatured, projecting that stereotype onto this

defendant would be flat wrong and work a miscarriage of justice.  Any suggestion that Stefan

was but another Wall Street banker bowing to the master of greed, and engaging in unlawful

conduct to retain his "plum," high-paying and "cushy" job at Visium could not be farther from

the truth.  Stefan had no motivation whatsoever – financial or otherwise – to commit the offenses

of conviction.

    While applying his graduate school education, Stefan dedicated himself to working hard,

learning the industry and treating his colleagues fairly, respectfully and with loyalty.  He also

acted to protect their well-being.  These values had long been inculcated in him by his family –

values that were just not uttered, but that he practiced and carried out, even when they conflicted

with his own interests.  For example, after Goldman Sachs acquired Spear Leeds, where Stefan

headed a team of investment professionals, he was offered the opportunity to continue the

business for Goldman.  The offer, however, was for him alone.  Stefan agreed to accept the offer, but only if it extended to his entire team.  Goldman declined, and Stefan refused to accept out of loyalty to his team colleagues, sacrificing an exceptional opportunity for himself personally.  That selfless action exemplifies Stefan's work ethic and life values.

Nor did Stefan join Visium – or have any need or desire to stay at Visium – for the pay.  Far from it.  He previously had earned multiples of his Visium compensation at several previous positions in investment banking.  Nonetheless, he eventually agreed to join the firm of Jake Gottlieb, who was beginning a relationship with, and would later marry, his sister.

While compensation of $200,000 is enviable in many sectors, on Wall Street and especially at hedge funds, including Visium, such pay was considered relatively small.  The Credit Fund portfolio manager, Chris Plaford, was paid by Visium as much as "several millions of dollars" in annual compensation – as much as ten times Stefan's earnings there.  Mr. Plaford acknowledged that he did not grant Stefan a bonus.  Tr. 786.

Even Jason Thorell, the Credit Fund trader, was paid more.  Mr. Thorell, who escaped prosecution and testified under a grant of immunity, struggled under oath to acknowledge his own criminal conduct.  Among other things, he had emailed broker quotes to Visium Operations while concealing, at Mr. Plaford's direction, that they were from Mr. Plaford.  Tr. 417.  Mr. Thorell was paid as much as $350,000 for his Credit Fund work – nearly double what Stefan earned at Visium.  Tr. 242.  Co-conspirators Mr. Plaford and Mr. Thorell received bonuses for their work during the scheme; Stefan did not.  Mr. Thorell now is pursuing a monetary bounty in connection with the very scheme he was engaged in.  Moreover, Stefan is now facing the distinctly unappealing possibility of forfeiture and restitution payments while co-conspirators Mr. Plaford and Mr. Thorell reap windfalls from their Credit Fund fees and bonuses.

While Stefan well acknowledges the significance of the jury's verdict regarding the offenses of conviction, it is important to appreciate the relative positions, relationships, work and compensation at the Credit Fund -- not as an excuse, but to place Stefan in appropriate context and assist the Court in fashioning an appropriate sentence. First, Stefan's position and role at Visium had been diminishing, and his limited role and treatment at the Credit Fund further dimmed. He was <u>not</u> a portfolio manager in the Credit Fund, but an analyst. Ex. D at 5. During the period that included 2011 to 2013, Stefan worked primarily in Visium's Global Fund, where he was given the title of portfolio manager with responsibility for a narrow sleeve of investing in positions in that fund – <u>not</u> the Credit Fund. His assignments in the Credit Fund between 2011 and 2013 were episodic, *ad hoc* and largely related to helping out in situations with underlying distressed companies, based on his experience in restructuring.

Unlike Mr. Plaford, who also was a Visium partner, Stefan would not interact with investors (Tr. 757), and did not present to the pricing or valuation committee. It was Mr. Plaford who decided each month which securities would be overridden, and he admitted that "Stefan wasn't involved in that part of the process...." Tr. 760. Mr. Plaford displayed little respect or value for Stefan and admitted not giving him a bonus. Tr. 786. He dictated to him price quotes "because [he] wouldn't trust him to do hardly anything on his own" and supported his quotes to Stefan, asserting that "I'm going to tell you where I think they are." Tr. 687. For the entire term of the charged scheme Stefan received <u>no pecuniary gain</u> in connection with the Credit Fund or the offense conduct: no fees, no bonus, nothing beyond his standard annual salary, negotiated with Visium years earlier, in 2007. Nor would there be an incidental, derivative or other financial benefit anticipated – or even hoped for – down the road, even in the short term.

4

Stefan well knew that he had no professional or personal interest in staying with Visium. This was especially so and especially painful as his sister's marriage with Visium CIO, Jake Gottlieb, was deteriorating terribly.  There was no future or desire to pursue enhanced status, position, compensation or anything positive.  Stefan understandably wanted to leave Visium. His sister's marriage to Jake Gottlieb, Visium's CIO, was deteriorating, and their relations were becoming increasingly vitriolic and contentious.  Finally, in 2012, after Gottlieb filed for divorce, any ongoing tenure, continuing at Visium became untenable. Expecting fees or a bonus, much less respectful or favorable treatment, from Mr. Plaford or Gottlieb would be foolish even to consider.

█████████████████████████████████████████████████████

████████████████████████████████  His medical conditions and numerous injuries and prescription medications are summarized in the Probation Office's Pre-Sentence Investigation Report ("PSR") at §§ 103-25.  ███████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████  █████████

████████████████████████████████████████████████████████

████████████████████████████

The "formidable responsibility" of "[i]mposing a sentence on a fellow human being, " *United States v. Gupta*, 904 F. Supp. 2d 349, 350 (S.D.N.Y. 2012) assumes heightened significance in this case.  As this Court has remarked, it is <u>the entire life</u> of the person awaiting

sentence that is to be considered.  As Stefan comes before the Court, we respectfully submit that when Stefan's life in its entirety is considered, along with the jury's verdict, in light of all the facts and exceptional circumstances a most lenient sentence is warranted and supported by the sentencing objectives set forth in Section 3553(a).

## I.      PERSONAL BACKGROUND OF THE DEFENDANT

### A.      Early Life

Stefan Lumiere was born in New York, New York on July 25, 1970, the son of Richard and Bianca Lumiere.  PSR § 96.  His father is an obstetrician/gynecologist who graduated from Cornell Medical School.  (Ex. A-1, Richard Lumiere Letter.)  He instilled in Stefan the value of service as he served as Commander in the United States Public Health Service Cancer Control Program and spent time volunteering at free clinics.  PSR § 96.  Stefan's mother graduated from the University of Montreal with a degree in science and nutrition.  *Id.*  She worked for many years as a dietician and supported her husband by assisting him with his medical practice.  *Id.*  Stefan has an older sister, Erica, a younger sister, Alexandra, and a younger brother, Justin.  *Id.*

Stefan has been fortunate to have a loving and supportive family.  He had a very happy childhood and remains close to his family.  (Ex. A-20, Fratamico Letter.)  Stefan spent summers in France with his family and spent time with his grandmother in Montreal, Canada.  PSR § 102. His parents focused on instilling the value of hard work and education, and taught Stefan not to focus on unimportant things like brand labels.  *Id.* § 98.  His father was especially thrifty with material items, but he always made sure to provide Stefan with essentials and financed his participation in after-school activities.  *Id.*

**B.     Relationship with family**

Stefan has always felt that his family is "his most important asset." (Ex. A-22,

Baumgartner Letter.)  "This is a man who is part of an extremely tight-knit and loving immediate

family – even in [his] forties, he is often with his mother and father, sisters and brother, nieces

and nephew." (Ex. A-30, Robbins Letter.)

Stefan has a strong commitment to his family and has consistently made sure to be there

for his loved ones in times of need. ███████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████  When Stefan's younger brother, Justin,

was struggling through a divorce and stress at work, Stefan provided him with advice and

financial assistance. *Id.*

Stefan's devotion to his family is most clearly displayed in the relationship he has

developed with his younger sister and nieces.  When his younger sister, Alexandra, and her

husband went through a difficult divorce, Stefan became a "surrogate father" to his sister's

children. (Ex. A-1.)  He is "Alexandra's fiercest protector and confidante, as she faces new

challenges as a single mother." *Id.*  Alexandra's children, ages nine and eleven, consider Stefan

a "father figure who has been more involved in their lives than their father ever was." (Ex. A-

2,.)  Alexandra's daughter Casey Gottlieb says that Stefan "feels like a dad to me…He loves me

like a dad…He believes in me." (Ex. A-7.)  Stefan has always had a strong desire to protect his

nieces, which he exhibited when he jumped into a pool without hesitation, to save his niece from

drowning because he knew that she could not swim. *Id.* Stefan "feels especially close to the girls" and "has become a constant and loving presence in their lives." (Ex. A-1.)

