**THIS EMPLOYMENT AGREEMENT** (this "Agreement") is made as of _____ 2007 (the "Effective Date"), between **VISIUM ASSET MANAGEMENT, LP**, a Delaware limited partnership (the "Company"), and Stefan Lumiere (the "Employee").

## RECITALS

**WHEREAS**, the Company desires to secure the services and employment of the Employee on behalf of the Company, and the Employee desires to enter into employment with the Company, upon the terms and conditions hereinafter set forth in this Agreement;

**WHEREAS**, the Employee is to be employed by the Company in the positions set forth in the Addendum attached hereto (as may be amended from time to time, the "Addendum"); and

**WHEREAS,** each of the Company and the Employee anticipates that in connection with the performance of his or her duties and responsibilities as an employee of the Company, the Employee will be granted access to the Company's facilities and is likely to receive directly, be exposed to and/or be responsible for developing certain confidential and proprietary information as well as certain ideas, concepts and/or inventions belonging in whole or in part to the Company (as defined more particularly herein, the "Confidential Information" and "Inventions," respectively).

**NOW, THEREFORE**, in consideration of the mutual covenants and promises contained herein, the parties hereto, each intending to be legally bound hereby, agree as follows:

1. <u>Employment; Duties</u>. Beginning on the Effective Date, the Company hereby agrees to employ the Employee as an employee of the Company in the position set forth in the Addendum, and the Employee accepts such employment for the Employment Term specified in Section 3 below. The Employee shall perform those duties from time to time designated by the Company, subject to the understanding that such duties shall be consistent with the duties customarily performed by individuals acting in a like capacity within the Company.

2. <u>Performance</u>. The Employee shall serve the Company conscientiously, competently, faithfully and to the best of his or her ability and shall devote substantially all of his or her business time, energy, experience and talents to the performance of his or her employment duties.

3. <u>Employment Term</u>. The Employee understands and acknowledges that employment with the Company shall commence on the date set forth above and shall continue uninterrupted for an unspecified duration and constitutes "at-will" employment. Each of the Employee and the Company acknowledges that this Agreement may be terminated at any time, for or without Cause (as defined in Section 4), at the option of either the Company or the Employee. The term of employment hereunder shall be the "Employment Term."

4.   Termination.

(a)   <u>Voluntary Termination by the Company or Involuntary Termination for Death or Disability</u>.  Except as otherwise set forth in this Section 4, if this Agreement is terminated by the Company other than for Cause, or in the event of termination upon the Employee's death or Disability (defined herein), the Company shall pay to the Employee (or his or her estate), his or her (1) pro-rated salary through the termination date (if any), and (2) a pro-rated portion of his or her discretionary bonus and (3) the unvested portion of his or her deferred compensation (if any), each in accordance with the Addendum.

For purposes of this Agreement, Disability shall mean the Employee's physical or mental disability which results in the Employee being unable, for a period of more than six consecutive months, to perform his or her duties hereunder on substantially a full-time basis.  In the event of Disability, the Company may at its option terminate the Employment Term hereunder upon not less than 15 days' written notice; <u>provided, however</u>, that such termination shall not prejudice the Employee's rights or benefits under the Company's contributor disability, if any, in effect at the time of such termination.

No payments will be made under this Section 4(a) unless the Employee (or his or her estate) executes a valid release in a form acceptable to the Company.

(b)   <u>Voluntary Termination by the Employee</u>.  Except as otherwise set forth in this Section 4, if this Agreement is terminated by the Employee for any reason, the Company shall pay to the Employee his or her pro-rated salary through the termination date (if any).

