UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| - v. - | :       16 Cr. 483 (JSR) |
| STEFAN LUMIERE, | : |
|                      Defendant. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### GOVERNMENT'S SUPPLEMENTAL SENTENCING SUBMISSION

                                                JOON H. KIM
                                                Acting United States Attorney
                                                Southern District of New York
                                                Attorney for the United States of America

Ian McGinley
Damian Williams
Joshua A. Naftalis
Assistant United States Attorneys
- Of Counsel -



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

June 8, 2017

**BY ECF FILING AND HAND DELIVERY**

The Honorable Jed S. Rakoff
United States District Judge
Southern District of New York
500 Pearl Street, Room 1340
New York, New York 10007

    Re:    *United States* v. *Stefan Lumiere*
            16 Cr. 483 (JSR)

Dear Judge Rakoff:

      In response to the Court's request for additional information about the methodology the Government used to calculate the management and performance fees assessed on investors in the Credit Fund attributable to the mismarking scheme (*see* GX 18, p. 35), the Government respectfully submits the attached declaration from Jan Jindra, who testified about these issues at trial.

                             Respectfully submitted,

                             JOON H. KIM
                             Acting United States Attorney


                By:      _____/s/_____
                             Ian McGinley
                             Damian Williams
                             Joshua A. Naftalis
                             Assistant United States Attorneys

cc:    Jonathan N. Halpern, Esq. (by email)
        Counsel for Stefan Lumiere

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
UNITED STATES OF AMERICA,
:
          Plaintiff,
: **DECLARATION OF**
     - v. -                                  **JAN JINDRA**
:
STEFAN LUMIERE,                     16 Cr. 483 (JSR)
:
          Defendant.
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

       JAN JINDRA, pursuant to the provisions of 28 U.S.C. § 1746, declares as follows:

       1.     I am presently employed as a Financial Economist with the Division of Economic and Risk Analysis of the U.S. Securities and Exchange Commission (the "SEC"). I hold a Ph.D. in financial economics from Ohio State University. As part of my duties and responsibilities at the SEC, I testified at trial in this matter and participated in analyzing valuation issues relating to the specific fund for which Stefan Lumiere worked, Visium's Credit Fund (the "Credit Fund"). I respectfully submit this declaration to explain the general methodology I used to calculate the management and performance fees assessed on investors in the Credit Fund attributable to the defendant's mismarking scheme. *See* GX 18, p. 35.

## I. Background

       2.     I am informed that the defendant's mismarking scheme began in July 2011. Hence, I focused my analysis on bond and bank loans (referred to as "securities" or "security" below) held by the Credit Fund from July 2011 through December 2012. For the purposes of this declaration, I relied on data sources disclosed in my trial testimony, such as:

1

a. Files from Morgan Stanley Fund Services (GX 706-A through GX 761-K) detailing, on an aggregate basis, the holdings of the Credit Fund, including, among other things, the securities held by the Credit Fund and the prices Visium assigned these securities.

b. Comparable market prices for the securities held by the Credit Fund. Specifically, I relied on the following established pricing sources: Reuters, IDC, Bloomberg and Markit. In this declaration, refer to these prices as "third party prices."

c. The broker quotes provided by Jonathan Brook, Scott Vandersnow, and Matthew O'Callaghan (the "Friendly" broker quotes).

3. Based upon my general knowledge of this criminal matter, the Complaint and the Indictment in the matter, and my review of documents from the Credit Fund, I am aware that the defendant's mismarking scheme consisted of using Friendly broker quotes to support inflated prices, overriding available prices from third parties. As I stated at trial, I used the following criteria to identify relevant securities affected by the mismarking scheme:

a. Visium received one or more Friendly broker quotes supporting the price of the security for the month in question.

b. The prices used by Visium to value the security for the month-end Net Asset Value ("NAV") was within the range of the Friendly broker quotes provided.

c. There was a comparable publicly available market price for the security for the month in question.[1]

## II. Effect of the Mismarking Scheme on Management and Performance Fees

4. To determine the amount of management and performance fees attributable to the defendant's mismarking scheme, I followed three broad steps. First, I calculated the markup, i.e., the difference between the price used by the Credit Fund and the third party price, for each relevant security for each month. Second, I aggregated the securities markups for each month to arrive at the aggregate markup of the Credit Fund for each month. Finally, I used the aggregate

---

[1] I used the comparable price for bonds from Reuters, when available. If Reuters did not have a price, I then used IDC and, finally, Bloomberg, if neither Reuters nor IDC was available. I used Markit for bank loans.

2

markup of the Credit Fund to calculate both the management and performance fees due to the defendant's scheme. I describe each step in detail below.