This dedication to family extends beyond his immediate family. After his cousin Gregory passed away, Stefan spent days with Gregory's family, telling stories to help them through their time of need. As one of his cousins tells it, "[h]e exhibited an uncommon compassion and maturity." (Ex. A-11, Bevans Letter.) ████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████ According to his aunt, Stefan's younger cousins "were always safe in [his] hands." (Ex. A-14, Korby Letter.) When that same aunt went through a difficult time period, ██████████████████ ██████████████████████████████████████████████████████████ ███████████████ She describes Stefan as the "family's protector." *Id.*

Even people who are not related to Stefan consider him "like family." (Ex. A-13, Penson Letter.) His childhood friend, Vanessa Penson, refers to Stefan as one of the kindest men she knows. *Id.* ████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████

Recently, Stefan has had the good fortune of meeting his girlfriend, Olga Bardon, who now lives with him. (Ex. A-10.) She is a Spanish teacher in the New York City Public School System who has stood by Stefan through this time of great adversity. *Id.* Like those who have been with Stefan throughout his life, Olga knows him as "a very affectionate man who is considerate with others and goes out of his way to make people feel comfortable and

appreciated." *Id.* Stefan's example has inspired Olga "to be the best I can be as a human being

and teacher." *Id.*



### C.    Relationships with friends and colleagues

Stefan's upbringing is reflected in his character.  He is a "look-straight-ahead kind of

guy." (Ex. A-1.)  The values of kindness, hard work, and education have not gone unnoticed by

those who know Stefan best.  His family's insistence on diligent effort and generosity shined

through as a student at the Insituto Centroamericano de Administracion de Empresas ("Central

American Institute of Business Administration" or "INCAE"), where he was considered one of

the most "focused, hard-working" students in the class.  (Ex. A-32, Kissling Letter.)  His

classmates note that Stefan gave "enormous effort" and excelled academically due to a

"willingness to succeed." (Ex. A-22.) "He was so determined to make this work that he learned

Spanish in a few months to be able to attend classes." (Ex. A-32.)  Stefan "made a tremendous

effort to keep up in every class" even though he needed to work "probably double [the] time" of

other students because he was new to the language.  (Ex. A-36, Avendano Letter.)

One classmate remembers that he "was always willing to lend a hand" to students that

needed support.  (Ex. A-32.)  Stefan was known as a "very supportive and trustful friend." (Ex.

A-22.)  He even offered to let his Costa Rican classmate stay in his home if he did a summer

internship in New York.  *Id.*  This classmate cited this as merely an example of "Stefan's

constant desire of helping people, without any personal interest."  *Id.*  Stefan built relationships

with other students and took the time to learn about Latin American culture from his friends at INCAE. (Ex. A-50, Garcia Ramirez Letter.)

As he entered the workforce, Stefan constantly displayed a willingness to work hard and support his colleagues. Tibor Nemes, Stefan's friend and colleague over the last 20 years, details how Stefan "always held himself to the highest ethical standards." (Ex. A-18, Nemes Letter.) Like Stefan's classmates at INCAE, Tibor describes Stefan as someone who is always willing to help those around him. *Id.* When working on a project together, Tibor noted that "Stefan had guided me to make sure all processes and checks were in place so our investor clients were not exposed to any operational or compliance risk. . . ." *Id.* In their personal lives, Tibor recognizes that Stefan "has always gone out of his way to help others." *Id.* He guided Tibor when Tibor was going through a difficult period, feeling lost in his career. *Id.*

Paul Fratamico, another of Stefan's colleagues in the investment industry, has known Stefan to be "industrious, hardworking, and of good moral character." (Ex. A-20.) He personally saw Stefan "conduct himself honestly and in a straightforward manner, always demonstrating respect for the regulations and laws governing securities markets" when they worked to research similar investment ideas. *Id.* Another colleague, Daniel Travers, describes Stefan as a "completely straight and honest guy," a view that he believes was "universally held" among colleagues. (Ex. A-28, Travers Letter.) During the financial crisis, Stefan took "selfless interest in people whose careers were upended…offering sincere help considerably beyond the norm." *Id.*

Stefan has always tried to make those around him feel loved and appreciated. He makes a "genuine effort" to engage with the families of his friends, going as far as to roll around and play with their children for hours. (Ex. A-51, Chris Marshall Letter.) Children of friends

10

affectionately refer to Stefan as "Uncle." *Id.* ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

Stefan has frequently given his own possessions to others without regard for whether or not they will be returned, including "clothes, furniture, cell phones, guitars, dishes, money and time." (Ex. A-12, Acacia Lawson Letter.) He constantly puts his trust in others, willing to let friends of friends stay at his home even if he has not met them, just because they need a place to stay. *Id.* As one friend described, Stefan is not just willing to help others, but he is willing to put others before himself: "[Stefan's] way of thinking is very different from the average person, because in conversations with him, he's always shown a kind heart in the sense that he is willing to put other people first and him second." (Ex. A-45, Rivera Letter.)

Stefan's desire to help others has consistently extended beyond close friends and family members. He has never lived a lifestyle of excess, instead using his resources to help others. Stefan has donated time and money to various charitable causes. He mentored students from the Mott Hall Charter School and contributed to Minds Matter, a charitable organization designed to empower young people from low-income families to prepare for college. (Ex. A-27, Heine Letter.) Even though he was recovering from knee surgery he "hobbled around the basketball court trying to keep up with students," one of the many activities he participated in with the children. (Ex. A-17. Pilkington Letter.) In addition, Stefan has served on a committee for the St. Jude's Pediatric Cancer Research Center and made donations to Little Baby Face Foundation, a charitable organization that provides reconstructive surgery to children with debilitating facial deformities. (Ex. A-27.) He has also made frequent contributions to Goodwill and the Salvation

11

Army. *Id.* When Stefan has the opportunity to help others, he has consistently displayed an eagerness to do so: "He is a generous human being, especially with that most valuable of New York commodities, time." (Ex. A-17.)

### D.    Education and employment

Stefan attended the French Lycee School growing up, following the cultural roots of his mother and father who both speak French. (Ex. A-2); PSR § 97. He spent his high school years at Kent School in Connecticut where he was actively involved in the school community. (Ex. A-34, Whitmer Letter.) Following high school, Stefan attended Tulane University, earning a Bachelor of Arts in Sociology. (Ex. A-2); PSR §126. Stefan hoped to expand his education, so he applied, and was admitted, to a business school in Costa Rica, INCAE, which follows Harvard Business School's case-study curriculum. He specifically chose INCAE because he wanted to "learn the language, the culture and to establish a local professional network." (Ex. A-32.) He graduated with a master's degree in business administration and returned to the United States to pursue his career. (Ex. A-1.)

Stefan took an entry-level position as an administrative assistant at Merrill Lynch Wealth Management, hoping to work his way up. He "threw himself into his work." *Id.* Stefan would wake up at 5:00 a.m. to go to work to give himself enough time during the day to study to complete the Chartered Financial Analyst Program. (Ex. A-15, Zúñiga Letter.) Recognizing that he had a passion for analytical work, Stefan joined an analytics training group at Spear, Leeds, & Kellogg LP ("Spear"). (Ex. A-41, Hershey Letter.) The Goldman Sachs Group, Inc. purchased Spear and, less than two years later, shut down the group that Stefan was working for, offering to retain a few members who had excelled, including Stefan. (Ex. A-17.) Stefan, however, refused to accept the offer unless the members of his team were retained. (Ex. A-3,

Justin Lumiere Letter.)  The new management was unwilling to keep on the whole team, so Stefan left.  *Id*.

Despite these unfortunate circumstances, Stefan maintained passion for his work.  He continued to work diligently, embracing new opportunities at different companies, leading to greater successes.  He moved on to other research and trading firms where his work led to media exposure, with news outlets interviewing him and quoting him for their articles.  Stefan was passionate about this work, but not motivated by greed.  He consistently turned down more lucrative offers in order to pursue career opportunities that he felt were the best fit for him.  As his family recognizes, "money was never important to Stefan, but independence and doing his best were what he prized most."  (Ex. A-2.)

Eventually, his career led him to Visium Asset Management LP ("Visium").  Stefan was excited about joining Visium because his sister Alexandra's boyfriend, Jacob Gottlieb, was the founder and Chief Investment Officer of Visium, and Stefan was the one who had encouraged Gottlieb to start his own fund when Gottlieb had been dissatisfied with his employment years earlier.  Stefan joined Visium to manage a sleeve of a portfolio in Visium's Balanced Fund.  Defense Objections to PSR ("Obj. PSR") at 33 (PSR § 152); *see also* Ex. I.

After the economic recession in 2008, Gottlieb shut down trading in several portfolios including the sleeve Stefan managed.  Stefan continued to conduct research in anticipation of the fund's re-opening for trading.  In addition, Gottlieb asked Stefan to provide advice for Visium's Credit Fund.  Obj. PSR at 31 (PSR § 13).  When he performed well, he was given the title of analyst for the Credit Fund, identifying buying opportunities for the Fund.  *Id.*

After more certainty developed in the economy, Stefan again became a portfolio manager of a small sleeve of a fund, this time the Global Fund.  *PSR* § 131; Obj. PSR at 31 (PSR § 13).

Because of his positive contributions to the Credit Fund during his time as an analyst, he was asked to provide advice to the Credit Fund on an *ad hoc* basis, but his primary responsibility was to the Global Fund.  PSR § 131.

Unfortunately, the relationship between Gottlieb and Stefan's sister soured.  (Ex. A-12.) Gottlieb allowed the animosity from his pending divorce to bleed into the workplace, harming Stefan's opportunities at Visium.  Stefan, who has been known to be "a bit naïve," tried to stick around and work with Gottlieb because Alexandra wanted Stefan to "keep an eye on Jake" and Stefan "thought he could protect Alexandra from her abusive husband in a brutal divorce" by staying with Visium.  (Ex. A-11.)  Stefan has "always been protective of his siblings" and wanted "to help her through a traumatic time while trying to protect her two small children. . ." (Ex. A-16.)  Gottlieb eventually removed Stefan from managing a sleeve of the Global Fund at the end of 2012, and Stefan left Visium in 2013.  PSR § 131.