(c)   <u>Termination for Cause</u>.  The Company may immediately terminate the Employee's employment hereunder for Cause (as defined below) at any time upon written notice to the Employee.  In the event of termination of the Employment Term for Cause, the Company shall pay to the Employee only his or her pro-rated salary through the termination date (if any). The Employee will not be eligible for any bonus.  For purposes of this Agreement, "Cause" shall mean:

(i) a material breach by the Employee of any of the terms of this Agreement or the Company's policies and procedures as set forth in the Company's Employee Handbook, Compliance Manual, or Code of Ethics and Personal Trading Policy in effect from time to time (each, a "Manual"), which is identified in a Manual as being subject to disciplinary action, up to and including termination;

(ii) the Employee's intoxication with alcohol or drugs while on Company premises during its regular business hours to such a degree that, in the Company's sole discretion, the Employee is abusive or incapable of performing his or her duties and responsibilities under this Agreement;

(iii) the Employee's conviction or plea of guilty or "no contest" to a felony;

2

(iv) misappropriation by the Employee of property (including but not limited to the Company's trading/working capital or other funds, whether or not allocated to the Employee) belonging to the Company and/or any of its clients;

(v) any conviction or plea of guilty or "no contest" by the Employee in any court to a misdemeanor involving: investments or an investment-related business, fraud, false statements or omissions, wrongful taking of property, bribery, perjury, forgery, counterfeiting, extortion or a conspiracy to commit any of the foregoing, unless such misdemeanor was the result of actions done in good faith following the advice of the Company's compliance personnel;

(vi) any finding by a federal or state regulatory agency or a self-regulatory organization that the Employee has been involved in a violation of such agency's or organization's rules (other than a violation designated as a "minor rule violation" under a plan approved by the Securities and Exchange Commission), unless such violation was the result of actions done in good faith following the advice of the Company's compliance personnel;

(vii) material noncompliance by the Employee with the Company's risk guidelines as set forth in writing or otherwise communicated to the Employee from time to time by the Company;

(viii) any act by the Employee materially detrimental to the Company that a reasonable person would deem to have been beyond the discretion of the Employee for a person in his or her position; or

(ix) noncompliance with, or any act by the Employee in violation of, Sections 8, 9 or 10 hereof or any policies adopted by the Company from time to time.

5. Compensation. The Employee's compensation plan is set forth in the Addendum.

6. Expenses. The Employee shall be entitled to reimbursement of reasonable and customary expenses that he or she incurs in direct connection with his or her employment duties, including but not limited to reimbursement for travel expenses and professional fees, in accordance with the Company's expense policies in effect from time to time. Extraordinary expenses incurred by the Employee, such as special equipment and software, must be approved by Jacob Gottlieb (the "Manager") or another officer of the Company. As further set forth in the Addendum, the Employee will be responsible for certain expenses specific to his or her duties and/or trading account and not generally incurred by all other employees ("Charged Expenses").

7. Employee Benefits. During the Employment Term, the Employee shall, in accordance with the applicable plan documents and applicable laws, be eligible to participate in such retirement, medical, dental, income deferral and other employee benefit plans and programs and fringe benefit plans as the Company has in effect from time to time, at a level consistent with his or her position within the Company.

3

8. <u>Conflicting Activities/Code of Ethics</u>. During the Employment Term it shall be the Employee's obligation to conduct personal, financial and business affairs to avoid conflicts of interest and the appearance of a conflict and shall not take any action that could reasonably be determined to directly or indirectly benefit the Employee or any family member or affiliate of the Employee at the direct or indirect detriment or expense of the Company (hereinafter, "Conflicting Action"). Such Conflicting Action includes but is not limited to frontrunning, making trades in an outside account in lieu of the Employee's Company account, all forms of outside employment, or participation of any kind in a similar or related business entity. Any determination of what constitutes a Conflicting Action is in the sole discretion of the Company.

The Employee is required to submit to the Manager a formal, written request prior to engaging in any activity outside the scope of his duties with the Company. The Company will determine whether the outside activity is a Conflicting Action. All requests are considered on a case-by-case basis and are subject to the sole discretion of the Manager. The Employee will be promptly notified in writing of the Manager's decision following the Manager's review.

The Employee shall comply with the letter and the spirit of the Company's Code of Ethics and Personal Trading Policy in effect from time to time, and provide the Company with all documents and information required by the Code of Ethics and Personal Trading Policy in a timely manner.