### A. Step 1: Markup of Individual Securities

5. As a first step in my analysis, I calculated the markup of each relevant security for each month. The relevant securities satisfy the criteria described in my testimony and in Section I above. The impact of the mismarking scheme on the valuation of the securities with overridden prices was also summarized in my testimony in this matter (GX 18). For example, page 13 of GX 18 summarized the markup of a particular security, Ability Acquisition (ATI) (12/09) Senior security. The summary showed the markup of this security for each month of the period I analyzed. Page 19 of GX 18 showed the markup of another relevant security, NEBRK 10 PERP. As described in my testimony, I performed this calculation for each security that satisfied the criteria described. The results of the markup calculations for each security and each month were then used in the second step of my analysis.

### B. Step 2: Markup of the Credit Fund

6. As a second step in my analysis, I calculated the aggregate markup of the Credit Fund each month. The aggregate markup of the Credit Fund was summarized in my testimony in this matter (GX 18). Specifically, pages 29 and 30 of GX 18 showed the aggregate markup of the Credit Fund for each month during the period analyzed and also provided a breakout of how much of the aggregate Credit Fund markup was due to selected securities in a particular month. For example, for April 2012, I calculated the aggregate Credit Fund markup to be $26.3 million (page 29 of GX 18). For this month, the Ability Acquisition (ATI) (12/09) Senior security accounted for $11.3 million of this markup with the other relevant securities accounting for the

remainder of the aggregate Credit Fund markup (page 30 of GX 18). The results of the aggregate Credit Fund markup calculations for each month were then used in the third step of my analysis.

### C. Step 3: Management and Performance Fees Attributable to the Scheme

7.      In the third step of my analysis, I calculated the management and performance fees attributable to the mismarking scheme. Below, I first describe in detail my calculations related to the management fees. I then provide a detailed description of my performance fees calculations.

#### C.1. Calculations of Management Fees Attributable to the Scheme

8.      The management fees attributable to the scheme are calculated as the difference between the actual management fees collected by the Credit Fund and the management fees the Credit Fund would have collected absent (but-for) the scheme. The management fee calculations were summarized in my testimony in this matter (GX 18).

9.      The Credit Fund collected management fees monthly. The management fees were directly tied to the value of the Credit Fund's assets and ranged between 1.5% and 2% annually.[2] I obtained the aggregate monthly management fees actually collected by the Credit Fund from the case materials (*see* GX 760-A – 761-K). Between July 2011 and December 2012, the Credit Fund collected $11,667,638 in management fees (page 35 of GX 18).

10.     To calculate the management fees the Credit Fund would have collected absent the mismarking scheme, I used three inputs for each month during the period: (i) the management fees actually collected by the Credit Fund, (ii) the value of the Credit Fund as

---

[2] Specifically, the Credit Fund had Series A and Series B investments. Each month, Series A charged a management fee of 1.5%/12 on assets under management (regardless of performance). Each month, Series B charged a management fee of 2.0%/12 on assets under management (regardless of performance). These Series A and Series B investments were blended into both the Onshore and Offshore portfolios within the Credit Fund.

4

reported, and (iii) the aggregate Credit Fund markup from step 2 above. For example, as page 31 of GX 18 showed, for September 2011, the aggregate Credit Fund markup was $20.3 million and the value of the Credit Fund was reported to be $483 million. The management fee collected for September 2011 was $713,459 (*see* GX 760-I). In general, the management fee attributable to the scheme is calculated as the management fee collected, multiplied by the ratio of the aggregate Credit Fund markup to the value of the Credit Fund. Specifically, for September 2011, the calculation is $713,459 *x* ($20.3 million / $483 million). As page 31 of GX 18 showed, the management fee attributable to the scheme for September 2011 equals $29,988. I performed this calculation for each month of the period analyzed and summed the monthly figures to arrive at the total management fee attributable to the scheme of $533,700 (*see* GX 18, p. 35).

*C.2. Calculations of Performance Fees Attributable to the Scheme*

11.     The performance fees attributable to the scheme are calculated as the difference between the actual performance fees collected by the Credit Fund and the performance fees the Credit Fund would have collected absent (but-for) the scheme. The performance fee calculations were summarized in my testimony in this matter (GX 18).

12.     The Credit Fund assessed performance fees yearly or at the time of a redemption by an investor. The performance fees were directly tied to the performance of the Credit Fund and subject to a so-called high water mark restriction. The maximum performance fees that could be charged by the Credit Fund ranged from 15% to 20%, subject to the high water mark restriction.[3] I obtained the performance fees actually collected by the Credit Fund from the case materials. Between July 2011 and December 2012, the Credit Fund collected $3,218,911 in performance fees (page 35 of GX 18).

---

[3] Series A charged a 15% performance fee. Series B charged a 20% performance fee.