Stefan has always had a constant desire to work, whether at an office or through physical labor.  After his legal issues prevented him from working in the securities industry, Stefan looked for another outlet to work.  He decided to start his own home improvement contracting company, GBG Development LLC, which he used to personally work on renovating his apartment.  *Id.* §130.  Stefan physically worked with contractors and was there "day after day until it was completed."  (Ex. A-9, Feder Letter.)  He also performed other jobs for family and friends to make sure he stayed busy, although he did not derive any personal profit from this work.  *Id.*  Stefan "reinvented himself in the process."  (Ex. A-1.)

14









Those close to him continue to stick by his side ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ His family, friends and colleagues who know him on a personal level appreciate the type of person  he is in their lives and in the lives of those around him. While Stefan has been convicted by some who have witnessed a brief snapshot of his employment from conflicting angles, the people who truly know Stefan on a personal level have expressed their admiration for the type of person he is.  Stefan has a long history as a family-oriented individual, a diligent worker, a loving friend, and a selfless human being.  His sentence should consider the complete picture of what makes Stefan such a valued person in the lives he has touched.

## ARGUMENT

Courts "may not presume that a Guidelines sentence is reasonable." *Id.* Instead, courts are required to "consider all of the § 3553(a) factors to determine whether they support the sentence requested." *Gall v. United States*, 552 U.S. 38, 49-50 (2007). As this Court has noted, the Guidelines "reflect an even more draconian approach to white collar crime, unsupported by any empirical data." Sentencing Memorandum and Order at 4, *United States v. Gupta*, 904 F. Supp.

18

2d 349 (S.D.N.Y. Oct. 24, 2012) (11 Cr. 907 (JSR)), Dkt. No. 127. As this Court has stated, imposing a sentence "requires a court to consider, with great care and sensitivity, a large complex of facts and factors. The notion that this complicated analysis, and moral responsibility, can be reduced to the mechanical adding-up of a small set of numbers artificially assigned to a few arbitrarily-selected variables wars with common sense." *Id.* at 1-2.

18 U.S.C. 3553(a) requires a sentence that is "sufficient, but not greater than necessary . . . ." The pertinent factors to consider under § 3553(a) are: (1) the history and characteristics of the defendant, (2) the nature and circumstances of the offense, (3) the need to protect the public from further crimes of the defendant, (4) the need to afford adequate deterrence, (5) the need to avoid unwarranted sentencing disparities, (6) the need to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner, and (7) the kinds of sentences available. These factors, as applied to Stefan, compel a non-custodial sentence.

## II.   CONSIDERATION OF SECTION 3553(A) FACTORS MERIT A LENIENT SENTENCE

### A.   History and Characteristics of the Defendant

Stefan's "history and characteristics" counsel heavily in favor of a lenient sentence.

Courts frequently grant sentences below the applicable Guidelines range based on a defendant's strong community of family and friends. *See, e.g.*, *United States v. Harding*, No. 05 CR. 1285-02 (RWS), 2006 WL 2850261, at *5 (S.D.N.Y. Sept. 28, 2006) (granting below-Guidelines sentence because of defendant's "significant network [of family and community members] that is ready to support [the defendant] upon his release from prison"); *United States v. Butler*, 264 F.R.D. 37, 39 (E.D.N.Y. 2010) (imposing a non-Guidelines sentence despite "staggering" losses where defendant's large community of friends and family suggested high

probability of rehabilitation). Stefan comes from a large, loving, supportive family. He is close

with his parents (Bianca and Richard Lumiere), brother (Justin Lumiere), and his two sisters

(Alexandra Gottlieb and Erica Lumiere), all of whom submitted letters on his behalf. He is

especially close with the children in his family. His sister Alexandra divorced Jacob Gottlieb (the

head of Visium), and is now a single mother raising two girls, Lila and Casey Gottlieb. Lila and

Casey adore Stefan, as reflected in their letters; they love him and rely on him like a father. He is

also close with his large extended family, many of whom submitted letters. In addition to his

family, he is in a stable, committed relationship with Olga Bardon, a public school teacher in the

Bronx. He has a wide circle of friends from all phases of life who have rallied behind him to

submit heartfelt letters attesting to his good character. Several of Stefan's notable traits shine

through the 65 letters submitted on his behalf.

     First, he leaps to help others in need, generously giving his time, advice and possessions

to an unusual extent, leaving a trail of grateful friends and relatives. They do not just *describe*

him as empathetic, kind, and generous, but also provide example after example of his graciously

stepping up to help others in a way that most busy people do not make time for. Courts have

frequently granted lesser sentences in recognition of defendants' good works. *See, e.g.*, *United*

*States v. Thurston*, 544 F.3d 22, 26 (1st Cir. 2008) (affirming downward variance from five years

to three months and supervised release in $5 million Medicare fraud in part because of

defendant's "charitable work, community service, generosity with time, and spiritual support and

assistance to others"). To mention just a few:



(Ex. A-13.)

20

- Stefan's former girlfriend Acacia Lawson describes how Stefan generously gave clothes, furniture, cell phones, guitars, dishes, money, and his own time to her artist friends and relatives who were in need. (Ex. A-12.)

-  (Ex. A-14.)

- Matthew Pilkington is Stefan's former boss and business partner, as well as president of the Bond Club, which formed a mentoring relationship with the Mott Charter School in the Bronx. Mr. Pilkington notes, "The members were very interested in this program but when it came to asking for volunteers only Stefan was willing to step forward. He was recovering from knee surgery but hobbled around the basketball court trying to keep up with students, happily helping design an egg safety cage for an egg drop competition with a Mott student, and explaining how his business worked to the students. He was truly a nurturing mentor." (Ex. A-17.)

- Friend and former co-worker John Kerrigan writes that, when he was having a very hard time, he happened to run into Stefan on a train. Stefan took him out to lunch and devoted the rest of his day to helping Mr. Kerrigan find a solution. (Ex. A-35.)

Second, his love for and close relationship with his nieces echo through numerous letters.

(Exs A-1, A-10, A-14.) Several of his nieces submitted letters to the Court, excerpts of which do not sufficiently convey their devotion to their uncle:

- Ten-year-old niece Casey Gottlieb, daughter of Stefan's sister Alexandra, writes that Stefan "feels like a dad to me." She fell into a pool before she knew how to swim and Stefan unhesitatingly ran past people in swimsuits, jumping in fully clothed to save her. He tells her stories, teaches her life lessons, cheers her up when she is sad, and shows her that he believes in her by asking for her advice. (Ex. A-7.)

- Nine-year-old niece Lila Gottlieb describes Stefan as her "favorite person," noting that he "does so many things to make me feel happy." (Ex. A-6.)

- Ten-year-old niece Francesca Howard writes that, when she cries, Stefan "knows how to turn [her] tears into laughter." He attends her school performances. (Ex. A-8.)

Third, numerous character witnesses told stories about Stefan's eschewing a benefit because he did not think he had fairly earned it. For example, his former classmate Scott Lister described Stefan being declared the winner of a swim race, the winner of which would get to

compete in the State Championship—whereupon Stefan announced that he had seen the other student finish first. (Ex. A-19.)

This history and these characteristics demonstrate that Stefan is a beloved and generous member of his supportive community of family and friends.

### B.    Nature and Circumstances of the Offense

The nature and circumstances of Stefan's offense are unusual in several respects that warrant a lenient sentence.

First, Stefan was not motivated by greed and, in fact, had nothing to gain from the criminal scheme. In sharp contrast to that in most securities fraud cases, his compensation was unaffected by the scheme. There was likewise no prospect of a derivative benefit for Stefan such as a promotion, enhanced stature, or eventual bonus. Obj. PSR at 34 (PSR § 78). Any gain from the offense went to Visium and other individuals at Visium, not to Stefan directly or indirectly. Although the government suggests that his involvement in the scheme was motivated by Stefan's desire to keep his job (Sentencing Memorandum at 9), this contention is both unsupported by evidence and contradicted by reality. In fact, Stefan *wanted to leave* Visium. His sister was on her way to a bitter divorce from the head of Visium, Jake Gottlieb, and it was abundantly clear to Stefan that he had no career prospects there. Indeed, Stefan voluntarily left his job at Visium. Tr. 134, 157, 162, 391.

Second, based on the government's presentation, Stefan's role relative to Mr. Plaford and Mr. Thorell's was minor—and certainly not a leading one—in the criminal scheme to misprice Visium's holdings. Stefan did pass along prices to third-party brokers and received quotes back, which were used in valuations.. He did not originate these prices himself, however; he received them from Mr. Plaford, the Credit Fund's portfolio manager, who came up with prices and

handed them down to Stefan with explanations. PSR § 40(a); Tr. 684-85 (Mr. Plaford testified that the monthly process was for Mr. Plaford to tell Stefan the price and Stefan would pass it to a broker); Tr. 687 (Mr. Plaford testified that he came up with prices for everything himself and "wouldn't trust" Stefan to do it); Tr. 739 (Mr. Plaford testified that he provided China Med pricing to Stefan and asked Stefan to convey that pricing to brokers), Tr. 758 (Mr. Plaford testified that he decided every month which securities would be overridden). Stefan was also not a member of Visium's Valuation Committee, the group tasked with determining the appropriate valuation for the securities held by Visium. Moreover, Stefan had no contact with investors and was not involved in preparing disclosures to investors. Obj. PSR at 31 (PSR § 61), 34 (PSR § 78). Underlining Stefan's secondary role in motivating or executing the criminal scheme, *his departure from Visium had no effect on the criminal scheme*, which continued unabated for some time after he left the company. Tr. 758-59. In fact, Mr. Plaford continued the scheme until Visium transferred responsibility for pricing from the investment team to the operations team. Tr. 759.