9. <u>Non-Solicitation of Employees</u>

(a) Since our employees are our most valuable asset and we invest substantial financial resources to attract and retain top professionals, Employee agrees, except with the prior written consent of the Manager, that during the Employment Term and for a period of two years following the termination of the Employment Term for any reason, the Employee will not, directly or indirectly, on his or her own behalf or on behalf of others, including employee's New Employer or New Business, solicit, engage, cause, encourage or authorize directly or indirectly to be employed or engage any employee, consultant or agent of the Company or any of its Affiliates at the time of this Agreement or persons who were an employee, consultant or agent of the Company within one year prior to the end of the Employment Term or consulting term or persons who shall have subsequently become an employee, consultant or agent of the Company or any of its Affiliates, or encourage any employee, consultant or agent of the Company or any of its Affiliates to leave the employ or service of the Company, nor shall the Employee assist or encourage any person or entity to do any of the foregoing or otherwise interfere with the relationship between the Company and any employee, consultant or agent or between an Affiliate and any employee, consultant or agent of the Company. In the event that Company waives by written consent the following restrictions and an Employee or any other of Company's employees, consultants or agents is hired by another entity though the assistance of Employee or other similar manner, Employee agrees to ensure that such hiring entity shall pay Company a recruiting fee of 25% of such employee's, consultant's or agent's current yearly compensation. In the event that more than one employee, consultant or agent is hired by another entity under the same or similar circumstances, Employee agrees to ensure that such hiring entity shall pay Company a recruiting fee of 50% of each employee's, consultant's or agent's current yearly compensation. The Company and the Employee acknowledge that the Employee has been given

4

an opportunity to have this Agreement reviewed by counsel and that the time and scope of this Section 9 have been specifically negotiated by sophisticated parties, and agree that the provisions of this Section 9 are reasonable under the circumstances of the activities contemplated by this Agreement. In the event that any portion of the provisions set forth in this Section 9 or any other section of this Agreement shall be determined by any court of competent jurisdiction to be unenforceable by reason of its being too extensive in any respect, the parties hereto agree that the maximum period or scope reasonable under such circumstances shall be substituted and that such court shall be allowed to revise the restrictions contained herein to cover the maximum period and scope determined by such court to be permitted by law. "New Employer" means an entity that employs the services of the Employee after the cessation of his or her employment by the Company, whether or not the Employee has any ownership interest in such entity and, including, without limitation, an entity, including a sole proprietorship, which shall be owned by Employee.

(b) Upon the termination of the Employee (1) by the mutual consent of the Employee and the Company or (2) by the resignation of the Employee upon forty five (45) days prior written notice to the Company (the date of such notice, "Notice Date"), any of the foregoing being a ("Severance Event"), the Company may, at its option, to be exercised by the Company in its sole and absolute discretion and Company's written consent, within fifteen (15) days after the Notice Date, as the case may be, offer to perform all of the following actions:

1. not prohibit the Employee from soliciting investors in the Visium Funds while the Employee is still employed by the Company;

2. not prohibit the Employee from soliciting employees of the Company while the Employee is still employed by the Company;

3. not prohibit the Employee from taking steps to start his New Business while the Employee is still employed by the Company; and

4. for use solely in connection with the required disclosures to the investors of the New Employer, provide the Employee with the Company's supporting data to the investment performance results if applicable and determinable.

10. Confidentiality

(a) Company Business. The Employee understands that the Company is engaged in a continuous program of research, development, production, and marketing in connection with its business and that as an essential part of the Employee's employment with the Company, the Employee may be expected to make new contributions to and create valuable inventions for the Company. The Employee agrees not to engage in any research, trading or business activity for any other person during the Employment Term without first obtaining written consent of the Manager pursuant to Section 8 of this Agreement.

(b) Assistance. The Employee agrees to assist the Company in obtaining and enforcing patents, copyrights, mask work rights, trade secrets and other legal protections for the

5

Company's ideas, concepts or inventions in any and all countries. The Employee agrees to cooperate with a reasonable request by the Company to execute any document for use in obtaining or enforcing such patents, copyrights, mask work rights, trade secrets and other legal protections. The Employee's obligations under this paragraph will continue beyond the termination of the Employment Term, provided that the Company compensates the Employee at a reasonable rate for time or expenses actually spent by the Employee at the Company's request on such assistance, if such assistance is provided after termination.

        (c)      <u>Confidential Information</u>.