13. To calculate the performance fees the Credit Fund would have collected absent the mismarking scheme, I used the following inputs: (i) the high water mark restriction, (ii) the inflows and outflows of money into and out of the Credit Fund as a result of investor subscriptions and redemptions, respectively, (iii) first-in-first-out assumption related to the aggregate flows of investor money into and out of the Credit Fund, (iv) actual performance fees collected by the Credit Fund, (v) estimates of the actual performance of the Credit Fund based on data from Bloomberg, and (vi) the aggregate Credit Fund markup from step 2 described in Section II.B above.

14. The payment of a performance fee was subject to a high water mark restriction (HWM). The HWM for each investment was originally set at the price at which the investor bought shares of the Credit Fund. If at fiscal year-end, the share price increased above the HWM, i.e., the Credit Fund reported profits, the investor paid a performance fee on the increase in the share price and the HWM was reset to the fiscal year-end value of the Credit Fund. If the fiscal year-end price was below the HWM, i.e., the Credit Fund suffered losses, no performance fee was paid and the HWM remained at the previous level. Effectively, the losses were carried forward to the following fiscal year. When redemptions were made, the withdrawal share price was compared to the HWM for the investment being withdrawn. If the share price at withdrawal exceeded the established HWM, the investor paid a performance fee on the difference between the value being withdrawn and the HWM of the investment. For example, as page 32 of GX 18 showed, investors who invested at the end of fiscal year 2010 and held through the fiscal year-end 2011, paid performance on the increase of $11 per share (= $1,590 per share value as of December 2011 minus $1,579 per share value as of December 2012). If the performance fee for

6

these investors was 20%, the performance fee paid was $2.20 per share (= $11 $x$ 20%).[4] However, absent the scheme, this investor would not have paid any performance fee because the per share value of the Credit Fund would have been $1,513, below the high water mark set in December 2010.

15.     I collected the aggregate subscriptions and redemptions for the Credit Fund from the case documents. To determine the appropriate HWM for each dollar that was held in, contributed to, or withdrawn from the Credit Fund, I used a first-in-first-out assumption. Specifically, under this approach, withdrawals from the Credit Fund were first traced back to the money that was invested before June 2011. If withdrawals during the period analyzed were to exceed the June 2011 balance, they would be traced to subsequent contributions. I noted that for this particular Credit Fund, the amount of withdrawals during the period analyzed did not exceed the money invested as of June 2011. Using the first-in-first-out approach, for each dollar held, contributed, or withdrawn, I calculated the Credit Fund's profits subject to performance fees which take into account the appropriate HWM.

16.     Next, I performed five calculations to arrive at the estimate of the performance fees attributable to the scheme:

> a. First, I calculated the ratio of actual performance fees collected by the Credit Fund to the estimate of the actual profit of the Credit Fund based on data from Bloomberg to arrive at a *blended performance fee rate (for both Series A and B)* for each year.
>
> b. Second, I adjusted the Credit Fund per share value by netting out the effect of the aggregate Credit Fund markup each month to arrive at the *Credit Fund's monthly per share value absent the scheme* (I also refer to this as the "but-for

---

[4] The Credit Fund's 2009 fiscal year-end value was $1,199, i.e., below its 2010 value (Source: Bloomberg).

7

per share value"). For example, the per share value of the Credit Fund as of December 2011 as actually reported was $1,590 (page 32 of GX 18). After netting out the effect of the mismarking scheme, I calculated the but-for per share value of the Credit Fund to be $1,513 (page 32 of GX 18). As page 33 of GX 18 showed, I netted out the effect of the mismarking scheme for each month during the period.

c. Third, using the Credit Fund's monthly but-for per share value, I calculated the *profits subject to performance fees absent the scheme*.[5] For example, for investors who invested money into the Credit Fund on December 2011 and still held the Credit Fund on December 2012, I noted that the per share profits subject to performance fees absent the scheme would have been $60, i.e., December 2012 but-for per share value of $1,573 less December 2011 but-for per share value of $1,513.

d. Fourth, I calculated the performance fees that would have been collected by the Credit Fund absent the scheme as the product of the calculated profits (from point c. above) and blended performance fee rate (for both Series A and B) (from point a. above).

e. Finally, the performance fees attributable to the scheme are calculated as the difference between the actual performance fees collected and the performance fees that would have been collected by the Credit Fund absent the scheme (from the fourth calculation). As page 35 of GX showed, the estimate of the performance fees attributable to the scheme is $2,622,709.

---

[5] As discussed, this estimate takes into account the HWM applying the first-in-first-out approach.

8

I declare under penalty of perjury that the foregoing is true and correct.

Dated: San Francisco, California
June 8, 2017

_____
JAN JINDRA, Ph.D.