Third, Stefan played no role in investor communications and, thus, had no involvement with Visium's misrepresentations to investors that may have caused their losses. The government characterizes the criminal conduct at issue as an investor misrepresentation scheme—as the government puts it, a "scheme to defraud investors in Visium's Credit Fund by deceiving them about how the Credit Fund's monthly net asset value ('NAV') would be calculated, and exploiting that deception to report fraudulently inflated performance results to investors." Sentencing Memorandum at 2. In light of that characterization, it is particularly notable that Stefan made no representations to investors. He had no contact with investors, was not involved in preparing disclosures to investors, and is not accused of deceiving others at Visium who were

23

involved in investor communications (e.g., Mr. Plaford). Tr. 757 (Mr. Plaford testified, "I don't believe Stefan had much, if any interaction with investors").

Fourth, others at Visium were more culpable. Mr. Plaford benefited directly from the scheme and was determined to present certain prices, which he identified, to investors—with or without Stefan's participation. Mr. Plaford acknowledged that he "earned millions of dollars in 2012" which was "many more millions than Stefan earned." Tr. 737. Stefan was a relatively low-ranking employee at Visium. Although Stefan was the portfolio manager for a small strategy in a separate Visium fund, the Global Fund, which had nothing to do with the criminal scheme, his work on the Credit Fund was only as an *analyst* and later as an *ad hoc* consultant. Obj. PSR. at 30 (PSR § 13); Tr. 756. Mr. Plaford was the sole portfolio manager for the Credit Fund. *Id.* at 756-57.

Stefan's sentence should reflect that he was not the originator of the scheme, its leader, or a direct financial beneficiary.

### C.    Need To Protect the Public

Stefan poses no threat whatsoever to the public. Indeed, the PSR notes that he is "not viewed as . . . a danger to the community." PSR at 44. To the contrary, the supportive letters submitted on his behalf provide powerful testimony that—far from needing to protect the public from Stefan—Stefan finds many ways to contribute positively to the lives of others in his community. He has been a great supporter of his many relatives and friends. *See supra* at 16-17. He comes from a loving, supportive family and has a network of friends that also continues to support him. Moreover, the crime of which he was convicted was not a violent crime, but a financial crime specific to the securities industry—an industry in which he can no longer work. Thus, there is no risk of recidivism. Given the consensus that Stefan is not a danger to the

24

community—and his ability to contribute positively—this factor weighs heavily in favor of a lenient sentence.

### D.      Need To Afford Adequate Deterrence

Stefan has already been punished harshly. He is out of the securities industry—the industry where he had spent decades building a successful career and for which he earned an M.B.A.—and faces a presumable bar by the SEC. He has been humiliated with a public trial that not only resulted in his conviction for securities fraud, but also featured lurid accusations—all widely covered by the media. Other than property for sale that he owns on East 96th Street, Stefan's substantial debts (over $1 million) far outstrip his assets. PSR § 132. These punishments are substantial. He has fallen from his life as a successful investment professional to a life where he is unemployed, insolvent, humiliated, ████████████████████████████████ ████████████████████ For anyone in the securities industry or elsewhere who has followed this downfall, it already serves as a terrifying cautionary tale. Deterrence requires no more.

If a custodial sentence is deemed necessary, the deterrent effect is accomplished by a short prison term. As this Court has noted, "there is [] considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders." *United States v. Adelson*, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006). A longer sentence would therefore be greater than necessary to deter similarly-situated potential wrongdoers.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████



The suffering already visited upon Stefan and the unnecessary torment of a custodial sentence yield the conclusion that adequate deterrence does not require a custodial sentence.

### E.    Need To Avoid Unwarranted Sentencing Disparities

Stefan should not be punished more harshly than those who participated more directly and, unlike him, reaped benefits from the criminal scheme. Mr. Thorell was more directly involved in the criminal scheme and was paid more by Visium than Stefan—but escaped prosecution entirely, forfeited no property, paid no fines, and now seeks a whistle-blower's bounty. Tr. 430, 485-86. Mr. Plaford was Stefan's boss, generated the prices at issue, directed Stefan to obtain the broker quotes for which he was prosecuted, and received substantial additional compensation as a result of the criminal scheme. Stefan is the proverbial "low man on the totem pole."

### F.    Need To Provide Medical Care and Vocational Training

26

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████

Stefan is also committed to building a new professional life outside of the securities industry. He is currently pursuing the related fields of construction and real estate—he acquired the 96th street property, performed renovations himself and with others for whom he has provided jobs, and has been marketing it for resale. A prison sentence would be counterproductive to his efforts to pursue this professional path.

The need to obtain medical care and professional experience that will allow Stefan to find a new career path, both warrant a non-custodial sentence as the appropriate outcome for Stefan.

### G.    A Non-Custodial Sentence Is Available

Section 3553(a) also warrants consideration of the "kinds of sentences available." It is within the Court's discretion to impose a non-custodial sentence, such as probation, home detention, or community confinement in a halfway house. Given the availability of this non-custodial sentence for securities fraud and its appropriateness in this case, for the reasons discussed above, a non-custodial sentence is the only appropriate punishment here.

## III.    A LENIENT SENTENCE IS WARRANTED UNDER THE SENTENCING GUIDELINES

The law imposes no obligation on the sentencing court to apply the Sentencing Guidelines. *Gall v. United States*, 552 U.S. 38, 49-51 (2007). A "district court may not presume that a Guidelines sentence is reasonable." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc). In sentencing, the district court is required to find the facts relevant to a sentencing enhancement by a preponderance of the evidence. *See United States v. Hertular*, 562

F.3d 433, 447 (2d Cir. 2009); *United States v. Mi Sun Cho*, 713 F.3d 716, 722 (2d Cir. 2013).

"The government's burden is to establish material and disputed facts by the preponderance of the

evidence." *United States v. Streich*, 987 F.2d 104, 107 (2d Cir. 1993). "In the context of

sentencing, if the government seeks increased punishment, it has the burden of proving that the

circumstances warrant such an increase." *United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir.

1992).

### A.    The PSR's Sentencing Guidelines Calculation

The PSR groups Counts One through Three pursuant to USSG § 3D1.2(d), PSR § 74, and

applies § 2B1.1, as follows:

- Base offense level of seven (§ 2B1.1(a)(1); PSR § 75)

- Increase of 20 levels for loss exceeding $9.5 million but not exceeding $25 million (§ 2B1.1(b)(1)(K)); PSR § 76)

- Increase of two levels for offense involving more than 10 victims (§ 2B1.1(b)(2)(A)(i)); PSR § 77)

- Increase of four levels because defendant was an investment adviser (§ 2B1.1(b)(19)(A)(iii); PSR § 78)

According to the PSR, the adjusted and total offense level is 33.  Because Criminal

History Category I applies, the Guidelines range, as computed in the PSR, is 135-165 months.

(PSR § 138).  Stefan objects to the calculation.

### B.    No Loss Resulting from the Offense Has Been Proved

#### 1.    The Government's Evolving Positions on Claimed Loss Amounts and Victims

The PSR reflects the Government's initial position on loss for 16 investors – including 15

institutional investors – with investment loss claims totaling approximately $23 million.  PSR §

66.  The PSR identifies the Government's "list of victims and their respective loss amounts"

28

(PSR § 69), but is silent as to how each claimed investment loss is calculated and what the bases for the loss amounts are. According to the PSR, "[e]ach investor invested in the Credit Fund after the fraud began in June 2011." PSR § 66. Since filing the PSR, the Government has revised its loss calculations and now asserts that the total loss was $15,703,526 across 13 investors, plus an additional $5 million associated with Morgan Stanley. On May 17, 2017, the Government provided a summary chart reflecting these revised figures (Exs. F, G), and previously provided two Visium-issued spreadsheets of investor information for 2011 to 2013, onshore (VAM 000806665) and offshore (VAM 00080664) ("Visium Spreadsheets"). On May 25, 2017, the Government provided oral explanations of how it calculated investor losses. ("Visium Spreadsheets"). Notably, the asserted loss on investment being claimed is the <u>entire loss</u> for the investor's investment in the Fund after June 2011 (Exs. F, G). The Government takes the "position that none of these investors would have invested in the Credit Fund had they known about the fraud." PSR § 66. The Government repeats its position in its Sentencing Memorandum at 6. The Visium Spreadsheets show remaining balances in investor accounts after December 31, 2013, but the Government treats these remaining balances as unrecoverable and thus worthless.