        (i)      The Employee understands that employment by the Company creates a confidential relationship and trust with respect to any information of a confidential or secret nature that may be disclosed to or otherwise learned by the Employee during his or her employment and that relates to the business of the Company or to the business of any parent, Affiliate, customer, or supplier of the Company or any other party with whom the Company agrees to hold information of such party in confidence ("Confidential Information"). Such Confidential Information includes but is not limited to any securities trading strategies, concepts, ideas, or plans; trade secrets, trading studies and analyses, and computer trading program systems relating to the Company, inventions, marketing plans, product plans, business strategies, financial information (including but not limited to any written information regarding the investment or trading performance or results of the Employee, the Company or any other Employee, manager, or Affiliate of the Company), forecasts, personnel information and customer information. Confidential Information also includes, but is not limited to, knowledge of the Company's operations; technical and scientific information; information relating to software architecture, design or code; research and development information; plans or projections; current and prospective customer and/or investor lists, advertiser lists, supplier lists, customer sales analyses, and price lists; and any other non-public information concerning the Company's business. At all times, both during the Employment Term and after the Employee's termination for any reason, the Employee will keep and hold all such Confidential Information in strict confidence and trust, and will not use or disclose in any manner, whether written orally or otherwise (including but not limited to disclosure by means of speeches, papers or interviews) any Confidential Information without the prior written consent of the Company, provided, however, that it is recognized that oral (but not written) communication by the Employee of the his or her and/or the Company's performance may be necessary to properly perform his or her duties and that such communication is specifically excepted from this Section 10. The Employee understands that all documents (including computer records, facsimiles and e-mail) and materials created, received or transmitted in connection with the Employee's work or using the Company's facilities are the Company's property and subject to inspection by the Company at any time. Upon termination of the Employment Term (or at any time when requested by the Company), the Employee will promptly deliver to the Company all documents and materials of any nature pertaining to the Employee's work with the Company and will provide written certification of compliance with this Agreement. Under no circumstances following termination of the Employment Term will the Employee retain any property of the Company, or any documents or materials or copies thereof containing any Confidential Information.

        (ii)      The Employee acknowledges that this Confidential Information is among the Company's most important business assets, that the value of this Confidential

6

Information would be diminished or extinguished by disclosure and that by reason of such disclosure, the Company will suffer immediate and irreparable injury.

(iii)   The Employee acknowledges the trade secret status of the Confidential Information, and that the Confidential Information constitutes a legitimate protectable interest of the Company.

(d)   Previous Agreement and Information Belonging to Others. The Employee understands that it is the Company's policy to respect the intellectual property rights of others. The Employee represents that performance of all the terms of this Agreement and in particular this Section 10 and his or her duties as an employee in his or her position within the Company will not breach any invention assignment, confidential information or similar agreement with any former employer or other party. The Employee will not bring to the Company's facilities or use in the performance of the Employee's duties any documents or materials of a former employer that are not generally available to the public or have not been legally transferred to the Company or the Employee, nor will the Employee induce any other person to perform such acts.

(e)   Non-Compete. During the term of this Agreement and for a period of six months thereafter, Employee will not, directly or indirectly, own, manage, operate, control, be employed by, participate in, or be connected with the ownership, management, operation or control of any business similar to the type of business conducted by the Company.

11.   Subsequent Activities of Employee.

(a)   Company Rights. If this Agreement is terminated for any reason and at the time of such termination or within 12 months thereafter, the Employee forms an intention to commence or acquire an equity interest in (whether or not such interest is controlling) or otherwise join an investment advisory business, money management business, trading business (proprietary or otherwise) hedge fund business (whether within the United States or not) or other similar business as a manager, partner, equity owner or participant or in such other capacity that the Employee's duties would forseeably include, directly or indirectly, the raising of capital the setting of fees or any decisions in connection therewith (each such business hereinafter a "New Business"), the Employee shall promptly notify the Manager in writing of such intention together with a proposed business plan for such business, and after having given such notice shall also give the Company written notice of any other New Business that the Employee subsequently intends to commence or acquire an equity interest in (each such business to be included and considered a "New Business" for purposes of this Agreement).