Notably, one of the investors identified by the Government, Deutsche Bank, received a substantial distribution in February 2014, which is within the period that the Government asserts all balances were unrecoverable and therefore worthless. This distribution apparently does not cause the Government to revisit its mistaken assumption that the remaining amounts in accounts after 2013 were worthless. The Government's loss calculation simply disregards this unambiguous distribution for purposes of calculating Deutsche Bank's loss.

C.     **Credit Fund Performance in 2011 and 2012**

As a preliminary matter, the Government's contention that select investors actually lost

money in 2011 and 2012 following their investment after June 2011 is questionable based on the

information reported in the PSR.  This is especially so for investors who redeemed their

investment at the end of 2012 or soon thereafter.  For example, the PSR reports that investors

earned 6% on their investment in 2012. PSR § 15.  Therefore, if an investor with contributions

on or before January 1, 2012 redeemed its investment at the end of 2012 or early in 2013, it

would have made money – 6% – not lost money for the yearlong period. To the extent that a

hapless investor prematurely redeemed its investment in 2012 – before the full year-end 6%

return could be realized – and somehow actually did sustain a loss, that mistimed investment

decision implicates investment, market or other factors apart from any effect that could result

from offense conduct. The investment profit streak might have been expected to continue until

mid-2013, when the PSR states that the Fund received "a string of redemption [] requests."  PSR

§ 15.

The PSR reports investment returns in the Fund's performance from exceptionally high

returns of 20% and 30% in 2009 and 2010, respectively, to more modest returns in 2011 and

2012, of 1% and 6%, respectively.  Thus, in both 2011 and 2012, during the charged offenses,

there was no reported loss in the Credit Fund.  In addition, according to the PSR, in mid-2013

there were "a string of redemption, or withdrawal, requests from investors." PSR § 15.  No

mention is made – and no consideration apparently has been taken – of the performance of any

position in any particular security, illiquid asset or special situation.  Neither the PSR nor the

Government claims any connection between the purported investor losses and the offense

conduct.  Nor is evidence cited linking the decline in value to the charged offense.  The PSR also

reports that certain investors were unable to be fully redeemed because certain positions could not be liquidated.  PSR § 15.

Nonetheless, the Government seeks a 20-level increase in the Guidelines computation on the basis of its claims.  The Government has failed to substantiate the calculations of actual loss and meet its burden on establishing loss as claimed.

In its Sentencing Memorandum, the Government refers to the trial testimony of "two [unidentified] victims" whose "losses were undisputed at trial" as support for its claimed total loss amount of $23.4 million.  Sentencing Memorandum at 7.  One of the unidentified witnesses, Peter Vasiliadis, who works for Morgan Stanley in the Alternative Investment Partners (AIP) unit, testified that "[o]verall," Morgan Stanley's AIP unit lost "[a]bout $5 million" "on its investment with the Visium credit fund."  Tr. 847, 863.  The claimed loss of $5 million for Morgan Stanley was included in the PSR list of investor losses.  PSR § 69.  The Government, however relies solely on the testimony of Mr. Vasiliadis, and does not explain why this loss is not reflected in the underlying data on which the Government relies for other investors. As the Visium Spreadsheet shows, the contribution pre-dated July 2011, and the reported loss was dramatically less.

The PSR originally claimed William Blair sustained a  loss of $500,000.  PSR § 69.  The Government has since reclassified the investor and assigned a diminished loss of just $277,980.  Ex. E.  In one more example, the reported JPMorgan Trust Company loss has declined by $1.8 million since the PSR.  PSR § 69, Ex. E.

Even with the loss total revisions, the calculations are not reliable and the Government has not substantiated its loss claims. The corresponding 20-level Guidelines increase is not justified.

31

D.    **Actual Loss: The Government's Theory: Investor Loss**

The Government's position fails to acknowledge any causal link between offense conduct and loss. No such connection can be established. Also overlooked is an array of investment risk and other performance issues unrelated to the offenses of conviction.

The Government asserts that its position on a 20-level increase for loss is vindicated by "common sense, the trial record and relevant case law."  Sentencing Memorandum at 7.  It is not. The Government does not come near satisfying its burden of proving a causal link between any claimed investment loss and the offense conduct.  Instead, it seeks a legal shortcut,  bypassing the legal requirement of identifying causal factors and distinguishing them from other factors that affect investment performance.  Losses or gains resulting from the offense conduct have not been identified, and the Government has not undertaken that exercise.

For legal support, the Government turns to two summary orders lacking precedential effect and a third case cited in the summary orders that involve "intended loss," based on invested and reinvested sums induced in a Ponzi scheme.  In light of their facts and circumstances, the cited cases are unavailing, and the Government's reliance is misplaced.  Each of the cases is based on the factual scenario, completely inapplicable here, where an investor "ultimately receives nothing of value in return" for his investment.  The two summary orders, *United States v. Balboa*, 622 F. App'x 31 (2d Cir. 2015), and *United States v. Stitsky*, 536 F. App'x 98 (2d Cir. 2013), which the Government cites, rely on *United States v. Hsu*, 699 F.3d 112 (2d Cir. 2012). The two summary orders, *United States v. Balboa*, 622 F. App'x 31 (2d Cir. 2015), and *United States v. Stitsky*, 536 F. App'x 98 (2d Cir. 2013), which the Government cites, rely on *United States v. Hsu*, 669 F.3d 112 (2d Cir. 2012).

This case is distinguished from *Hsu*, where an investor "ultimately receive[d] nothing of value in return" for his investment," and "loss [was] measured by the amount of principal

32

invested. . . ." *Id. See also Balboa*, 622 F. App'x at 32 (applying loss based on victims' ultimately receiving nothing in return for investment); *Stitsky*, 536 F. App'x at 111 (affirmed district court's measure of loss where investors were left with "nothing of value when the fraud was uncovered," and investment "Units" "conferred no value at all on the investors").

The Government does not claim "that investors had been left 'with nothing of value when the fraud was uncovered.'" *Stitsky*, 536 F. App'x at 111. The Government's recent loss summary (Ex. E) reflects diminished losses since the PSR. Unlike the three cases that it cites, even the Government does not seek to calculate loss based on the total sum of the investors' investment. The Government's own evidence, the Visium Spreadsheets, make clear that Credit Fund investments did increase in value from month to month. Significantly, the value of the mismarking offense conduct affected at most only a small fraction of the overall NAV of the Fund for any particular month. Tr. 925-26.

Because loss cannot be measured without considering causal links to the offense conduct, the Government's approach does not meet the reasonableness standard in sentencing. *See United States v. Leonard*, 529 F.3d 83, 92 (2d Cir. 2008) ("[A] sentence may (but need not necessarily) be vacated as 'unreasonable' because some steps taken by the sentencing court in determining or imposing the sentence did not comport with the requirements of law, either substantive or procedural.") (citing *United States v. Fernandez*, 443 F.3d 19, 26 (2d Cir. 2006)). *See also United States v. Pereira*, 465 F.3d 515, 519 (2d Cir. 2006). "An error in determining the applicable Guideline range . . . would be the type of procedural error that could render a sentence unreasonable. . . ." *United States v. Selioutsky*, 409 F.3d 114, 118 (2d Cir. 2005). *See also Leonard*, 529 F.3d at 92. While the Guidelines require that the sentencing court "make a reasonable estimate of the loss, given the available information," a court of appeals will

33

"determine [] whether the trial court's method of calculating the amount of loss was legally

acceptable." *United States v. Rutkoske*, 506 F.3d 170, 178 (2d Cir. 2007) (internal quotation

marks omitted) (quoting *United States v. Olis*, 429 F.3d 540, 545 (5th Cir. 2005) (cited in

*Leonard*, 529 F.3d at 92-93.)

### E.   The Applicable Legal Standard for Establishing Actual Loss

"Actual loss" is defined by the Sentencing Guidelines to mean the "reasonably

foreseeable pecuniary harm that resulted from the offense." U.S.S.G. Section 2B1.1, cmt.

(n.3(A)(i)). Even in fraud cases involving calculating complexities, "[t]he loss must be the result

of the fraud." *United States v. Ebbers*, 458 F.3d 110, 128 (2d Cir. 2006) (explaining that

"[l]osses from causes other than the fraud must be excluded from the loss calculation").

Although a "court need only make a reasonable estimate of the loss," its determination must

nevertheless be "legally acceptable." *Rutkoske*, 506 F.3d at 178; *see also United States v.*

*Ferguson*, 584 F. Supp. 2d 447, 451 (D. Conn. 2008) ("[T]he district court's estimate must be

grounded in sound economic principles").

The Second Circuit has flatly rejected the position that the Government urges this Court

to take. In *Leonard*, 529 F.3d at 85, 93, a securities fraud case involving the sale of illiquid

securities, the case was remanded because the sentencing court had failed to deduct from the

securities purchase price of the actual value of the instruments <u>despite the finding that the</u>

<u>investors would not have invested in the securities if not for the defendant's misrepresentation</u>.

Instead, it erroneously had computed "the loss amount as the entire cost of the total shares that

the defendants sold." *Leonard*, 529 F.3d at 85.  The Second Circuit rejected the government's

argument that the total sale amount was the proper measure of loss "on the ground that the

members would not have invested had they realized the [undisclosed] true size of the sales

34

commissions." *Id.* at 93. Acknowledging that illiquid securities were "extremely difficult to value" and only a "reasonable estimate" of the loss amount was required was not a bar to re-sentencing.  The Second Circuit remanded to assess the actual value of the securities the defendants sold apart from that which was attributed to the fraud. *Id.* at 93.