Beginning on the date of such notice, the Company, its Affiliates (as defined below) and the Manager in his individual capacity shall collectively have the right (the "First Refusal Right") to select in their sole discretion to either (1) furnish for management by such New Business up to 50% of the capital that the Employee will manage (whether such capital is proprietary or a third parties capital), directly or indirectly, in connection with the New Business for the Fee (as defined below) or (2) direct up to one hundred million dollars ($100,000,000), as contributions into the funds managed by the New Business for the Fee.

7

In addition, the First Refusal Right shall apply whenever the New Business raises additional capital beyond the capital managed at the inception of the New Business that the Employee will manage, directly or indirectly. For the purpose of this Agreement an "Affiliate" of the Company is a company that controls, is controlled by or is under common control with, the Company or the Manager, with "control" of a company meaning direct or indirect ownership of at least 50% of such company's equity capital.

(b) The "Fee" shall be either (1) 70% of the standard fees charged generally to other clients of the New Business during such quarter or (2) the best available terms, including liquidity and fees. The Company and its Affiliates shall have the option to exercise either option (1) or (2) in their sole discretion.

(c) In the event the Company has rights pursuant to this Section 11, the Employee hereby agrees that before joining or commencing any New Business, Employee will bring the requirements of this Section 11 to the attention of any party that may serve as a manager, partner, equity owner or participant or in such other capacity that such party's duties would forseeably include, directly or indirectly, the raising of capital the setting of fees or any decisions in connection therewith with respect to such New Business.

(d) The Employee agrees to pay the Company a portion of the Gross Revenues for the first five (5) Fiscal Years including and after the Severance Event as follows:

(i) For the Fiscal Year including the Severance Event, twenty percent (20%) of Gross Revenues;

(ii) For the first Fiscal Year after the Severance Event, twenty percent (20%) of Gross Revenues;

(iii) For the second Fiscal Year after the Severance Event, fifteen percent (15%) of Gross Revenues;

(iv) For the third Fiscal Year after the Severance Event, fifteen percent (15%) of Gross Revenues;

(v) For the fourth Fiscal Year after the Severance Event, ten percent (10%) of Gross Revenues

"Gross Revenue" means management fees, performance fees and any other fees or revenues prior to any deduction of any kind, that the New Employer may earn, from time to time, with respect to capital contributed to any funds or, any managed accounts, or otherwise, managed or sponsored by the New Business, or on its behalf, from existing Visium Funds and Affiliates.

(e) Notwithstanding the foregoing provision, the Company and the Employee may mutually agree that the Employee shall pay to the Company in cash an amount equal to two percent (2%) of the Assets Under Management, in lieu of the foregoing payments.

(f) The New Business shall report to the Company and its Affiliates:

8

    (i)    The weekly estimated performance of the Investment;

    (ii)    a monthly risk summary which shall include, but not be limited to the concentration, the capital base, the industry diversification and the geographic diversification of the funds, the liquidity of Investments and the leverage employed for the funds;

    (iii)    a quarterly statement of change in capital of the Investment; and

    (iv)    the annual audited financial statements of the funds, as applicable, and audited capital account statements of the Investment.

(e) The Employee shall have the New Business enter into agreements embodying the terms set forth in this section in form and substance satisfactory to the Company and the New Business shall not use the name "Visium" or any variation of "Visium" under any circumstances.

(f) The Company and the Employee acknowledge that the Employee has been given an opportunity to have this Agreement reviewed by counsel and that the time and scope of this Section 11 have been specifically negotiated by sophisticated parties, and agree that the provisions of this Section 11 are reasonable under the circumstances of the activities contemplated by this Agreement. In the event that all or any portion of the provisions set forth in this Section 11 shall be determined by any court of competent jurisdiction to be unenforceable by reason of its being too extensive in any respect, the parties hereto agree that the maximum period or scope reasonable under such circumstances shall be substituted and that such court shall be allowed to revise the restrictions contained herein to cover the maximum period and scope determined by such court to be permitted by law.