In *Rutkoske*, 506 F.3d at 178, another securities fraud case, the Second Circuit rejected the Government's approach that the loss should be determined by attributing "the total amount of the decline in the value of [company] shares to [the defendant's] offense conduct. . . ."  There, the district court had calculated loss primarily relying on the losses brokerage customers sustained "as a result of their purchases and sales" during a given time period that ended on a date without "particular relevance to the offense conduct." *Id.*  The Government urges the same approach here.

In other criminal cases involving sentencing for securities fraud, the Second Circuit, like the Fifth and Tenth Circuits, has invoked economic principles that guide loss calculation in civil cases. *See Rutkoske*, 506 F.3d at 179; *Olis*, 429 F.3d at 546; *United States v. Nacchio*, 573 F.3d 1062, 1078–79 (10th Cir. 2009).  The *Rutkoske* court, for example, cited guidance from the Supreme Court in *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), where the court observed that "a plaintiff must prove that the misrepresentation proximately caused the economic loss." *Rutkoske*, 506 F.3d at 179. *See Dura*, 544 U.S. at 346.  In *Rutkoske*, the court remanded based on "[t]he District Court's basic failure at least to approximate the amount of loss caused by the fraud without even considering other factors relevant to a decline [of the securities' price]." *Rutkoske*, 506 F.3d at 180 (emphasis added); *see also Ferguson*, 584 F. Supp. 2d at 453 (same).  The Government attempts no such undertaking here, and its failure to do so is fatal to computation of loss under the Guidelines.

35

In *Ebbers* and other cases, the court could not rule out non-fraud factors that led to the decline in the securities' price. *Rutkoske*, 506 F.3d at 179; *Ferguson*, 584 F.Supp. 2d at 452. *See also United States v. Gushlak*, 728 F.3d 184, 197 (2d Cir. 2013) (emphasizing in determining investor loss, for restitution, importance of relying on quantitative analysis and sophisticated principles of corporate finance and statistics).   The principle applies generally as well in fraud cases. *See, e.g., United States v. Whiting*, 471 F.3d 792 (7th Cir. 2006) (remanded because of insufficient causal link of offense conduct to losses). The inability to do so here similarly prevents a reasonable estimate of a loss calculation.

### F.   No Causal Link Between Any Decline in Investment Value and Offense Conduct

No attempt is made to tie the offense to a decline in investment value, and no causal link can be established.  Because of the overwhelming obstacles in linking any offense conduct to investor losses, no reasonable estimate or determination can be made by the Court.  Accordingly, any such losses are not and cannot be reasonably foreseeable.

### G.   Investment Risks and Other Factors

The Government does not acknowledge investment risks and related factors that affect the Credit Fund's investment performance.  For example, large institutional investors routinely assume risks when they decide to invest in the Credit Fund and other hedge funds. Assuming such risk is a significant factor in considering investment performance and investor losses.  For example, the Fund's offering memorandum (Confidential Explanatory Memorandum) identifies and describes in detail certain risk factors," such as Nature of Investments ("There can be no assurance that the Investment Manager will correctly evaluate the nature and magnitude of...factors that could affect the value of and return on investments."); Investment Rate Risk

("[T]here can be no guarantee that the Investment Manager will be successful in fully mitigating the impact of interest rate changes . . . [A] rise in interest rates may negatively impact the Fund's performance."); Short Term-Trading Risks ("Because market trends in general and changes in market trends during a trading day cannot be predicted with any degree of accuracy or consistency, the Fund's performance may fluctuate substantially from period to period, and it is possible that the Fund may sustain substantial and continuing losses."); Special Situations ("In any investment opportunity involving [investments in companies undergoing liquidtions, spin-offs, reorganizations, or bankruptcies], there exists the risk that the contemplated transaction either will be unsuccessful, will take considerable time or will result in a distribution of cash or a new security the value of which will be less than the purchase price ….."); *see also* Use of Leverage; Exchange Traded Funds; High Yield Securities; Convertible Securities and other risk factors. GX 408.

**H.     The Evidence of Investor Loss at Trial**

The Government relies on the testimony of two witnesses (Vasiliadis and Carl) to claim that their investment firms "obviously would not have invested" had they known the truth. Sentencing Memorandum at 7. The Government did not elicit evidence tying the losses to the offenses, and neither witness testified that any loss resulted from offense conduct.  Instead, the witnesses were asked whether their investors sustained a gain or loss and how much money was lost.  Tr. 863; 899-900.  An investor loss in the Credit Fund post-June 2011 in and of itself is proof of nothing pertaining to a Sentencing Guidelines loss calculation.

Nor was offense conduct, much less Stefan's conduct, cited by the witnesses as a reason for redeeming their investments.  There was no testimony that they were aware of any allegation of possible misconduct at the Credit Fund.  Indeed, the first published reports of mismarking allegations appeared in March 2016 – years after the charged conduct concluded and after

investor redemptions were well under way. *See* Ex. H., Alexandra Stevenson, "Visium Hedge Fund Being Investigated by Justice Dept. and S.E.C." N.Y. TIMES (March 7, 2016).

Under the particular circumstances of this case, a reasonable estimate of any loss cannot be assessed under the Guidelines.

## I.  Additional Reasons That Losses Were Not Reasonably Foreseeable

To the extent Fund loss calculations can be substantiated, significant market factors were principal causes.  In relation to the total Fund, the Government's evidence of mismarked securities never exceeded $26 million in additional assets under management in any one month within a fund totaled approximately $463 million. (Tr. 925-26). It is not reasonably foreseeable that mismarking a subset of Fund securities would generate aggregate investor losses in light of overall performance.

While experiencing some monthly volatility, Fund performance was effectively flat during the period July 2011 through December 2012.  Thus, had the investor base remained constant during this period without changes in subscriptions and redemptions, no losses would have been sustained.  For one example, the timing of an investor's subscription and redemption – having nothing to do with mismarked securities – in itself can have an effect on the value of its own investment in the Fund.  Nonetheless, losses may have occurred for investors entering and leaving the Fund depending on their timing.  At most, even though any effects on loss are incalculable, mismarked securities would be expected to account for only a limited impact on overall performance.  This is especially so in light of the relative stability of the Fund's performance during this time period.

Market performance doubtless has a significant impact on investor gains and losses. Such a factor affects Fund performance during the Fund Period far more than the subset of mismarked

38

securities in this case.  To infer foreseeability under the circumstances imposes a broader and

unreasonable -- and erroneous -- causal link between the offense conduct and decline in Fund

performance.

Doing so also mistakenly assumes that had these institutional investors not invested in

Visium, they would have effectively held their money as cash.  Such an approach would be

unrealistic, as professional investors like Morgan Stanley and William Blair apply benchmarks to

targeted allocations of investable funds.  It therefore is highly likely that had Credit Fund

investors not invested in Visium, they would have selected a different fund with a similar

strategy in which to invest.  In light of the common, if unremarkable, understanding among

institutional investors that hedge funds offer the opportunity to realize outsized returns in

exchange for substantial risk, it is just as likely that these investors would have experienced

similar or perhaps greater losses had they chosen to invest in a competing fund.  That hedge

funds as an industry have generally performed poorly over the past several years is well

documented in the financial press. Thus, to the extent that losses can be substantiated, it is not

realistic to assume that the losses sustained from Visium investments could have been averted

irrespective of the offense conduct.  Simply put, the risks inherent in hedge fund investing

simply cannot be superseded or overlooked here.

### J.    The Proposed 20-Level Enhancement Overstates The Seriousness of the Offense And Disproportionately Affects the Sentencing Guidelines Range

The PSR's loss amount overstates the seriousness of the offense as to Stefan, especially

in light of his role, conduct and compensation at Visium when compared to Mr. Plaford's.  *See*

*supra* at 3. Level increases of 16 to 20 wield an enormously disproportionate and improper

influence on the ultimate range that the Guidelines have devised.  The disproportionate effect on

the total offense level of 33 and ultimate Guideline range is thoroughly misaligned with

sentencing objectives, especially where no causal link to investor loss exists.  A downward

departure is warranted.  *See, e.g., United States v. Speight*, 75 F. App'x 802, 806 (2d Cir. 2003)

(summary order) (downward departure to 72-month sentence from 188-235 months, based on

defendant's demands from officials totaling $80 million).

### K.   The Government's Alternative Approach to Loss

In its Sentencing Memorandum, for the first time, the Government proposes an

alternative Guidelines loss calculation in contrast to its position on investor losses.  It suggests

that using the "gain resulting from the offense" (U.S.S.G. § 2B1.1, App. Note (3)(B)) in the form

of management and performance fees generated from mismarking is an appropriate measure.

Doing so generates an offense level of 29 and a Guidelines range of 87 to 108 months.

Sentencing Memorandum at 8 n.5.  The PSR makes no such alternative loss proposal.  The

Government contends that a total of $3,156,409 in "excess fees," based on broker quotes from

three brokers, was collected by Visium for the Credit Fund from a total of $14.9 million in fees,

for the period July 2011 through December 2012.  Tr. 912.  Far from being undisputed, the

assumptions used in the computation method raise concerns that the calculation of the "excess

fees" may be overrated.