    12.    This Section intentionally left blank.

    13.    <u>Injunctive Relief</u>. The Employee understands that if he or she violates any provision of this Agreement set forth in Section 9 or 10 the Company will suffer immediate and irreparable injury. If the Employee violates any of such provisions, the Employee agrees that, in addition to any other remedies that may apply, the Company shall be entitled to preliminary and final injunctive relief to enforce this Agreement, without the posting of any bond or other security, enjoining or restraining the Employee from any violation or threatened violations of this Agreement, and the Employee consents to the issuance of such injunction. The Company shall be entitled to obtain temporary, preliminary and permanent injunctive relief from any court of competent jurisdiction, without regard to any provisions of this Agreement concerning arbitration. The Employee further agrees that should the Company prevail in any proceeding whether in court or in arbitration, concerning the matters referred to in this Section 13, that the Employee shall pay the Company's reasonable attorney's fees and expenses in any such proceeding.

    14.    <u>Notice</u>. Any and all notices referred to hereunder shall be sufficient if furnished in writing, delivered by hand, or sent by registered or certified mail, telex or facsimile copier to the Company's main office or if to the Employee, to him or her at his or her address as

set forth from time to time on the books and records of the Company. Notice shall be deemed received when actually received if by hand delivery, one business day after sending if by telex or facsimile, and three business days after sending if by mail.

15. Governing Law. This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of New York.

16. Arbitration. The Employee and the Company agree to arbitrate any controversy or claim arising out of this Agreement or otherwise relating to the Employee's employment by the Company or the termination of such employment to the extent required (including, but not limited to, any claims of breach of contract, wrongful termination or age, sex, race or other discrimination pursuant to the Age Discrimination in Employment Act, Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act of 1993, or any other applicable federal, state or local law). Any such arbitration shall be fully and finally resolved in binding arbitration in a proceeding in the State of New York, City of New York, in accordance with the National Rules for the Resolution of Employment Disputes of the American Arbitration Association before a single arbitrator. The arbitrator shall not have the authority to modify or change any of the terms of this Agreement, except as provided in Section 20 hereof. The arbitrator may award interim relief and grant specific performance in addition to monetary damages. The Employee and the Company further agree that no demand for punitive damages shall be made in any arbitration proceeding. Any monetary award shall be in U.S. dollars. The arbitrator's award shall be final and binding upon the parties, and judgment upon the award may be entered in any court of competent jurisdiction in any state of the United States or country or application may be made to such court for a judicial acceptance of the award and an enforcement as the law of such jurisdiction may require or allow. The prevailing party as determined by the arbitrator shall, in addition to any other relief or award, be entitled to recover its reasonable attorneys' fees and reasonable costs incurred. Notwithstanding the foregoing, the Company shall have the right to, and be permitted to, seek and obtain injunctive relief from a court of competent jurisdiction pursuant to Section 13 of this Agreement.

17. Verification of Documents and Confidentiality. The Employee agrees to provide the Company with any proper document required to carry out the terms of this Agreement. Each of the Company and the Employee represents that its or his or her performance of all the terms of this Agreement will not breach any agreement to keep in confidence Confidential Information acquired by the Company or the Employee, as the case may be, and neither the Company nor the Employee has entered into or will enter into any oral or written agreement in conflict herewith.

18. Assignment, Binding Effect. The Employee may not assign his or her interest in or delegate his duties under this Agreement without the prior written consent of the Company. This Agreement is for the employment of the Employee, personally, and for the services to be rendered by him or her which must be rendered by him or her and no other person. This Agreement shall be binding upon and inure to the benefit of the Company and its successors and assigns.

19. <u>Notification</u>. The Employee hereby authorizes the Company to notify the Employee's potential future employers of the terms of this Agreement and the Employee's responsibilities under it.

20. <u>Construction and Severability</u>. If any provision of this Agreement shall be held invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired, and the parties undertake to implement all efforts which are necessary, desirable and sufficient to amend, supplement or substitute all and any such invalid, illegal or unenforceable provisions with enforceable and valid provisions which would produce as nearly as may be possible to the fullest extent afforded under the law, the result previously intended by the parties without renegotiation of any material terms and conditions stipulated herein.

21. <u>Headings</u>. The inclusion of headings in this Agreement is for convenience of reference only and shall not affect the construction or interpretation hereof.

22. <u>Entire Agreement, Modification</u>. This Agreement, together with the Addendum, constitutes the entire agreement of the parties hereto with respect to the subject matter hereof, supersedes all prior discussions, agreements and undertakings, both written and oral, and may not be modified or amended in any way except in writing signed by the parties hereto. Employee agrees and acknowledges that he or she has not relied on any statements or promises not contained in this Agreement or the Addendum, including without limitation any statement or promise regarding a promotion to General Counsel of the Company other than what is expressly contained on the Addendum.