Particularly telling is the absence of any trial testimony from the Government's investor

witnesses, Messrs. Vasiliadis and Carl, regarding the management and professional fees, if any,

that their respective firms actually paid to Visium. The witnesses testified at length about the

investments their respective companies, William Blair and Morgan Stanley AIP, made in the

Credit Fund.  However, neither one testified as to any paid fees.  What were the specific terms of

the Credit Fund fee arrangements, how were fees assessed and computed and what were the fees

actually owed – these questions all were unaddressed.  These issues directly implicate the accuracy of any purported calculation of "excess fees."[1]

Instead of relying on actual figures to compute loss, the Government chose instead to rely on a hypothetical analysis.  To the extent that the investment managers had in fact paid Visium any fees for the 2011-2012 period or had a fee arrangement, knowing the terms and amounts paid would be critical in gauging the reliability and accuracy of the Government's calculations, as well as their reasonableness.[2]

      1.    Treatment of Loss Carryforwards:  Roll-Forward Analysis of Investor Capital

Currently unaddressed is how loss carryforwards were treated in the Government's calculations.  Performance fees for the Credit Fund were assessed only to the extent that investors did not sustain cumulative losses, or loss carry-forwards, to offset gains.  For example, if an investor sustained a Credit Fund loss in the first year of its investment (no performance fee due) and in the second year the Fund value of the investment increased, but not as much as the first year's loss, then there would be a partial offset, and no performance fees would be due -- even though there was a gain in the second year.  Assuming that the value of the investment increased again in the third year, only if the increased value exceeded the value of the original investment would a performance fee be due. The amount due would be limited to the difference between the two values.  The original high-water mark thus would be replaced by the new high-water mark of the third-year investment.

---

[1]  Even if the fees associated with particular trades could be calculated with reasonable precision, a question remains as to whether market trades may have been misidentified as mismarked.

[2]  To the extent such figures are also relied on in imposing restitution or forfeiture orders on Mr. Lumiere, the accuracy of the calculations assumes even greater importance.

The failure to take into account loss carryforwards likely resulted in an overstatement of "excess fees." To the extent that there are losses or that loss carryforwards offset gains, no performance fee would be due.  To the extent that monthly marked assets caused losses, they too can be carried forward and added to preexisting loss carryforwards.  Failing to account for the loss carryforwards can be expected to result in overstated fees.

2.      Treatment of Different Share Classes

Different share classes in the Credit Fund paid different percentages of management and performance fees.  Knowing the percentage fees that were applied to each share class should help determine whether the applications were correct and the calculations accurate for this particular category.

3.      Treatment of Subscriptions and Redemptions

The failure to account for subscription and redemption activity for the July 2011 - December 2012 period would necessarily fail to reflect the effects of loss carryforwards on the amount of performance fees the Credit Fund charged.  As a consequence, the calculated amount of performance fees would be affected.

4.      Treatment at the Individual Investor Level

Investors typically do not act uniformly.  An investor may hold different share class interests, have different loss carryforward amounts and engage in different subscription and redemption activity.  Because loss carryforwards turn on both the date of an investor's subscription in the Credit Fund and its subsequent performance, the specific carryforward amount – and the resulting performance fees assessed – is necessarily linked to each investor and the amount of capital contributed.  The failure to perform the analysis at the individual investor level would not yield an accurate result.

42

For the foregoing reasons, the Government's calculations may significantly overstate the "excess fees" calculations. The resulting computations cannot be accepted as accurate or a reasonable estimate absent appropriately accounting for these considerations.

### L.   No Intended Loss Results from the Offense Conduct

The Sentencing Guidelines directs that generally loss under Section 2B1.1(b)(1) is to be calculated as "the greater of actual loss or intended loss." The Guidelines Application Notes define "intended loss" to means "the pecuniary harm that the defendant purposely sought to inflict." Section 2B1.1 n.3(A)(ii). Thus, computing any intended loss requires an evaluation of the defendant's subjective intent. Neither the Probation Office nor the Government contends that intended loss should be the applicable Guidelines measure of loss. Indeed, both the PSR and the Sentencing Memorandum make no reference to intended loss. In light of the facts and circumstances, the position is completely understandable.

A subjective inquiry is but the start of the exercise. As the Sentencing Commission made clear in connection with amendments to the Guidelines, effective November 1, 2015, the determination of intended loss is required to follow the method applied in *United States v. Manatau*, 647 F.3d 1048 (10th Cir. 2011). Amendments to the Sentencing Guidelines (effective November 1, 2015), Policy Statements, and Official Commentary at 29. In *Manatau*, the Tenth Circuit set forth an approach that requires prosecutors and courts to hew narrowly to a limited inquiry regarding the defendant's state of mind. It rejected encompassing broader inferences about the level of a defendant's knowledge. Moreover, the court specifically made clear what "intended loss" does not mean. The Tenth Circuit held that "'[i]ntended loss' does not mean a loss that the defendant merely *knew* would result from his scheme or a loss he might have *possibly and potentially* contemplated." *Manatau*, 647 F.3d at 1050. The authoritative *Manatau*

43

method goes even farther in limiting how the inquiry is applied. That a defendant is "aware" or even "practically certain" that losses will result from his actions is legally insufficient to include such losses in the total computation. *Manatau*, 647 F.3d at 1050. Rather, to find that losses qualify as "intended" and may be considered for a Guidelines loss calculation, the sentencing court is required to find that the defendant "had [] a 'conscious object' to cause" such losses. *Id.* The trial record lacks any support to satisfy the Guidelines and *Manatau* standards.

**M.    Victims Under the Guidelines Have Not Been Established**

The PSR states that "[t]wo levels are added because the offense involved 10 or more victims," and cites § 2B1.1(b)(2)(A)(i). PSR § 77. The PSR identifies 16 Credit Fund institutional and individual investors and corresponding loss claims that the Government provided. PSR §§ 66, 69. The Government now claims 14 victims. However, none of the identified investors qualifies as a "victim" under the Guidelines. Victim is defined by the Guidelines as "any person who sustained any part of the actual loss determined under subsection (b)(1)." U.S. Sentencing Guidelines Manual, Section 2B1.1(c)(1), cmt. 1 (Nov. 2016). The Guidelines define "[p]erson" to include "individuals, corporations, companies, associations, firms, partnerships, societies, and joint stock companies." *See also United States v. Skys*, 637 F.3d 146, 153 (2d Cir. 2011) ("'victims'… are only those persons or entities who sustained 'actual loss determined' by the court 'under subsection (b)(1)'").

The Government has not established a causal link between loss and offense conduct and therefore cannot properly assert that any identified investor sustained an actual loss. See *supra*, at 32. Accordingly, no victim has been identified and, a two-level increase is unwarranted.

44

### N.    A Four-Level Increase is Unwarranted Because Lumiere Was Not an Investment Adviser

The PSR states that four levels are added "because the offense involved a violation of securities law and, at the time of the offense, the defendant was an investment adviser."  PSR § 78.  The PSR cites Section 2B1.1(b)(19)(A)(iii).  Stefan objects to this paragraph and the four-level enhancement under USSG § 2B1.1(b)(19)(A)(iii) because he was not an "investment adviser." The Government does not assert that he qualifies as an "investment adviser," and there is no evidence that supports such a claim.  The four-level increase also is objectionable because the specific offense characteristic is misapplied and overstates Stefan's limited conduct with respect to the Credit Fund.

As a threshold matter, Stefan does not qualify under the statutory definition of investment adviser in 15 U.S.C. Section 80b-2 (a)(11). Stefan did not, in connection with the Credit Fund, for compensation, engage in the business, directly or through publications or writings, as to the value of securities or advisability of investing or trading in securities. Nor did he engage in the business of advising others on the valuing or advising on securities for compensation.  See *supra*, at 4, for discussion of Stefan's work for the Credit Fund.  The limited professional role Stefan held at the Credit Fund disfavors applying the enhancement.  This is especially so when Stefan's duties and compensation arrangements are compared with those in *United States v. Regensberg*, 635 F. Supp. 2d 306, 311-12 (S.D.N.Y. 2009), an "investment adviser" case, in which the court rejected application of the enhancement.  There, the defendant "was to receive a percentage of the profits, if any, that an investor garnered from his or her investment." *Id.* at 311. While in *Regensberg*, the district court acknowledged that the defendant may have discussed "with his victims" the comparative risks of two investment products, the court determined that he received no compensation for the advice.  By contrast, in this case, Stefan did not communicate with

45

investors or clients to review valuation, pricing or investment strategies –and he received no compensation for his assignments in the Credit Fund.

In pressing for the four-level increase, the Government pivots, however, from the PSR's asserted basis for applying the Guideline section. The PSR relies exclusively on the assertion that Stefan was an "investment adviser. " The Government did not correct the designation or seek to expand the basis for applying the adjustment. Now, the Government overlooks the specific grounds cited in the PSR and relies on a separate clause of the enhancement for "a person associated with an investment adviser." *See* Section 2B1.1(b)(19)(A).

To support its position on "person associated," the Government reaches for a decade-old unpublished opinion in the Eleventh Circuit, *United States v. Longo*, 184 F. App'x 910 (11th Cir. 2006). Even in that case, however, the job position and responsibilities assumed far greater significance than what Stefan's tenuous connection with the Credit Fund allowed. In *Longo*, the "person associated with an investment advisor" was "a compliance officer who managed portfolios." *Id.* at 915 (emphasis added). These substantial job responsibilities were significantly greater than Stefan's, especially regarding the duties associated with an investment advisor. To the extent, however, that Stefan is deemed to qualify as a "person associated," the designation (and accompanying four-level increase) significantly overstates Stefan's position, role and duties, and the four-level increase should be significantly decreased.