23. <u>Duration, Survival</u>. Sections 9, 10, 11, 13, 14, 15, 16, 17, 18, 19, 20, 28 and 29 of this Agreement shall survive the termination of this Agreement and shall continue to be binding in accordance with their terms upon the Employee and the Company.

24. <u>Waiver</u>. No waiver by either party hereto of any of the requirements imposed by this Agreement on, or any breach of any condition or provision of this Agreement to be performed by, the other party shall be deemed a waiver of a similar or dissimilar requirement, provision or condition of this Agreement at the same or any prior or subsequent time. Any such waiver shall be express and in writing, and there shall be no waiver by conduct.

25. <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, all of which taken together shall constitute one instrument.

26. <u>Due Authorization</u>. The execution of this Agreement has been duly authorized by all necessary action of the Company.

27. <u>Third Party Beneficiaries</u>. Neither party intends for this Agreement to benefit any third party other than the Affiliates of the Company and no other person shall have any indirect or direct cause of action or claim in connection with this Agreement.

28. <u>Nondisparagement</u>. The Employee and the Company agree that they will not make, or cause to be made, any statements, or statements required to be filed with any governmental agency, observations or opinions, or communicate any information (whether oral

11

or written) that disparage or are likely in any way to harm the reputation of each other except to the extent required or advisable in connection with any litigation or governmental investigation. Any action by any individual other than a member of the management team shall not be deemed an act of the Company for purposes of this Section.

29. Release of Claims And Agreement Not To Sue upon event of Employee's Termination. As consideration for the obligations undertaken by the Company pursuant to this Agreement, the Employee for himself, his executors, administrators, heirs and assigns, hereby fully releases, waives and fully discharges the Company Released Parties (defined to include the Company, its subsidiaries and Affiliates, predecessors, successors, and assigns, and their respective officers, directors, agents and employees, whether past, present or future) from any and all claims, causes of action, suits, demands, damages, judgments or liabilities, of any nature, including attorney's fees and costs, known or unknown, absolute or contingent, arising from or relating to the Employee's employment or separation from employment. For purposes of this Agreement, release includes, without limitation, any and all claims for breach of contract (including the Employment Agreement and the governing documents and agreements of the Company), wrongful discharge or impairment of economic opportunity, any claims under common law or at equity, claims of defamation or intentional infliction of emotional harm, claims of any tort, claims for reimbursements or commissions, and any and all rights and discrimination claims the Employee may have arising under the Age Discrimination in Employment Act, Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1991, the Civil Rights Act of 1866, the Americans with Disabilities Act, the Fair Labor Standards Act, the Family and Medical Leave Act, the Workers' Adjustment and Retraining Notification, the Employee Retirement Income Security Act of 1974 and any and all other federal, state or local laws or regulations. The Employee agrees not to sue or to file any claims or actions against the Company with respect to claims covered by the aforementioned mutual releases and affirms that no such claims or actions are currently pending.

30. Mandatory Deferral

The following deferral plan has been carefully designed to provide the Employee a financial incentive to continue his or her Employment Term and to "smooth" out cash flow over the Employment Term. It provides for the mandatory deferral of 15% of the Employee's total annual compensation earned during each calendar year (including each year-end bonus amount paid in the following year pursuant to the "Discretionary Bonus" section set forth herein) that is greater than $150,000 (the "Deferred Amount"). In the event that the Employee's base salary exceeds $150,000, the Employee shall defer 15% of the compensation amount exceeding their base salary. The Deferred Amount will be subtracted from the Employee's year-end bonus and shall not be paid to the Employee. Instead the Deferred Amount shall be retained by the Company and credited to an unfunded account on its books. The Deferred Amount together with Interest (equal to an investment in Visium Balanced Fund, LP) may be paid to the Employee: (a) three years following its deferment if Employee is still employed by the Company, or (b) in the event of a Termination pursuant to Sections 4(a) or 4(c) of the Employment Agreement.