## IV.    A RESTITUTION ORDER IS INAPPLICABLE

Restitution in this matter is governed by 18 U.S.C. § 3663A *et seq.* ("MVRA"). Under the MVRA, "a court's power to order restitution is limited to actual loss." *United States v. Carboni*, 204 F.3d 39, 47 (2d Cir. 2000). Thus, the government may only seek restitution for the victims' losses "directly caused by the conduct composing the offense of conviction." *United*

46

*States v. Silkowski*, 32 F.3d 682, 689 (2d Cir. 1994). Indeed, the MVRA applies only when "an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1)(B). Accordingly, "even where a defendant's complex fraud scheme results in many victims whose identities and losses are difficult to ascertain, the district court should identify the victims and their actual losses prior to imposing restitution under the MVRA." *United States v. Catoggio*, 326 F.3d 323, 329 (2d Cir. 2003). In *Catoggio*, the Second Circuit vacated the lower court's restitution order that was not based on an "accurate" figure of the victims' losses in that case. Finally, in seeking restitution, the government bears the burden of proving the amount of loss sustained by the victim resulting from the offense by a preponderance of the evidence. 18 U.S.C. § 3664(e).

Since the government cannot demonstrate that the victims suffered any actual loss, Stefan should not be assessed a restitution penalty. *See e.g.*, *United States v. Boccagna*, 450 F.3d 107, 119 (2d Cir. 2006) ("Criminal restitution, on the other hand, is not concerned with a victim's disappointed expectations but only with his actual loss"). The government has failed to demonstrate that the victims' losses resulted from Stefan's offense conduct. Accordingly, the Government has not met its burden with respect to restitution.

## V.   A FORFEITURE ORDER IS NOT WARRANTED FOR LUMIERE

The PSR calls for forfeiture, but does not identify the amount to be forfeited. See PSR §§ 152, 153. The Government now seeks an order from the Court to compel Stefan to forfeit $2,622,709 in performance fees even though it has utterly failed to establish any actual gain that Stefan obtained from the offense conduct. It argues that this precise sum represents "the amount of excess fees that Stefan and his co-conspirators gained from the offense." Sentencing Memorandum at 12.

47

The Government bears the burden to prove by a preponderance of the evidence that the property sought is forfeitable. *United States v. Capoccia*, 503 F.3d 103, 116 (2d Cir. 2007). It has presented no evidence that Stefan received any portion of the "excess fees" – a part of the Visium's performance fees. He did not. For his work in 2011 and 2012, Stefan received no performance fees and no bonus, just his annual salary of approximately $200,000. Ex. J. The Government has not presented evidence that the performance fees were even actually paid. Under the circumstances here, an order of forfeiture as to Stefan would be inconsistent with its purposes, and forfeiture at least as to Stefan is not warranted.

"Criminal forfeiture focuses on the disgorgement by a defendant of his 'ill-gotten gains.'" *United States v. Contorinis*, 692 F.3d 136, 146 (2d Cir. 2012), citing *United States v. Kalish*, 626 F.3d 165, 170 (2d Cir. 2010) (other citation omitted). The "calculation of a forfeiture amount in criminal cases is usually based on the defendant's actual gain." *Contorinis*, 692 F.3d at 146, citing *United States v. McGinty*, 610 F.3d 1242, 1247 (10th Cir. 2010). The purpose of criminal forfeiture focuses on the "defendant's actual gain" so that "we can separate the criminal from his profits… thus removing the incentive others may have to commit similar crimes tomorrow." *Contorinis*, 692 F.3d at 146-47, citing House Judiciary Committee Report of testimony from Justice Department official (citation omitted). *See also United States v. Nicolo*, 597 F.Supp.2d 342, 347 (W.D.N.Y. 2009) ("a defendant may be ordered to forfeit monies received *by him* as a result of the fraud") (emphasis added) (citing *United States v. Uddin*, 551 F.3d 176, 181 (2d Cir. 2009), all cited in *Contorinis*, 692 F.3d at 147. In *Contorinis*, the court held that a defendant nonetheless may be ordered to forfeit proceeds received by "others who participated jointly in the crime, provided the actions generating those proceeds were reasonably foreseeable to the defendant." *Id.* at 147.

48

The Second Circuit has held that the defendant could <u>not</u> be compelled to forfeit "funds never acquired by [the defendant] or someone working concert with him." *Contorinis*, 692 F.3d at 147. To be "acquired" by him, "the property must have, at some point, been under the defendant's control or the control of his co-conspirators in order to be considered." *Id.* The Second Circuit held that absent such control an order of forfeiture would be inconsistent with the "broadly accepted principle that forfeiture is calculated based on a defendant's gains. " *Id.*, citing *McGinty*, 610 F.3d at 1247. *See also United States v. Reese*, 36 F. Supp.3d 354, 364-65 (S.D.N.Y. 2014) (deposited funds subject to forfeiture if "controlled" by co-conspirators).

In this case there is a lack of supporting evidence that justifies forfeiture here. Even if the calculation of "excess" performance fees were accurate, no evidence has been presented as to the amount that was actually paid to Visium – or to the Credit Fund, Mr. Plaford, its portfolio manager, or any other individual on the credit team. Even if "excess fees" had been paid to Visium, those fees would not qualify for forfeiture because Visium, as the control person, was not identified as a co-conspirator in this case. Accordingly, Visium's receipt or control of fees would disqualify the funds as forfeitable proceeds.

At trial, the evidence on the receipt and payment performance fees was sharply limited and legally insufficient. Even if credited, Mr. Plaford's trial testimony is unavailing to the Government's position. For example, he did not testify as to what the performance fee was or when it was paid. Mr. Plaford simply testified that "Jake [Gottlieb] and the rest of the credit team" received the performance fee. Tr. 653. For his part, Mr. Plaford agreed that he would "certainly do [his] best to . . . to forfeit to the government all the proceeds that are determined [he] made from this crime." Tr. 778.

What is clear, however, is that Stefan did not receive any portion of the Credit Fund performance fees for his work in 2011 and 2012.  For that same period Stefan received no fees, no bonus, and nothing beyond his standard annual salary. He received no benefit in connection with the Credit Fund or the offense conduct.  It is clear that Stefan, who worked primarily in the Global Fund, was not a member of the Credit Team, and he was not treated as such.

In addition, since "the rest of the credit team" were not identified as co-conspirators, the fees they received are not properly forfeitable.  The amount of those fees also may not properly be included in a forfeiture order.  Forfeiture of monies that innocent third parties control or receive would directly undermine the deterrent and other objectives in seeking to remove the "gain from the actual offender."  Even with respect to the decision for what Stefan, "the analyst," was to be paid "out of" performance fees, Mr. Plaford testified that there were multiple deciders: "[m]ostly me and Jake." Tr. 654.  But noticeably absent was any claim that "the analyst" actually received payment of any fees.  Nor was there testimony that this summary description applied during 2011 to 2013 – the term of the offenses of conviction to which the forfeiture allegation was to be made subject– or at any particular time.

The Government's alternative efforts to eke out some measure of forfeiture from Stefan similarly are legally unavailing.  Its proposal that Stefan forfeit a year's salary – approximately $200,000 – has no legal basis. *See Contorinis*, 692 F.3d at 148 n. 4 (instructing sentencing court to determine "[t]o what extent appellant's interest in salaries, bonuses, dividends, or enhanced value of equity... can be said to be money 'acquired' by the defendant 'through the illegal transactions resulting in forfeiture"').  As the Government is well aware, Stefan primarily was assigned to the Global Fund, not the Credit Fund – even when he agreed to handle *ad hoc* restructuring and related requests from Mr. Plaford.

50

Stefan's employment and supplemental contract with Visium – not the Credit Fund --
was entered in 2007 with the same salary amount long before the commencement of the illegal
scheme, as charged, and his compensation from Visium for 2011 and 2012 was for work
unrelated to the Credit Fund. *See* Ex. J. Stefan's salary has no link to his participation in the
offense conduct, and no evidence has been provided.   The salary amount for Stefan –
approximately $200,000 (a fraction of Mr. Plaford's and many others at Visium) -- remained
unchanged during the offense period during which he received no bonus or other increase to his
2007 base salary.  The Government does not assert otherwise.  Furthermore, Stefan did not
receive any financial benefit as a result of any assignment related to the Credit Fund for 2011-13.
Thus, a year's salary for Stefan also is not subject to forfeiture.

## CONCLUSION

For the foregoing reasons, we respectfully request that the Court impose a non-custodial
sentence, which we submit is sufficient, but not greater than necessary, to satisfy the objectives
of sentencing.

Dated: May 26, 2017                                   Respectfully submitted,
       New York, NY

                                                      FOLEY & LARDNER LLP


                                                      /s/ Jonathan N. Halpern
                                                      Jonathan N. Halpern
                                                      Jonathan H. Friedman
                                                      90 Park Avenue
                                                      New York, NY 10016
                                                      (212) 682-7474
                                                      jhalpern@foley.com
                                                      jfriedman@foley.com