Summary Of Deferral Terms

- Deferred Amount - 15% of total compensation greater than Employee's Annual Salary, subject to conditions *supra*.

- Interest - Hypothetical return of an investment in Visium Balanced Fund, LP. Interest on the Deferred Amount will be credited yearly on the balance of the Employee's total Deferred Amount.

- Payout of Deferred Amount

    o Cliff Vesting – Deferred Amount will vest 3 calendar years following the date it is subtracted from Employee's year-end bonus. Payout of vested Deferred Amount (plus Interest attributable to such vested Deferred Amount) may be made by the Company in its discretion. Such payout, if applicable, shall be made within 30 days of vesting.

    o Unvested Deferred Amounts may be paid to the Employee in the event of a Termination pursuant to Sections 4(a) or 4(c) of the Employment Agreement. Payout of unvested Deferred Amounts (plus Interest attributable to such unvested Deferred Amounts), if applicable, shall be made within 30 days of the event triggering a payout under the Employment Agreement.

It is the intention of the parties that this deferred compensation arrangement be treated as an unfunded deferred compensation arrangement for tax purposes and for purposes of Title I of the Employee Retirement Income Security Act of 1974. Nothing contained in this Agreement and no action taken pursuant to the provisions of this Agreement shall create or be construed to create a trust of any kind or a fiduciary relationship between the Company and the Employee (or his or her estate or designated beneficiary) and the Employee's or any other person's right to the payment of deferred compensation under this Agreement shall not be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, attachment or garnishment, except by will or the laws of descent and distribution.

IN WITNESS WHEREOF, the parties hereto, intending to be legally bound, have hereunto executed this Agreement as of the day and year first written above.

| VISIUM ASSET MANAGEMENT, LP | EMPLOYEE |
|---|---|
| By: *[signature]*<br>Mark Gottlieb | By: *[signature]*<br>Stefan Lumiere |

13

# EMPLOYMENT AGREEMENT
# ADDENDUM

**Name: Stefan Lumiere**

**Salary:** $200,000 per annum to be deducted from Employee's Payout. Salary will be paid in accordance with the Company's normal payroll practices (pro rated for any partial payment period at the beginning or end of the Employment Term). Any amounts to be paid hereunder shall be less the required deductions pursuant to applicable tax withholding laws and regulations.

**Payout:**
- For year 2007, 10% of net trading profits adjusted for Expenses (see below)
- Beginning in year 2008, 10% of net trading profits up to a +15% net rate of return on Gross Exposure (see Risk Limits below) and 12% of net trading profits that exceed a +15% net rate of return on Gross Exposure

**Discretionary Bonus:** Employee shall be eligible for a discretionary bonus. The amount of such bonus shall be determined at the sole discretion of the Company and paid to the Employee on or about January 31st of each applicable year. Except as provided in the Agreement, the Employee must be in the employ of the Company at the time bonuses are paid to be eligible for a discretionary bonus.

**Gross Exposure:**
- Starting Gross Exposure of USD $100 Million not to exceed $50M long and $50M short
- Increase Gross Exposure by 20% for every +5% increase in net rate of return. Capital may also be increased at the discretion of the Company at any time.

**Risk Limits:**
- Net exposure of +30% long to -30% short in overall portfolio
- Maximum concentration in single name of 10% of overall portfolio
- -5% drawdown from Gross Exposure requires a 33% reduction in Gross Exposure
- -10% drawdown from Gross Exposure requires a 33% reduction in Gross Exposure, a review of the portfolio and approval by Management to initiate new positions
- -15% drawdown from Gross Exposure requires liquidation of positions
- The Company, at its sole discretion, may adjust or waive Risk Limits at any time

14

Confidential FOIA Treatment Requested by Visium Asset Management
VAM 000229219

**Expenses:**

- Employee's Salary will be deducted 100% from Employee's Payout
- Staff salaries will be deducted 50% from Employee's Payout
- Staff bonuses will be deducted 100% from Employee's Payout
- Expenses, including but not limited to research services, market data subscriptions, consulting services and business travel are deducted 50% from net trading profits until December 31, 2008 and 100% from net trading profits thereafter.

Confidential FOIA Treatment Requested by Visium Asset Management

VAM 000229220